# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORA FERNANDEZ; AUGUSTO SCHREINER; EDDIE TORO VELEZ; VICTOR R. VELA DIEZ DE ANDINO; GEORGINA VELEZ MONTES; and JUAN VIERA and ESTHER SANTANA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UBS AG; UBS FINANCIAL SERVICES, INC.; UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO;  UBS TRUST COMPANY OF PUERTO RICO; UBS BANK USA; CARLOS V. UBIÑAS; MIGUEL A. FERRER; BANCO POPULAR de PUERTO RICO; and POPULAR SECURITIES, LLC, <br><br> Defendants. | No. 15-cv-02859-SHS <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

SUMMARY OF THE ACTION ................................................................................. 1

JURISDICTION AND VENUE .............................................................................. 7

THE PARTIES.......................................................................................................... 8

    A.    PLAINTIFFS ............................................................................................8

    B.    THE UBS DEFENDANTS ........................................................................9

    C.    THE UBS INDIVIDUAL DEFENDANTS .................................................11

    D.    THE POPULAR DEFENDANTS ...............................................................14

THE FUNDS............................................................................................................ 15

DEFENDANTS' FIDUCIARY AND CONTRACTUAL DUTIES............................................. 18

    A.    THE UBS DEFENDANTS' FIDUCIARY AND CONTRACTUAL DUTIES ........................19

    B.    THE POPULAR DEFENDANTS' FIDUCIARY AND CONTRACTUAL DUTIES .................21

DEFENDANTS' BREACHES OF THEIR  OBLIGATIONS TO MEMBERS OF THE
CLASS ................................................................................................................... 22

    A.    DEFENDANTS LOADED THE FUNDS WITH HIGH-RISK PUERTO RICO DEBT ...........23

    B.    THE FUNDS WERE HIGHLY LEVERAGED, WHICH GREATLY AMPLIFIED THE
          RISKS OF SIGNIFICANT LOSSES FOR CLASS MEMBERS ...........................................25

    C.    WHILE SERVING CONFLICTING ROLES, DEFENDANTS EXPLOITED UNIQUE
          ASPECTS OF THE PUERTO BOND MARKET TO GENERATE LARGE FEES AND
          COMMISSIONS ........................................................................................................27

          1.    Defendants Generated Massive Commissions Underwriting Puerto
                Rico Government Debt Issuances .................................................................28

          2.    Defendants Pocketed Inflated Fees From Selling the Securities
                Defendants Underwrote Into the Funds .......................................................28

          3.    Defendants Generated Millions Of Dollars In Advisory Fees
                Loading The Funds With The Puerto Rico Debt They Brought To
                Market ..........................................................................................................29

    D.    DEFENDANTS ADOPTED POLICIES TO INCENTIVIZE AND PRESSURE THEIR
          EMPLOYEES TO PUSH CLASS MEMBERS TO INVEST IN THE HIGH-RISK
          FUNDS REGARDLESS OF CLASS MEMBERS' BEST INTERESTS ................................30

          1.    Defendants Improperly Pushed Their Clients To Invest In The
                Funds............................................................................................................31

          2.    Defendants Provided Incentives To Their Financial Advisors To
                Place And Keep Clients In The Funds Regardless of Their Clients'
                Interests .......................................................................................................36

3.      The UBS Defendants Instituted A Dividend Reinvestment Program To Generate Additional Inflated Commissions ............................................38

4.      The UBS Defendants' Loan Scheme Generated Even More Commissions While Heightening Investors' Risks ..................................39

5.      The UBS Defendants Deliberately Disabled Their Own Internal Controls To Push Clients Into the Funds ....................................................41

6.      The UBS Defendants Approved Additional Fees For Financial Advisors Who Kept Their Clients Invested In The Funds........................42

E.      DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY MISREPRESENTING THE NATURE AND RISK OF THE FUNDS ................................................43

F.      DEFENDANTS' UNIFORM BREACHES OF FIDUCIARY AND CONTRACTUAL DUTIES CAUSED SUBSTANTIAL DAMAGES TO CLASS MEMBERS ...........................47

G.      DEFENDANTS' ADMISSIONS AND GOVERNMENT INVESTIGATIONS INTO DEFENDANTS' WRONGDOING ...................................................................49

CLASS ACTION ALLEGATIONS ..........................................................................52

CAUSES OF ACTION ............................................................................................55

COUNT I BREACH OF FIDUCIARY DUTY AGAINST  DEFENDANTS UBS PUERTO RICO AND UBS FINANCIAL ...........................................................55

COUNT II AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST DEFENDANTS UBS AG, UBS TRUST, UBS PUERTO RICO,  UBS FINANCIAL, UBIÑAS AND FERRER ...........................................56

COUNT III BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT POPULAR SECURITIES..........................................................................58

COUNT IV AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST BANCO POPULAR .........................................................................59

COUNT V BREACH OF CONTRACT AGAINST DEFENDANTS UBS AG, UBS FINANCIAL,  UBS PUERTO RICO, UBS TRUST, AND UBS BANK ........................................................................................................60

COUNT VI BREACH OF CONTRACT AGAINST POPULAR SECURITIES.............62

PRAYER FOR RELIEF ..........................................................................................64

JURY DEMAND ....................................................................................................65

Plaintiffs Nora Fernandez, Augusto Schreiner, Eddie Toro Velez, Victor R. Vela Diez De Andino, Georgina Velez Montes, and Juan Viera and Esther Santana (collectively, the "Plaintiffs"), by and through their attorneys, on behalf of themselves and a Class (as defined herein) of similarly situated persons who were and/or are invested in one or more of twenty-three (23) closed-end mutual funds (the "Funds"), which were sponsored or co-sponsored by UBS Financial Services Incorporated of Puerto Rico ("UBS Puerto Rico") and Banco Popular de Puerto Rico ("Banco Popular") bring this action against Defendants UBS AG; UBS Financial Services, Inc.; UBS Puerto Rico; UBS Trust Company of Puerto Rico; UBS Bank USA (together "UBS" or the "UBS Defendants"); former UBS executives Carlos V. Ubiñas and Miguel A. Ferrer, and against Banco Popular de Puerto Rico and Popular Securities, LLP (collectively, the "Popular Defendants" and, together with the UBS Defendants, "Defendants"). On behalf of the Class, Plaintiffs seek damages and equitable relief to remedy Defendants' breaches of their fiduciary and contractual duties and the other misconduct alleged herein.

The allegations in this Amended Complaint are based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief (including the extensive investigation of counsel and review of publicly available information) as to all other matters stated.

## SUMMARY OF THE ACTION

1.       This class action arises out of the misconduct of financial services companies that owed Puerto Rico-based investors the highest standard of fiduciary duty. In violation of that duty, Defendants steered Class members, many of whom are older individuals focused on generating income for retirement, to invest in the Funds, which were high-risk, volatile investments that ultimately crashed, losing Class members vast sums of money. Defendants did

so to line their own pockets with enormous fees and commissions and without any regard for the suitability of these risky investments for Plaintiffs and other Class members.

2.      The Funds are incorporated under Puerto Rico law.  Each is structured to provide tax-free income for Puerto Rico residents so long as at least 67% of each Funds' holdings are comprised of Puerto Rico assets.

3.      During the Class Period (defined *infra*), Defendants portrayed the Funds as safe, secure, "fixed income" securities that would preserve Class members' principal investments while providing tax-free income.  Indeed, multiple UBS clients invested in the Funds provided sworn testimony in a proceeding before the United States Securities and Exchange Commission (the "SEC"), captioned *In the Matter of Miguel A. Ferrer and Carlos J. Ortiz*, File No. 3-14862 (the "SEC Proceeding"), confirming that UBS uniformly told them that their "money was safe" in the Funds and that there was "absolutely no risk whatsoever" in these investments.  As Plaintiffs and other Class members discovered too late, the Funds were not safe at all.

4.      Instead, the Funds were volatile investments that posed serious risks.  For example, the Funds were highly leveraged, with approximately 50% of their assets financed through borrowing.  Further, the Funds invested in hundreds of millions of dollars of debt securities issued by the Puerto Rico government, which, given the instability of the Puerto Rico economy in recent years, were especially risky.  This combination of high leverage and exposure to high-risk debt securities made the Funds ticking time bombs for Plaintiffs and the other members of the Class.

5.      For Defendants, however, the Funds were cash cows, which Defendants milked at every turn for hundreds of millions of dollars in fees and commissions.  Disregarding obvious conflicts of interest, Defendants profited handsomely by participating in all aspects of the

creation, management and trading of the Funds.  First, Defendants amassed tremendous fees by underwriting debt issued by the Government of Puerto Rico.  For example, since 2000, Defendant UBS alone earned more than $200 million in underwriting fees in connection with bringing Puerto Rico bonds to market.  Next, by serving as investment advisers to the Funds, Defendants generated tens of millions of dollars in advisory and transactional fees by causing the Funds to purchase, from Defendants themselves or related entities, the Puerto Rico bonds Defendants themselves (or their related entities) had underwritten.  Further profiting from their conflicted positions, Defendants then secured dramatically inflated commissions by selling shares of the Funds to Plaintiffs and other members of the Class.  During the Class Period, Defendants garnered commissions on sales of Fund shares that were generally at least *twice* the commissions earned on non-Fund securities.

6.     Motivated by the inflated commissions and other fees generated by these conflicts, Defendants steered Plaintiffs and other Class members into the risky Funds without any regard for the suitability of these investments.  For example, a recently released recording of a June 2011 speech by Defendant Ferrer, then Chairman of UBS Puerto Rico, shows how he bullied and berated UBS's Financial Advisors to push Class members to purchase more and more shares of the Funds – regardless of the serious risks involved or the suitability of the Funds.  Defendant Ferrer's speech was delivered in response to Financial Advisors' list of twenty-two concerns about the Funds, which was created to explain the Financial Advisors' misgivings about selling the Funds to UBS clients.  This list included concerns about the fact that the Funds had "excessive leverage," "instability" and "geographic concentration."   In his speech, Defendant Ferrer dismissed the Financial Advisors' concerns as "bullshit," and he repeatedly stated that they had better sell the Funds or "look for another job."  Confirming UBS's complete

failure to conduct any meaningful analysis of the suitability of the Funds, Defendant Ferrer exhorted the Financial Advisors to ignore the serious risks they had identified, "change their way of thinking," and push the Funds on clients by focusing "once more on the very attractive benefits of our funds."  Otherwise, Ferrer threatened, the Financial Advisors could "go home [and] get a new job."  Sworn testimony given by Financial Advisors in the SEC Proceeding similarly confirms that Defendant Ferrer "said constantly that [Financial Advisors] needed to recommend the [F]unds to clients, that if we did not we were not good advisors."

7.      The UBS Defendants even devised two additional schemes to enable greater sales and fees from the Funds.  First, the UBS Defendants manipulated their own internal controls to disable and bypass overconcentration alerts that UBS's Branch Management Supervisory System ("BMSS") would have generated for Financial Advisors with respect to the Funds.  Sidestepping its own controls allowed UBS to have Class members heavily invested in the Funds in violation of UBS guidelines and policy.  Second, dissatisfied that they were not earning fees for having clients remain invested in the Funds UBS Puerto Rico's senior officials successfully lobbied Defendant UBS Financial Services, Inc. ("UBS Financial") to grant an exception to its guidelines for compensation of Financial Advisors.  As a result, much like residual commissions that insurance agents receive each year a policy is in force, UBS Puerto Rico's Financial Advisors became eligible to be compensated simply for having clients remain invested in the Funds.

8.      Defendants' practice of disregarding any analysis of the suitability of the Funds for their clients was directly contrary to what Defendants were required by law to do and what they promised Class members they would do.  As set forth in the respective client agreements between Defendants and the members of the Class and on Defendants' corporate websites, Defendants promised Plaintiffs and other Class members that Defendants would provide, for

4

example, a "*customized* approach to wealth management" by recommending only "suitable" investments that were consistent with investors' "unique needs and goals" and "tolerance to risk." Instead, Defendants breached their fiduciary and contractual duties to Plaintiffs and other Class members by, up through the highest levels of Defendants' organizations, adopting and carrying out policies designed to push Plaintiffs and other Class members to invest in the very profitable Funds without any regard for Plaintiffs' and other Class members' circumstances or risk appetites.

9.     In addition, Defendant UBS engaged in an improper loan scheme by extending "non-purpose" loans and lines of credit to Class members in order to increase investments in the Funds on margin – thereby reaping even more inflated commissions on both the Funds and the loans while increasing Class members' exposure to risk. UBS sought to evade restrictions on the use of margin by procuring "non-purpose loans" through its Utah affiliate, Defendant UBS Bank USA, in order for clients to purchase Fund shares. UBS Bank USA was not, however, authorized to do business in Puerto Rico. Moreover, UBS's internal policies prohibited using the proceeds from these loans to purchase securities. Ultimately, UBS's loan scheme resulted in *approximately $500 million* in loans to Puerto Rico customers. The scheme also greatly increased the risks of the Funds to Class members by creating "double leverage," as the personal leverage of the loan was added to the already highly leveraged nature of the Funds.

10.     By putting their own financial interests ahead of the financial interests of Plaintiffs and other Class members, and adopting centralized policies and practices to further these improper objectives, Defendants breached their fiduciary duties and their contractual obligations to Plaintiffs and the other members of the Class.

11.     Defendants' house of cards started to collapse in mid-2013.  Specifically, when the risks posed by the Funds' leverage, concentration in Puerto Rico debt, and Defendants' loan scheme materialized, the Funds plummeted in value.  By March 2014, the Funds had lost more than half their value, suffering billions of dollars in losses and wiping out many Class members' life savings.

12.     The collapse of the Funds and Defendants' misconduct has sparked a host of government investigations, including by Puerto Rico regulators, federal prosecutors and the Federal Bureau of Investigation.  As reported in the Puerto Rico newspaper, *El Nuevo Día*, these government investigations are focused directly on UBS and Popular and their roles in the collapse of the Puerto Rico bond market.

13.     Significantly, Defendant UBS has already ***admitted*** its involvement in certain of the misconduct alleged herein.  For example, UBS disclosed on March 14, 2014, that it had engaged in the loan scheme, stating that it had caused certain of its clients to "invest[] proceeds of non-purpose loans in closed-end fund securities."  Further, acknowledging the size and scope of its improper loan scheme, UBS entered into a settlement with the Puerto Rico Commissioner of Financial Institutions (*Oficina del Comisionado de Instituciones Financieras de Puerto Rico*, or "OCIF," in Spanish) – the regulator that oversees Puerto Rico's financial system.  Pursuant to this December 2013 settlement, UBS Bank USA agreed to transfer a ***$562 million*** loan portfolio that had been secured by Puerto Rico securities – including loans used to finance investments in the Funds – to UBS Financial Services, Inc. of Puerto Rico.  UBS Bank USA also agreed that it would no longer grant or offer loans collateralized by Puerto Rico securities, and would no longer offer any loans to residents of Puerto Rico.

14.     In addition, in October 2014, UBS Puerto Rico entered into a settlement agreement with the OCIF concerning UBS Puerto Rico's misconduct in selling the Funds.  As set forth in the settlement agreement, after reviewing UBS Puerto Rico's practices in selling the Funds to a small sample of senior-aged, conservative, risk-adverse clients, the OCIF found that UBS Puerto Rico's Financial Advisors "may have" pushed such clients to purchase too large an amount of the Funds in light of the clients' liquid net assets and that this practice "may have also been potentially unsuitable based on the particular customer's conservative financial objectives, risk tolerance and needs."  Further, among other things, the OCIF found that "certain purchases" of Funds by the sample clients "may have been induced by misrepresentations or omission of material facts based on the manner in which the investments were recommended to the investors by the agents [*i.e.,* the UBS financial advisors]."  In connection with this settlement, UBS Puerto Rico paid $1,681,556 in restitution to 34 sample clients and paid a $3,500,000 fine to the OCIF.

15.     Through this action, Plaintiffs seek to recover the losses caused by Defendants' breaches of duty and other misconduct, as well as disgorgement of the fees and other profits Defendants reaped in violation of their duties to Plaintiffs and to the other members of the Class.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), as it is a class action for damages in excess of $5 million and at least one defendant is a citizen of a different state than Plaintiffs, all of whom are citizens of Puerto Rico.

17.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and because the UBS Client Relationship Agreement (the "UBS Client Relationship Agreement"), and its

predecessors, provide that venue is appropriate in this District.   In addition, Defendant UBS Financial's principal place of business is located in this District.

**THE PARTIES**

A.   PLAINTIFFS

19.   Plaintiff Nora Fernandez ("Fernandez") is a client of the UBS Defendants; purchased and/or held Tax-Free Puerto Rico Target Maturity Fund, Inc., Puerto Rico AAA Portfolio Bond Fund, Inc. and Puerto Rico AAA Portfolio Bond Fund II, Inc. shares during the Class Period; and, as a result of Defendants' misconduct alleged herein, suffered losses on these investments.  Plaintiff Fernandez is of legal age and is a resident of Puerto Rico.

20.   Plaintiff Augusto Schreiner ("Schreiner") is a client of the UBS Defendants; purchased and/or held Puerto-Rico Fixed Income Fund I, Inc., Puerto-Rico Fixed Income Fund II, Inc., PR Fixed Income Fund III, Inc., PR Fixed Income Fund IV, Inc., PR Fixed Income Fund V, Inc., PR AAA Portfolio Bond Fund, Inc., Tax-Free Puerto Rico Fund, Inc. and Tax-Free Puerto Rico Target Maturity Fund, Inc. shares during the Class Period; and, as a result of Defendants' misconduct alleged herein, suffered losses on these investments.  Plaintiff Schreiner is of legal age and is a resident of Puerto Rico.

21.   Plaintiff Eddie Toro Velez ("Toro Velez") is a client of the Popular Defendants; purchased and/or held Puerto Rico Investors Tax-Free Fund III, Inc. and Puerto Rico Investors Tax Free Fund, V Inc. shares during the Class Period; and, as a result of Defendants' misconduct alleged herein, suffered losses on these investments.  Plaintiff Toro Velez is of legal age and is a resident of Puerto Rico.

22.   Plaintiff Victor R. Vela Diez De Andino ("Vela") is a client of the Popular Defendants; purchased and/or held Puerto Rico Fixed Income Fund, Inc. and Puerto Rico Investors Tax Free Fund VI shares during the Class Period; and, as a result of Defendants'

8

misconduct alleged herein, suffered losses on these investments.  Plaintiff Vela is of legal age and is a resident of Puerto Rico.

23.     Plaintiff Georgina Velez Montes ("Velez") is a client of the UBS Defendants; purchased and/or held Puerto Rico Fixed Income Fund III, Inc. shares during the Class Period; and, as a result of Defendants' misconduct alleged herein, suffered losses on these investments. Plaintiff Velez is of legal age and is a resident of Puerto Rico.

24.     Plaintiffs Juan Viera and Esther Santana ("Viera/Santana") are clients of the UBS Defendants; purchased and/or held Puerto Rico AAA Portfolio Bond Fund, Inc. and Puerto Rico Fixed Income Fund II, Inc. shares during the Class Period; and, as a result of Defendants' misconduct alleged herein, suffered losses on these investments.  Plaintiffs Viera/Santana are of legal age and residents of Puerto Rico.

## B.     THE UBS DEFENDANTS

25.     Defendant UBS AG ("UBS AG") is a Swiss global financial services company with its principal places of business in Zurich and Basel, Switzerland.

26.     Defendant UBS Financial is a wholly owned subsidiary of UBS AG that is incorporated in Delaware.  UBS Financial's principal places of business are in New York, New York, and Weehawken, New Jersey, and, according to the OCIF, it has 17 branches in Puerto Rico.  The company is registered with the SEC as a broker-dealer and an investment adviser. UBS Financial is also registered with the OCIF as an investment adviser.   UBS Financial's business activities include securities and commodities brokerage, investment advisory and asset management services in connection with the investment, cash management, and financial planning and borrowing needs of individual and institutional clients.  During the Class Period, UBS Financial employed Financial Advisors who advised Plaintiffs and the Class to invest in the

9

Funds.  As set forth below in ¶¶ 34, 183, UBS Financial was specifically named as a contracting party in the UBS Client Relationship Agreement.

27.     Defendant UBS Financial Services Incorporated of Puerto Rico (defined above as "UBS Puerto Rico") is a wholly owned subsidiary of UBS Financial.  UBS Puerto Rico is registered with the SEC as a broker-dealer and is a member of the Financial Industry Regulatory Authority ("FINRA") and Securities Investor Protection Corporation ("SIPC") and, as acknowledged in UBS marketing materials regarding the Funds, "[UBS Puerto Rico] also offer[ed] investment advisory services, which are provided through [its] affiliate, [UBS Financial], which is registered with the SEC as a broker-dealer and investment adviser."  UBS Puerto Rico is incorporated under the laws of the Commonwealth of Puerto Rico, has its principal offices in San Juan, Puerto Rico, and maintains 19 branches spread throughout Puerto Rico.  UBS Puerto Rico has derived substantial income from its service as a financial advisor to, and underwriter for, Puerto Rico governmental entities seeking to raise capital in the bond markets.  As set forth below in ¶¶ 34, 183, UBS Puerto Rico was specifically named as a contracting party in the UBS Client Relationship Agreement.

28.     Defendant UBS Trust Company of Puerto Rico ("UBS Trust") is a trust company incorporated under the laws of the Commonwealth of Puerto Rico and has its principal offices in San Juan, Puerto Rico.  UBS Trust offers personal and corporate trust services, retirement services, investment consulting services, and money management services.  UBS Trust acts as the issuing, paying, and transfer agent, and as the administrator and custodian of the UBS Closed-End Funds (defined in ¶ 42 below).  UBS Trust manages the assets of the UBS Closed-End Funds through its UBS Asset Managers of Puerto Rico division ("UBS Asset Managers").  UBS Asset Managers is the investment adviser for the UBS Closed-End Funds and derived

substantial income from managing and acting as investment adviser to the Funds.  UBS Trust is an affiliate of, and shares offices and certain personnel with, UBS Puerto Rico.  As set forth below in ¶¶ 34, 183, UBS Trust was named as a contracting party in the UBS Client Relationship Agreement.

29.     UBS Bank USA ("UBS Bank") is a subsidiary of UBS Americas, Inc., which in turn operates as a subsidiary of UBS AG.  UBS Bank's principal place of business is in Salt Lake City, Utah.  UBS Bank primarily offers deposit and borrowing services to high-net-worth investors.  As alleged in greater detail below, UBS Bank made loans to investors in the UBS Closed-End Funds secured by the investors' shares in those funds, merely to facilitate the sale of additional Fund shares.  The amount of the loans sometimes reached approximately 80% of the value of the investors' shares of UBS Closed-End Funds that served as collateral.  As alleged herein in ¶¶ 34, 183, UBS Bank was specifically named as a contracting party in the UBS Client Relationship Agreement.

30.     UBS AG, UBS Financial, UBS Puerto Rico, UBS Trust, and UBS Bank are referred to hereafter collectively as "UBS" or the "UBS Defendants."  The UBS Defendants owed the "highest standard of fiduciary duty" as well as other duties to Plaintiffs and the other members of the Class, because they acted as investment advisors and were covered by the Puerto Rico Uniform Securities Act.

C.     THE UBS INDIVIDUAL DEFENDANTS

31.     During the Class Period, Defendant Carlos V. Ubiñas ("Ubiñas") was Chairman of the Board of Directors and Executive Vice President of each of the UBS Closed-End Funds. He was also Executive Vice President of each of the Jointly Managed Funds.  Ubiñas served as President of UBS Puerto Rico since 2005 and, beginning in 2009, served as Chief Executive Officer ("CEO") of UBS International and UBS Puerto Rico.  Ubiñas has also served as Chief

11

Operating Officer for all UBS operations in Puerto Rico.  Ubiñas was publicly identified as one of UBS Puerto Rico's "Direct Owners and Executive Officers" who "direct[s] the management or policies" of UBS Puerto Rico.

32.     During the Class Period, Defendant Miguel A. Ferrer ("Ferrer") was a Director and President of each of the UBS Closed-End Funds.  He was also a Director of each of the Jointly Managed Funds.  Beginning in 1965, Ferrer held a variety of leadership positions within the UBS entities.  Ferrer served as the Chairman and CEO of UBS Puerto Rico and the CEO and founder of UBS Trust until September 2009.  Three months later, Ferrer was rehired as Vice Chairman of UBS Puerto Rico and he became Chairman in 2010.  He remained in that position until he was terminated by UBS Puerto Rico in June 2014.

33.     The UBS Defendants are the largest asset managers in Puerto Rico, with more than 130 Financial Advisors and tens of thousands of retail accounts.  UBS and its affiliates hold approximately half of the brokerage licenses in all of Puerto Rico.  According to the UBS Defendants' own sales documents, as of June 30, 2013, UBS Asset Managers managed or co-managed approximately $10.3 billion in assets.

34.     The UBS Client Relationship Agreement states as follows:  "Known as the Client Relationship Agreement, this document outlines the terms and conditions of your relationship with us."  The UBS Client Relationship Agreement specifically defines "UBS" to include all the UBS Defendants.  It states:  "'UBS,' 'we,' 'us'' 'our,' and 'ours' refer to UBS Financial Services Inc. and … its successor firms subsidiaries, correspondents and Affiliates, including its parent company, UBS AG."  "Affiliates" is further defined to refer to "[UBS Puerto Rico] (which clears through [UBS Financial]), [UBS Bank], UBS Credit Corp., UBS Trust Company, N.A. and their insurance agency affiliates and subsidiaries and all other subsidiaries and affiliates."

35.     The UBS Defendants act as alter egos in their financial dealings in Puerto Rico and generally disregard corporate distinctions in order to conduct their business.  For example, the UBS Defendants have substantial overlap in directorships and upper management, including:

- Defendant Ferrer is the CEO and founder of UBS Trust and the Chairman, CEO and President of UBS Puerto Rico.  Ferrer is also a Director and shareholder of UBS Puerto Rico.

- The President and CEO of UBS Financial, Robert Mulholland ("Mulholland"), is also a member of UBS AG's Wealth Management Americas Executive Committee.  Further, Mulholland is publicly identified as one of UBS Puerto Rico's "Direct Owners and Executive Officers" who "direct[s] the management or policies" of UBS Puerto Rico.

- The Corporate Secretary of UBS Financial, Suzanne Tambra King, is also the Corporate Secretary of UBS Puerto Rico.

- The Chief Compliance Officer of UBS Financial, Douglas Thornley Siegal, is also the Chief Compliance Officer for UBS Puerto Rico.

- A Senior Vice President of UBS Puerto Rico, Leslie Highley, is a Managing Director and Executive Vice President of UBS Trust, a Portfolio Manager of the UBS Asset Managers division of UBS Trust and a Director of the Funds and oversees 27 funds advised or co-advised by UBS Asset Managers and Banco Popular.

- UBS Trust also shared offices with UBS Puerto Rico.

36.     Further, as noted above, UBS itself acknowledged that UBS Puerto Rico "offer[ed] investment advisory services" provided "through [its] affiliate, [UBS Financial]." UBS Puerto Rico's legal, compliance and market risk functions were also handled by UBS Financial personnel in the latter's Weehawken, New Jersey office.  UBS Financial is also publicly identified as one of UBS Puerto Rico's "Direct Owners and Executive Officers" with a "75% or more" ownership interest, which "direct[s] the management or policies" of UBS Puerto Rico.  Additional information regarding the exact relationship between these entities is within the exclusive control of the UBS Defendants, and discovery will therefore demonstrate the extent to which these entities act for each other.

13

### D.    THE POPULAR DEFENDANTS

37.    Defendant Popular Securities, LLC, formerly known as Popular Securities, Inc. ("Popular Securities"), is a registered broker/dealer and a member of FINRA and SIPC.  Popular Securities is a subsidiary of Popular, Inc., and an affiliate of Defendant Banco Popular (defined below).  Popular Securities employs over 50 financial advisers in Puerto Rico, and conducts business in Puerto Rico.  As of December 31, 2013, Popular Securities had $4 billion in assets under management.

38.    Defendant Banco Popular de Puerto Rico ("Banco Popular") was organized in 1893 and is Puerto Rico's largest bank with approximately $28 billion assets.  It is the principal banking subsidiary of Popular, Inc., a publicly owned bank holding company that carries on business in Puerto Rico and the mainland United States.  Banco Popular has the largest retail franchise in Puerto Rico, with 171 branches and 599 ATMs as of December 31, 2013.  Through its Popular Asset Management division ("Popular-PAM"), Banco Popular serves as "Co-Investment Adviser," together with UBS Asset Managers, to nine funds jointly managed by UBS and Popular (i.e., the "Jointly Managed Funds," as defined below).

39.    Defendants Popular Securities and Banco Popular, including without limitation its Popular-PAM division, are collectively referred to herein as "Popular" or the "Popular Defendants."

40.     The Popular Defendants owed the "highest standard of fiduciary duty" as well as other duties to Plaintiffs and the other members of the Class who purchased the Jointly Managed Funds, because they acted as investment advisers and were covered by the Puerto Rico Uniform Securities Act.

41.    The Popular Defendants act as alter egos in their financial dealings in Puerto Rico and generally disregard corporate distinctions in order to conduct their business.  For example,

the Popular Defendants have substantial overlap in directorships and upper management, including:

- The Chief Financial Officer for Banco Popular, Jorge Junquera, was Treasurer of its Popular-PAM division and was also the Chairman of Popular Securities.

- The Treasurer for the Popular-PAM division of Banco Popular, Eduardo Figueroa, was also a Vice President of Banco Popular and Manager of the Mutual Funds Administration Group for the Popular Fiduciary Services Division.

- The Legal Counsel of Banco Popular, Illich Colon ("Colon"), was also the Corporate Secretary of its Popular-PAM division.  Colon also served as Secretary of the Puerto Rico Investors Tax-Free Funds and oversees 9 affiliated funds advised or co-advised by UBS Asset Managers and Banco Popular.

- Javier Rubio, who served as a Senior Vice President and Director for the Puerto Rico Tax-Free Family of Funds and oversees 14 affiliated funds advised or co-advised by UBS Asset Managers and Banco Popular, was also Senior Vice President of Banco Popular and Chief Investment Officer of its Popular-PAM division.

## THE FUNDS

42.     The funds at issue are closed-end mutual funds, incorporated in Puerto Rico, that pooled capital to earn income by investing in securities.  There are two sets of funds in which Class members invested, and which by 2008,  had $9 to $10 billion in assets under management:

a. **The Jointly Managed Funds**:     Between 1995 and 1999, Defendant UBS, then doing business as Paine Webber, and Defendant Popular sold shares in nine closed-end mutual funds which they jointly managed.  These funds included:  Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund II, Inc.; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Investors Bond Fund I; Puerto Rico Tax-Free Target Maturity Fund, Inc.; and Puerto Rico Tax-Free Target Maturity Fund II, Inc. (collectively, the "Jointly

Managed Funds").  As explained in the testimony of UBS employees in the SEC Proceeding, "to this day," UBS and Popular "still maintain their relationship of co-advising" the Jointly Managed Funds…. So those funds are managed by Popular as well as by UBS.  And in fact they trade at Popular. They trade very actively at Popular."

b. **The UBS Funds**:  Starting in 2001, Defendant UBS (then doing business as UBS Paine Webber) sold shares in a series of funds it managed alone.  These funds included:  Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; and Puerto Rico Fixed Income Fund VI, Inc. (collectively, the "UBS Closed-End Funds" and together with the Jointly Managed Funds, the "Funds").

43.    The Funds exploit regulatory and tax exemptions available only to Puerto Rico-based investors.

44.    *First*, the Funds provided tax-free income to Puerto Rico residents.  While interest income earned by any investor in Puerto Rico government bonds is exempt from municipal, state and federal taxes (so-called "triple tax exempt"), the Funds were able to provide tax-free

earnings to Puerto Rico residents that derived from a broader array of assets.  In particular, while two-thirds of Fund assets were required to be invested in Puerto Rico-issued securities (i.e., securities issued by the Puerto Rico government, Puerto Rico mortgage-backed and asset-backed securities, or corporate obligations and preferred stock of Puerto Rico entities), each Fund could hold up to one-third of its assets in otherwise taxable non-Puerto Rico securities, such as corporate or United States government bonds.  Accordingly, the Funds offered investors tax-exempt income from certain assets that would otherwise be taxed.

45.     By structuring the Funds with two-thirds of their holdings in Puerto Rico assets, Defendants were able to market Fund securities as providing "tax-exempt or *tax*-advantaged" income to Puerto Rico-based investors that was also "exempt from Puerto Rico and United States estate and gift taxes."  As Defendants explained in correspondence to the SEC, the Funds were "exclusively tailored to the Puerto Rico market, will be attractive as an investment vehicle solely to investors who are residents of Puerto Rico and will be sold only to Puerto Rico residents." Notably, as testimony by UBS Puerto Rico executive Carlos Ortiz in the SEC Proceeding establishes, the Funds are "typically owned by individuals" not institutions.

46.     ***Second***, unlike almost every other mutual fund offered in the United States, the Funds are exempt from the Investment Company Act of 1940 (the "1940 Act").  Specifically, Section 6(a)(1) of the 1940 Act exempts from SEC registration and the requirements of the 1940 Act an investment company that is "organized or otherwise created under the laws of and having its principal office and place of business in Puerto Rico," so long as the securities of any such company are sold solely to residents of Puerto Rico.

47.     This exemption allowed Defendants to structure and operate the Funds in a manner that bypassed the 1940 Act's rules regarding conflicts of interests involving mutual fund

transactions, as well as restrictions on the use of leverage.  For example, as alleged below, Defendants generated increased fees by performing various conflicting roles at every stage of the creation and management of the Funds, including serving as:  (i) underwriters of bonds in which the Funds invested; (ii) investment advisers to the Funds; and (iii) financial service providers who sold the Funds to retail clients and served as the retail clients' Financial Advisors.  The 1940 Act prohibits such conflicts in U.S.-based mutual funds.

48.    Defendants were able to grow the Funds to more than $10 billion in assets under management as of 2012 and realize their ambitious revenue goals by marketing the Funds to Class members as safe, fixed income investments that would, above all, preserve Class members' capital.  As alleged herein, however, the Funds were risky because they:  (i) were acutely vulnerable to Puerto Rico's declining economy; (ii) were overly concentrated in long-term, high risk assets that were not properly hedged; and (iii) employed leverage to boost returns while placing Class members' capital directly at risk.

## DEFENDANTS' FIDUCIARY AND CONTRACTUAL DUTIES

49.    The UBS and Popular Defendants owed a uniform fiduciary duty to Plaintiffs and other Class members.  Most fundamentally, this common law and statutory duty required Defendants to act in the best interests of Plaintiffs and other Class members, and to act with the care, prudence, loyalty and candor required of fiduciaries.  As set forth in Puerto Rico ADC SECUR Regulation 6078, Section 25.1, Defendants – whether acting as a broker-dealer or as an investment adviser – owed a *uniform* obligation to "observe the highest standard of fiduciary duty" toward the members of the Class:

> *Every broker-dealer, issuer, investment adviser, investment adviser representative, federal covered adviser, investment adviser representative of a federal covered adviser*, *agent or any other person subject to the provisions of the* Act, *must observe the highest standard of fiduciary duty toward their customers and investors.*

18

50.     In their marketing materials, the UBS Defendants and the Popular Defendants each acknowledged the fiduciary duties they owed to Class members, and these Defendants specifically agreed to honor those pre-existing obligations by entering into client relationships with Plaintiffs and other members of the Class.

### A.     THE UBS DEFENDANTS' FIDUCIARY AND CONTRACTUAL DUTIES

51.     The UBS Defendants entered into the UBS Client Relationship Agreements or "master account agreements" with Class members that, in addition to their statutory duties, memorialized the UBS Defendants' duties to recommend only those investments that were suitable and appropriate.  In particular, these client agreements defined the contracting parties as "client[s] of UBS," on the one hand, and, on the other, UBS Financial and UBS Puerto Rico as well as, *inter alia*, all of their "subsidiaries and affiliates" including UBS AG.  The UBS Client Relationship Agreements between Plaintiffs Fernandez, Schreiner, Velez Montes, Viera and Santana, and UBS contained the same or substantially similar terms as those between UBS and the rest of the members of the Class.

52.     The UBS Client Relationship Agreement specified that Class members were assigned a "Financial Advisor" from UBS.  They also specified that the UBS Defendants would provide a "***customized*** approach to wealth management" that was "built on your personal relationships with your Financial Advisor and shaped by an understanding of your needs and aspirations."

53.     Defendant Ferrer has admitted under oath that all UBS Financial Advisors in Puerto Rico advise clients.  Therefore UBS Financial Advisors owe a fiduciary duty to act in the clients' best interests.  As Defendant Ferrer testified in the SEC Proceeding, UBS Financial Advisors in Puerto Rico "put together a recommendation for clients on how to build a portfolio of investments that will take them to whatever goal they seek.  It is much more than just selling."

54.     Further, the UBS Defendants acknowledged the fiduciary duties they owed to their customers in other disclosures.  These duties were explicitly memorialized in the contracts UBS entered into with Class members.  For example, UBS agreed that it owed Plaintiffs and other Class members the following duties:

a.  UBS must "[a]ct in what we reasonably believe to be your best interests, and in the event of a conflict of interest, place your interests before our own."

b.   "We must have a reasonable basis for believing that any securities recommendations we make to you are suitable and appropriate for you, given your individual financial circumstances, needs and goals."

c.  UBS must "[m]ake investment decisions or recommendations that:

- Are suitable and appropriate for you.

- Are consistent with your investment objectives and goals.

- Reflect any restrictions you have placed on us."

55.     UBS also promised that, in serving as a fiduciary for Plaintiffs and other Class members, it would provide personalized investment advice tailored to each client, which would be driven by a "financial plan we create together . . . that informs which solutions are right for you based on what you want to achieve."  Moreover, UBS promised that it would "meet [class members'] unique needs" using "a holistic wealth management approach to carefully understanding [their] unique needs and goals" and would "deliver an optimal investment solution to meet them."  UBS also promised that it would "work with [investors] to adapt [their] portfolio to the changing market environment and personal life events" and "look outside the firm to [find] the appropriate solutions to address [investors'] needs."

56.     Further, UBS Puerto Rico and UBS Financial acknowledged in materials incorporated into the UBS Client Relationship Agreement, including the UBS Agreements and Disclosures Booklet, that they were "jointly responsible" for:

- "Ongoing monitoring of your account activity."

- "Using due diligence to learn the essential facts relative to you, your orders and your account."

- "Providing you investment advice…and having reasonable grounds for believing that any recommended transaction relating to your brokerage account is suitable for you based on the facts you disclosed, including your other security holdings and financial situation and needs."

**B.     THE POPULAR DEFENDANTS' FIDUCIARY AND CONTRACTUAL DUTIES**

57.     Like UBS, the Popular Defendants entered into client relationship agreements with Class members and owed Class members duties to recommend only those investments that were suitable and appropriate.  Among other things, the Popular Defendants were responsible for determining whether any investment advice or recommendations they gave to Class members were suitable for Class members.  Further, the Popular Defendants were bound to operate in compliance with all applicable laws, rules and regulations relating to their own operations, the supervision of their sales representatives and other personnel, and the supervision of transactions and other activity in Class members' accounts.

58.     Moreover, as set forth in marketing materials and on Popular's website, the Popular Defendants promised that they would "work with our clients to understand their particular circumstances and financial goals [and] offer specialized, trustworthy advice with one objective in mind:  to help our clients achieve their goals and those of their families."  Further, Popular Securities' financial consultants were supposed to offer "objective advice," "create strategies that work[ed] with our clients' capital in the most efficient way possible," and "prepare an investment plan based on each client's objectives and particular level of risk tolerance." Among other things, Popular Securities represented:

21

**Needs Assessment, Objectives and Current Situation**

- We evaluate your current life stage, your income needs and your tolerance to risk.

**Investment Policy Agreement**

- An agreement between both parties established how to invest your money (including asset distribution, risk tolerance and liquidity requirements).

**Investment Proposal**

- We design a plan based on the investment alternatives that adjust to your needs.

**Strategy Implementation**

- We jointly execute the plan you approved.

**Evaluation and Revision**

- We adjust the plan according to the changes in your life.

*Source:  http://www.popular.com/en/securities-team*

**DEFENDANTS' BREACHES OF THEIR
OBLIGATIONS TO MEMBERS OF THE CLASS**

59.     Plaintiffs and other Class members entrusted their retirement savings and other capital to Defendants and thus were owed the highest standard of fiduciary duty.  Defendants were also statutorily and contractually obligated to act with the care, prudence, loyalty and candor required of the kind of sophisticated fiduciaries that Defendants claimed to be.  As alleged herein, Defendants promised Plaintiffs and other Class members that they would adhere to these obligations, including, for example, by providing "customized" advice based on Class members' "unique needs," recommending only "suitable" investments, and "look[ing] outside" Defendants' own securities offerings to ensure that Class members' retirement savings and other capital were safely and appropriately invested.  Above all, as Defendants recognized, they were required to place the interests of Class members before their own.  As set forth herein, Defendants abandoned these obligations and pushed Class members into the Funds – without any

22

regard to the suitability of the investment or the clients' needs or risk appetite – in order to obtain exorbitant fees and commissions for themselves.  This conduct breached duties owed to all Class members.

### A.   DEFENDANTS LOADED THE FUNDS WITH HIGH-RISK PUERTO RICO DEBT

60.     Contrary to Defendants' portrayal of the Funds as safe, secure and conservative investments, Defendants populated the Funds with some of the riskiest government-backed securities in the marketplace.  For years, Puerto Rico government debt—which comprised the majority of the Funds' portfolios—has been particularly risky given Puerto Rico's large debt-load and increasing borrowing costs, as well as the enduring economic problems on the island, including continually rising unemployment, a recession spanning multiple years and a declining tax base.

61.     Despite the risks posed by Puerto Rico government debt, Defendants packed the Funds with hundreds of millions of dollars of these high-risk securities.  Even worse, Defendants concentrated the Funds' portfolios in the securities of only a few government issuers.

62.     At least fifteen of the Funds had more than *37%* of their holdings invested in bonds issued by Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("PR Employees Retirement") and the Puerto Rico Sales Tax Financing Corporation ("COFINA," by its Spanish acronym).

63.     Given its experience as an underwriter for such bonds, UBS had particular reason to know that PR Employees Retirement bonds were high risk.  As set forth in an October 2010 report prepared by Conway MacKenzie, Inc. (the "Conway MacKenzie Report"), in 2007, PR Employees Retirement was working with the Merrill Lynch Global Markets & Investment Banking Group ("Merrill Lynch") to issue $7 billion worth of bonds.  Merrill Lynch was unable to complete the issuance because there was little appetite for such bonds in the international

marketplace. UBS then took over as underwriter and issued approximately $3 billion worth of bonds in the local Puerto Rico market, notwithstanding the "lackluster demand in the global market," whether the Puerto Rico market was large enough to absorb the bond offering, and the deterioration of the global market in the first half of 2008. The Conway Mackenzie Report concluded that several warning signs concerning market conditions suggested that the bonds were unduly risky.

64.    Despite knowing how risky these PR Employees Retirement bonds were, UBS purchased for its own Funds *more than half* of the $3 billion worth of near-junk PR Employees Retirement bonds that it had underwritten. According to its 2012 Annual Report, Puerto Rico Investors Tax-Free Fund IV, Inc. owned more than $151 million face amount of bonds issued by PR Employees Retirement and COFINA, and bonds issued by these two Puerto Rico government entities constituted more than *55%* of this fund's asset value.

65.    Similarly, the Tax-Free Puerto Rico Fund II held approximately *52.7%* of the value of its assets in bonds issued by PR Employees Retirement and COFINA. For PR Fixed Income Funds V, bonds from these two issuers constituted more than *51.5%* of the fund's assets. Consequently, in addition to being highly exposed to the economic condition of the Puerto Rico government, the risks in the Funds were concentrated and wholly dependent upon the creditworthiness of specific government agencies and bond issuances.

66.    The concentration of risk in the Funds' portfolios would normally have been prohibited by the Investment Companies Act of Puerto Rico, which set a maximum threshold for investment in a single issuer of 25% of a portfolio at the time. But Defendants were able to exceed the customary threshold by obtaining a waiver. As a result, the Funds were even *less*

*diversified* — and therefore **higher risk** — than contemplated by the Investment Companies Act of Puerto Rico.

**B.    THE FUNDS WERE HIGHLY LEVERAGED, WHICH GREATLY AMPLIFIED THE RISKS OF SIGNIFICANT LOSSES FOR CLASS MEMBERS**

67.    As alleged above, the Funds are exempt from the 1940 Act, including its restrictions on the level of leverage available to mutual funds registered with the SEC.  Whereas the 1940 Act generally requires funds to have 300% asset coverage—and can thus borrow only one dollar for every three dollars of capital—the Funds can borrow one dollar for every single dollar of capital.  As a result, the Funds are highly leveraged, because they are allowed to hold twice the amount of assets as the amount of equity for a maximum leverage ratio of approximately 50%.  By the end of 2013, the Funds' leverage ratios hovered just below the 50% maximum level, ranging from 40% to 48%.

68.    The Funds generated leverage by entering into repurchase agreements and by issuing short-term notes.  When entering repurchase agreements, the Funds sold securities to UBS Puerto Rico, Banco Popular, or their affiliates, but agreed to buy those securities back at a later date and at a price greater than the original sale price, resulting in fees to the Funds' conflicted affiliates.  Similarly, when the Funds issued short-term notes, the only buyers were conflicted affiliates, including UBS Puerto Rico, Banco Popular, and related companies.  For example, as of August 2012, *all* of the short-term notes issued by the Jointly Managed Funds were held by their affiliates.  Specifically, Popular Securities held between 4% to 22% of the short-term notes issued by each Jointly Managed Fund.  The rest were held by Puerto Rico Short-Term Investments Fund, Inc., an investment fund managed by UBS Asset Managers of Puerto Rico, which, in turn, issued securities that UBS marketed to retail investors in Puerto Rico.  In sum, through both of these means of increasing leverage, the Funds' affiliates engaged

in self-dealing transactions that enabled Defendants to further line their own pockets with investors' capital.

69.     The highly leveraged structure of the Funds also significantly increased the risk of massive losses for Plaintiffs and the other members of the Class.  To use a simple example, because the Funds had an approximately 50% leverage ratio, a 20% decline in the value of the Funds' assets would cause the Funds (and, thus, investors) to suffer a 40% loss.  Similarly, an asset value decline of 40% would cause the Funds to lose 80%.  This is because, after repayment of the Funds' debts in full, the entire loss would be borne by the Funds' capital, which was supplied by Plaintiffs and other members of the Class.  As a result, the Funds were structurally predisposed to suffer enormous losses in the event of changes to interest rates and credit downgrades such as those that took place toward the end of the Class Period.  As alleged below, this is exactly what happened.

*                    *                    *

70.     During the Class Period, UBS itself acknowledged the riskiness of the Funds by secretly unloading a substantial portion of its own inventory of shares in the Funds on UBS's own clients.  Specifically, in the spring of 2009, to avoid any potential losses to UBS Puerto Rico, Defendant UBS Financial ordered UBS Puerto Rico and Defendants Ferrer and Ubiñas to substantially reduce the inventory of Fund shares that UBS owned.  To satisfy this directive, these Defendants launched an initiative termed "Objective:  Soft Landing," whereby UBS Puerto Rico pushed its own inventory of Fund shares on UBS clients.  As a result of this initiative, between March and September 2009, UBS Puerto Rico sold *75% of its Fund share inventory* to UBS clients.  As described by at least one Financial Advisor, this was nothing more than "turning around and screwing the client."  Instead of informing clients that UBS Puerto Rico was

reducing its inventory and thereby reducing prices, Financial Advisors were instructed to encourage clients to pick up the new slack in the market by purchasing or continuing to hold Fund shares.   Eugenio Belaval ("Belaval"), who at the time was in charge of wealth management, capital markets, and trust services and consulting for UBS Puerto Rico, and who testified at the SEC Proceeding, "We were telling the people aggressively that they should be buying.  We were telling people that had the funds that they should not be selling…***That was the theme throughout the office***."

71.     The UBS Defendants further increased the risks of investing in the Funds by entering into interest rate swap agreements with various financial institutions, whereby UBS Puerto Rico made massive bets to hedge against the rise and fall of interest rates.  As Belaval testified, certain periods of "market imbalances" between 1995 and 2008 were caused by interest rate changes, which increased the cost of the Funds' leverage.   The swap transactions failed miserably causing tremendous losses to the Funds and thus, investors in the Funds.  Under pressure from senior UBS officials to eliminate the massive exposure that they took on, UBS Puerto Rico has unwound billions of dollars of these swaps.

### C.     WHILE SERVING CONFLICTING ROLES, DEFENDANTS EXPLOITED UNIQUE ASPECTS OF THE PUERTO BOND MARKET TO GENERATE LARGE FEES AND COMMISSIONS

72.     Notwithstanding Defendants' common law and statutory fiduciary duties, which were also memorialized as explicit promises in the UBS Client Relationship Agreements (defined above) to "[a]ct in what we reasonably believe to be [Class members'] best interests, and in the event of a conflict of interest, place your interests before our own," Defendants seized upon the Funds' exemption from the 1940 Act to craft a scheme that allowed them to garner millions of dollars in fees and commissions through self-dealing transactions that substantially and secretly increased the risks of the Funds.  In fact, not only did Defendants' conflicted roles

generate outsized fees, but they also provided Defendants with unique insight into the risks of the assets backing the Funds – which Defendants disregarded in pushing Class members to invest in the Funds.

### 1. Defendants Generated Massive Commissions Underwriting Puerto Rico Government Debt Issuances

73.     First, Defendants served as underwriters for a significant portion of the bonds issued by the Commonwealth of Puerto Rico and its political subdivisions, organizations, agencies, and instrumentalities, generating hundreds of millions of dollars in fees for doing so.

74.      For example, UBS's promotional materials boast that it is the "most active investment bank" in Puerto Rico municipal financings, noting that, from 2008 to mid-2013, UBS had been lead or co-lead underwriter in 19 Puerto Rico municipal financings worth more than $13.2 billion, including a $1.2 billion financing by COFINA in 2009 and more than $1.3 billion in financing by PR Employees Retirement in 2008.  The same materials indicate that Defendant Popular was lead or co-lead underwriter in 5 Puerto Rico municipal financings worth more than $3.7 billion.  These include, among others, a $2.9 billion debt offering by PR Employees Retirement.  Since 2000, Defendant UBS alone earned more than $200 million in underwriting fees in connection with bringing Puerto Rico bonds to market.

75.     In serving as underwriters for these bonds, Defendants became intimately familiar with the weak financial health of certain Puerto Rico government issuers and the creditworthiness – or lack thereof – of their debt.

### 2. Defendants Pocketed Inflated Fees From Selling the Securities Defendants Underwrote Into the Funds

76.     After underwriting various municipal and other Puerto Rico bond offerings, as described supra, Defendants then sold those bonds into the Funds, in the process earning millions of dollars in commissions and fees.

28

77.     Because Defendants purchased the securities from their own internal trading desks, then marked up the fees as they would an institutional trade so the Funds overpaid, Defendants' sales, commissions and fees were all increased, at clients' expense.

### 3.     Defendants Generated Millions Of Dollars In Advisory Fees Loading The Funds With The Puerto Rico Debt They Brought To Market

78.     Second, Defendants acted as advisers to, and managers of, the Funds, pocketing investment advisory and management fees for selecting the assets to be purchased by the Funds. Defendants' control over the Funds – and the Funds' approximately *$10 billion* in capital – provided Defendants with a captive market and an immediate and controllable demand for the municipal debt offerings they had been underwriting for over a decade.

79.     For example, Defendants UBS and Popular earned annual advisory fees ranging from 0.4% to 1.0% of each of the Jointly Managed Funds' average weekly net assets for their services in selecting and monitoring the assets of the Jointly Managed Funds.  In addition, Popular reaped administrative fees ranging from 0.10% to 0.15% of each Jointly Managed Funds' average weekly net assets and collected "custody and transfer agency" fees at an annual rate of 0.05% to 0.10% of average weekly net assets.  Together, the fees Defendants collected by providing various advisory and management services to the Jointly Managed Funds exceeded *$10 million per year*.

80.     Similarly, for the UBS Closed-End Funds, UBS's advisory agreements provided UBS with annual investment advisory fees in the amount of 0.75% of each the UBS Closed-End Funds' average weekly gross assets.  In addition, UBS collected annual administrative fees equal to 0.15% of each Fund's average weekly gross assets.  Together, these fees provided UBS with approximately *$50 million in fees per year* for the various services it provided to the UBS

Closed-End Funds.  These fees accounted for more than fifty-three percent of UBS Puerto Rico's revenues in 2008.

81.    To generate these fees, Defendants purchased for the Funds the very Puerto Rico bonds that they themselves had underwritten.  In total, UBS participated as an underwriter for 30 Puerto Rico debt offerings, valued at over $21 billion, that issued securities purchased by the Funds.  In certain instances, UBS sold *more than half* of total bond issuances that UBS underwrote to its own captive Funds.  For its part, Popular Securities served as an underwriter for over 20 offerings, worth nearly $5 billion, that were purchased, in part, by the Funds.

82.    In other words, Defendants used the Funds as a dumping ground for the high-risk Puerto Rico government bonds they underwrote.  As advisers and co-investment advisers to the Funds, Defendants controlled billions of dollars in capital that could drive demand and prices for the offerings they underwrote, and provided a ready-made, captive market that could be used to dispose of risky securities such as Puerto Rico municipal debt.  Such self-dealing is impermissible.

### D.    DEFENDANTS ADOPTED POLICIES TO INCENTIVIZE AND PRESSURE THEIR EMPLOYEES TO PUSH CLASS MEMBERS TO INVEST IN THE HIGH-RISK FUNDS REGARDLESS OF CLASS MEMBERS' BEST INTERESTS

83.    As set forth in the preceding section, Defendants earned enormous fees and commissions in underwriting bonds issued by the Puerto Rico government and then earned further fees and commissions in their capacity as advisers to the Funds, by loading the Funds' asset portfolios with those same securities.  But Defendants did not stop there.  Rather, Defendants pushed shares of the Funds on their retail clients in order to generate significantly inflated sales commissions – all while portraying the Funds as safe, secure "fixed income" investments with little or no risk to investors' principal.  Among other things, the UBS Defendants pushed their clients to increase their holdings through dividend re-investment

programs and a loan scheme in which UBS recommended that its clients purchase additional Fund shares on margin.

1.      **Defendants Improperly Pushed Their Clients To Invest In The Funds**

84.     During the Class Period, Defendants UBS and Popular pushed Class members – who, with an average age of 60, included many seniors and retirees – into purchasing shares of the Funds without performing the required analyses to determine whether the Funds were suitable investments.  Instead, based on uniform policies adopted at the highest levels of their respective organizations, Defendants breached their fiduciary duties by exhorting clients to invest in the risky Funds without regard for the clients' circumstances or risk appetites.

85.     As discussed further below in Section E, in communications to Class members during the Class Period, Defendants UBS and Popular repeatedly touted the Funds as safe, secure, fixed income investments that would provide high, tax-free returns to Class members while preserving their invested principal.  Moreover, Defendants consistently represented to Class members that the Funds were both low-risk and low-volatility investments.  Defendant UBS even categorized the Funds as "Fixed Income" investments within its clients' monthly account statements.  Classifying the Funds as "fixed income" investments on account statements understated Class members' true exposure to riskier asset classes and enabled the UBS Defendants to encourage increased investment in the Funds as part of a purportedly conservative and well-balanced portfolio.  In reality, however, the investments were not fixed income investments and Class members' principal was placed directly at risk.

86.     Sworn testimony from multiple UBS clients given in connection with the SEC Proceeding confirms that Defendant UBS uniformly touted the Funds as safe and risk-free investments.  For example:

a.  Jorge Flores-Álvarez, a client of UBS who invested in Puerto Rico Fixed Income Fund III, Inc. and Puerto Rico Fixed Income Fund V, Inc., testified that he specifically explained to UBS that he wanted his money to be safe and that UBS told him that his investment in the Funds "was guaranteed," meaning that "when the investment was … sold several years later, the money invested would come back to [him] entirely."  Mr. Flores-Álvarez also testified that UBS told him that "there was no risk at all" and "no risk whatsoever" in investing in the Funds;

b.  Roberto Cintrón-Estades, a client of UBS who invested in Puerto Rico Fixed Income Fund V, Inc. testified that he also informed UBS that he wanted an investment with limited risk and, in response, UBS told him "that there was absolutely no risk whatsoever" in investing in one of the Funds;

c.  Osvaldo Torres-Santiago, a retiree and client of UBS who invested in Puerto Rico Investors Tax-Free Fund VI, Inc. testified that UBS specifically told him that his "money was safe" in that investment;

d.  Hipólito León-Nogueras, a retiree and UBS client who invested the entirety of his savings in Puerto Rico Investors Tax-Free Fund VI, Inc. and Tax-Free Puerto Rico Fund II, Inc. testified that he informed UBS that he wanted to keep his "money as safe as possible because it was all the money [he] had," and that UBS "always" told him that his "money was going to be basically safe" while invested in the Funds; and

e.  Sonia Marrero De Diego, a UBS client who invested in Puerto Rico Fixed Income Fund V, testified that she asked UBS to advise her regarding an investment that

"would be safe" and that UBS told her that investment in the Funds was "good, very safe."

87.     In pushing Class members to invest in the Funds, Defendants specifically targeted retirees and other clients interested in retirement planning.  For example, the SEC Proceeding revealed emails dated March 17, 2009, and May 14, 2009, in which Defendant Ferrer directed Defendant UBS's Financial Advisors to channel "IRA investors" into the Funds.  Gustavo Del Valle, a UBS Financial Advisor from July 2006 to November 2010, testified in the SEC Proceeding that the Funds were "recommended as an IRA investment" by UBS and that he received emails telling Financial Advisors to "go out and look for clients that wanted to – that needed to invest in IRA accounts and offer the [F]unds to them."  As UBS representatives acknowledged in the SEC Proceeding, when "UBS PR talks about giving information to the market, it means providing information to FAs [i.e., UBS Financial Advisors]."  In other words, UBS deemed a message delivered to its Financial Advisors to be disseminated to the market.

88.     UBS pushed Class members to invest in the Funds through various means, including "Investor Conferences" for all current and potential investors.  For example, at a UBS Investor Conference held in June 2008, which Defendant Ferrer hosted, UBS personnel touted the Funds' market returns and portrayed them as low risk.  Similarly, at a February 28, 2013 investor conference titled "Retirement Planning and Investments" held at UBS's offices in San Juan, Puerto Rico, UBS pushed the Funds on investors while misleadingly portraying the Funds as safe, secure investments for purposes of retirement planning.

89.     UBS also issued directives to its Financial Advisors to push their clients to invest in the Funds.  For example, a recently released recording of a June 2011 speech by Defendant Ferrer, then the Chairman of UBS Puerto Rico, demonstrates how UBS's top management

pressured Financial Advisors to deliver a uniformly positive message in selling the high-risk Funds to Class members without regard for or analysis of their suitability.  As reported by *Reuters* in a February 6, 2015 article titled "Exclusive:  Recording Shows How UBS Drove Reluctant Brokers to Sell High-Risk Puerto Rico Funds," UBS Puerto Rico's Financial Advisors had "balked at promoting [the Funds] to their clients" because they were "such risky investments."  When asked by UBS's top brass why they were not selling more of the Funds, the Financial Advisors responded by creating a list of twenty-two concerns they had about continuing to push the Funds on clients, including *inter alia* that the Funds had "excessive leverage," showed "instability," and suffered from "geographic concentration," "excessive supply" and a "lack of information."  According to *Reuters*, the UBS Financial Advisors were "wary, in part, because many of the [F]unds were loaded up with debt of the Puerto Rican government and related entities that was underwritten by UBS."

90.     The Financial Advisors' concerns with continuing to sell the Funds were unacceptable to UBS executives.  Accordingly, on June 2, 2011, Defendant Ferrer called a meeting with the Financial Advisors and delivered a blistering speech designed to bully them into selling the Funds regardless of the serious risks involved.  In his speech, Defendant Ferrer dismissed the Financial Advisors' concerns about the Funds as "bullshit, bullshit" and repeatedly informed them that they had better sell the Funds or "find yourselves another job."  Ferrer elaborated:

> "I will read [the list of concerns] to you, there are twenty-two.  I think we could even get to fifty or one hundred if we want.
>
> Low liquidity, excessive leverage, interest increase, guarantee, instability, excessive supply, bad reputation, spread pressure, AB, geographic concentration, lending capability, lack of information, UBS commitment, brokers' trust, churning, rating versus 102, lack of cooperation, size of the lines of interest, way of selling, lack of publicity, stable reporting, costs of management, no trail.

We are screwed.  So, I mean, what do we do?  We finish this meeting, we have a coffee, and we go home.  Because if we do not have this product [i.e., the Funds], which is the only thing that is available right now, you have nothing to do.  I suppose you should look for another job."

91.     Confirming UBS's complete disregard for the suitability of the Funds, Defendant Ferrer exhorted the Financial Advisors to "change their way of thinking" and "stop this nonsense," to ignore their concerns and to continue to push the Funds on clients by uniformly focusing "once more on the very attractive benefits of our funds."  Otherwise, Ferrer threatened, they could "go home [and] get a new job."  Further, noting that the Financial Advisors had "almost a billion dollars in cash" in client accounts that was "not generat[ing] commissions," Ferrer reminded them that they got paid to sell product, "not to sit on [their] fucking ass [and] do nothing [sic]."

92.     In a second recorded speech also delivered at the June 2, 2011 meeting, UBS executive Ramon "Cholo" Almonte (then a senior broker at UBS) similarly pressured the UBS Financial Advisors to deliver a uniformly positive message in selling Funds to Class members. For example, Mr. Almonte told the Financial Advisors that they had to "educate the client" that "the fiscal and credit situation of Puerto Rico has improved in a miraculous way" and to stop "collaborat[ing] in…the fear, the panic."  Mr. Almonte also reminded Financial Advisors that there is still money out there and "…that money should return to us."

93.     In the SEC Proceeding, UBS Financial Advisors also testified that Defendant Ferrer pushed them to sell the Funds to clients as safe investments.  For example, Gustavo Del Valle testified that Ferrer "said constantly that we needed to recommend the [F]unds to clients, that if we did not we were not good advisors."  Mr. Del Valle also testified that he received

emails from Ferrer exhorting the Financial Advisors to sell the Funds as "safe investments for the clients."

94.     Through such uniform messages coming from Defendants' top executives, Class members were pushed into purchasing the Funds without any analysis of the suitability of such a high-risk investment.  Regardless of whether their clients had identified themselves as being "conservative" investors or as having a "moderate" risk appetite, Defendants funneled enormous portions of their clients' portfolios into the risky Funds.  For example, some UBS clients designated as "conservative" investors within UBS's own monthly client reports had ***100% of their portfolios invested in the Funds.***

95.     Popular also pushed conservative and moderate-risk clients into investments in the high-risk Funds without regard to their risk appetite.  For example, Popular clients who had risk profiles stating that they sought "liquidity" and investments that had a "low degree of risk of loss of principal value" were heavily concentrated in the Funds.

96.     In sum, Defendants disregarded their fiduciary, contractual and other duties, and instead aggressively and inappropriately pushed the high-risk Funds on unsuspecting Class members.

>    **2.     Defendants Provided Incentives To Their Financial Advisors To Place And Keep Clients In The Funds Regardless of Their Clients' Interests**

97.     Defendants generously rewarded their employees for placing clients into the Funds.  To induce their Financial Advisors to breach their fiduciary duties and contractual obligations to their clients, Defendants paid Financial Advisors materially inflated sales commissions on transactions in Fund shares.  The Financial Advisors were therefore highly motivated to push shares of the Funds on their retail clients in order to generate significantly inflated sales commissions, which only came from ignoring their fiduciary and contractual

responsibilities by placing and keeping clients in the Funds, regardless of whether such investments were in the clients' best interests.

98.    For example, if Defendants had sold Puerto Rico bonds directly to investors, Defendants would have earned only the original "mark up" and/or commission for selling those bonds (generally less than 1%).  By bundling the risky bonds into the Funds and selling shares of the Funds to clients, however, Defendants charged the Funds the original mark up or commission amount and then also charged clients an inflated commission to purchase shares of the Funds, which were in turn laden with the risky bonds.

99.    In the initial offering of each of the Funds, those commissions were generally 4.75%.  When trades occurred on the secondary market, Defendants usually earned a combined 5% commission – 3.5% on the purchase side of the transaction (the "mark up") and 1.5% on the sale side of the transaction (the "mark down").  Consequently, Defendants and their agents (i.e., investment/financial advisors to Class members) had a strong incentive to:  (i) sell shares in the Funds rather than simply offering their clients the underlying bonds; and (ii) continually sell clients more or different shares of Funds in order to earn commissions on the secondary market.

100.    Further, if instead of advising investors to purchase shares of the Funds, Defendants had advised Class members to purchase shares of listed equities or preferred securities, Defendants would have earned substantially lower commissions.  In UBS's own fee disclosure brochure, UBS provides the following example of the ***maximum*** costs a client might incur in an equity transaction: "Client purchases 1,000 shares of a listed security that is trading at $20, which represents a total investment of $20,000.  The maximum commission is $435.00 (20,000 x 0.0175 + 85), plus a $5.25 processing and handling fee (per transaction), making the maximum cost for the trade $20,440.25."  In UBS's own representative equity transaction, UBS

receives a commission/fee of 2.2% ($440.25/$20,000).   Similarly, UBS indicates in the same disclosure brochure that it charges a maximum of 2% for purchases of preferred securities. Again, for a $20,000 transaction, UBS's 2% commission would total $400.

101.    For the Funds, by contrast, UBS charged an upfront commission of 4.75% for investors to purchase the Funds in the initial offering – a 200% increase in fees from exchange-traded securities.   Thus, an investor purchasing $20,000 in Fund shares in the initial offering would have been charged $950 – more than *two times* the upfront cost of purchasing listed equities or preferred securities.   Further, because Defendants received 5% in commissions on secondary market transactions in Fund shares (including both sell and buy-side commissions), Defendants were highly motivated to continue encouraging investments in the Funds throughout the Class Period.   These enhanced commissions provided a powerful incentive for UBS and Popular to direct Class members to invest in the Funds – contrary to their best interests.

### 3.    The UBS Defendants Instituted A Dividend Reinvestment Program To Generate Additional Inflated Commissions

102.    Even when clients were already invested in the Funds, Defendants pursued strategies to capture additional lucrative commissions on Fund shares.   For example, the UBS Defendants implemented "dividend reinvestment" programs in which they pressed clients to receive the proceeds they earned on their Fund investments in the form of additional Fund shares issued at Net Asset Value ("NAV").   Class members who followed UBS's direction to reinvest their dividends and to retain those investments were left with an even greater exposure to the risky Funds.   UBS then pocketed yet additional commissions on clients who opted to resell the shares purchased with their dividends, which they were permitted to do at the then-existing market price.   The UBS Defendants' dividend reinvestment scheme generated approximately 1,000 to 2,000 additional transactions per month, totaling tens of millions of dollars in trades per

year.  This scheme ensured that the UBS Defendants once again profited handsomely at the expense of Class members.

103.    Defendant UBS did nothing to limit the risks posed by the dividend reinvestment scheme.  In fact, UBS encouraged increased reinvestment of dividend shares, and the level of dividend reinvestment in the Funds increased significantly, in some cases by as much as 30%, as of 2013.

> **4.     The UBS Defendants' Loan Scheme Generated Even More Commissions While Heightening Investors' Risks**

104.    UBS was not content with simply taking every single dollar it could from its clients' pockets.  UBS also pushed its clients to ***borrow additional money*** to invest further in the Funds and to generate even more commissions for the UBS Defendants.  It did so even though— as UBS representatives later publicly acknowledged—such arrangements were prohibited by UBS's own policies.

105.    To implement this loan scheme, UBS Puerto Rico's representatives contacted their clients who owned shares of the Funds, and, acting as agents of the UBS Defendants, offered them loans secured by the investors' shares in the Funds.  The loans were made by UBS Bank, which issued the loans in the forms of lines of credit, repos, or similar financing structures. Consistent with its uniform policy of pushing for increased investment in the Funds, UBS then pressed Class members to use the loan proceeds to purchase more shares of the Funds.  The principal amount of the loans involved in this scheme fluctuated, sometimes reaching close to ***80% of the value of the investors' shares of the Funds that collateralized the loans***.

106.    Further, when the Funds paid dividends, they were not credited to the loans. Instead, Class members were pushed to use those earnings to buy additional shares of the Funds

through the dividend reinvestment scheme described above, thereby increasing UBS's commissions while maximizing investors' debt load and exposure to the high-risk Funds.

107.    The UBS Defendants advised Class members to become heavily leveraged with respect to their investments in the high-risk Funds, contrary to their best interests.  Many Class members had retired, needed the money in the short term, or had otherwise expressed concerns about incurring losses.  Accordingly, this strategy not only exposed clients to extraordinary risk, but was also contrary to Class members' express instructions.  Further, the UBS Defendants misrepresented to Class members that this investment strategy was low risk.

108.    In fact, investing in the Funds on margin increased the risk of loss to Class members for two reasons.  First, Class members risked losing more than the amount invested if the value of the Funds depreciated sufficiently, giving rise to a margin call in the account, which occurred.  Second, Class members who received loans pursuant to the loan scheme were required to pay interest on the margin loan, which increased the cost of maintaining the investment as well as the amount of appreciation required before they realized any gain.  Of course, using margin enabled Class members to purchase greater interests in the Funds, thereby generating increased commissions for the UBS Defendants.

109.    In many instances, when Class members sought to sell their shares of the Funds, UBS encouraged those Class members to maintain their Fund investments and to instead obtain a loan to satisfy any near-term liquidity needs.  For example, in a June 2011 speech, UBS executive Ramon "Cholo" Almonte (then a senior broker at UBS) exhorted UBS Financial Advisors to pressure clients into borrowing more money regardless of their particular circumstances, stating:

> "[If clients call to complain] 'I have this situation, I am getting divorced…they
> are running my business, or my property…and I need money.'  […]  [W]e see

how to find them [i.e., the clients] a loan … or tell them 'these are your other assets that you can mortgage, you can do something, before they leave the last pocket, there's an exit."

Further, even when investors demanded that UBS stop reinvesting available funds in securities through their UBS accounts and liquidate all outstanding debit or loan balances therein, UBS ignored these instructions and continued to reinvest Class members' money in shares of the Funds.  UBS did not liquidate the debit or apply it to outstanding loan payable balances in Class members' accounts.

110.   UBS's loan scheme was known internally and openly discussed at UBS, including in its mainland United States and Puerto Rico offices.  Through bonuses and other financial incentives, members of UBS's senior management encouraged the company's Financial Advisors to induce their clients to apply for loans to purchase additional Fund shares.  Members of UBS Puerto Rico senior management also received bonuses and other compensation for their assistance in implementing, generating, and maintaining these loans.

111.   As an October 2, 2013 article published in the *New York Times* noted, UBS's clients were "piled into highly leveraged bond funds run by UBS [i.e., the Funds] and were encouraged by its brokers to borrow even more money to invest in those funds."  Further, this article states that "money was lent improperly, exacerbating current losses, according to UBS employees in the region close to the situation."  The article cites a transcript of an internal meeting at UBS during September 2013 in San Juan, Puerto Rico, in which Robert Mulholland, UBS's head of wealth management advisers, characterized the situation as "the perfect storm."

### 5.   The UBS Defendants Deliberately Disabled Their Own Internal Controls To Push Clients Into the Funds

112.   The UBS Defendants even took affirmative steps to bypass their own internal controls to get as many of their clients as possible to invest in the Funds.  From approximately

41

2000 on, UBS maintained the computer-based BMSS program that was designed to generate alerts and/or reports when clients' accounts were overconcentrated in particular securities, including the Funds.   This was to ensure, *inter alia*, that clients maintained a diversified portfolio.

113.    At some point following the implementation of the BMSS, however, it was ***modified*** with respect to the Funds such that they were exempt from these reports.   Thus, the BMSS was manipulated to prevent it from generating alerts to Financial Advisors when ***any*** client of UBS Puerto Rico was overconcentrated in the Funds.   This resulted in vast quantities of shares of the Funds being sold to investors that would have never occurred absent the UBS Defendants' deliberate modification of the BMSS.

114.    The overrides to the BMSS programming could only have been approved by high ranking officials at UBS Financial.

### 6.    The UBS Defendants Approved Additional Fees For Financial Advisors Who Kept Their Clients Invested In The Funds

115.    Around 2010, the financial compensation for all of the Financial Advisors who worked under the UBS Financial umbrella was set in the Financial Advisor Compensation Guide, which was prepared by a committee run by Matthew Levitan, who was Head of Compensation and Benefits at UBS Financial.

116.    Closed-end funds generally do not pay so-called "12b-1 fees," which, according to the SECs website, are "fees paid by the fund out of fund assets to cover distribution expenses and sometimes shareholder service expenses."   Such fees are an alternate way of paying an open-end fund's sales-related expenses, such as compensating investment professionals.

117.    In 2009-2010, a group of Financial Advisors at UBS Puerto Rico approached Defendant Ferrer and Belaval to complain that because the Funds were closed-end funds, the

Financial Advisors were not earning fees similar to 12b-1 fees for keeping their clients invested in the Funds.

118.    As a result, Belaval went through UBS's legal department to find out if UBS could pay the Financial Advisors something similar to a 12b-1 fee for keeping their clients invested in the Funds.  Belaval's request was denied.

119.    Following the denial of Belaval's request, the Financial Advisors began selling the Funds because the Financial Advisors did not earn any fees from maintaining their clients' Fund investments.  UBS developed an alternate plan to compensate the Financial Advisors for keeping the Funds on their clients' books.

120.    Belaval was able to persuade senior UBS officials to agree to an exception to the Financial Advisor Compensation Guide, known as the assets under control award ("AUC").  Under the AUC, Financial Advisors were compensated anywhere from 1 to 5 basis points, depending on seniority, for all of the assets on their respective clients' books.

121.    During the approximately three year time period in which the AUC program was active, UBS Puerto Rico's Financial Advisors, and no other UBS Financial Advisors, were incentivized by *millions* of dollars in fees for keeping Class members invested in the Funds, to the detriment of those Class members.

E.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY MISREPRESENTING THE NATURE AND RISK OF THE FUNDS

122.    During the Class Period, Defendants breached their fiduciary duties to Class members by consistently misrepresenting the nature, stability and risk of the Funds in marketing and selling these instruments to Class members, who sought a fixed and stable monthly income stream with no risk to their capital.

123.    In communications with Class members during the Class Period, Defendants repeatedly touted the Funds as safe, secure, fixed income investments that would provide high, tax-free returns while preserving the principal of Class members' investments.  Defendants also repeatedly represented to Class members that the Funds were low-risk and low-volatility investments.  As noted above in ¶ 86, sworn testimony from multiple UBS clients given in connection with the SEC Proceeding confirms that Defendant UBS uniformly touted the Funds as safe and risk-free investments.

124.    These statements were based on uniform scripts and buzz-words directed by Defendants' most senior officials.  For example, at UBS, Defendant Ferrer repeatedly touted the "low-volatility" and "conservative" nature of the Funds in pressuring UBS's Financial Advisors to push the Funds on its clients as safe investments, including:

      a.   in an email dated September 18, 2008, Ferrer urged UBS Financial Advisors to recommend the Funds to "clients searching for low volatility and respectable returns";

      b.   in two separate emails sent on September 30, 2008, Ferrer again exhorted UBS Financial Advisors that the "low volatility" of the Funds was a "great reason to consider them as a timely investment" and boasted that "all is well in Puerto Rico and our client base is enjoying the fruits of conservative investing";

      c.   in an email dated March 17, 2009, Ferrer recommended that UBS's Financial Advisors actively push the Funds on "IRA investors," stating "Rest assured our IRA's [sic] based on Funds are very attractive choices for investors."  Further, in sworn testimony before the SEC, "Ferrer acknowledged that the purpose of th[is] email was to get customers to buy product";

d.  in an email dated May 14, 2009, Ferrer again urged UBS's Financial Advisors to press IRA investors to purchase the Funds, stating "You can offer attractive alternatives for many IRA investors; our Funds."  Ferrer confirmed in sworn testimony that "his message was to sell more IRA investments to customers."

Further, as noted above, Mr. Del Valle also testified that he received emails from Ferrer exhorting the Financial Advisors to sell the Funds as "safe investments for the clients."  In addition, as also discussed above, recently released recordings of June 2011 speeches by Defendant Ferrer and UBS executive Ramon Almonte demonstrate how UBS's top management pressured Financial Advisors to deliver a uniformly positive message in selling the high-risk Funds to Class members without regard for or analysis of their suitability.  UBS representatives acknowledged in the SEC Proceeding that when "UBS PR talks about giving information to the market, it means providing information to FAs [i.e., UBS Financial Advisors]."

125.   The Annual Reports published during the Class Period for each of the Funds also indicated that the investment goal of each of the Funds was to provide current income "***consistent with the preservation of capital***" for its shareholders.

126.   Offering circulars and prospectuses for the notes issued by the Funds repeatedly stated that the "investment objective of each of the [Funds] is to achieve a high level of current income that, for Puerto Rico Residents, is exempt from U.S. federal and Puerto Rico income taxes, ***consistent with the preservation of capital***."

127.   In monthly account statements, Defendant UBS expressly categorized the Funds as "Fixed Income" – thereby portraying to Class members that the Funds were fixed income assets.  The UBS Defendants even portrayed the Funds as providing "guaranteed" income, indicating that investment in the Funds was "guaranteed" under the Constitution of Puerto Rico.

But, while certain of the underlying bonds purchased by the Funds could be given payment priority in a financial crisis, the Funds were in no way ***guaranteed*** under the Puerto Rico Constitution.  On the contrary, the Funds placed investors' principal directly at risk – and, as set forth herein, Class members suffered massive losses on their Fund investments.

128.    Defendants also falsely portrayed the Funds as safe and secure investments at numerous "Investor Conferences" held during the Class Period, including in conferences held in June 2008, March 2009 and February 2013, which thousands of clients, including Class members, attended.  For example, in an email to Financial Advisors following the March 2009 investor conference, Defendant Ferrer stated that UBS's "…clients received a huge dose of comfort on their investments…" at the conference.

129.    Moreover, in newspaper publications during the Class Period, Defendants sought to falsely assure Class members that the Funds were safe and secure investments.  For example, in a newspaper interview published in *El Vocero* on April 24, 2009, Defendant Ferrer stated that the Funds "offer[] much less volatility and relative positive results" and that "the [Funds] have had an excellent return" during the 2008/2009 financial crisis.  Ferrer also stated:

> "[M]any investors call [UBS Puerto Rico] scared about the news of the drop in the financial markets, when the reality is that news doesn't have any relevance for the investor.  […]  [T]he Puerto Rican investor that has their money invested in [the Funds and the underlying bonds] has obtained fantastic results."

130.    Contrary to Defendants' portrayal to Class members, the Funds were not safe, secure, low-risk, fixed income investments, were not guaranteed, and did not preserve Class members' capital.  Instead, as alleged herein, the Funds were high-risk, speculative instruments that placed Class members' principal investment directly at risk.  The risks inherent in the Funds materialized when the Funds essentially collapsed, wiping out much of Plaintiffs' retirement savings and eviscerating the value of Class members' principal investment.  As explained below,

the Funds lost nearly half their original value by September 2013 and have continued to decline in value.

F.    **DEFENDANTS' UNIFORM BREACHES OF FIDUCIARY AND CONTRACTUAL DUTIES CAUSED SUBSTANTIAL DAMAGES TO CLASS MEMBERS**

131.    In June 2013, the Funds began a precipitous decline in value, as the risks posed by the Funds' concentration in the high-risk Puerto Rico government debt and Defendants' improper loan scheme first started to materialize. Specifically, the value of the Puerto Rico municipal bonds that UBS and Popular had underwritten and then stuffed into the Funds began to decline – as concerns regarding the creditworthiness of the Puerto Rico government and rating agency downgrades intensified. As investors in Puerto Rico government debt ran for cover, the market value of the Funds' assets – which, as set forth above, were primarily comprised of Puerto Rico government debt instruments – plummeted. This caused Class members to suffer enormous losses on the principal they invested in the Funds.

132.    The highly leveraged and highly concentrated nature of the Funds further exacerbated investors' losses. As alleged above, because the Funds purchased roughly 50% of their asset portfolios through leverage, even small losses on those assets translated into significantly larger losses for investors. For instance, the Puerto Rico Fixed Income Fund I, Inc. portfolio had net assets of $361 million as of June 2013, but the use of 50% leverage allowed the Fund to hold total investments of $748 million. Moreover, $338 million of this Fund's portfolio was invested in just two Puerto Rico government issuers, representing close to half of the Fund's total investments. By September 30, 2013, the securities of these two issuers had lost 36% of their value in just three months. But because securities of these two issuers comprised close to half of the total assets in the Fund and the leverage ratio was roughly 50%, the losses from these securities caused the total value of the fund to decline by 34%.

133.    By September 2013, the lack of any investor demand for the Funds rendered the secondary market non-existent.  An article published in *Caribbean Business* on September 12, 2013, quoted industry sources as stating that Fund prices had "collapsed," that "[l]everaged funds and individuals are getting killed with margin calls," and that some of members of the Class had lost "everything."

134.    UBS officials clearly understood the impact their imprudence had on Class members.  According to *The New York Times*, the head of wealth management advisors in the Americas for UBS, Robert Mulholland, told UBS Financial Advisors in a closed town hall meeting in San Juan in September 2013 that—in contrast to UBS's reassurances to Plaintiffs and other Class members—the Funds' use of leverage had exacerbated the risks and losses to investors.  Mulholland also stated that losses were "piling up," and that the UBS Closed-End Funds could not be traded.  In response to these losses, and to minimize UBS's exposure to potential losses from its loan scheme, Mulholland instructed UBS Financial Advisors to sell their clients' most liquid assets—i.e., securities other than the UBS Closed-End Funds—regardless of "whether they are in the [Funds] account or outside of the account."

135.    In early December 2013, Moody's warned that it might downgrade Puerto Rico's debt rating within 90 days – with S&P and Fitch issuing similar warnings around the same time. By January 29, 2014, UBS itself issued a report predicting that, "[g]iven the myriad obstacles facing Puerto Rico, we believe that at least one rating agency will [downgrade Puerto Rico government debt] within the next 30 days."

136.    On February 4, 2014, as UBS had expected, Standard & Poor's downgraded Puerto Rico government debt to speculative grade, or "junk" status – meaning that there was a very high risk that the Puerto Rico government would default on its debt obligations.  Three days

later, Moody's Investors Service followed suit, and downgraded Puerto Rico's general obligation bonds and Puerto Rico's senior lien COFINA bonds to junk.  As the Defendants themselves admitted in a February 3, 2014 letter to the OCIF (i.e., Puerto Rico's financial regulator) sent by counsel for the Jointly Managed Funds, these downgrades had a devastating impact on the Funds, "as evidenced by the substantial decrease in the Funds' net asset value and the market prices of the shares."

137.    As a result of the misconduct alleged herein, Plaintiffs and the other members of the Class have been harmed.  Among other things, Plaintiffs and the other members of the Class suffered losses in their supposedly safe, conservative, "fixed income" investments in the Funds. If Plaintiffs and the other members of the Class had actually been invested in a safe, fixed income investment instead of the Funds, they would have earned a steady stream of income and had their principal returned.  Defendants have also been unjustly enriched by the inflated fees and commissions they charged Plaintiffs and the other members of the Class for placing them and keeping them in the risky funds, including by luring them into the loan scheme.

**G.    DEFENDANTS' ADMISSIONS AND GOVERNMENT INVESTIGATIONS INTO DEFENDANTS' WRONGDOING**

138.    On October 2, 2013, *The New York Times* reported that UBS Financial Advisors had provided clients with non-purpose loans to purchase the Funds, prompting UBS to announce its own "internal investigation" into this misconduct.  Since then, according to press reports, UBS has suspended at least seven Financial Advisors and terminated at least one Financial Advisor involved with the Funds.  Then, on March 13, 2014, UBS admitted that its "internal review…disclosed that certain clients, many of whom acted at the recommendation of one Financial Advisor, invested proceeds of non-purpose loans in closed-end fund securities in contravention of their loan agreements."  While UBS purported to blame a significant portion of

its improper lending scheme on a single Financial Advisor, such an explanation cannot be reconciled with the volume of loans issued by Defendant UBS Bank—which exceeds half a billion dollars—and the involvement of numerous high-level UBS officials from Puerto Rico, New York and Utah.

139.   In addition to UBS's admissions, government regulators have also turned their sights on UBS and Popular.  For example, following its own investigation into UBS loans to Fund investors, the OCIF announced on December 23, 2013, that it had reached a settlement in which UBS Bank agreed to transfer a *$562 million* loan portfolio collateralized by the Funds and other securities to UBS Puerto Rico.  Significantly, and in a clear acknowledgment that UBS Bank had improperly issued loans to UBS Puerto Rico clients, UBS Bank agreed that it would no longer grant or offer loans collateralized by Puerto Rico securities, and would no longer offer any loans to Puerto Rico residents.  As OCIF Commissioner Rafael Blanco stated, the agreement with the OCIF acknowledged that "these loans are secured, among other things, by securities [shares in closed-end funds] that can only be sold, assigned and owned by residents of Puerto Rico."

140.   On March 18, 2014, *El Nuevo Día* disclosed that U.S. federal prosecutors and the Federal Bureau of Investigation were conducting an investigation into the causes of the collapse of the bond market in Puerto Rico.  The article noted that federal prosecutors' primary targets included UBS and Popular and, according to the article, neither UBS nor Popular denied they were the focus of an investigation when asked by *El Nuevo Día*.

141.   In October 2014, UBS Puerto Rico entered into a settlement agreement with the OCIF concerning the offer and sale of the Funds from 2010 through 2013.  As set forth in the settlement agreement, the OCIF examined whether UBS Puerto Rico had complied with Puerto

Rico's securities laws in connection with selling the Funds to a sample of UBS Puerto Rico's clients representing "senior, low net worth investors with conservative investment profiles whose investments in local closed end funds represented a substantial level of their liquid net assets." Among other things, the OCIF found that:

a.       UBS financial advisors may have "engaged in the recommendation and trading" of outsized amounts of Funds for the sample clients as compared to their "liquid net assets given their conservative investment objectives, risk tolerance and more modest financial profile" and that this practice "may have also been potentially unsuitable based on the particular customer's conservative financial objectives, risk tolerance and needs."

b.       "Certain purchases" of Funds by the sample clients "may have been induced by misrepresentations or omission of material facts based on the manner in which the investments were recommended to the investors by the agents [*i.e.,* the UBS financial advisors]."

c.       UBS financial advisors "may have made transactions in their clients' accounts without obtaining prior authorization, or exercised discretionary power in effecting certain transactions for the clients' accounts without first obtaining written authority from the customers."

d.       "UBS may have failed to maintain and enforce appropriate supervisory procedures in connection with certain client transactions during January 1st, 2006 to May 31st, 2010, regarding the use of [UBS] non-purpose loans by clients to purchase securities and/or in the trading of one or similar closed-end funds in relation to the clients' liquid net assets given their conservative investment

objectives, risk tolerance and more modest financial profile."  Accordingly, "UBS was not able to prevent, detect and promptly correct (i) potentially unsuitable recommendations or (ii) potentially improper transactions in the client accounts at issue."

e.      "UBS may have failed to maintain accurate books and records in connection with certain customers' information and the activities of [certain UBS financial advisors]."

Further, the settlement agreement states that the OCIF examined whether UBS financial advisors either "recommended that" or "permitted certain clients to" "purchase securities in UBS brokerage accounts during 2011 – 2013 in violation of the customers' loan agreements and UBS policies" and that "such practice may have been potentially unsuitable based on the customers' financial objectives, risk tolerance and needs, and/or certain purchase may have been induced by misrepresentations or omissions of material facts.  In connection with this settlement, UBS Puerto Rico paid $1,681,556 in restitution to 34 of its clients and paid a $3,500,000 fine to the OCIF.

142.    Most recently, on February 6, 2015, a *Reuters* article reported that "two whistleblower complaints involving the [F]unds [have been] filed at the U.S. Securities and Exchange Commission."

## CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of:  All persons who were clients of UBS Puerto Rico and/or Popular Securities and who were invested in any of the Funds during the Class Period and were damaged as a result of the conduct alleged herein.

144.    The "Class Period" is the period from May 5, 2008 through May 5, 2014.

145.   Excluded from the Class are Defendants named herein, any subsidiaries or affiliates of the Defendants, officers and directors of the Defendants, heirs, successors or assignees of any of the Defendants or their officers and directors, and any entity in which any Defendant has a controlling or substantial interest.

146.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of Puerto Rico-based investors purchased and/or held shares in the Funds during the Class Period and sustained losses as a result of Defendants' misconduct.  Fund investors can be identified from records maintained by Defendants and may be notified of the pendency of this action by mail or other means.

147.   Plaintiffs' claims are typical of the claims of the other members of the Class because they arise from Defendants' breaches of their fiduciary, contractual, and statutory duties, which Defendants uniformly owed to all Class members; are based upon common law and statutory duties that were memorialized in uniform or substantially similar agreements between Class members and Defendants; and arise from Defendants' uniform course of misconduct, which included:  (a) imprudently and improperly creating and implementing a policy of steering members of the Class to invest in the Funds (without regard to their suitability) due to Defendants' conflicts of interest; (b) imprudently and improperly creating and implementing a policy of disregarding the interests of Class members in favor of Defendants' own conflicted interests in generating inflated commissions and fees on the funds; (c) imprudently and improperly recommending that members of the Class remain invested in the Funds; (d) breaching their duty of candor by characterizing the Funds as safe, conservative, "fixed

income" investments; and (e) breaching their duty of candor by failing to warn members of the Class of the severe risks of continuing to retain investments in the Funds.  If cases were brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

148.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The many questions of law and fact common to the Class include:

a.   whether the UBS and Popular Defendants are fiduciaries to the members of the Class;

b.   whether the UBS and Popular Defendants breached their fiduciary duties to the Class by, among other things, creating and implementing a policy of steering members into investments in the Funds based on the UBS and Popular Defendants' own pecuniary interests and without regard to their suitability as appropriate investments for the members of the Class;

c.   whether the UBS and Popular Defendants breached their contractual obligations to members of the Class;

d.   whether the UBS and Popular Defendants breached their contractual duties of good faith and fair dealing with respect to the Class; and

e.   whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

149.    A class action is superior to all other available methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable.  As the damages suffered by each individual Class member may be relatively small, the expense and burden of

individual litigation make it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

150.    In addition, prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Prosecution of separate actions would also create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

## CAUSES OF ACTION

### COUNT I
### BREACH OF FIDUCIARY DUTY AGAINST
### DEFENDANTS UBS PUERTO RICO AND UBS FINANCIAL

151.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

152.    Plaintiffs and other Class members reposed trust and confidence in UBS Puerto Rico and UBS Financial's superior knowledge of and expertise in investment matters generally and the Puerto Rico closed-end mutual fund market in particular, and entrusted UBS Puerto Rico and UBS Financial to conduct themselves in the best interests of Class members, and not in UBS Puerto Rico and UBS Financial's own self-interest.

153.    As the investment advisors for Plaintiffs and other Class members, UBS Puerto Rico and UBS Financial owed Plaintiffs and other Class members the "highest standard of fiduciary duty," including the duties of due care, loyalty, good faith, candor, and prudence.

154.    In fulfilling those duties, UBS Puerto Rico and UBS Financial were obligated to recommend investments to Class members based on due consideration and analysis of the suitability of any such investment.

155.    UBS Puerto Rico and UBS Financial breached their fiduciary duties by implementing policies that pushed Plaintiffs and other Class members to invest in the Funds regardless of Class members' investment objectives and by engaging in self-dealing transactions in a manner detrimental to Plaintiffs and other Class members.

156.    UBS Puerto Rico and UBS Financial also breached their fiduciary duties by enabling the Funds to be purchased on margin, and by facilitating the extension of "non-purpose" loans for the improper purchase and/or maintenance of investments in Fund shares.

157.    In breaching the duties they owed Plaintiffs and other members of the Class, UBS Puerto Rico and UBS Financial disregarded for the rights of, and fiduciary duties owed to, Plaintiffs and other Class members

158.    As a direct and proximate consequence of UBS Puerto Rico and UBS Financial's breaches of their fiduciary duties, Plaintiff and the Class have suffered, and continue to suffer, damages in an amount to be proven at trial.  Additionally, since, *inter alia*, UBS Puerto Rico and UBS Financial engaged in intentional, willful, reckless, oppressive and/or wanton conduct, and such conduct was part of a pattern of similar conduct directed at the public generally, Plaintiffs and the other members of the Class are entitled to an award of punitive damages.

<u>COUNT II</u>
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
AGAINST DEFENDANTS UBS AG, UBS TRUST, UBS PUERTO RICO,
UBS FINANCIAL, UBIÑAS AND FERRER**

159.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

160.    UBS Puerto Rico and UBS Financial owed the Class the fiduciary duties of due care, unflinching loyalty, good faith, candor, and prudence.  That UBS Puerto Rico and UBS Financial owed the Class these fiduciary duties was well known to Defendants UBS AG, UBS

Financial, UBS Trust, UBS Puerto Rico, Ubiñas and Ferrer (the "UBS Aiding and Abetting Defendants").

161.    As alleged herein, UBS Puerto Rico and UBS Financial breached their fiduciary duties to Plaintiffs and other Class members.

162.    Each of UBS Puerto Rico and UBS Financial aided and abetted the other's breaches of fiduciary duty.

163.    The UBS Aiding and Abetting Defendants aided and abetted UBS Puerto Rico and UBS Financial's breaches of fiduciary duty.  The UBS Aiding and Abetting Defendants actively and knowingly participated in UBS Puerto Rico and UBS Financial's breaches of their fiduciary duties to the Class.  The UBS Aiding and Abetting Defendants also colluded with UBS Puerto Rico and UBS Financial in their attempts to circumvent UBS Puerto Rico and UBS Financial's fiduciary duties to the Class.

164.    The UBS Aiding and Abetting Defendants' actual knowledge of UBS Puerto Rico and UBS Financial's breaches of fiduciary duty is based on, among other things, the nature of the scheme alleged herein, the substantial overlap in executives and senior managers between UBS Puerto Rico and UBS Financial and the UBS Aiding and Abetting Defendants, and the fact that the UBS Defendants acted as alter egos in their dealings in Puerto Rico and generally disregarded corporate distinctions in order to conduct their business.

165.    The UBS Aiding and Abetting Defendants participated in the breaches of the fiduciary duties by UBS Puerto Rico and UBS Financial for the purpose of advancing their own interests.

166.    Class members have been harmed by the UBS Aiding and Abetting Defendants aiding and abetting UBS Puerto Rico and UBS Financial's breaches of fiduciary duty.

167.    As a direct and proximate result of the UBS Aiding and Abetting Defendants'

aiding and abetting UBS Puerto Rico and UBS Financial's breaches of fiduciary duty, Plaintiffs

and other members of the Class suffered injuries for which monetary damages are sought.

Additionally, since, *inter alia*, the UBS Aiding and Abetting Defendants engaged in intentional,

willful, reckless, oppressive and/or wanton conduct, and such conduct was part of a pattern of

similar conduct directed at the public generally, Plaintiffs and the other members of the Class are

entitled to an award of punitive damages.

### COUNT III
### BREACH OF FIDUCIARY DUTY AGAINST DEFENDANT
### POPULAR SECURITIES

168.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

169.    At all times, Plaintiffs and other Class members reposed trust and confidence in

Popular Securities' superior knowledge of and expertise regarding investment matters generally

and the Puerto Rico closed-end mutual fund market in particular, and entrusted Popular

Securities to conduct itself in the best interests of Class members, and not in Popular Securities'

own self-interest.

170.    As the investment advisor for Plaintiffs and other Class members, Popular

Securities owed Plaintiffs and other Class members the "highest standard of fiduciary duty,"

including the duties of due care, loyalty, good faith, candor, and prudence.

171.    In fulfilling those duties, Popular Securities was obligated to recommend

investments to Class members based on due consideration and analysis of the suitability of any

such investment.

172.    Popular Securities breached its fiduciary duties by implementing policies that

pushed Plaintiffs and other Class members to invest in the Funds regardless of Class members'

investment objective and by engaging in self-dealing transactions in a manner detrimental to Plaintiffs and other Class members.

173.    In breaching the duties it owed Plaintiffs and other members of the Class, Popular Securities disregarded the rights of, and fiduciary duties owed to, Plaintiffs and other Class members.

174.    As a direct and proximate consequence of Popular Securities' breaches of its fiduciary duties, Plaintiff and the Class have suffered, and continue to suffer, damages in an amount to be proven at trial.

**COUNT IV**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
**AGAINST BANCO POPULAR**

175.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176.    Popular Securities owed the Class the fiduciary duties of due care, unflinching loyalty, good faith, candor, and prudence.  That Popular Securities owes the Class these fiduciary duties was well known to Popular-PAM.

177.    As alleged herein, Popular Securities has breached and continues to breach its fiduciary duties to Plaintiffs and other Class members.

178.    Banco Popular, including through its Popular-PAM division, aided and abetted Popular Securities' breaches of fiduciary duty.  Banco Popular, including through its Popular-PAM division, actively and knowingly participated in Popular Securities' breach of its fiduciary duties to the Class.  Banco Popular, including through its Popular-PAM division, also colluded with UBS Puerto Rico in its attempt to circumvent Popular Securities' fiduciary duties to the Class.

179.    Banco Popular, including through its Popular-PAM division, participated in the breaches of the fiduciary duties by Popular Securities for the purpose of advancing its own interests.  Banco Popular's actual knowledge of Popular Securities' breaches of fiduciary duty is based on, among other things, the nature of the scheme alleged herein, the substantial overlap in executives and senior managers between Popular Securities and Banco Popular, and the fact that the Popular Defendants acted as alter egos in their dealings and generally disregarded corporate distinctions in order to conduct their business.

180.    Class members have been harmed by Banco Popular aiding and abetting Popular Securities' breaches of fiduciary duty.

181.    As a direct and proximate result of Banco Popular aiding and abetting Popular Securities' breaches of fiduciary duty, Plaintiffs and other members of the Class suffered injuries for which monetary damages are sought.

## COUNT V
## BREACH OF CONTRACT AGAINST DEFENDANTS UBS AG, UBS FINANCIAL, UBS PUERTO RICO, UBS TRUST, AND UBS BANK

182.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

183.    Defendants UBS AG, UBS Financial, UBS Puerto Rico, UBS Trust and UBS Bank each owe contractual obligations to Plaintiffs and each member of the Class who entered into a UBS Client Agreement.  The UBS Client Relationship Agreement expressly defines "UBS" to include UBS AG, UBS Financial, UBS Puerto Rico and UBS Bank, as well as affiliated companies, including UBS Trust.  For purposes of this Count, UBS AG, UBS Financial, UBS Puerto Rico, UBS Trust, and UBS Bank are referred to collectively as the "UBS Contracting Defendants."

184.    The UBS Client Relationship Agreement explicitly states that the UBS Contracting Defendants will provide a "customized approach to wealth management" that is "built on your personal relationships with your Financial Advisor and shaped by an understanding of your needs and aspirations."  The UBS Client Relationship Agreement provides that these terms were to "apply to all Accounts you open with UBS [Delaware] or UBS [Puerto Rico]."

185.    In addition, the UBS Client Relationship Agreement incorporates by reference "other agreements and disclosures we refer to here," which includes the UBS Agreements and Disclosures Booklet.  In the UBS Agreements and Disclosures Booklet, the UBS Contracting Defendants promise to "[a]ct in… [Class members'] best interests, ***and in the event of a conflict of interest, place*** [Class members'] ***interests before our own***" (emphasis added).  The UBS Contracting Defendants also promised to "[m]ake investment decisions or recommendations that…[a]re suitable and appropriate for you…[a]re consistent with your investment objectives and goals."   Further, UBS Puerto Rico and UBS Financial acknowledged in the UBS Agreements and Disclosures Booklet that they were "jointly responsible" for:

- "Ongoing monitoring of your account activity."

- "Using due diligence to learn the essential facts relative to you, your orders and your account."

- "Providing you investment advice…and having reasonable grounds for believing that any recommended transaction relating to your brokerage account is suitable for you based on the facts you disclosed, including your other security holdings and financial situation and needs."

186.    The UBS Contracting Defendants breached their contractual duties by imprudently advising Plaintiffs and other Class members to purchase and/or retain shares in the Funds, which were risky, unsafe and illiquid, without regard to Class members' individual

circumstances.  In fact, rather than provide the promised "customized" financial advice, UBS Financial and UBS Puerto Rico advised customers to purchase and retain shares in the Funds without conducting any analysis or giving any consideration to the needs of Plaintiffs and other Class members.  Further, UBS Financial and UBS Puerto Rico breached their contractual duties by failing to warn Plaintiffs and other Class members of the risks of continuing to hold the Funds.

187.    UBS Financial and UBS Puerto Rico's breaches of their duty of good faith and fair dealing were motivated by conflicts of interest that incited UBS Financial and UBS Puerto Rico to put their own pecuniary interests, as well as the interests of their affiliates such as the other UBS Defendants, ahead of the interests of Plaintiffs and the Class.  Those conflicts of interest caused UBS Financial and UBS Puerto Rico improperly to recommend investments in the Funds without regard to the individual characteristics of the members of the Class, thereby causing substantial harm to Plaintiffs and the Class.

188.    As a direct and proximate result of UBS Financial and UBS Puerto Rico's breaches of contract, Plaintiffs and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

189.    UBS Financial and UBS Puerto Rico are liable to Plaintiffs and each member of the Class for the damages resulting from their breaches of the UBS Client Relationship Agreement and the UBS Agreements and Disclosures Booklet incorporated by reference therein.

### COUNT VI
### BREACH OF CONTRACT AGAINST POPULAR SECURITIES

190.    The Popular Defendants owed express or implied contractual obligations to Plaintiffs and each member of the Class that entered into a client relationship with the Popular Defendants.  The Popular Defendants' contractual duties to Plaintiffs and other members of the

Class included the duty to act in Class members' best interests and analyze their investment objectives to provide investment advice consistent with Class members' best interests.

191.    The Popular Defendants breached these contractual duties by imprudently recommending that Plaintiffs and other Class members purchase and/or retain shares in the Funds, which were extraordinarily risky and placed Class members' principal at great risk, without regard to Class members' individual circumstances.   In fact, rather than provide customized financial advice, and in violation of their duty of good faith, the Popular Defendants pushed Class members to purchase and retain the Funds.   Further, the Popular Defendants breached their contractual duties by failing to warn Plaintiffs and the members of the Class of the risks of continuing to hold the Funds.

192.    As set forth above, the Popular Defendants' breaches of their duties of good faith were motivated by conflicts of interest that incentivized the Popular Defendants to put their own pecuniary interests ahead of the interests of Plaintiffs and the Class.   Those conflicts of interest caused the Popular Defendants to breach their duties by improperly recommending investments in the Funds without regard to the individual characteristics of the members of the Class, which caused substantial harm to Plaintiffs and the Class.

193.    As a direct and proximate result of the Popular Defendants' breaches of their contractual obligations, Plaintiffs and the Class have sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

194.    The Popular Defendants are liable to Plaintiffs and each member of the Class for the damages resulting from their breaches of their contractual duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

(a)    Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Determining and declaring that UBS Puerto Rico, UBS Financial, and Popular Securities have breached their fiduciary duties to Plaintiffs and the Class;

(c)    Determining and declaring that the UBS Aiding and Abetting Defendants and Banco Popular aided and abetted the breaches of fiduciary duties alleged herein;

(d)    Determining and declaring that the UBS Contracting Defendants have breached their contractual duties to Plaintiffs and the Class;

(e)    Determining and declaring that the UBS Contracting Defendants have breached their duties of good faith and fair dealing to Plaintiffs and the Class;

(f)    Awarding to Plaintiffs and other members of the Class an appropriate measure of damages to be determined at trial, including punitive damages, together with pre- and post-judgment interest;

(g)    Ordering disgorgement of all fees paid by Plaintiffs and other members of the Class to Defendants during the time Defendants were faithless fiduciaries;

(h)    Awarding attorney fees pursuant to the common fund doctrine and other applicable law; and

(i)    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury as to all causes of action averred in this Complaint.


Dated this 8th day of May, 2015.

GRANT & EISENHOFER P.A.

/s/ Daniel L. Berger
Jay W. Eisenhofer
Daniel L. Berger
Mary S. Thomas
Deborah A. Elman
Robert D. Gerson
485 Lexington Ave 29th Floor
New York, New York 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

BERNSTEIN LITOWITZ BERGER &
   GROSSMANN LLP

/s/ Hannah Ross
Gerald Silk
Hannah Ross
Jeremy Robinson
Michael Blatchley
Jake Nachmani
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444


KESSLER TOPAZ
   MELTZER & CHECK, LLP

/s/ Michael K. Yarnoff
Michael K. Yarnoff
Johnston de F. Whitman, Jr.
Joshua E. D'Ancona
Margaret E. Onasch
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056

THE LAW OFFICES OF ANDRES W.
   LOPEZ P.S.C.

/s/ Andrés W. López
Andrés W. López (*pro hac vice pending*)
PO Box 13909
San Juan, Puerto Rico 00908
Tel:  (787) 294-9508


*Counsel for Plaintiffs*