UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NORA FERNANDEZ; AUGUSTO
SCHREINER; EDDIE TORO VELEZ;
VICTOR R. VELA DIEZ DE ANDINO;
JUAN VIERA; GEORGINA VELEZ
MONTES; and ESTHER SANTANA, on
behalf of themselves and all others similarly
situated,

               Plaintiffs,

    v.

UBS AG; UBS FINANCIAL SERVICES,
INC.; UBS FINANCIAL SERVICES
INCORPORATED OF PUERTO RICO; UBS
TRUST COMPANY OF PUERTO RICO;
UBS BANK USA; CARLOS V. UBIÑAS;
MIGUEL A. FERRER; BANCO POPULAR
de PUERTO RICO; and POPULAR
SECURITIES, LLC,

               Defendants.

No. 15 Civ. 2859 (SHS)

**MIGUEL A. FERRER'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION
TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**STROOCK & STROOCK & LAVAN LLP**
180 Maiden Lane
New York, New York  10038
(212) 806-5400
*Attorneys for Defendant Miguel A. Ferrer*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND ........................................................................................................3

      A.     The Funds...........................................................................................................3

      B.     The UBS Defendants' Alleged Breach Of Their Fiduciary Duty...............4

      C.     The Sole Claim Against Ferrer .......................................................................5

      D.     The SEC Proceeding Against Ferrer And Its Press Coverage ....................7

ARGUMENT .................................................................................................................................12

I.     Plaintiffs' Claims Are Precluded By SLUSA ...................................................12

II.    Plaintiffs Fail To State A Claim Against Ferrer For Aiding And Abetting Breach Of
Fiduciary Duty ........................................................................................................12

III.   Plaintiffs' Claim Against Ferrer Is Time-Barred ............................................14

      A.     Puerto Rico's One-Year Statute Of Limitations Applies..........................14

      B.     Plaintiffs Were On Notice Of Their Claim Prior To May 30, 2013 .........16

IV.   Plaintiffs Lack Standing To Bring Claims With Respect To Funds In Which They Did
Not Invest................................................................................................................20

CONCLUSION.............................................................................................................................20

APPENDIX ...................................................................................................................................... i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arturet-Velez v. R.J. Reynolds Tobacco Co.*,
    429 F.3d 10 (1st Cir. 2005)................................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................12

*Cantor Fitzgerald Inc. v. Lutnick*,
    313 F.3d 704 (2d Cir. 2002)............................................................................15

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)..............................................................................9

*Colon v. Blades*,
    914 F. Supp. 2d 181 (D.P.R. 2011)...........................................................12, 15

*Design Strategy, Inc. v. Davis*,
    469 F.3d 284 (2d Cir. 2006)............................................................................13

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d 162 (S.D.N.Y. 2011)..............................................................13

*Hodge v. Parke Davis & Co.*,
    833 F.2d 6 (1st Cir. 1987)..........................................................................16, 19

*Kaiser v. Armstrong World Indus., Inc.*,
    872 F.2d 512 (1st Cir. 1989)...........................................................................16

*Kirschner v. Bennett*,
    648 F. Supp. 2d 525 (S.D.N.Y. 2009)..............................................................14

*Marketxt Holdings Corp. v. Engel & Reiman, P.C.*,
    693 F. Supp. 2d 387 (S.D.N.Y. 2010)..............................................................15

*Muto v. CBS Corp.*,
    668 F.3d 53 (2d Cir. 2012)..............................................................................15

*NECA-IBEW Pension Trust Fund v. Bank of America Corp.*,
    No. 10 Civ. 440 (LAK)(HBP), 2013 WL 620257 (S.D.N.Y. Feb. 15, 2013)..........19

*Ortiz v. Municipio De Orocovis,*
  13 P.R. Offic. Trans. 619, 113 P.R. Dec. 484 (1982) ............................................16

*Quintana Lopez v. Liggett Grp., Inc.,*
  336 F. Supp. 2d 153 (D.P.R. 2004) ........................................................................19

*Rivera-Muniz v. Horizon Lines Inc.,*
  737 F. Supp. 2d 57 (D.P.R. 2010) ..................................................................17, 18

*Rodriguez v. U.S.,*
  54 F.3d 41 (1st Cir. 1995) .....................................................................................13

*Rodríguez–Surís v. Montesinos,*
  123 F.3d 10 (1st Cir. 1997) .............................................................................16, 17

*Román y Gordillo, S.C. v. Bank of New York Mellon Corp.,*
  No. 12 Civ. 0212 (DF), 2014 WL 1224361 (S.D.N.Y. Mar. 20, 2014)...................15

*Soto-Lebrón v. Federal Express Corp.,*
  538 F.3d 45 (1st Cir. 2008) ...................................................................................13

*Staehr v. Hartford Financial Services Group, Inc.,*
  547 F.3d 406 (2d Cir. 2008) ....................................................................................9

*Stuart v. Am. Cyanamid Co.,*
  158 F.3d 622 (2d Cir. 1998) ............................................................................14, 15

*Suarez v. Ford Motor Co.,*
  No. Civ. 01-1242(JAG), 2002 WL 879065 (D.P.R. Apr. 24, 2002) *report and recommendation adopted by*, 204 F. Supp. 2d 302 (D.P.R. 2002) .........................18

*Torres v. E.I. Dupont De Nemours & Co.,*
  219 F.3d 13 (1st Cir. 2000).......................................................................16, 17, 18

*Torres v. Nat'l Starch and Chem. Corp.,*
  896 F. Supp. 71 (D.P.R. 1995) ...............................................................................13

*Villarini–García v. Hospital Del Maestro, Inc.,*
  8 F.3d 81 (1st Cir. 1993) .......................................................................................17

**Statutes**

31 L.P.R.A. § 5141 ...................................................................................................12, 15

31 L.P.R.A. § 5298 .....................................................................................................2, 15

**Other Authorities**

Fed. R. Civ. P. 12(b)(6)...................................................................................................12

N.Y. C.P.L.R. § 202......................................................................................................14

*Restatement (Second) of Torts* § 876(b)......................................................................13

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Miguel A. Ferrer ("Ferrer") submits this memorandum of law, and joins in the memoranda of law submitted on behalf of Defendants UBS AG, UBS Financial Services, Inc. ("UBS Delaware"), UBS Financial Services Incorporated of Puerto Rico ("UBS PR"), UBS Trust Company of Puerto Rico, UBS Bank USA ("UBS Bank") and Carlos V. Ubiñas ("Ubiñas") (collectively, the "UBS Defendants"),[1] in support of his motion to dismiss the Amended Class Action Complaint (the "Complaint" or "Compl.").

## PRELIMINARY STATEMENT

Plaintiffs bring this action on behalf of themselves and on behalf of a putative class of "[a]ll persons who were clients of UBS Puerto Rico and/or Popular Securities and who were invested in any of the Funds during the Class Period and were damaged as a result of the conduct alleged herein." (Compl. at ¶ 143.) Generally, Plaintiffs assert claims against the UBS Defendants, the Popular Defendants,[2] Ferrer and others, seeking damages in connection with a purported scheme to "steer[] Class members, many of whom are older individuals focused on generating income for retirement, to invest in the Funds, which were high-risk, volatile investments that ultimately crashed, losing Class members vast sums of money" in order to "line [Defendants'] own pockets with enormous fees and commissions and without any regard for the suitability of these risky investments for Plaintiffs and other Class members." (*Id.* at ¶ 1.)

While Plaintiffs assert state law claims against certain Defendants for either breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and/or breach of contract (Compl. at

---

[1] Specifically, Ferrer joins in and incorporates by reference the arguments set forth in the UBS Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Class Action Complaint (the "UBS Memo"). To the extent not otherwise defined, defined terms used herein are given the meaning ascribed to them in the Complaint and UBS Memo.

[2] The Popular Defendants include Banco Popular de Puerto Rico and Popular Securities, LLC. (Compl. at ¶¶ 37-39.)

¶¶ 151-194), the sole claim against Ferrer, a former CEO and Chairman of UBS PR, is for aiding and abetting the UBS Defendants' breach of their alleged fiduciary duty to Plaintiffs.  (*Id.* at ¶¶ 159-167.)  Plaintiffs do not contend that Ferrer himself breached any duty, but assert that Ferrer assisted in the UBS Defendants' alleged scheme by misrepresenting the Funds as "conservative" investments with "low-volatility" and "pressuring UBS's Financial Advisors to push the Funds on its clients as safe investments" through emails, at a sales meeting and in a news article.  (*Id.* at ¶ 124; *see also id.*, *e.g.*, ¶¶ 89-91, 128-29.)  Plaintiffs' claim against Ferrer should be dismissed for the following reasons:

First, as set forth in the Popular and UBS Defendants' motions to dismiss, the Complaint should be dismissed under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), which precludes putative class actions brought under state law alleging misrepresentations or omissions in connection with the purchase or sale of a covered security.

Second, Plaintiffs fail to state an aiding and abetting claim against Ferrer.  As explained in the UBS Memo, Plaintiffs' underlying claim for breach of fiduciary duty against the UBS Defendants fails as a matter of law because: (1) the claim is time-barred under the applicable statute of limitations and/or statute of repose; (2) it is duplicative of their breach of contract claim; and/or (3) Plaintiffs fail to sufficiently state a claim under Rules 8 and 9(b) of the Federal Rules of Civil Procedure.  (*See* UBS Memo §§ I-V.)   Accordingly, because there was no primary breach of any fiduciary duty on the part of the UBS Defendants, there can be no claim for aiding and abetting such breach, and the Complaint against Ferrer should be dismissed.

Third, Plaintiffs' claim against Ferrer is itself time-barred.  Under Puerto Rico's statute of limitations for general tort claims, Plaintiffs were required to assert their aiding and abetting claim within one year "from the time the aggrieved person had knowledge" of such claim.  31

L.P.R.A. § 5298. However, Plaintiffs' own Complaint, which repeatedly relies on almost identical allegations contained in a highly publicized proceeding against Ferrer commenced by the United States Securities and Exchange Commission on May 1, 2012—a proceeding in which Ferrer prevailed on the merits after a three week hearing—demonstrates that Plaintiffs were on notice of Ferrer's alleged conduct, and any potential harm resulting therefrom, at least *two years* before they filed their initial complaint.

Finally, Plaintiffs lack standing to bring claims with respect to the Funds in which they did not invest. For the foregoing reasons, as well as those set forth in the UBS Memo, Ferrer respectfully requests that this Court dismiss the Complaint with prejudice.

## FACTUAL BACKGROUND

### A.    The Funds

The funds at issue are twenty-three "closed-end mutual funds, incorporated in Puerto Rico, that pooled capital to earn income by investing in securities" (collectively, the "Funds" or "CEFs"). (Compl. at ¶ 42.)  Nine of the Funds were jointly managed by the Popular Defendants and the UBS Defendants, and fourteen were managed solely by the UBS Defendants. (*Id.*)  The Funds, which could only be sold to Puerto Rico residents, offered investors unique advantages because, while "interest earned by any investor in Puerto Rico government bonds is exempt from municipal, state and federal taxes," the Funds were able to "provide tax-free earnings to Puerto Rico residents for a broader array of assets." (*Id.* at ¶ 44.)  In particular, each Fund "could hold up to one-third of its assets in otherwise taxable non-Puerto Rico securities, such as corporate or United States government bonds," so they were able to offer investors "tax-exempt income from certain assets that would otherwise be taxed." (*Id.*)  The remaining two-thirds of each Fund's assets were required by law "to be invested in Puerto Rico-issued securities (i.e., securities

issued by the Puerto Rico government, Puerto Rico mortgage-backed and asset-backed securities, or corporate obligations and preferred stock of Puerto Rico entities)." (*Id.*)

Additionally, each Fund was able to "borrow one dollar for every single dollar of capital" it held, allowing a maximum leverage ratio of approximately 50%. (*Id.* at ¶ 67.) According to Plaintiffs, by the end of 2013, "the Funds' leverage ratios hovered just below the 50% maximum level, ranging from 40% to 48%." (*Id.*)

### B. The UBS Defendants' Alleged Breach Of Their Fiduciary Duty

Plaintiffs allege that the UBS Defendants owed Plaintiffs a fiduciary duty to "act in the best interests of Plaintiffs and other Class members, and to act with the care, prudence, loyalty and candor required of fiduciaries." (Compl. at ¶ 49.) Plaintiffs further contend that, through the UBS Client Relationship Agreements or "master account agreements," the UBS Defendants had a contractual duty to recommend "only those investments that were suitable and appropriate" and "provide a 'customized approach to wealth management'" in their clients' best interests. (*Id.* at ¶ 51; ¶¶ 52-56.)

According to the Complaint, the UBS Defendants breached their obligations to Plaintiffs by pushing them to buy the Funds in order to earn commissions and fees "without any regard for the suitability of these investments," which was "directly contrary to what Defendants were required by law to do and what they promised Class members they would do." (Compl. ¶¶ 6-8; *see also id.* at ¶¶ 83-96.) Specifically, Plaintiffs allege that the UBS Defendants misrepresented the nature of the Funds as "both low-risk and low volatility investments" and "repeatedly touted the Funds as safe, secure, fixed income investments that would provide high, tax-free returns to Class Members while preserving their invested principal" (*id.* at ¶ 85; *see also* ¶¶ 3-4, 84-96, 122-30) when the Funds were actually "packed" with "hundreds of millions of dollars" of "high-

risk" government-backed securities (*id.* at ¶¶ 60-61) and were "highly leveraged." (*Id.* at ¶ 67.) Yet Plaintiffs fail to allege when Plaintiffs purchased the Funds, or what information was provided in connection with such purchases.

Plaintiffs further contend that the UBS Defendants "manipulated their own internal controls to disable and bypass overconcentration alerts" in their branch management supervisory system and "successfully lobbied [UBS Financial] to grant an exception to its guidelines for compensation of Financial Advisors" to ensure that UBS PR financial advisors "became eligible to be compensated simply for having clients remain invested in the Funds." (*Id.* at ¶ 7; *see also* ¶¶ 112-21.)

In addition, Plaintiffs allege that the UBS Defendants "engaged in a loan scheme by extending 'non-purpose' loans and lines of credit to Class members in order to increase investments in the Funds on margin – thereby reaping even more inflated commissions on both the Funds and the loans while increasing Class members' exposure to risk." (Compl. at ¶ 9; ¶¶ 104-11.) Such loans were allegedly prohibited by UBS's own policies. (*See id.* at ¶ 104.)

According to the Complaint, by March 2014, when the "risks posed by the Funds' leverage, concentration in Puerto Rico debt, and Defendants' loan scheme materialized," the Funds had "lost more than half their value, suffering billions of dollars in losses and wiping out many Class members' life savings." (*Id.* at ¶ 11.)

### C. The Sole Claim Against Ferrer

The Complaint alleges that Ferrer was, at various times during the Class period, a Director of each of the Funds and served as CEO and Chairman of UBS PR. (Compl. ¶ 32.) However, Plaintiffs do not allege that Ferrer himself breached any individual fiduciary duty to any Plaintiff, but rather that Ferrer aided and abetted in the UBS Defendants' breach of *their* alleged fiduciary duty. (*See* Compl. at ¶¶ 159-67.) Moreover, the only allegations concerning

Ferrer's specific conduct relate entirely to the UBS Defendants' alleged misrepresentations concerning the nature of the Funds. (*See*, *e.g.*, *id.* at ¶¶ 6, 87-91, 93, 124, 128-29.) The Complaint does not identify any involvement by Ferrer in connection with any other aspect of the UBS Defendants' alleged breach, including the alleged margin "loan scheme" (*id.* at ¶ 9, ¶¶ 104-11), the alleged disabling of the UBS Puerto Rico overconcentration alerts, or the alleged granting of an exception to the UBS Financial guidelines for compensating UBS PR financial advisors. (*Id.* at ¶¶ 7, 112-21.)

With regard to Ferrer, Plaintiffs contend that he "repeatedly touted the 'low-volatility' and 'conservative' nature of the Funds in pressuring UBS's Financial Advisors to push the Funds on its clients as safe investments" through several emails, including the following:

- On September 18, 2008, Ferrer allegedly "urged UBS Financial Advisors to recommend the Funds to 'clients searching for low volatility and respectable returns'";

- In two emails on September 30, 2008, Ferrer purportedly "exhorted UBS Financial Advisors that the 'low volatility' of the Funds was a 'great reason to consider them as a timely investment' and boasted that 'all is well in Puerto Rico and our client base is enjoying the fruits of conservative investing'";

- On March 17, 2009, Plaintiffs allege that Ferrer "recommended that UBS's Financial Advisors actively push the Funds on 'IRA investors,' stating 'Rest assured our IRA's [sic] based on Funds are very attractive choices for investors'"; and

- On May 14, 2009, Ferrer allegedly "urged UBS's Financial Advisors to press IRA investors to purchase the Funds, stating 'You can offer attractive alternatives for many IRA investors; our Funds.'"

(Compl. at ¶ 124.)

Plaintiffs further allege that "at a UBS Investor Conference held in June 2008, which Defendant Ferrer hosted, UBS personnel touted the Funds' market returns and portrayed them as low risk." (*Id.* at ¶ 88.) After a similar investor conference in March 2009, Plaintiffs contend Ferrer pushed UBS PR financial advisors to recommend the Funds by stating that "UBS's

'…clients received a huge dose of comfort on their investments…' at the conference," which Plaintiffs contend falsely portrayed the Funds as "safe and secure investments." (*Id.* at ¶128.)

According to Plaintiffs, Ferrer also falsely portrayed the Funds as safe and secure investments in an April 24, 2009 newspaper interview published in *El Vocero*, in which Ferrer purportedly "stated that the Funds 'offer[] much less volatility and relative positive results' and that 'the [Funds] have had an excellent return' during the 2008/2009 financial crisis." (Compl. at ¶ 129.) Ferrer also allegedly told the interviewer that "'[M]any investors call [UBS Puerto Rico] scared about the news of the drop in the financial markets, when the reality is that news doesn't have any relevance for the investor. […] [T]he Puerto Rican investor that has their money invested in [the Funds and the underlying bonds] has obtained fantastic results.'" (*Id.*)

Finally, Plaintiffs contend that during a June 2, 2011 sales meeting, Ferrer "bullied and berated UBS's Financial Advisors to push Class members to purchase more and more shares of the Funds – regardless of the serious risks involved or the suitability of the Funds." (Compl. at ¶ 6; *see also id.* at ¶¶ 89-91.)

### D. The SEC Proceeding Against Ferrer And Its Press Coverage

As referenced throughout the Complaint and repeatedly relied upon by Plaintiffs, on May 1, 2012, over *two years prior* to Plaintiffs' initial Complaint in this action, the United States Securities and Exchange Commission (the "SEC") issued an Order Instituting Administrative and Cease-and-Desist Proceedings (the "OIP") against Ferrer asserting allegations concerning, like here, Ferrer's purported misrepresentations about the pricing, performance, liquidity and volatility of the Funds. (*See* Compl. at ¶ 3 (*In the Matter of Miguel A. Ferrer and Carlos J. Ortiz*, File No. 3-14862) (the "SEC Proceeding"); *see also id., e.g.*, ¶¶ 6, 45, 53, 70, 86-87, 93,

123-24.)  Critically, the allegations against Ferrer asserted by Plaintiffs in the Complaint are virtually identical to those contained in the OIP, including, but not limited to, the following:

- "Ferrer, UBS PR's senior officer in Puerto Rico … touted the CEFs as safe investments with high, stable prices and which yielded consistently higher returns than similar funds." (OIP ¶ 2.)

- "… Ferrer nonetheless repeatedly pumped CEF sales and misrepresented the nature and liquidity of the CEF market, both directly to investors and to UBS PR's financial advisors, who repeated those misstatements to customers."  (OIP ¶ 5.)

- "Despite this knowledge [that investors would suffer huge losses], Ferrer stepped up his campaign [in spring 2009] to tout CEF sales.  He pushed financial advisors to solicit sales of CEFs …." (OIP ¶ 8.)

- In 2008 and 2009, "Ferrer repeatedly pushed financial advisors to solicit new customers while touting the purported strong market for the Funds." (OIP ¶ 27.)

- "UBS PR attempted to generate customer demand by promoting the CEFs at a UBS PR Investor Conference in June 2008.  Ferrer hosted the conference, at which a UBS PR managing director touted the CEFs' extraordinary market returns and low risk and volatility …." (OIP ¶ 34.)

- "… Ferrer repeatedly misled UBS PR's financial advisors throughout the fall of 2008 into continuing to promote CEF sales.  In email after email, he repeatedly misstated the strength, stability and liquidity of the CEF Market. …" (OIP ¶ 39.)

- "For example, on September 18, 2008, Ferrer told financial advisors '[i]n the midst of all the turmoil [of the then-ongoing financial crisis], I note the superior performance of our local funds. . . . [Y]ou should look at these for clients searching for low volatility and respectable returns.' (emphasis in original). On September 30, Ferrer sent another email to 'note our Funds did not budge in the midst of all the bad news yesterday?  Their low volatility . . . [is] a 'great reason to consider them as a timely investment. Plus their returns are superior!' (emphasis in original). On October 9, 2008, Ferrer emailed financial advisors to 'keep in mind that local investors have side stepped the wrath of the marketplace and have been enjoying superior returns from our Funds.'" (OIP ¶ 40.)

- "On March 31, 2009, UBS PR and Ortiz made misrepresentations and omissions to thousands of customers at a UBS PR Investor Conference about the CEFs' superior returns and consistent liquidity levels.  Before the conference, Ferrer urged UBS PR's sales force to 'call your clients, [because] the information presented will offer comfort to holders of Puerto Rico bonds and Funds' (emphasis in original)."  (OIP ¶¶ 69-70.)

- "The day after the investor conference, Ferrer sent an e-mail to UBS PR's sales force stating:

  'Wow! What a show. Our clients received a huge dose of comfort on their investments, the right consideration in view of what we believe the local market for bonds (and funds) is headed. This will offer you another opportunity to do right for your own client base by showing each client how he or she can benefit from the opportunities at hand. The ball is now in your court.'" (OIP ¶ 72.)

- "During the ensuing months [after April 2009], Ferrer stepped up his campaign to create CEF demand while also concealing the liquidity crisis and inventory dump. Ferrer directed UBS PR's sales force to push their customers to buy CEFs while dismissing UBS PR customers and financial advisors' concerns about CEF prices and liquidity." (OIP ¶ 73.)

- "Ferrer further misled investors about the state of the CEF market in a newspaper interview published in *El Vocero* on April 24, 2009. Specifically addressing the CEF market, Ferrer stated in the newspaper article:

  'The local mutual funds have had an excellent return during all this process,' explained Ferrer. But through all of this, many investors call [UBS PR] scared about the news of the drop in financial markets, 'when the reality is that news doesn't have any relevance for the investor.' In general, 'the Puerto Rican investor that has their money invested in bonds and mutual funds has obtained fantastic results . . . The result of an investor in local mutual funds, that has been able to reinvest dividends, has been superior and in some cases comparable with the stock market Indices,' said Ferrer, and he assured that this type of investment offers much less volatility and relative positive results.'" (OIP ¶ 74.)[3]

In light of UBS PR's prominence as Puerto Rico's largest asset manager (Compl. at ¶ 33), the SEC's charges were heavily publicized in Puerto Rico, both at the time the SEC issued its OIP in May 2012 and throughout the administrative proceeding against Ferrer.[4] For example,

---

[3] Annexed as Exhibit A to the Declaration of Melvin A. Brosterman in Support of Ferrer's Motion to Dismiss the Amended Class Action Complaint, dated June 18, 2015 (the "Brosterman Decl."), is a copy of the OIP. A court may take judicial notice of the content of documents incorporated into the Complaint by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). Moreover, "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters." *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). On May 1, 2012, the SEC also filed an Order Instituting Administrative and Cease-and-Desist Proceedings against UBS PR asserting similar claims, imposing civil penalties and ordering disgorgement payments. (*See* Brosterman Decl. Ex. B.)

[4] In fact, as early as February 4, 2011, *Bloomberg* reported that the SEC had issued a Wells notice to UBS PR and certain current and prior UBS employees "regarding 'secondary market trading and associated disclosures' of closed-end funds sold in the Caribbean island in 2008 and 2009." (*See* Brosterman Decl., Ex. C.)

the publications *El Nuevo Día*, *El Vocero* and *Caribbean Business* provided extensive coverage

of the alleged misrepresentations by UBS PR and Ferrer, including the following:

- A May 2, 2012 *El Vocero* article entitled "Disclosure of Shady Dealings by UBS; Local executives state they will contend SEC's accusations" reported that Ferrer had been accused of "making false representations to the investors, hiding the liquidity crisis and covering up their control of 23 of their closed-end mutual funds during the period of 2008 to 2009" which allegedly "was the result of a corporate strategy implemented in 2008, when the brokerage firm approached thousands of investors on the island highlighting the advantages of closed-end funds and promising a stable and high yield market, while all the time knowing how risky the investments were**.**" (Brosterman Decl., Ex. D);

- A May 2, 2012 *El Nuevo Día* article entitled "Federal Fine for UBS Puerto Rico; Alleged Investor Fraud for Transactions between 2008 and 2009" reported that the SEC accused Ferrer and UBS PR "of committing fraud against thousands of its investors … by allegedly hiding and misrepresenting the market, price and value of the securities included in about 23 closed-end mutual funds managed by the brokerage firm." (Brosterman Decl., Ex. E);

- A May 2, 2012 *Caribbean Business* article entitled "Ferrer to fight SEC charges; UBS settles for $26.6M" reported that Ferrer allegedly "made misrepresentations and did not disclose numerous material facts about the closed-end funds" and "repeatedly made misleading statements about closed-end fund market prices and touted that the funds would always trade at high premiums to net asset value" even while UBS Puerto Rico was reducing its inventory and "causing huge investor losses." (Brosterman Decl., Ex. F);

- An October 10, 2012 *El Vocero* article entitled "Federal case filed against UBS begins" reported that the SEC's "case involving stock market fraud against [UBS PR], several of its subsidiaries and two of its top executives—Miguel A. Ferrer and Carlos J. Ortiz—began in the Federal Court in San Juan." According to the article, the SEC was seeking sanctions "for the aggressive marketing of several closed-end mutual funds between 2008 and 2009, even when [they] allegedly were already aware that the market was in crisis." (Brosterman Decl., Ex. G);

- A December 11, 2012 *El Nuevo Día* article entitled "The UBS fraud case resumes; Miguel Ferrer fights the charges against him" reported that "[a]fter being on hold for almost two months, the Securities and Exchange Commission ('SEC') administrative proceeding hearings in a case of fraud against Miguel Ferrer and Carlos Ortiz, executives of [UBS PR], resumed yesterday in Washington." (Brosterman Decl., Ex. H.)

Based upon the allegations in the OIP and the resulting press coverage, a separate

securities class action complaint (the "Securities Action") was filed against Ferrer, UBS PR and

others on August 13, 2012 in the United States District Court for the District of Puerto Rico, which complaint contained allegations relating to Ferrer almost identical to those set forth in the OIP and substantially similar to those in Plaintiffs' Complaint here. (*See* Brosterman Decl., Ex. I.)[5]  The Securities Action itself was also publicized in the press.  (*See id.*, Ex. K.)

After 13 hearing days in October and December 2012, Chief Administrative Law Judge Brenda P. Murray entirely dismissed the SEC Proceeding against Ferrer, finding that "UBS PR, Ferrer and Ortiz did not engage in a fraudulent course of conduct or a scheme and did not mislead customers and FAs when they represented the Funds as profitable, safe, and stable investments …." (Brosterman Decl., Ex. L at 91.)  Judge Murray also found "not one bit of evidence that UBS PR, Ferrer and Ortiz engaged in a course of conduct to mislead or a scheme to mislead investors by hiding or disguising the fact that UBS PR was in a period when it was not buying Fund shares and was reducing Fund share prices." (*Id.* at 93.)

With regard to Ferrer's statements and representations to UBS financial advisors and others, Judge Murray determined that, among other things: (a) Ferrer's statements to *El Vocero* and the financial advisors were not fraudulent because "the information was factually accurate" and "in these circumstances, there were no material omissions" (*id.* at 82);[6] (b) Ferrer's emails to the financial advisors "consisted of just a few lines and were obviously not meant to be a full blown analysis of the benefits and risks of owning Fund shares" (*id.*); and (c) no financial advisor testified that he forwarded Ferrer's emails or repeated their contents to customers (*id.*).

---

[5] In their attempt to consolidate this action with the Securities Action, Plaintiffs, in fact, conceded that the two actions shared a "significant overlap in alleged misconduct, defendants, and relevant time periods, as well as the shared factual and legal issues that will arise."  (Brosterman Decl., Ex. J) (Joint Consolidated Memorandum of Law in Opposition to Defendants' Motions to Transfer Venue and in Further Support of Plaintiffs' Joint Motion for Modification of the October 16, 2012 Consolidation Order, dated August 8, 2014, at 3 (Dkt No. 40, 3:14-cv-01441-CCC)).

[6] Judge Murray also found that an objective reading of the *El Vocero* article reveals that Ferrer's "statements were about *all mutual funds* in Puerto Rico" and the statements that Plaintiffs find objectionable "were *not about UBS PR Funds*."  (Brosterman Decl. Ex. L at 82.) (emphasis added)

Judge Murray also found that the "persuasive evidence is that for certain investors during the

relevant period [from 2008 through 2009] the Funds were an attractive investment" because they

"paid higher returns than other comparable investments, had significant tax advantages for

Puerto Rico residents, consistently paid monthly interest, and had a dividend reinvestment policy

that benefited investors."  (*Id.* at 83.) (citations omitted)

## ARGUMENT

A complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a

claim if a plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Threadbare recitals of the

elements of a cause of action supported by mere conclusory statements, do not suffice." *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009).  Plaintiffs fail to meet these threshold requirements.

## I.      Plaintiffs' Claims Are Precluded By SLUSA

For the reasons set forth in the UBS Memo, the Plaintiffs' claims should be dismissed

because SLUSA precludes putative class actions, like this one, brought under state law alleging

misrepresentations or omissions in connection with the purchase or sale of a covered security.

(*See* UBS Memo at § I; *see also* Popular Defendants' Memorandum of Law in Support of their

Motion to Dismiss at § I.)

## II.     Plaintiffs Fail To State A Claim Against Ferrer
##         For Aiding And Abetting Breach Of Fiduciary Duty

Plaintiffs' claim for aiding and abetting breach of fiduciary duty falls under article 1802

of the Civil Code of Puerto Rico, its general tort statute, which provides that a "person who by an

act or omission causes damage to another through fault or negligence shall be obliged to repair

the damage so done."  31 L.P.R.A. § 5141 (2015); *see Colon v. Blades*, 914 F. Supp. 2d 181, 190

(D.P.R. 2011) (article 1802 applied to breach of fiduciary duty claim and controls "where '[t]he

parties … did not enter into negotiations to establish rights or obligations between them'") (citing *Santiago Nieves v. A.C.A.A.*, 19 P.R. Offic. Trans 755, 762, 119 D.P.R. 711 (1987)).

Puerto Rico and New York follow tort principles articulated in the *Restatement (Second) of Torts*. *See Soto-Lebrón v. Federal Express Corp.*, 538 F.3d 45, 57 (1st Cir. 2008) (looking to *Restatement (Second) of Torts* and the interpretation of claims in other jurisdictions regarding intentional infliction of emotional distress); *Rodriguez v. U.S.*, 54 F.3d 41, 45 (1st Cir. 1995) (adopting *Restatement (Second) of Torts* "as the appropriate framework for analysis" of a false arrest claim); *Torres v. Nat'l Starch and Chem. Corp.*, 896 F. Supp. 71, 73 (D.P.R. 1995) (looking to the *Restatement (Second) of Torts* for "guidance" on common law principals governing products liability).

With regard to a claim for aiding and abetting a breach of duty, the *Restatement (Second) of Torts* § 876(b) ("Persons Acting in Concert") states that "for harm resulting to a third person from the tortious conduct of another, a person is liable if he … knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." *See also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 303 (2d Cir. 2006) (to plead a claim for aiding and abetting breach of fiduciary duty, plaintiffs must show "(1) the existence of a violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.") (internal quotations and citations omitted).  It is, therefore, axiomatic that absent an underlying breach of fiduciary duty by another party, any claim for aiding and abetting such breach must be dismissed.  *See*, *e.g.*, *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196

(S.D.N.Y. 2011) (dismissing aiding and abetting breach of fiduciary duty claim where there was no underlying breach); *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 537 (S.D.N.Y. 2009) (same).

As set forth in the UBS Memo, Plaintiffs' underlying claim against the UBS Defendants for breach of fiduciary duty must be dismissed because: (1) it is time-barred (*see* UBS Memo at § II); (2) it is extinguished by PRUSA's statute of repose (*see id.* at § III); (3) it is duplicative of Plaintiffs' breach of contract claim (*see id.* at § IV); and/or (4) Plaintiffs failed to plead the elements of their claim (*see id.* at § V). Accordingly, because there was no underlying breach of fiduciary duty by the UBS Defendants, the claim against Ferrer for aiding and abetting such breach should be dismissed. *See Kirschner*, 648 F. Supp. 2d at 537.

## III. Plaintiffs' Claim Against Ferrer Is Time-Barred

Moreover, even if Plaintiffs sufficiently stated a claim against Ferrer for aiding and abetting the UBS Defendants' alleged breach, which they have not, Plaintiffs' own Complaint establishes that they were on notice of their potential claim against Ferrer at least *two years* before they filed their initial complaint, thereby rendering their claim time-barred under Puerto Rico's one-year statute of limitations.[7]

### A. Puerto Rico's One-Year Statute Of Limitations Applies

Where "jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626-27 (2d Cir. 1998). This rule, however, is subject to applicable statutory exceptions, including New York's "borrowing" statute, N.Y. C.P.L.R. § 202, which provides that "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period ... of either: (1) New York; or (2) the

---

[7] Plaintiffs' initial complaint in this action was filed in this Court on May 30, 2014. *See* Dkt No. 1, Case No. 3:14-cv-1441-CCC (D.P.R.). Accordingly, the claim against Ferrer is time-barred under the applicable statute of limitations if Plaintiffs are deemed to have been on inquiry notice of such claim prior to May 30, 2013.

state where the cause of action accrued." *Id.* at 627; *see also Muto v. CBS Corp.*, 668 F.3d 53, 57 (2d Cir. 2012).[8] Here, Plaintiffs' claim accrued in Puerto Rico.

Where the "'injury is purely economic, the place of injury [for purposes of N.Y. C.P.L.R. § 202] usually is where the plaintiff resides and sustains the economic impact of the loss.'" *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) (quoting *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529-30 (1999)). Plaintiffs are all residents of Puerto Rico who purchased shares of the Funds in Puerto Rico. (*See* Compl. at ¶¶ 16, 19-24.) Furthermore, the proposed class consists of other similarly situated "Puerto Rico-based investors." (*Id.* at ¶ 146.) Therefore, the applicable statute of limitations for the claim against Ferrer will be the shorter of New York's or Puerto Rico's.

Under New York law, a claim for aiding and abetting breach of fiduciary duty is subject to either a three-year or six-year limitations period, depending on whether the underlying breach of fiduciary duty claim "seek[s] only money damages" or is "based on allegations of … fraud," respectively. *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 398 (S.D.N.Y. 2010) (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 118 (1st Dep't 2003).

However, under Puerto Rico law, the statute of limitations for asserting a claim under article 1802 of the Civil Code of Puerto Rico is one year "from the time the aggrieved person had knowledge" of the claim. 31 L.P.R.A. § 5298 (2015) (one year prescription period for "[a]ctions to demand civil liability for grave insults or calumny, and for obligations arising from the fault or negligence mentioned in § 5141 of this title, from the time the aggrieved person had knowledge thereof"); *see also Colon*, 914 F.Supp.2d at 191 (one-year limitations period applied to breach of

---

[8] The presence of a choice-of-law provision in the UBS Master Account or Client Relationship Agreements does not render New York's borrowing statute inapplicable, as such choice-of-law clauses apply only to substantive issues, and statutes of limitations are considered procedural. *See Román y Gordillo, S.C. v. Bank of New York Mellon Corp.*, No. 12 Civ. 0212 (DF), 2014 WL 1224361, at *12, n.6 (S.D.N.Y. Mar. 20, 2014) (applying Mexican statute of limitations) (citing *Portfolio Recovery Associates, LLC v. King*, 14 N.Y.3d 410, 416 (2010).

fiduciary duty claim against corporate officer where the officer himself, as opposed to the corporation, had no pre-existing duty or obligation to plaintiff). Plaintiffs were therefore required to commence their action against Ferrer within one year of having notice of their claim.

**B.      Plaintiffs Were On Notice Of Their Claim
          Prior To May 30, 2013**

In Puerto Rico, a plaintiff has knowledge of a claim when he has "(1) notice of the injury and (2) notice of the person who caused it." *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000) (citing *Colón Prieto v. Géigel*, 15 P.R. Offic. Trans. 313, 330, 115 P.R. Dec. 232, 246 (P.R. 1984)). Notice of the injury occurs where there "exist some outward or physical signs through which the aggrieved party may become aware and realize that he has suffered an injurious aftereffect. …" *Kaiser v. Armstrong World Indus., Inc.*, 872 F.2d 512, 516 (1st Cir. 1989). Even if the full extent of the injury is unclear at the time the plaintiff suspects he has been injured, a plaintiff still has an obligation to file suit—he may not "wait for his injury to reach its final degree of development … according to his subjective appraisal and judgment." *Ortiz v. Municipio De Orocovis*, 13 P.R. Offic. Trans. 619, 622, 113 P.R. Dec. 484, 487 (1982).

Similarly, a plaintiff has notice of the person who caused the injury once he has some knowledge of the general cause of the injury. *See Hodge v. Parke Davis & Co.*, 833 F.2d 6, 7 (1st Cir. 1987) (plaintiff's knowledge of "her injuries, their physical cause, and their relation to the workplace" was sufficient to provide notice of who caused the injury). Knowledge of the exact name of the tortfeasor is not required, nor is the limitations period tolled while the plaintiff investigates the intra-corporate relationships between the parties responsible for his injuries. *See id.*; *see also Rodríguez–Surís v. Montesinos*, 123 F.3d 10, 16 (1st Cir. 1997).

Further, the statutory prescription period begins to run once a plaintiff has "deemed knowledge" of a claim. *Torres*, 219 F.3d at 19. Under the concept of "deemed knowledge," "a

plaintiff's subjective awareness is measured against the level of awareness that the plaintiff, having been put on notice as to certain facts and having exercised reasonable care regarding a potential claim, *should* have acquired." *Rodríguez–Surís* 123 F.3d at 14. Thus, "actual knowledge is not required where, by due diligence, such knowledge would likely have been acquired." *Villarini–García v. Hospital Del Maestro, Inc.*, 8 F.3d 81, 84 (1st Cir. 1993); *see also Rodríguez–Surís*, 123 F.3d at 16 (once made aware of facts sufficient to put her on notice of a potential tort claim, a plaintiff "must pursue that claim with reasonable diligence, or risk being held to have relinquished her right to pursue it later, after the limitation period has run").

Under this (or any other) standard, the allegations relating to Ferrer contained in the OIP and Securities Action, which Plaintiffs essentially parrot in their own Complaint, more than provided Plaintiffs with "deemed knowledge" of any potential claim against Ferrer and required them to pursue such claim with reasonable diligence. *Torres*, 219 F.3d at 19. As shown in the Appendix annexed hereto, a simple comparison of the allegations contained in the OIP against the specific allegations relating to Ferrer in the Complaint demonstrates that Plaintiffs knew, or should have known, of Ferrer's alleged statements concerning the Funds, and any potential harm resulting therefrom, no later than May 2012, at least *two years prior* to commencing this action.

Contemporaneous press coverage concerning the OIP and SEC proceeding, including, but not limited to, articles in *Caribbean Business*, *El Vocero* and *El Nuevo Día*, also gave Plaintiffs ample notice of facts sufficient to put them on notice of any potential claim against Ferrer in 2012. (*See* Brosterman Decl., Exs. D through H.)[9] Courts have repeatedly found that public investigations and prosecutions of individuals, like here, put plaintiffs on inquiry notice and cause the limitations period to begin to run. *See Rivera-Muniz v. Horizon Lines Inc.*, 737 F.

---

[9] Indeed, Plaintiffs were on notice of the SEC's investigation of UBS PR "regarding 'secondary market trading and associated disclosures' of closed-end funds sold in the Caribbean island in 2008 and 2009" as early as February 4, 2011. (Brosterman Decl., Ex. C.)

Supp. 2d 57, 65 (D.P.R. 2010) (judicial notice taken of the fact that criminal investigations against defendants were reported in the press, and because plaintiffs were charged with notice of such reports in the media, the statute of limitations ran from that time) (citations omitted); *Arturet-Velez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 15 (1st Cir. 2005) (attributing knowledge of possible claims against defendant tobacco company to plaintiff "where law suits [sic] against tobacco companies have been common for years, generating vast publicity and at least intermittent success"); *Suarez v. Ford Motor Co.*, No. Civ. 01-1242(JAG), 2002 WL 879065, at *3 (D.P.R. Apr. 24, 2002) *report and recommendation adopted by*, 204 F. Supp. 2d 302 (D.P.R. 2002) (charging plaintiffs with sufficient knowledge where there was "easily accessible data in the public domain from judicial governmental and media sources, concerning the design characteristics of sport utility vehicles in general, and Ford Explorers in particular").

Here, because each of the UBS Plaintiffs held shares of the Funds as of May 1, 2012 (*see* Affidavit of Annie Naughton in Support of the UBS Defendants' Motion to Dismiss, Exs. A through D), they had sufficient reason to follow any Fund-related news and were, therefore, required to pursue any potential claim "with reasonable diligence." *Torres*, 219 F.3d at 19.

Further, if there was any doubt as to whether the OIP and related press coverage provided sufficient facts to put Plaintiffs on notice of a potential claim, the Court need look no further than the Securities Action, which was commenced in August 2012 and was itself publicized in the press. *See* Brosterman Decl., Ex. K. There, plaintiffs timely filed a class action complaint that contained allegations against Ferrer almost identical to those set forth in the OIP, and which allegations Plaintiffs concede share a "significant overlap in alleged misconduct, defendants, and relevant time periods, as well as the shared factual and legal issues that will arise" with the allegations set forth in their own Complaint. (Brosterman Decl., Ex. I at 3.) Yet Plaintiffs here,

without any explanation, waited until almost two years later to file their initial complaint against Ferrer.[10]  *See also NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, No. 10 Civ. 440 (LAK)(HBP), 2013 WL 620257, at *10 (S.D.N.Y. Feb. 15, 2013) (earlier lawsuits put plaintiffs on notice of their claims).

Nor does Plaintiffs' alleged reliance on "a recently released recording of a June 2011 speech" by Ferrer resurrect their claim.[11]  (Compl. ¶¶ 6, 89-91.)  First, the purported statements by Ferrer were made in a sales meeting in June 2011, well over two years before Plaintiffs commenced this action.  Second, the OIP contains allegations concerning the same alleged conduct sufficient to have put Plaintiffs on notice of a potential claim against Ferrer, including the allegation that "[d]uring the ensuing months" after April 2009, "Ferrer directed UBS PR's sales force to push their customers to buy CEFs while dismissing UBS PR customers and financial advisors' concerns about CEF prices and liquidity." (Brosterman Decl. Ex. A at ¶ 73.)

Accordingly, because Plaintiffs are charged with notice of the allegations set forth in the OIP, as well as the related press coverage, as of May 2012, the applicable one-year prescription period for the claim against Ferrer began running from that time, and Plaintiffs' action against Ferrer should be dismissed as time-barred.  *See Quintana Lopez v. Liggett Grp., Inc.*, 336 F. Supp. 2d 153, 158–59 (D.P.R. 2004) (dismissing complaint where "Plaintiffs have failed to meet

---

[10] "If a plaintiff brings an action more than a year after the injury took place, she bears the burden of proving that she lacked the requisite 'knowledge' at the relevant times." *Hodge v. Parke Davis & Co.*, 833 F.2d at 7 (citing *Iluminada Rivera Encarnación v. Estado Libre Asociado de P.R.*, 113 P.R. Dec. 383, 385 (P.R. 1982)).  As stated above, all of the acts that Plaintiffs allege constituted Ferrer's alleged aiding and abetting of the underlying breach occurred on or before 2011.  Thus, Plaintiffs are required to plead that they lacked the requisite knowledge to bring their complaint within a year of having "deemed knowledge" of their claim, yet the Complaint is silent on this matter.

[11] Additionally, though Plaintiffs' allegations in the Complaint concerning the UBS Defendants' alleged margin "loan scheme" (Compl. at ¶ 9, ¶¶ 104-11), the attempts to disable the UBS Puerto Rico overconcentration alerts, or the granting of an exception to the UBS Financial guidelines for compensating UBS financial advisors (*id.* at ¶¶ 7, 112-21) were not contained in the May 1, 2012 OIP, the Complaint does not assert that Ferrer made any statement, took any action or had any involvement in connection with those alleged "schemes."

their pleading burden of proving their timeliness to file the suit and/or their 'lack of knowledge' to toll the statute of limitations.").

IV. **Plaintiffs Lack Standing To Bring Claims With Respect To Funds In Which They Did Not Invest**

Finally, as set forth in the UBS Memo, Plaintiffs lack standing to assert claims with respect to the Funds in which they did not invest or sustain any injury. *See* UBS Memo at § VI.

## CONCLUSION

For the reasons set forth herein, and those set forth in the UBS Memo, Ferrer respectfully requests that the Court dismiss with prejudice Plaintiffs' claim against Ferrer pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and award such other and further relief as the Court deems appropriate.

Dated: June 18, 2015
New York, New York

STROOCK & STROOCK & LAVAN LLP

By:  s/ Melvin A Brosterman
Melvin A. Brosterman
Francis C. Healy
Stephanie A. Weathers-Lowin

180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Fax: (212) 806-6006
mbrosterman@stroock.com
fhealy@stroock.com
sweatherslowin@stroock.com

*Attorneys for Defendant Miguel A. Ferrer*

# APPENDIX

## COMPARISON OF ALLEGATIONS IN THE MAY 1, 2012 SEC ORDER INSTITUTING PROCEEDINGS AND THE ALLEGATIONS IN THE AMENDED CLASS ACTION COMPLAINT

| ALLEGATION IN MAY 1, 2012 OIP | ALLEGATION IN COMPLAINT |
|---|---|
| "Ferrer, UBS PR's senior officer in Puerto Rico … touted the CEFs as safe investments with high, stable prices and which yielded consistently higher returns than similar funds." (¶ 2) | "During the Class Period (defined infra), Defendants portrayed the Funds as safe, secure, 'fixed-income' securities that would preserve Class members' principal investments while providing tax-free income." (¶ 3)<br><br>"[I]n communications to Class members during the Class Period, Defendants UBS and Popular repeatedly touted the Funds as safe, secure, fixed income investments that would provide high, tax-free returns to Class members while preserving their invested principal. Moreover, Defendants consistently represented to Class members that the Funds were both low-risk and low-volatility investments." (¶¶ 85, 123) |
| "Ferrer … [was] well aware throughout 2008 that investor demand was dropping and UBS PR was propping up the market.  But Ferrer nonetheless repeatedly pumped CEF sales and misrepresented the nature and liquidity of the CEF market, both directly to investors and to UBS PR's financial advisors, who repeated those misstatements to customers." (¶ 5) | "During the Class Period, Defendants breached their fiduciary duties to Class members by consistently misrepresenting the nature, stability and risk of the Funds in marketing and selling these instruments to Class members, who sought a fixed and stable monthly income stream with no risk to their capital." (¶ 122) |

| ALLEGATION IN MAY 1, 2012 OIP | ALLEGATION IN COMPLAINT |
|---|---|
| "By the spring of 2009, UBS PR's parent company determined that UBS PR's growing inventory represented a significant financial risk to the firm.  The parent's senior executives ordered UBS PR to quickly and substantially reduce its inventory of CEF shares.  With Ferrer's knowledge and under Ortiz's supervision, UBS PR orchestrated a scheme in which it dumped about $35 million, or 75 percent, of UBS PR's inventory of CEF shares on unsuspecting investors." (¶ 6)<br><br>"To accomplish the scheme, Ortiz executed a plan, dubbed 'Objective: Soft Landing' in one memo, in which UBS PR routinely offered and sold its CEF shares by undercutting pending customer sell orders. … Ferrer knew full well this scheme would cause investors huge losses, a fact he communicated to UBS PR's parent company executives." (¶ 7) | "During the Class period, UBS itself acknowledged the riskiness of the Funds by secretly unloading a substantial portion of its own inventory of shares in the Funds on UBS's own clients.  Specifically, in the spring of 2009, to avoid any potential losses to UBS Puerto Rico, Defendant UBS Financial ordered UBS Puerto Rico and Defendants Ferrer and Ubiñas to substantially reduce the inventory of Fund shares that UBS owned. To satisfy this directive, these Defendants launched an initiative termed 'Objective: Soft Landing,' whereby UBS Puerto Rico pushed its own inventory of Fund shares on UBS clients. As a result of this initiative, between March and September 2009, UBS Puerto Rico sold 75% of its Fund share inventory to UBS clients." (¶ 70) |
| "UBS PR attempted to generate customer demand by promoting the CEFs at a UBS PR Investor Conference in June 2008.  Ferrer hosted the conference, at which a UBS PR managing director touted the CEFs' extraordinary market returns and low risk and volatility, but failed to disclose the share prices and liquidity depended largely on UBS PR's willingness to purchase CEF shares into inventory." (¶ 34) | "UBS pushed Class members to invest in the Funds through various means, including 'Investor Conferences' for all current and potential investors.  For example, at a UBS Investor Conference held in June 2008, which Defendant Ferrer hosted, UBS personnel touted the Funds' market returns and portrayed them as low risk." (¶ 88) |

| **ALLEGATION IN MAY 1, 2012 OIP** | **ALLEGATION IN COMPLAINT** |
|---|---|
| "Notwithstanding his knowledge of the weak demand for CEF shares in the secondary market and UBS PR's increasing use of inventory to support and stabilize the CEF market, Ferrer repeatedly misled UBS PR's financial advisors throughout the fall of 2008 into continuing to promote CEF sales.  In email after email, he repeatedly misstated the strength, stability and liquidity of the CEF Market. …" (¶ 39) | "… For example, at UBS, Defendant Ferrer repeatedly touted the 'low-volatility' and 'conservative' nature of the Funds in pressuring UBS's Financial Advisors to push the Funds on its clients as safe investments, including: |
| | a. in an email dated September 18, 2008, Ferrer urged UBS Financial Advisors to recommend the Funds to 'clients searching for low volatility and respectable returns'; |
| "For example, on September 18, 2008, Ferrer told financial advisors '[i]n the midst of all the turmoil [of the then-ongoing financial crisis], I note the <u>superior performance of our local funds</u>. . . . [Y]ou should look at these for clients searching for low volatility and respectable returns.' (emphasis in original). On September 30, Ferrer sent another email to 'note our Funds did not budge in the midst of all the bad news yesterday? Their low volatility . . . [is] a '<u>great</u> reason to consider them as a timely investment. Plus their returns are superior!' (emphasis in original). On October 9, 2008, Ferrer emailed financial advisors to 'keep in mind that local investors have side stepped the wrath of the marketplace and have been enjoying superior returns from our Funds.'" (¶ 40) | b. in two separate emails sent on September 30, 2008, Ferrer again exhorted UBS Financial Advisors that the 'low volatility' of the Funds was a 'great reason to consider them as a timely investment' and boasted that 'all is well in Puerto Rico and our client base is enjoying the fruits of conservative investing'; |
| | c. in an email dated March 17, 2009, Ferrer recommended that UBS's Financial Advisors actively push the Funds on 'IRA investors,' stating 'Rest assured our IRA's [sic] based on Funds are very attractive choices for investors.'  Further, in sworn testimony before the SEC, 'Ferrer acknowledged that the purpose of th[is] email was to get customers to buy product'; |
| | d. in an email dated May 14, 2009, Ferrer again urged UBS's Financial Advisors to press IRA investors to purchase the Funds, stating 'You can offer attractive alternatives for many IRA investors; our Funds.'  Ferrer confirmed in sworn testimony that 'his message was to sell more IRA investments to customers.'" (¶ 124) |

| ALLEGATION IN MAY 1, 2012 OIP | ALLEGATION IN COMPLAINT |
|---|---|
| "On March 31, 2009, UBS PR and Ortiz made misrepresentations and omissions to thousands of customers at a UBS PR Investor Conference about the CEFs' superior returns and consistent liquidity levels.  Before the conference, Ferrer urged UBS PR's sales force to 'call your clients, [because] the information presented will offer comfort to holders of Puerto Rico bonds and Funds' (emphasis in original)." (¶¶ 69-70)<br><br>"The day after the investor conference, Ferrer sent an e-mail to UBS PR's sales force stating: 'Wow!  What a show.  Our clients received a huge dose of comfort on their investments, the right consideration in view of what we believe the local market for bonds (and funds) is headed. This will offer you another opportunity to do right for your own client base by showing each client how he or she can benefit from the opportunities at hand. The ball is now in your court.'" (¶ 72) | "Defendants also falsely portrayed the Funds as safe and secure investments at numerous 'Investor Conferences' held during the Class Period, including in conferences held in June 2008, March 2009 and February 2013, which thousands of clients, including Class members, attended.  For example, in an email to Financial Advisors following the March 2009 investor conference, Defendant Ferrer stated that UBS's '…clients received a huge dose of comfort on their investments…' at the conference." (¶ 128) |
| "Ferrer further misled investors about the state of the CEF market in a newspaper interview published in *El Vocero* on April 24, 2009. Specifically addressing the CEF market, Ferrer stated in the newspaper article:<br><br>'The local mutual funds have had an excellent return during all this process,' explained Ferrer. But through all of this, many investors call [UBS PR] scared about the news of the drop in financial markets, 'when the reality is that news doesn't have any relevance for the investor.' In general, 'the Puerto Rican investor that has their money invested in bonds and mutual funds has obtained fantastic results . . . The result of an investor in local mutual funds, that has been able to reinvest dividends, has been superior and in some cases comparable with the stock market Indices,' said Ferrer, and he assured that this type of investment offers much less volatility and relative positive results.'" (¶ 74) | "Moreover, in newspaper publications during the Class Period, Defendants sought to falsely assure Class members that the Funds were safe and secure investments. For example, in a newspaper interview published in *El Vocero* on April 24, 2009, Defendant Ferrer stated that the Funds 'offer[] much less volatility and relative positive results' and that 'the [Funds] have had an excellent return' during the 2008/2009 financial crisis.  Ferrer also stated:<br><br>'[M]any investors call [UBS Puerto Rico] scared about the news of the drop in the financial markets, when the reality is that news doesn't have any relevance for the investor. […] [T]he Puerto Rican investor that has their money invested in [the Funds and the underlying bonds] has obtained fantastic results.'" (¶ 129) |

| ALLEGATION IN MAY 1, 2012 OIP | ALLEGATION IN COMPLAINT |
|---|---|
| "Despite this knowledge [that investors would suffer huge losses], Ferrer stepped up his campaign [in spring 2009] to tout CEF sales. He pushed financial advisors to solicit sales of CEFs …." (¶ 8)<br><br>"During the ensuing months [after April 2009], Ferrer stepped up his campaign to create CEF demand while also concealing the liquidity crisis and inventory dump.  Ferrer directed UBS PR's sales force to push their customers to buy CEFs while dismissing UBS PR customers and financial advisors' concerns about CEF prices and liquidity." (¶ 73) | "For example, a recently released recording of a June 2011 speech by Defendant Ferrer, then Chairman of UBS Puerto Rico, shows how he bullied and berated UBS's Financial Advisors to push Class members to purchase more and more shares of the Funds – regardless of the serious risks involved or the suitability of the Funds." (¶ 6) |
| "From March to September 2009, 21 of the 23 CEFs experienced significant price declines" which allegedly resulted in losses of "more than $500 million." (¶¶ 83-84) | By March 2014, "the Funds had lost more than half their value, suffering billions of dollars in losses and wiping out many Class members' life savings."  (¶ 11) |