# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORA FERNANDEZ; AUGUSTO SCHREINER; EDDIE TORO VELEZ; VICTOR R. VELA DIEZ DE ANDINO; GEORGINA VELEZ MONTES; and JUAN VIERA and ESTHER SANTANA, on behalf of themselves and all others similarly situated, | Civil Case No.: 15-cv-02859-SHS |
| | **ORAL ARGUMENT REQUESTED** |
| Plaintiffs, | |
| v. | |
| UBS AG; UBS FINANCIAL SERVICES, INC.; UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO; UBS TRUST COMPANY OF PUERTO RICO; UBS BANK USA; CARLOS V. UBIÑAS; MIGUEL A. FERRER; BANCO POPULAR de PUERTO RICO; and POPULAR SECURITIES, LLC, | |
| Defendants. | |

# PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS
### TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

SUMMARY GLOSSARY OF DEFINED TERMS .......................................... xii

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ................................................................................ 6

    A.    Background Of The Funds ............................................................ 6

    B.    Defendants' Fiduciary And Contractual Duties ......................... 8

    C.    Defendants Breached Their Fiduciary And Contractual Duties ............................ 8

    D.    Defendants' Breaches Of Duty Caused Class Members Substantial Damage ..... 11

    E.    Defendants' Admissions And Government Investigations ................................. 12

RELEVANT PROCEDURAL HISTORY ...................................................... 13

ARGUMENT ................................................................................................... 14

I.    APPLICABLE LEGAL STANDARDS ................................................ 14

II.    PLAINTIFFS HAVE ADEQUATELY ALLEGED THEIR CLAIMS .......................... 17

    A.    Plaintiffs Have Adequately Alleged That UBS Puerto Rico And UBS Financial Breached Their Fiduciary Duties ......................... 17

    B.    Plaintiffs Have Adequately Alleged That Certain UBS Defendants Aided And Abetted Breaches Of Fiduciary Duty ................... 27

    C.    Plaintiffs Have Adequately Alleged That The UBS Contracting Defendants Breached Their Contractual Duties ........................ 29

    D.    Plaintiffs Have Adequately Alleged That Popular Securities Breached Its Fiduciary Duties .......................................... 30

    E.    Plaintiffs Have Adequately Alleged That Banco Popular Aided And Abetted Popular Securities' Breach Of Fiduciary Duty ....................... 33

    F.    Plaintiffs Have Adequately Alleged That Popular Securities Breached Its Contractual Duties ........................................ 34

III.    SLUSA DOES NOT APPLY TO THIS BREACH OF DUTY ACTION ....................... 38

A.      SLUSA Does Not Apply Because The Funds Are Not "Covered Securities" And All Alleged Misrepresentations Concern The Funds ................................... 38

B.      SLUSA Cannot Bar All Claims In This Action .................................................. 43

IV.   DEFENDANTS' STATUTE OF LIMITATIONS DEFENSES FAIL ............................ 44

A.      Plaintiffs' Injuries Began After May 2013 ......................................................... 46

B.      Plaintiffs Lacked Knowledge Of The Cause Of Their Injuries ......................... 47

C.      The SEC Action And The Securities Action Did Not Put Plaintiffs On Notice ... 49

D.      Defendants' Statute Of Limitations Arguments Are Fact Issues Inappropriate For Resolution At The Pleading Stage ................................................................. 53

V.    PRUSA DOES NOT APPLY TO PLAINTIFFS' CLAIMS ........................................... 54

VI.   PLAINTIFFS HAVE STANDING TO BRING THIS SUIT ON BEHALF OF ALL PURCHASERS OF ALL THE FUNDS ....................................................................... 56

CONCLUSION ................................................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbas v. Dixon,*
    480 F.3d 636 (2d Cir. 2007)............................................................52

*Adria Int'l Grp., Inc. v. Ferré Dev., Inc.,*
    241 F.3d 103 (1st Cir. 2001)......................................................35, 37

*Ambac Assur. UK Ltd. v. J.P. Morgan Inv. Mgmt., Inc.,*
    88 A.D. 3d 1 (1st Dep't 2011)......................................................23

*Ambert v. Caribe Equity Grp., Inc.,*
    2011 WL 4626012 (D.P.R. Sept. 30, 2011)...................................54

*AMECO v. Jaress Corp.,*
    98 P.R.R. 820 (1970)...................................................................35

*An-Port, Inc. v. MBR Indus., Inc.,*
    772 F. Supp. 1301 (D.P.R. 1991)..................................................31

*Anwar v. Fairfield Greewich Ltd.,*
    728 F. Supp. 2d 372 (S.D.N.Y. 2010).......................................39, 43

*Asociacion de Enfermeria Visitante Auffant, Inc. v. Great–West Life & Annuity*
    *Ins. Co.,*775 F. Supp. 2d 333 (D.P.R. 2011) ................................55

*Aviation LLC v. Atl. Aviation Flight Servs., Inc.,*
    2007 WL 2454115 (S.D.N.Y. Aug. 27, 2007)...............................20

*BAII Banking Corp. v. UPG, Inc.*
    985 F.2d 685 (2d Cir. 1993).........................................................21

*Bais Yaakov of Spring Valley v. Houghton Mifflin Harcourt Publishers, Inc.,*
    36 F. Supp. 3d 417 (S.D.N.Y. 2014)............................................57

*Bates v. Long Island R.R. Co.,*
    997 F.2d 1028 (2d Cir. 1993).......................................................51

*Bayerische Landesbank v. Aladin Capital Mgmt. LLC,*
    692 F.3d 42 (2d Cir. 2012).....................................................19, 29

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)................14

*Brody v. Brody,*
    2009 WL 436404 (S.D.N.Y. Feb. 17, 2009).............................53, 55

*Brown v. E.F. Hutton Grp.*,
   991 F.2d 1020 (2d Cir. 1993) ................................................................. 25

*Chadbourne & Parke v. Troice*,
   134 S.Ct. 1058 (2014) ...................................................................... passim

*Colón Prieto v. Géigel*,
   115 D.P.R. 232, 15 Off. Trans. 313 (1984) ........................................... 45

*Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*,
   838 F.2d 612 (1st Cir. 1988) ................................................................. 16

*Crigger v. Fahnestock & Co.*,
   443 F.3d 230 (2d Cir. 2006) ................................................................. 25

*CRT Investments, Ltd. v. Merkin*,
   29 Misc. 3d 1218(A), 918 N.Y.S.2d 397 (Sup. Ct. 2010) ...................... 26

*Dandong v. Pinnacle Performance Ltd.*,
   2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011) ........................................ 25

*de Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002) ............................................................... 24

*DeBlasio v. Merrill Lynch & Co.*,
   2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........................................ 16

*Delgado Rodriguez v. Nazario de Ferrer*,
   1988 WL 580813 (P.R. May 16, 1988) ............................................. 45, 47

*Diaz-Rivera v. Supermercados Econo, Inc.*,
   22 F. Supp. 3d 146 (D.P.R. 2014) ........................................................ 46

*Doe 171 v. Order of Saint Benedict*,
   2012 WL 1410320 (D.P.R. Apr. 20, 2012) ........................................... 52

*E.W. French & Sons, Inc. v. Gen. Portland, Inc.*,
   885 F.2d 1392 (9th Cir. 1989) .............................................................. 52

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
   551 F. Supp. 2d 210 (S.D.N.Y. 2008) .................................................. 26

*Elbit Sys., Ltd. v. Credit Suisse Grp.*,
   917 F. Supp. 2d 217 (S.D.N.Y. 2013) .................................................. 14

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011) .................................................. 29

*Espada v Lugo*,
    312 F.3d 1 (1st Cir. 2002)................................................................45, 48

*FAMM Steel Inc. v. Sovereign Bank*,
    571 F.3d 93 (1st Cir. 2009)...............................................................35

*Fesseha v. TD Waterhouse Inv'r Servs., Inc.*,
    305 A.D.2d 268 (1st Dep't 2003) ......................................................19

*Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*,
    414 F.3d 325 (2d Cir. 2005)..............................................................19

*Flickinger v. Harold C. Brown & Co., Inc.*,
    947 F.2d 595 (2d Cir. 1991)..............................................................20

*Flores-Febus v. MVM, Inc.*,
    45 F. Supp. 3d 175 (D.P.R. 2014)......................................................51

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007)...............................................27

*Fydman & Co. v. Credit Suisse First Boston Corp.*,
    272 A.D.2d 236 (1st Dep't 2000) ......................................................20

*GLM Corp. v. Klein*,
    665 F. Supp. 283 (S.D.N.Y. 1987) ....................................................19

*Gordon & Co. v. Ross*,
    63 F. Supp. 2d 405 (2d Cir. 1999) .....................................................44

*Guzman-Camacho v. State Ins. Fund Corp.*,
    418 F. Supp. 2d 3 (D.P.R. 2006)........................................................47

*Henneberry v. Sumitomo Corp. of Am.*,
    532 F. Supp. 2d 523 (S.D.N.Y. 2007)...............................................16

*Hidalgo-Velez v. San Juan Asset Mgmt.*,
    759 F.3d 98 (1st Cir. 2014)...........................................................39, 40

*Hudson v. Delta Kew Holding Corp.*,
    2014 WL 1924324 (N.Y. Sup. Ct. Apr. 22, 2014)..............................47

*IBM v. Liberty Mut. Ins. Co.*,
    363 F.3d 137 (2d Cir. 2004)..............................................................20

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010)...............................................25

*In re Ames Dep't. Stores, Inc. Note Litig.*,
   991 F.2d 968 (2d Cir. 1993)...........................................................................52

*In re Beef Indus. Antitrust Litig.*,
   600 F.2d 1148 (5th Cir. 1979) ......................................................................52

*In re China Valves Tech. Secs. Litig.*,
   979 F. Supp. 2d 395 (S.D.N.Y. 2013).............................................................56

*In re CitiGroup Inc. Bond Litig.*,
   723 F. Supp. 2d 568 (S.D.N.Y. 2010).....................................................15, 16, 58

*In re Frito–Lay N. Am., Inc. All Natural Litig.*,
   2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013).................................................57

*In re Global Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003).............................................................53

*In re Grumman Olson Indus., Inc.*,
   329 B.R. 411 (Bankr. S.D.N.Y. 2005) ...........................................................15

*In re Herald*,
   730 F.3d. 112 (2d Cir. 2013)...........................................................................40

*In re IndyMac Mortg.-Backed Sec. Litig.*,
   718 F. Supp. 2d 495 (S.D.N.Y. 2010).............................................................57

*In re Kingate Management Ltd. Litig.*,
   784 F.3d 128 (2d Cir. 2015)...........................................................................40

*In re Lehman Bros. Sec. & ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010).............................................................57

*In re Luxottica Grp. S.p.A., Sec. Litig.*,
   293 F. Supp. 2d 224 (E.D.N.Y. 2003) ...........................................................14

*In re Main Street AC, Inc.*,
   234 B.R. 771 (N.D. Cal 1999) .......................................................................18

*In re Mirena IUD Prods. Liab. Litig.*,
   29 F. Supp. 3d 345 (S.D.N.Y. 2014)...............................................................55

*In re Morgan Stanley ERISA Litig.*,
   696 F. Supp. 2d 345 (S.D.N.Y. 2009).............................................................15

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ...................................................................26

*In re Tremont Sec. Law, State Law, and Insurance Litig.*,
  2014 WL 1465713 (S.D.N.Y. Apr. 14, 2014)..................................................................38

*In re Vivendi Universal, S.A.*,
  2004 WL 876050 (S.D.N.Y. Apr. 22, 2004)...................................................................14

*In re WRT Energy Sec. Litig.*,
  2005 WL 323729 (S.D.N.Y. Feb. 9, 2005).....................................................................16

*Johnson v. Nextel Commc'ns, Inc.*,
  660 F.3d 131 (2d Cir. 2011)..........................................................................................17

*Jones v. Bock*,
  549 U.S. 199 (2007).......................................................................................................52

*Kaufman v. Cohen*,
  307 A.D. 2d 113 (1st Dep't 2003) .................................................................................27

*Kronos, Inc. v. AVX Corp.*,
  81 N.Y.2d 90 (1993)......................................................................................................47

*Kurtzman v. Bergstol*,
  40 A.D.3d 588 (2d Dep't. 2007) ...................................................................................17

*LaSala v. Bank of Cyprus Public Co. Ltd.*,
  510 F. Supp. 2d 246 (S.D.N.Y. 2007)............................................................................43

*LaSala v. TSB Bank, PLC*,
  514 F. Supp. 2d 447 (S.D.N.Y. 2007)............................................................................44

*LC Capital Partners, LP v. Frontier Insurance Group, Inc.*,
  318 F.3d 148 (2d Cir.2003)...........................................................................................49

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 1993)..........................................................................................27

*Levy v. Young Adult Inst., Inc.*,
  2015 WL 1958889 (S.D.N.Y. Apr. 30, 2015).................................................................16

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
  842 F. Supp. 2d 587 (S.D.N.Y. 2012)............................................................................37

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).......................................................................................................56

*Matana v. Merkin*,
  989 F. Supp. 2d 313 (S.D.N.Y. 2013)............................................................................37

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)........................................................49

*Montalvo v. LT's Benjamin Records, Inc.*,
   56 F. Supp. 3d 121 (D.P.R. 2014)............................................................34

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)......................................................6, 56, 57

*Norman v. Salomon Smith Barney, Inc.*,
   350 F. Supp. 2d 382 (S.D.N.Y. 2004).....................................................43

*Ortega v. Pou*,
   135 D.P.R. 711 (P.R. 1994) ....................................................................47

*PaineWebber, Inc. v. First Boston Inc.*,
   136 D.P.R. 541 (P.R. 1994) ....................................................................55

*Pearce v. Duchesneau Grp., Inc.*,
   392 F. Supp. 2d 63 (D. Mass. 2005) ..............................................16, 32

*Pension Comm. of U. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   750 F. Supp. 2d 450 (S.D.N.Y. 2010).............................................39, 58

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006).....................................................15

*Persson v. Scotia Prince Cruises Ltd.*,
   330 F.3d 28 (1st Cir. 2003)......................................................................35

*Quintana Lopez v. Liggett Group, Inc.*,
   336 F. Supp. 2d 153 (D.P.R. 2004).........................................................53

*R.F.D. Grp. Ltd. v. Rubber Fabricators, Inc.*,
   323 F. Supp. 521 (S.D.N.Y. 1971) ..........................................................18

*Rahl v. Bande*,
   328 B.R. 387 (S.D.N.Y. 2005)..................................................................15

*Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v.
   Bank of New York Mellon*, 775 F.3d 154 (2d Cir. 2014) ........................58

*Rodriguez v. Banco Cent.*,
   727 F. Supp. 759 (D.P.R. 1989)..............................................................34

*Rodriguez-Suris v. Montesinos*,
   123 F.3d 10 (1st Cir. 1997)......................................................................49

*Roman et al v. UBS Financial Services et al,*
  Civil Case No. 3-12-cv-01663-CCC (D.P.R. filed Aug. 13, 2012) .........................13

*Romano v. Kazacos,*
  609 F.3d 512 (2d Cir. 2010)...................................................................................42

*Rombach v. Chang,*
  355 F.3d 164 (2d Cir. 2004)...................................................................................54

*S.E.C. v. Zandford,*
  535 U.S. 813 (2002)................................................................................................42

*Salgado* v. *Piedmont Capital Corp.,*
  534 F. Supp. 938 (D.P.R. 1981)............................................................................54

*Satellite Broad. Cable, Inc. v. Telefonica de España,*
  786 F. Supp. 1089 (D.P.R. 1992)..........................................................................31

*Schmitz v. Davis,*
  2010 WL 3861843 (D. Kan. Sept 23, 2010) ........................................................51

*Schuh v. Druckman & Sinel, L.L.P.,*
  602 F. Supp. 2d 454 (S.D.N.Y. 2009)...................................................................18

*Sergeants Benevolent Ass'n Annuity Fund v. Renck,*
  19 A.D.3d 107 (N.Y. Sup. Ct. App. Div. 1st Dept, 2005)..............................18, 20

*Soley v. Wasserman,*
  2010 WL 931888 (S.D.N.Y. Mar. 12, 2010) ......................................................54

*Speakman v. Allmerica Fin. Life Ins.,*
  367 F. Supp. 2d 122 (D. Mass. 2005) ............................................................35, 36

*Staehr v. Hartford Financial Services, Inc.,*
  547 F.3d 406 (2d Cir. 2008)..................................................................................51

*Superintendent of Ins. Of State of N.Y. v. Bankers Life & Cas. Co.,*
  400 U.S. 6 (1971)............................................................................................19, 42

*Szulik v. State St. Bank & Trust Co.,*
  935 F. Supp. 2d 240 (D. Mass. 2013) ..................................................................37

*Tollinche Puig v. Triple-S Mgmt. Corp.*
  2010 WL 3200382 (P.R. Ct. App. May 28, 2010)................................................54

*Torres Sánchez v. Hosp. Dr. Pila,*
  2002 WL 32090928 (P.R. Cir. Nov. 26, 2002).....................................................45

*Tucker v. Janney Montgomery Scott, Inc.,*
   1997 WL 151509 (S.D.N.Y. Apr. 1, 1997) ..................................................20

*U.S. Bank Nat'l. Ass'n v. Citigroup Global Mkts. Realty Corp.,*
   2014 WL 7714382 (S.D.N.Y. Nov. 14, 2014) ............................................15

*Uno Rests. Inc. v. Boston Kenmore Realty Corp.,*
   441 Mass. 376 (Mass. 2004) ......................................................................36

*Velazquez v. Schindler Corp. of P.R.,*
   968 F. Supp. 2d 475 (D.P.R. 2013) ......................................................45, 47

*Vera v. Dr. Bravo,*
   161 D.P.R. 308 (P.R. 2004) .......................................................................46

*Villarini-Garcia v. Hosp. Del Maestro, Inc.,*
   8 F.3d 81 (1st Cir. 1993) ...........................................................45, 46, 52, 53

*Westernbank Puerto Rico v. Kachkar,*
   2009 WL 6337949 (D.P.R. 2009) ..............................................................35

*Wiener v. Lazard Freres & Co.,*
   241 A.D.2d 114 (1st Dep't 1998) ..............................................................20

*Wilson Farm, Inc. v. Berkshire Life Ins. Co.,*
   2002 WL 31440151 (Mass. Supp. 2002) ...................................................31

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,*
   341 F. Supp. 2d 258 (S.D.N.Y. 2004) ................................................ passim

STATUTES

10 L.P.R.A. § 890(e) ..........................................................................................54

31 L.P.R.A. § 5294 ............................................................................................44

31 L.P.R.A. § 5298(2) .......................................................................................45

15 U.S.C. § 77r(b)(1) ........................................................................................38

15 U.S.C. § 78bb(f)(1) .......................................................................................37

15 U.S.C. § 78bb(f)(5)(B)(i)(I) .........................................................................38

15 U.S.C. § 78bb(f)(5)(E) .................................................................................38

Investment Company Act of 1940 ......................................................................2

Mass. Gen. Law ch. 260 §2................................................................................44

x

Securities Exchange Act of 1934, §10(b) ...................................................................................54

Securities Litigation Uniform Standards Act.................................................................... passim

**OTHER AUTHORITIES**

N.Y. C.P.L.R. § 213(2) ...........................................................................................................44

Richard A. Lord, 19 *Williston on Contracts* § 54:28 (4th ed.) .....................................................32

Fed. R. Civ. P. Rule 8 ...................................................................................................... passim

Fed. R. Civ. P. Rule 9(b)................................................................................................... passim

Fed. R. Civ. P. Rule 12(b)(6) ...............................................................................................14, 54

*Uniform Securities Act of Puerto Rico*, Regulation 6078, Section 25.1 ............................... passim

## SUMMARY GLOSSARY OF DEFINED TERMS

| TERM | DEFINITION |
|---|---|
| Ferrer | Defendant Miguel Ferrer, former Chair and CEO of UBS Puerto Rico and a Director of each of the Funds. |
| Ferrer Br. | Defendant Miguel A. Ferrer's Memorandum Of Law In Support Of His Motion To Dismiss Plaintiffs' Amended Class Action Complaint (ECF No. 87). |
| The Funds or The CEFs | Twenty-three closed end mutual funds incorporated under Puerto Rico law.  *See* Complaint ¶¶42-48. |
| Millett Aff. | The Affidavit of Maureen Millet (ECF No. 94) in Support of the UBS Defendants' Motion to Dismiss. |
| Naughton Aff. | The Affidavit of Annie Naughton (ECF No. 93) in Support of the UBS Defendants' Motion to Dismiss. |
| Plaintiffs | Plaintiffs Nora Fernandez ("Fernandez"), Augusto Schreiner ("Schreiner"), Eddie Toro Velez ("Toro Velez"), Victor R. Vela Diez De Andino ("Vela"), Georgina Velez Montes ("Velez"), and Juan Viera and Esther Santana ("Viera/Santana"). |
| Pop. Br. | Popular's Memorandum Of Law In Support Of Its Motion To Dismiss The Amended Class Action Complaint (ECF No. 89). |
| Popular or the Popular Defendants | Defendants Banco Popular de Puerto Rico ("Banco Popular") and Popular Securities, LLC ("Popular Securities"). |
| Pop., Ex. __ | The Declaration of James F. Ianelli (ECF No. 88). |
| Ubiñas | Defendant Carlos V. Ubiñas, CEO of UBS Puerto Rico and Chair and E.V.P. of the Funds. |
| UBS | The UBS Defendants, Ferrer and Ubiñas. |
| UBS Br. | The Memorandum Of Law Of The UBS Defendants In Support Of Their Motion To Dismiss Plaintiffs' Amended Class Action Complaint (ECF No. 91). |
| UBS Defendants | Defendants UBS AG, UBS Financial Services Inc. ("UBS Financial"), UBS Financial Services Incorporated of Puerto Rico ("UBS Puerto Rico"), UBS Trust Company of Puerto Rico ("UBS Trust") and UBS Bank USA ("UBS Bank"). |

Plaintiffs respectfully submit this omnibus memorandum of law in opposition to the motions filed by the UBS Defendants, the Popular Defendants and Defendant Ferrer to dismiss the claims asserted in Plaintiffs' Amended Class Action Complaint, ECF No. 68 (the "Complaint").[1] For the reasons set forth below, Defendants' motions should be denied in their entirety.

## PRELIMINARY STATEMENT

Defendants UBS and Popular, two of the largest financial institutions operating in Puerto Rico, breached their fiduciary and contractual duties by steering their clients, a class of Puerto Rico residents, to invest in one or more of twenty-three high-risk, closed-end mutual funds (the "CEFs" or "Funds"). Defendants owed Class members the "highest standard of fiduciary duty" under Puerto Rico law. Further, Defendants' fiduciary and contractual duties obligated them to, among other things, act in Class members' best interests, provide Class members with all material information regarding investment recommendations, perform diligence into the suitability of any investment recommendations and deal fairly. In violation of these duties, Defendants pushed Class members to invest in the high-risk Funds and, by doing so, Defendants placed their own interests in generating outsized fees squarely above Class members' interests.[2]

---

[1] All capitalized terms have the meaning ascribed to them in the Complaint. For quick reference to definitions of the parties and certain capitalized terms, please refer to the above "Summary Glossary Of Defined Terms." Unless otherwise indicated herein: (i) all references to "¶__" are to paragraphs in the Complaint; (ii) all emphasis is added; and (iii) all internal citations and quotations are omitted.

[2] Plaintiffs assert claims for breach of fiduciary duty against UBS Puerto Rico, UBS Financial (¶¶151-58) and Popular Securities (¶¶168-74); claims for aiding and abetting breach of fiduciary duty against UBS AG, UBS Trust, UBS Puerto Rico, UBS Financial, Ubiñas, Ferrer (¶¶159-67) and Banco Popular (¶¶175-81) and claims for breach of contract against UBS AG, UBS Financial, UBS Puerto Rico, UBS Trust, UBS Bank (¶¶182-89) and Popular Securities (¶¶190-94). The putative class consists of: "All persons who were clients of UBS Puerto Rico and/or Popular Securities and who were invested in any of the Funds during the Class Period and were damaged as a result of the conduct alleged [in the Complaint]" (¶143) (the "Class"). The "Class Period" is the period from May 5, 2008 through May 5, 2014. ¶144.

The Funds are incorporated under Puerto Rico law, can only be sold to Puerto Rico residents, do not trade on a national securities exchange and are not registered under the Investment Company Act of 1940 (the "1940 Act").  Defendants – who created, managed and sold the Funds – structured them to have a combination of extraordinary leverage and exposure to high-risk debt securities, which made the Funds ticking time bombs for Class members.  Defendants, however, portrayed the Funds to Class members as safe, secure, fixed-income investments that would "preserve their capital" in order to earn the enormous fees uniquely available through these instruments.

The Complaint alleges significant detail concerning Defendants' breaches of their fiduciary and contractual duties.  For instance, the UBS Defendants' "Objective: Soft Landing" plan in 2009 provides a striking example of their disloyalty and lack of good faith.  Pursuant to this plan, to alleviate concerns about their own exposure to the high-risk Funds, the UBS Defendants unloaded 75% of their Fund inventory onto their clients, actively *selling* their Fund holdings while telling their clients to *buy*.  As one UBS financial advisor stated, this was nothing more than "turning around and screwing the client."  Another stark example of Defendants' conflicted and disloyal conduct arose in 2011, when a group of UBS financial advisors voiced serious concerns about continuing to sell the high-risk Funds to clients.  In response, UBS management (specifically, Defendant Ferrer) bullied UBS's financial advisors into continuing to sell the Funds by threatening their very livelihoods, telling them to push the Funds on clients or "go home [and] get a new job."  Further, throughout the Class Period, the UBS Defendants systematically encouraged UBS financial advisors to oversell the Funds by *inter alia* disabling their own internal controls designed to warn UBS when a client was over-concentrated in the Funds and improperly lending money to

clients so they would invest even more in the Funds.  Defendants did so in order to enable UBS to generate more fees while heightening Class members' exposure to the high-risk Funds.

In mid-2013, the risks that Defendants had baked into the Funds materialized and, as a result, the Funds dropped precipitously in value and caused Class members to suffer billions of dollars in losses.  The Funds' collapse and Defendants' misconduct also sparked a host of government investigations.  Some government investigations remain ongoing, including inquiries by the U.S. Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA) as well as a criminal inquiry by the U.S. Department of Justice, which UBS disclosed for the first time on July 27, 2015.  *See* Ross Decl. at Ex. A, at 161.[3]  However, the UBS Defendants have already settled several of the government investigations concerning the Funds.  Significantly, in settlements reached with Puerto Rico's main financial regulator (the Puerto Rico Commissioner of Financial Institutions or the "OCIF" by its Spanish acronym), the UBS Defendants were found to have engaged in – and ***admitted*** to – certain of the breaches of duties alleged in this Action, including providing improper loans to spur further investments in the Funds and pushing clients to buy too large a stake in the Funds.  The Popular Defendants are likewise liable for these misdeeds, as well as their own disloyalty and lack of candor, because they jointly managed many of the Funds with the UBS Defendants and similarly focused on generating massive fees to the detriment of their clients.[4]

These and other facts alleged in the Complaint – which are all deemed true at this stage of the litigation – demonstrate how Defendants continually placed their own interests ahead of their

---

[3] Citations to "Ross Decl." refer to the accompanying Declaration of Hannah G. Ross In Support Of Plaintiffs' Opposition To Defendants' Motions To Dismiss The Amended Class Action Complaint.

[4] The Popular Defendants have already admitted in this Action that their "conduct" was "closely related" to that of the UBS Defendants because "Popular and the UBS Defendants *jointly* managed the [F]unds at issue and, through this joint venture, Popular stood to "benefit from" the UBS Defendants' relationship with its customers."  *See, e.g.,* Popular's Reply Brief to Motion Transfer, ECF No. 42 at 3.

clients' interests, failed in their duties of due care, loyalty, candor, and good faith and disregarded any analysis of the suitability of the Funds. These allegations plainly satisfy Rule 8(a)'s "notice" pleading standard, which applies to Plaintiffs' non-fraud based, breach of duty claims.

Rather than addressing most of the facts alleged in the Complaint, Defendants advance meritless arguments seeking to halt this Action at the pleading stage. As explained herein, Defendants' arguments cannot be credited and their motions to dismiss should be denied.

*First*, Defendants argue that Plaintiffs have failed to plead the requisite elements of their breach of fiduciary duty and related aiding and abetting claims. They are incorrect. The Complaint alleges that Defendants owed their clients the highest standard of fiduciary duty under Puerto Rico law (¶49), as well as the duties of due care, loyalty, candor, good faith and prudence (which Defendants owed under both Puerto Rico and New York law). Defendants' wholesale failure to address their statutory duty under Puerto Rico law confirms that the duty is well-pled and applicable. Plaintiffs also allege that Defendants breached their fiduciary duties by, *inter alia*, turning the Funds into high-risk, powder keg investments and unloading them on unwitting Class members without regard for the risks. Further, the Complaint explains that Class members suffered significant damages starting in mid-2013 when the risks of the Funds materialized and they lost more than half of their value. Likewise, for each of Plaintiffs' aiding and abetting claims, the Complaint alleges a primary violation, knowing assistance by the relevant Defendants and damages.

*Second*, Defendants incorrectly argue that Plaintiffs have failed to plead breach of contract claims. The Complaint, however, sufficiently pleads each element of Plaintiffs' breach of contract claims, including the relevant contractual provisions, how they were breached and the resulting damages. For example, the Complaint explains that the UBS Defendants were contractually

4

obligated to "deal fairly" with Plaintiffs and other Class members and to "have a reasonable basis for believing" that investment recommendations were "suitable and appropriate." ¶¶54, 56, 185. Similarly, the Complaint alleges that the Popular Defendants were contractually obligated to determine whether their investments recommendations were suitable (*see, e.g.*, ¶57 *and* Pop., Ex. G ("[W]e will … [d]etermine the suitability of any recommendations and investment advice")), and owed Plaintiffs a duty of good faith pursuant to their contractual relationship (*see, e.g.*, ¶¶191, 192). These duties were breached by *inter alia* Defendants' disregard for any suitability analysis. For example, in both "Objective: Soft Landing" and the near mutiny of financial advisors in 2011, the UBS Defendants demonstrated that they had zero regard for suitability and would push the Funds on Class members regardless of any risk. Again, Class members suffered significant damages when the Funds declined in value in mid-2013.

**Third**, Defendants mistakenly assert that "all of Plaintiffs' claims" are pre-empted by the *Securities Litigation Uniform Standards Act* ("SLUSA"). As Defendants themselves admit, the Funds are not "covered securities" under the express language of the statute. Plaintiffs also do not allege any misrepresentations "in connection with" any securities that are covered under SLUSA. In fact, the Supreme Court's recent decision in *Chadbourne & Parke v. Troice*, 134 S.Ct. 1058 (2014) ("*Troice*") rejects the exact same arguments that Defendants advance here and confirms that SLUSA does not apply.

**Fourth**, Defendants argue that virtually all of Plaintiffs' claims are time-barred. Again, Defendants are wrong. Plaintiffs' breach of fiduciary duty claims are governed by Puerto Rico's one-year statute of limitations for tort claims, which runs from the time that Plaintiffs became aware of their injuries. Here, Plaintiffs became aware of their injuries in June 2013 at the earliest and, because this Action was filed in May 2014, these claims are timely. Plaintiffs' contract claims

are likewise timely.  Defendants are also incorrect to claim that the Puerto Rico Uniform Securities Act's ("PRUSA") two-year statute of repose applies to bar certain of Plaintiffs' claims.  As Defendants acknowledge, PRUSA's two-year period applies only to securities cases that sound in fraud.  But this is not a securities case, which Defendants themselves have admitted in prior filings, and it does not sound in fraud.  In any event, Defendants' statute of limitations defenses are fact-based inquiries inappropriate for resolution on a motion to dismiss.

*Finally*, although the issue of standing is premature, Plaintiffs have standing to represent all Class members who invested in the Funds because their claims all arise from the same misconduct by the same Defendants and, therefore, implicate the "same set of concerns."  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012).

In sum, while Plaintiffs will ultimately be required to prove their claims at trial, the Complaint adequately pleads claims for breach of fiduciary duty, aiding and abetting and breach of contract under applicable law.  Defendants' motions to dismiss should be denied in their entirety.

## STATEMENT OF FACTS

### A.    Background Of The Funds

The Complaint focuses on the Funds, and all claims arise exclusively from Plaintiffs' and Class members' ownership interests in the Funds.  *E.g.,* ¶¶19-24, 151-194.  The Funds are closed-end mutual funds incorporated under Puerto Rico law, which exploit regulatory and tax exemptions to provide Puerto Rico residents tax-free income, so long as two-thirds of Fund assets are invested in Puerto Rico-issued securities.  ¶¶44-45.  The Funds can only be sold to Puerto Rico residents, do not trade nationally or on any national securities exchange and are exempt from registration under the 1940 Act.  ¶¶44-47.  The Funds at issue include fourteen closed-end funds

managed and sold exclusively by the UBS Defendants and nine closed-end funds jointly managed and sold by both the UBS Defendants and the Popular Defendants.  ¶42.  Fund-related documents establish that, in purchasing ownership interests in the Funds, Class members only acquired ownership of the Funds themselves and did not acquire any interest in any of the underlying securities owned by the Funds.  For example, Plaintiffs' account statements reflect only that Plaintiffs owned shares of the Funds themselves – not any underlying assets.  *See, e.g.,* Ross Decl., at Exs. B and C (Toro Velez's account statements; reflecting ownership of "Puerto Rico Invs. Tax Free Fd V Inc." and "Puerto Rico Invs. Tax Free Fd III Inc."); Ex. D (Vela's account statements; reflecting ownership of "Puerto Rico Fixed Income Fd Inc and "Puerto Rico Invs. Tax Free Fd IV").  Likewise, the Funds' own prospectuses made clear that investors were not acquiring an interest in the underlying securities owned by the Funds.  *See, e.g., id.* Ex. E, at 1-2 (PRFIF II prospectus stating:  "***The Fund*** is initially offering…shares of ***its*** common stock" and that "[a]n investment in the Fund is ***not*** equivalent to an investment in the underlying securities of the Fund" and they "should not view the Fund as a vehicle for trading purposes").

Due to the regulatory exemptions available to the Funds, Defendants, who created, sponsored and managed the Funds, were able to structure and operate them in a manner that bypassed the 1940 Act's rules regarding conflicts of interests.  ¶¶44-47.  Thus, Defendants generated massively inflated fees and commissions by performing conflicting roles at every stage of the creation and management of the Funds, including by serving as: (i) underwriters of bonds in which the Funds invested; (ii) investment advisers to the Funds; and (iii) financial service providers who sold shares of the Funds to retail clients, including Class members.  *Id.*

### B.     Defendants' Fiduciary And Contractual Duties

As set forth in the Complaint, Defendants owed Plaintiffs common law and statutory fiduciary and contractual duties to act in the best interest of Plaintiffs and the Class, including by acting with care, prudence, loyalty, good faith and candor.  ¶¶49-58.  In particular, as Puerto Rico broker-dealers and investment advisors, Defendants UBS Puerto Rico, UBS Financial and Popular Securities were required by statute to uniformly "observe the highest standard of fiduciary duty" in their dealings with Class members.  ¶49.  And, as memorialized in agreements with Class members and in other materials, Defendants owed Class members duties to, *inter alia*, act fairly and in good faith and to recommend only those investments that were suitable and appropriate. ¶¶51-58.

### C.     Defendants Breached Their Fiduciary And Contractual Duties

In service of Defendants' own greed, and regardless of Class members' interests, Defendants breached their fiduciary and contractual obligations by turning the Funds into incredibly high-risk investments and then pushing Class members to invest in them.  ¶¶59-130. As set forth in the Complaint, Defendants breached their duties in the following ways:

***Defendants Loaded The Funds With High-Risk Puerto Rico Debt***.  Defendants populated the Funds with hundreds of millions of dollars of Puerto Rico Government debt, some of the riskiest government-backed securities in the market place.  ¶¶60-61.  They did so even though the UBS Defendants had underwritten much of this Puerto Rico government debt and knew that it was exceedingly risky.  ¶¶63-65.  Nevertheless, at least fifteen of the Funds had more than 37% of their holdings invested in high-risk bonds issued by just two Puerto Rico public entities.  ¶62.  For example: (i) Puerto Rico Investors Tax-Free Fund IV, Inc., owned more than $151 million face amount of bonds issued by these two Puerto Rico government entities, which constituted more

than **55%** of this Fund's asset value  (¶64); (ii)  Tax-Free Puerto Rico Fund II, held approximately **52.7%** of the value of its assets in bonds issued by these two entities; and (iii)  PR Fixed Income Funds V, had more than **51.5%** of its assets invested in bonds from just these two issuers (¶65). Such intense overconcentration in particular issuers was a disaster waiting to happen.

*The Funds' High Leverage Greatly Amplified Their Risks.*  Because they were exempt from the 1940 Act, the Funds could borrow one dollar for every single dollar of capital and, thus, hold twice the amount of assets as the amount of equity for a maximum leverage ratio of approximately 50%.  ¶67 (comparing the Funds to registered mutual funds which can borrow only one dollar for every three dollars of capital).  Exploiting this exemption, Defendants leveraged the Funds to the hilt and, by the end of 2013, the Funds' leverage ratios hovered just below the 50% maximum level, ranging from 40% to 48%.  *Id.*  Much of this leveraging was accomplished through self-dealing repurchase and short term note transactions between UBS and Popular entities, including Defendants.  ¶68.  As a result, the Funds were structurally predisposed to suffer staggering losses in the event of changes in interest rates and credit downgrades, such as those that took place during the Class Period.  ¶69.

*Defendants Earned Outsized Fees From Conflicting Roles In The Creation Of the Funds.*  Defendants seized upon the Funds' exemption from the 1940 Act to garner millions of dollars in fees and commissions through self-dealing transactions that substantially increased the risks of the Funds while providing Defendants with unique insight into the risks of the Funds' underlying asset portfolio.  ¶72.  *First*, Defendants amassed tremendous fees by underwriting debt issued by the Government of Puerto Rico.  ¶¶73-74.  *Second*, Defendants sold the Funds the very Puerto Rico bonds they had underwritten – and did so from their own trading desks while marking up the fees as they would in an institutional trade.  ¶¶76-77.  *Third*, in purchasing these assets for

the Funds as investment advisers to the Funds, Defendants generated tens of millions of dollars in advisory and transactional fees.  ¶¶78, 81-82.  In sum, Defendants loaded the Funds with the high-risk Puerto Rico debt they had underwritten – while profiting at every step.  ¶82.

*Defendants Pushed Class Members To Invest In The High-Risk Funds.*  Next, Defendants breached their fiduciary and contractual duties by adopting uniform policies to incentivize and pressure their employees to steer Class members to invest in the Funds without regard for or any analysis of the suitability of the Funds, which they consistently portrayed as safe, secure "fixed income" investments.  ¶¶83-121.

Defendants did so in a number of ways, including by: (i) improperly driving clients to invest in the Funds regardless and without analysis of their risk profile, including by issuing directives to Financial Advisors to push their clients to invest in the Funds (¶¶84-96); (ii) touting the Funds as safe, secure, fixed-income investments that would provide high, tax-free returns to Class members while preserving their invested principal (¶¶3, 48, 59, 85-86); (iii) providing incentives to their financial advisors to place and keep clients in the Funds (¶¶97-101); (iv) instituting a dividend reinvestment program through which UBS pushed clients to accept interest payments in the form of additional Fund shares, increasing the clients' investment in the Funds and UBS's fees and commissions (¶¶102-03); and (v) instituting an improper loan scheme whereby UBS pushed its clients to borrow additional money to invest further in the Funds by extending "non-purpose" loans and lines of credit to Class members, and again reaping even more inflated commissions on both the Funds and the loans while increasing Class members' exposure to risk (¶¶104-11).   The UBS Defendants even granted an exception to UBS's own compensation guidelines to permit its financial advisors to earn fees by simply keeping Class members invested in the Funds.  ¶¶115-21.  Indeed, the UBS Defendants went so far as to disable their own internal

controls to block alerts programmed to protect Class member accounts from overconcentration specifically in the Funds.  ¶¶112-14.

Defendants also breached their fiduciary duties by uniformly misrepresenting the Funds as safe, secure, fixed-income investments that would provide high, tax-free returns while preserving the principal of Class members' investments.  ¶¶ 122-23.  These statements were based on uniform scripts and buzz-words directed by Defendants' most senior officials.  ¶124.  For example, at UBS, Defendant Ferrer repeatedly touted the "low-volatility" and "conservative" nature of the Funds in pressuring UBS's Financial Advisors to push the Funds on Class members as safe investments. *Id.*  Indeed, in a recorded speech delivered in June 2011, Ferrer heavily pressured UBS Financial Advisors, including by threatening their jobs, to deliver to Class members a uniformly positive message regarding the Funds.  ¶¶6, 89-91, 124(e).  The Funds' Annual Reports, prospectuses and offering circulars during the Class Period indicated that the investment goal of each of the Funds was to provide current income "*consistent with the preservation of capital*" for its shareholders. ¶¶125-26.  In monthly account statements, Defendant UBS expressly categorized the Funds as "Fixed Income," thereby portraying to Class members that the Funds were fixed income assets. ¶127.  Defendants also portrayed the Funds as safe and secure investments at numerous "Investor Conferences" during the Class Period.  ¶¶128-29.

### D.     Defendants' Breaches Of Duty Caused Class Members Substantial Damage

In mid-2013, the risks posed by the Funds' risky structure, self-dealing leverage arrangements, and Defendants' loan scheme materialized, causing the Funds to plummet in value.  ¶¶131-32.  By September 2013, the lack of any investor demand for the Funds rendered the secondary market non-existent.  ¶133.  In early February 2014 Standard & Poor's downgraded Puerto Rico government debt to speculative grade, or "junk" status, meaning that there was a very

high risk that the Puerto Rico government would default on its debt obligations. ¶136. Three days later, Moody's followed suit and downgraded Puerto Rico's general obligation bonds and Puerto Rico's senior lien bonds to junk. *Id.* By March 2014, the Funds had lost more than half their value, suffering billions of dollars in losses and wiping out many Class members' life savings. ¶11. Most recently, in July 2015, the UBS Defendants acknowledged to their clients that the Funds are effectively worthless by "reduc[ing] to zero the collateral value assigned to all closed-end funds shares." *See, e.g.,* Ross Decl., Ex. F (Reuters article titled "Exclusive:  UBS backs away from its Puerto Rico funds after downgrades").

### E.    Defendants' Admissions And Government Investigations

The collapse of the Funds and Defendants' misconduct have sparked a host of government investigations, including by Puerto Rico regulators, federal prosecutors and the Federal Bureau of Investigation. ¶12. Significantly, Defendant UBS has ***admitted*** its involvement in the alleged improper loan scheme, stating that it had caused certain of its clients to "invest[] proceeds of non-purpose loans in closed-end fund securities." *Id.* In addition, in October 2014, UBS Puerto Rico entered into a settlement agreement with the OCIF concerning UBS Puerto Rico's misconduct in selling the Funds. ¶141. As set forth in the settlement agreement, after reviewing UBS Puerto Rico's practices in selling the Funds to a sample of senior-aged, conservative, risk-adverse clients, the OCIF found that UBS Puerto Rico's Financial Advisors "may have" pushed such clients to purchase too large an amount of the Funds in light of the clients' liquid net assets and that this practice "may have also been potentially unsuitable based on the particular customer's conservative financial objectives, risk tolerance and needs." *Id.* Further, among other things, the OCIF found that "certain purchases" of Funds by the sample clients "may have been induced by misrepresentations or omission of material facts based on the manner in which the investments

were recommended to the investors by the agents [*i.e.,* the UBS financial advisors]."   *Id.* According to UBS's most recent SEC filing, ongoing government investigations include inquiries by the SEC, FINRA and a newly-disclosed criminal inquiry by the U.S. Department of Justice. *See* Ross Decl. at Ex A, at 161.

## **RELEVANT PROCEDURAL HISTORY**

This Action was initially filed in the United States District Court for the Southern District of New York (the "SDNY") on May 5, 2014.  Shortly after filing, Plaintiffs realized that there were significant efficiencies to be gained by coordinating with a distinct but related action pending in Puerto Rico, which asserts claims under the federal securities laws concerning the liquidity of the secondary market for the Funds (the "Securities Action").[5]  Accordingly, on May 30, 2014, Plaintiffs voluntarily dismissed the SDNY filing, filed this Action in the District of Puerto Rico, and promptly moved to consolidate this Action with the Securities Action.  (ECF. Nos. 1, 6).

Defendants opposed consolidation, vehemently arguing that consolidation was inappropriate because the two actions were completely different, including because they asserted different claims.  ECF. No. 36.  On January 30, 2015, the Puerto Rico District Court denied Plaintiffs' motion for consolidation in reliance on the arguments Defendants raised in their opposition brief.  ECF No. 52.  As discussed below, having successfully blocked consolidation of this Action and the Securities Action based on their argument that the two cases involve ***different*** claims, Defendants now take the inconsistent position that the two actions actually involve the ***same*** claims for purposes of their current motions.  Such gamesmanship should be rejected.  While

---

[5] The Securities Action is captioned *Roman et al v. UBS Financial Services et al*, Civil Case No. 3-12-cv-01663-CCC, and names many of the same Defendants in this Action, including UBS Puerto Rico, UBS Financial Services, Inc. and Ferrer.  On February 28, 2013, the defendants in the Securities Action moved to dismiss the consolidated amended complaint.  Ross Decl at Ex. G.  The District Court in the Securities Action denied the defendants' motion to dismiss on September 30, 2013.  *Id.* at Ex. H. That court then denied the defendants' motion for reconsideration.  *Id.* at  Exs. I and J.  At present, the Securities Action is in discovery.

opposing consolidation, Defendants also moved to transfer the Action back to the SDNY.  ECF Nos. 35, 37.  On March 30, 2015, the Puerto Rico District Court granted Defendants' motions to transfer, and, accordingly, this case was transferred to the SDNY where it was ultimately assigned to this Court.  ECF No. 53.

On May 8, 2015, Plaintiffs filed the operative Complaint.  On June 18, 2015, the UBS Defendants, Ferrer, and Popular moved to dismiss the Complaint.

## ARGUMENT

### I.   APPLICABLE LEGAL STANDARDS

*Rule 12(b)(6) Standards.*  "In evaluating a motion to dismiss a complaint pursuant to [Rule] 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor." *Elbit Sys., Ltd. v. Credit Suisse Grp.,* 917 F. Supp. 2d 217, 224 (S.D.N.Y. 2013) (Stein J.).  "The task of the court . . . is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 264 (S.D.N.Y. 2004) (SLUSA dismissal motion considered under Rule 12(b)(6)).  To survive a motion to dismiss, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  This is not an onerous burden, as Plaintiffs are only required to "nudge[] their claims across the line from conceivable to plausible." *Id*.

*Rule 8(a) Standards.*  Plaintiffs' breach of duty claims are governed by Rule 8(a)'s "notice" pleading standards. *In re Vivendi Universal, S.A.*, 2004 WL 876050, at *2 (S.D.N.Y. Apr. 22, 2004) ("allegations of breach of contract . . . need only meet the standards of Rule 8(a)"); *In*

*re Luxottica Grp. S.p.A., Sec. Litig.*, 293 F. Supp. 2d 224, 238 (E.D.N.Y. 2003) (breach of fiduciary duty and aiding and abetting claims analyzed under Rule 8).

Defendants claim that the heightened pleading standard of Rule 9(b) applies. *See, e.g.*, UBS Br. at 10; Pop. Br. at 27. They are wrong. As a general rule, the heightened pleading requirements of Rule 9(b) should be applied only where "the gravamen of the complaint is plainly fraud." *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 586 (S.D.N.Y. 2010). Here, Plaintiffs do not claim that Defendants committed fraud. To start, there can be little doubt that Plaintiffs' breach of contract claims do not allege fraud, as they are not contingent upon allegations of fraudulent conduct or fraudulent misrepresentations. *U.S. Bank Nat'l. Ass'n v. Citigroup Global Mkts. Realty Corp.*, 2014 WL 7714382, at *3 (S.D.N.Y. Nov. 14, 2014) (breach of contract claims did not sound in fraud).

Likewise, Plaintiffs' breach of fiduciary duty and aiding and abetting claims are not contingent upon on fraudulent misrepresentations or fraudulent conduct. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 196 (S.D.N.Y. 2006) (applying Rule 8 to breach of fiduciary duty claim). In any event, even allegations of knowing and intentional breaches of fiduciary duty are subject to Rule 8(a), not Rule 9(b). *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 364, 366 (S.D.N.Y. 2009) (applying Rule 8 to breach of fiduciary duty claim where defendants' financial incentives motivated them to knowingly increase the company's stock in risky assets that led to a multi-billion dollar write-down); *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 430 (Bankr. S.D.N.Y. 2005) (allegations concerning "a course of dishonest conduct involving self-dealing, misappropriation, diversion of assets" does not by itself trigger 9(b) as not every claim based on dishonesty necessarily sounds in fraud); *Rahl v. Bande*, 328 B.R. 387, 412-13 (S.D.N.Y. 2005) (breach of fiduciary duty claim held to Rule 8

pleading standard where plaintiffs alleged defendants deepened litigation trust's insolvency to enhance their personal wealth and caused litigation trust to enter into transactions under unfavorable terms).[6]

Contrary to Defendants' assertions, Rule 9(b) does not automatically apply whenever a complaint alleges misrepresentations. UBS Br. at 4, 10; Pop. Br. at 27. As this Court has recognized, even where a complaint alleges materially false and misleading statements, it will not sound in fraud absent express allegations of fraudulent conduct. *CitiGroup*, 723 F. Supp. 2d at 586 (alleged misrepresentations did not sound in fraud); *see also Levy v. Young Adult Inst., Inc.*, 2015 WL 1958889, at **17-18 (S.D.N.Y. Apr. 30, 2015); *In re WRT Energy Sec. Litig.*, 2005 WL 323729, at *6 (S.D.N.Y. Feb. 9, 2005). Here, the Complaint is not based on express allegations of fraudulent conduct. In fact, the short section of the Complaint alleging that Defendants "breached their fiduciary duties by misrepresenting the nature and risk of the Funds" does not state that any of the misrepresentations were made *knowingly*. *See* ¶¶122-30. Thus, these allegations do not sound in fraud. *CitiGroup*, 723 F. Supp. 2d at 587 (noting "[c]ritically, the complaint does not allege that any of the statements were *knowingly* false or misleading."). The fact that Plaintiffs "could have . . . alleged fraud is irrelevant" because "they carefully and specifically chose not to." *Id*.[7]

---

[6] *See also Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 622 (1st Cir. 1988) (breach of fiduciary duty claim analyzed under Rule 8(a)); *Pearce v. Duchesneau Grp., Inc.*, 392 F. Supp. 2d 63, 72 (D. Mass. 2005) (breach of fiduciary duty and breach of contract claims analyzed under Rule 8(a)).

[7] The UBS and Popular Defendants' reliance on *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605 (S.D.N.Y. July 27, 2009) is unavailing. There, the court concluded that Rule 9(b) applied because the plaintiffs, unlike Plaintiffs here, alleged that defendants' conduct amounted to "deceptive and misleading" practices that were "intended to defraud their customers" and thus sounded in fraud. *Id.* at *5, *10. *Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523 (S.D.N.Y. 2007) is also inapposite. There, the court applied Rule 9(b) to a breach of fiduciary duty claim because, unlike here, the plaintiff expressly alleged ***fraudulent*** misrepresentations, which, on their face, sounded in fraud.

Further, even if 9(b) applies to Plaintiffs' claims, Plaintiffs have pled these claims with sufficient particularity, *see infra* Section II.

## II.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THEIR CLAIMS

### A.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT UBS PUERTO RICO AND UBS FINANCIAL BREACHED THEIR FIDUCIARY DUTIES

To state a claim for breach of fiduciary duty, a plaintiff must allege: (1) a fiduciary relationship, (2) misconduct by the defendant, and (3) damages.  *See Kurtzman v. Bergstol*, 40 A.D.3d 588, 590, 835 (2d Dep't. 2007) (the elements of breach of fiduciary duty are: "the existence of a fiduciary relationship [between plaintiff and defendant], misconduct by the defendant, and damages that were directly caused by the defendant's misconduct"); *see also Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) ("The elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.").  Here, Plaintiffs have alleged (i) UBS Puerto Rico and UBS Financial owed fiduciary duties to Class members under both Puerto Rico law (in allegations which are uncontested) and New York law; (ii) Defendants' egregious breaches of such duty, and (iii) damages.  Plaintiffs' breach of fiduciary duty claims against UBS Puerto Rico and UBS Financial are well-pled and should be sustained.

*The UBS Defendants' Fiduciary Duty Under Puerto Rico Law*.  At a minimum, it is undisputed that UBS Puerto Rico and UBS Financial served as broker-dealers for the UBS Plaintiffs in Puerto Rico.  *See* UBS Br. at 7; *see also* ¶¶26-27.[8]  Under Puerto Rico law, "[e]very broker-dealer . . . must observe the highest standard of fiduciary duty toward their customers and

---

[8] Plaintiffs allege that the UBS Defendants "acted as investment advisors" to Plaintiffs and the Class.  *See, e.g.*, ¶30.  Notably, the UBS Defendants do not disclaim that they provided Plaintiffs with investment advisory services.  Instead, they contend only that Plaintiffs "do not plead that they entered into investment advisory agreements with UBS."  UBS Br. at 8.  In any event, the extent and precise nature of this broker/investment advisory relationship is a contested issue of fact that is inappropriate for resolution at the pleading stage.  Thus, the UBS Defendants' numerous arguments based upon their position that all of Plaintiffs' accounts with UBS must be deemed non-discretionary brokerage accounts are premature and can only be resolved following discovery.  *See* UBS Br. at 20-23, 25-26.

investors." *Uniform Securities Act of Puerto Rico*, Regulation 6078, Section 25.1 ("Regulation 6078"). Thus, as expressly alleged in the Complaint, UBS Puerto Rico and UBS Financial owed the "highest standard of fiduciary duty" to Plaintiffs and the Class. ¶49 (quoting Regulation 6078). Tellingly, the UBS Defendants do not address this allegation anywhere in their motion papers. *See, e.g.,* UBS Br. at 19-21 (addressing only their fiduciary duties under New York law). This silence is especially striking because the UBS client relationship agreements ("CRAs") explicitly acknowledge that "state laws," such as Regulation 6078, dictate the legal standards to which UBS was required to adhere when dealing with Class members. *See* Millett Aff., Ex A at 50 ("When [UBS] act[s] as your broker, we are held to the legal standards of…state laws, where applicable").[9] Accordingly, Plaintiffs' allegations that the UBS Defendants owed fiduciary duties under Puerto Rico law are uncontested and admitted, and the UBS Defendants have waived their opportunity to respond to them. *See R.F.D. Grp. Ltd. v. Rubber Fabricators, Inc.*, 323 F. Supp. 521, 524 (S.D.N.Y. 1971) ("Defendant takes no position as to the allegations . . . and its silence must be taken as an admission of these allegations"); *Schuh v. Druckman & Sinel, L.L.P.*, 602 F. Supp. 2d 454, 465 n.7 (S.D.N.Y. 2009) (declining to consider argument "made for the first time in the reply brief").

UBS Puerto Rico and UBS Financial's statutory duty under Puerto Rico law also belies their assertion that Plaintiffs' breach of fiduciary duty claim is "duplicative of their breach of contract claim." *See* UBS Br. at 19. The fiduciary relationship alleged here was not defined or created by contract, but is imposed under Puerto Rico statute because UBS Puerto Rico and UBS Financial were broker-dealers for the UBS Plaintiffs. ¶49; *see also Sergeants Benevolent Ass'n*

---

[9] Even if the CRAs did not expressly refer to state laws, which they do, they could not relieve UBS Puerto Rico and UBS Financial of their fiduciary obligations under Puerto Rico law. *See, e.g., In re Main Street AC, Inc.*, 234 B.R. 771, 776 (N.D. Cal 1999) (noting that party could not avoid Blue Sky law through reorganization plan).

*Annuity Fund v. Renck*, 19 A.D.3d 107, 110 (N.Y. Sup. Ct. App. Div. 1st Dept, 2005) (fiduciary

duty "is not dependent solely upon an agreement or contractual relation between the fiduciary and

the beneficiary but results from the relation") (quoting Restatement [Second] of Torts Sec. 874,

Comment b).[10]   The UBS Defendants' argument that their fiduciary duty arose from contract has

it backwards.  UBS Br. at 19.  In reality, Plaintiffs allege repeatedly that, in the CRAs, the UBS

Defendants "acknowledged the fiduciary duties they owed Class members," "agreed to honor those

pre-existing obligations" and "explicitly memorialized" the fiduciary duties they owed their clients

under applicable law.  ¶¶50, 54, 56.  Finally, even if the UBS Defendants' misconduct violated

both their fiduciary and contractual duties, such facts do not undercut the viability of Plaintiffs'

tort claims.  Where, as here, "an independent tort duty is present, a plaintiff may maintain both tort

and contract claims arising out of the same allegedly wrongful conduct."  *Bayerische Landesbank*

*v. Aladin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012) (applying New York law).  Thus,

Plaintiffs' fiduciary duty claims are well-pled and are not "duplicative" of their contract claims.

     ***The UBS Defendants' Fiduciary Duty Under New York Law***.  The UBS Defendants assert

that New York law governs their fiduciary duties to Plaintiffs and the Class because of the CRAs'

choice of law provision.  UBS Br. at 19-24.  Defendants are wrong.  Puerto Rico law applies to

Plaintiffs' fiduciary duty claims regardless of any contractual choice of law provision.  Tort claims,

such as Plaintiffs' fiduciary duty claims, are not subject to choice of law provisions.  *See, e.g.,*

*Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 335 (2d Cir.

---

[10] The cases cited by the UBS Defendants, *MashreqBank, psc v. ING Grp. N.V.*, 2013 WL 5780824 (S.D.N.Y. Oct. 25, 2013) and *Fesseha v. TD Waterhouse Inv'r Servs., Inc.*, 305 A.D.2d 268 (1st Dep't 2003) are inapposite because the plaintiffs in those cases did not allege fiduciary duties that existed apart from contracts. Here, however, Plaintiffs' uncontested allegation is that UBS Puerto Rico and UBS Financial owed statutory fiduciary duties under Puerto Rico law. While the broker-client relationships between the parties here were created by agreement, the fiduciary duties that attached to such relationships were created by function of Puerto Rico law, as well as New York law, *see infra*. *See GLM Corp. v. Klein*, 665 F. Supp. 283, 285-86 (S.D.N.Y. 1987) ("[I]f a breach of contract is also a breach of a legal duty independent of the contract, there is extra-contractual wrongdoing, and a [tort] action may lie.  This result obtains even if such extra contractual duty is born of the contract itself.").

2005) ("[U]nder New York Law … tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum selection clause.").   Accordingly, even New York law dictates that Puerto Rico Regulation 6078 governs and, thus, the UBS Defendants owed Class members "the highest standard of fiduciary duty."  *See supra*.[11]

Even if the Court were to disregard UBS Puerto Rico and UBS Financial's fiduciary duties under Puerto Rico law, Plaintiffs have still adequately alleged that the UBS Defendants owed them fiduciary duties under New York law.  In New York, "[a] fiduciary relationship exists…when one person is under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation."  *Flickinger v. Harold C. Brown & Co., Inc*., 947 F.2d 595, 599 (2d Cir. 1991).  In determining whether a fiduciary duty exists, courts are not bound by written agreements between the parties, but "will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge."  *Sergeants Benevolent Ass'n*, 19 A.D.3d at 110 (finding executives of investment manager were adequately alleged to be fiduciaries of investor that "did not possess sophisticated knowledge of investment management" and "relied on their expertise" where the defendants allegedly provided "investment advice regarding asset allocation" and other matters) (quoting *Wiener v. Lazard Freres & Co*., 241 A.D.2d 114, 122 (1st Dep't 1998)).[12]   Thus, under New York law, the issue of whether the UBS Defendants owed

---

[11] Indeed, the UBS Defendants' ***own cases*** establish that Puerto Rico law applies.  UBS Br. at 12.  For example, in *Tucker v. Janney Montgomery Scott, Inc.*, the court refused to apply New York law to plaintiff's breach of fiduciary duty claim, noting that the choice-of-law provision at issue governed the agreement only – not all claims and controversies, including tort claims, arising from it.  1997 WL 151509, at *4 (S.D.N.Y. Apr. 1, 1997).  *IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137 (2d Cir. 2004) has no bearing here.  There, no tort claims were at issue; rather, the case concerned whether plaintiff-employer's liability insurer had a duty to defend plaintiff in an ancillary litigation.  *Id.* at 140.  Accordingly, the court's ability to apply New York law was unfettered by the principal that tort claims are outside the scope of contractual choice-of-law provisions.

[12] *See also id.* at 111 ("the contract and the relationship of the parties must be plumbed to determine whether a fiduciary relationship exists"); *Aviation LLC v. Atl. Aviation Flight Servs., Inc*., 06 Civ. 15525, 2007 WL 2454115, at *3 (S.D.N.Y. Aug. 27, 2007) ([i]t is established New York law that a contractual relationship may give rise to fiduciary

heightened fiduciary duties by virtue of their providing investment advisory services to Plaintiff and other Class members is an issue of fact inappropriate for resolution on the pleadings.[13]

Further, and in any event, it is well established under New York law that even "[a] broker is a fiduciary [who] owes a duty of good faith and loyalty to his principal." *BAII Banking Corp. v. UPG, Inc*. 985 F.2d 685, 700-01 (2d Cir. 1993). In this fiduciary capacity, a broker "is under a duty to disclose to his principal all the material information that he has concerning the transaction involved." *Id*. The UBS Defendants concede this point, and admit that when communicating regarding purchases or sales, brokers owe their clients a fiduciary duty to provide "honest and complete information" and are prohibited from providing "incomplete or misleading advice." *See* UBS Br. at 21-22.[14]

Here, the Complaint alleges, for example, that Plaintiffs and other Class members "entrusted their retirement savings and other capital to Defendants" (¶59) and "reposed trust and confidence in UBS Puerto Rico and UBS Financial's superior knowledge of and expertise in investment matters . . ." (¶152). Accordingly, even independent of the UBS Defendants' fiduciary

---

duties regardless of whether the contract itself" states that it creates a fiduciary relationship); *Fydman & Co. v. Credit Suisse First Boston Corp*., 272 A.D.2d 236, 237 (1st Dep't 2000) (same).

[13] The UBS Defendants misplace reliance on contract language purportedly disclaiming a fiduciary duty, stating that "when we act as your broker-dealer, we do no enter into a fiduciary relationship with you." UBS Br. at 21 (citing Millett Aff., Ex. A at 50). But this purported disclaimer is ambiguous because, as noted above, the same contract expressly states that "when we act as your broker, we are held to the legal standards of…state laws." Thus, Class members, who are all Puerto Rico residents, would have had the reasonable expectation that Regulation 6078 applied – regardless of the disclaimer – to impose upon the UBS Defendants the "highest standard of fiduciary duty" as broker/dealers in Puerto Rico. This is especially true given the trust and confidence that Plaintiffs reposed in the UBS Defendants. *See, e.g.,* ¶¶59, 152, 169 (alleging that Plaintiffs and Class members "entrusted their…savings and other capital to Defendants" and "reposed trust and confidence in [Defendants'] superior knowledge of and expertise in investment matters generally and the [Funds] in particular"). Indeed, Defendants' own argument and authorities expressly require that a disclaimer must be "clear and unambiguous" to be valid. *See, e.g.,* UBS Br. at 21.

[14] The CRAs also confirm that UBS Puerto Rico and UBS Financial had "a duty to deal fairly with" clients, and, additionally, had to "have a reasonable basis for believing that any securities recommendations we make to you are suitable and appropriate for you, given your individual financial circumstances, needs and goals." *See, e.g.*, Millett Aff., Ex. A at 50; *see also* ¶¶54, 56.

duty under Puerto Rico law, Plaintiffs have adequately alleged that UBS Puerto Rico and UBS Financial owed fiduciary duties under New York law.

***The UBS Defendants Breached Their Fiduciary Duties.***   Based upon arguments that mischaracterize or ignore the allegations in the Complaint, the UBS Defendants contend that Plaintiffs have failed to allege any breach of fiduciary duties.  UBS Br. at 21-23.  Plaintiffs, in fact, allege myriad, egregious breaches by UBS Puerto Rico and UBS Financial.  Indeed, the Complaint alleges that UBS structured its operations to elevate its own financial interests over the interests of Class members in at least the following ways:

- UBS Puerto Rico and UBS Financial systematically over-concentrated clients in the risky Funds rather than diversifying their portfolios, increasing clients' risks of significant losses from the Funds.  UBS Puerto Rico and UBS Financial even disabled internal computer systems designed to alert Financial Advisors of overconcentration issues, manipulating the system so that otherwise automatically generated overconcentration reports were not generated for clients' Fund investments.  ¶¶112-14.

- UBS amplified client risk by implementing an improper loan scheme designed to drive putative Class members to borrow money in order to buy even more CEF shares with the borrowed funds.  Illegal in themselves, these loans exposed Class members to heightened risk in the form of double leverage and increased exposure to CEFs.  ¶¶104-11.

- UBS Puerto Rico and UBS Financial severely over-concentrated the Funds in bonds, many of which UBS had underwritten, from only a handful of issuers.  *See* ¶¶61-66; 81-82.

  o Those few issuers were extraordinarily risky, as UBS knew.  *See* ¶¶60, 62-63, 65, 75.

  o An enormous percentage of the risky bonds were held by the Funds.  ¶81 ("[i]n certain instances, UBS sold *more than half* of total bond issuances that UBS underwrote to its own captive Funds").

  o UBS stuffed the risky bonds into the Funds in order to drive demand and prices for offerings they underwrote, pocketing underwriting, investment, and advisory fees along the way.  *See* ¶¶78-82.

- These practices rendered the Funds far riskier than UBS Puerto Rico and UBS Financial had uniformly represented to all Class members, including Plaintiffs, throughout the Class Period.[15] ¶¶3, 84-88, 122-30.

- UBS amplified the Funds' risks by leveraging them to the hilt. *See* ¶¶67-69. By the end of 2013, the Funds had nearly a dollar of debt for every dollar of capital. ¶67.

  - o UBS created the leverage by causing the Funds to enter into repurchase agreements with UBS, Banco Popular, and its affiliates, and by selling short-term notes to conflicted affiliates. ¶68.

  - o These leverage agreements generated additional and increased fees for UBS and its affiliates at the expense of the Class. ¶¶68-69.

- UBS secretly unloaded a substantial portion of its own inventory of shares in the Funds on UBS's own clients, lowering its own risk by increasing client risk. Specifically, in 2009 as part of UBS's internal "Objective: Soft Landing" initiative, UBS Financial directed UBS Puerto Rico and Defendants Ferrer and Ubiñas to significantly reduce the amount of CEFs held in UBS Puerto Rico's own inventory in order to reduce its own risk. ¶71. Defendants complied with this directive by selling 75% of UBS's inventory of CEFs to clients, and, as one Financial Advisor aptly put it, "screwing the client." *Id.* UBS effectuated this massive sell-off by "telling the people aggressively that they should be buying … [and] that they should not be selling." *Id.* That is, UBS advised clients to buy, while UBS was selling CEFs in furtherance of UBS's desire to reduce its own exposure to these risky assets.

- UBS systematically incentivized Financial Advisors to invest clients in the Funds, rewarding those who did and threatening punishment to those who did not:

  - o To induce Financial Advisors to place clients into the Funds, Defendants paid Financial Advisors materially inflated sales commissions on transactions in Fund shares. ¶¶97-101.

  - o The UBS Defendants created additional incentive programs to reward Financial Advisors for *keeping* their clients invested in the Funds. ¶¶115-21.

  - o When Financial Advisors balked at continuing to sell the Funds, senior-most management at UBS Puerto Rico, including Defendant Ferrer, responded by bullying the Financial Advisors into continuing to sell the Funds, dismissing their

---

[15] Whether the Funds technically complied with the concentration parameters provided in UBS publications or permitted through waiver does not end the matter of whether the extraordinary concentrations of certain issuers in the CEFs was consistent with Defendants' representations that the Funds were safe investments. *Cf. Ambac Assur. UK Ltd. v. J.P. Morgan Inv. Mgmt., Inc.*, 88 A.D. 3d 1, 10-11 (1st Dep't 2011) ("[w]hether permitted or not, once the defendant acquired information about the riskiness of [the] securities it was also aware that such securities were incompatible with the stated investment objective of the accounts"). As discussed below, the Funds' risk disclosures were inadequate to warn of the actual dangers of the Funds. *See infra* 24-26 .

concerns with profanity and repeatedly informing them that they needed to sell the Funds or "find yourselves another job." *See* ¶¶6, 89-93.

These allegations, among others, plead clear breaches of the UBS Defendants' fiduciary duties, demonstrating that UBS generally and systematically: (i) put its own interests above its clients; (ii) disregarded any suitability analysis; (iii) failed to provide "honest and complete information"; (iv) otherwise violated their duties of candor, loyalty and fair dealing; and (v) uniformly breached the fiduciary duties that UBS Puerto Rico and UBS Financial owed Class members.[16]

Notwithstanding these detailed allegations, the UBS Defendants assert that Plaintiffs' have failed to plead reliance and that – remarkably – any reliance by clients on UBS's advice "would be unreasonable as a matter of law" because of information purportedly set forth in risk disclosures. *See, e.g.,* UBS Br. at 23.  But, contrary to Defendants' assertions, Plaintiffs do explicitly allege reliance.  *See, e.g.,* ¶¶59, 152, 169 (alleging that Plaintiffs and Class members "entrusted their…savings and other capital to Defendants" and "reposed trust and confidence in [Defendants'] superior knowledge of and expertise in investment matters generally and the [Funds] in particular").

Defendants' invocation of inadequate risk disclosures equally fails.  *First,* none of the Fund prospectuses or the unidentified "other disclosures" to which the UBS Defendants vaguely refer (UBS Br. at 9, 23) provided Class members with facts concerning UBS's disabling of its own internal controls, including Fund overconcentration alerts, UBS's obviously conflicted "Objective:

---

[16] Because these alleged breaches were carried out pursuant to uniform policies and practices that applied across the board to most or all CEF transactions of the Plaintiffs and Class members for long periods of time during the Class Period, Defendants' contention that Plaintiffs must allege breaches on a transaction-by-transaction basis simply ignores the nature of this putative class action and the detailed allegations of the Complaint concerning Defendants' conduct.  *See* UBS Br. at 22.  Indeed, Defendants' lead authority on this point, *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir. 2002) is inapposite because it involves an individual plaintiff and not a putative plaintiff class.

Soft Landing" initiative, UBS's improper loan scheme or the fact that UBS's own financial advisors had serious concerns about selling the Funds to clients – so much so that UBS management had to bully them into doing so by threatening their jobs.  Nor did these risk disclosures reveal the multiple self-dealing arrangements that permeated the underwriting, construction and leveraging of the Funds.[17]

*Second,* the risk disclosures that Defendants invoke are couched in vague, generic boilerplate language that could not suffice to provide notice of the deep problems pervading the Funds.  For example, the prospectus for the Tax-Free Puerto Rico Fund, Inc. (TFPRF), which was typical, stated merely that the Fund's "net asset value and its yield ***may*** fluctuate," that "a ***potential exists*** for conflicts of interest," and the Fund is "***more susceptible***" to issues affecting Puerto Rico issuers.  *See* Ross Decl., Ex. K at 1, 3, S-3.  Further, the TFPRF prospectus reassured investors that if "affiliated transactions" take place, Defendants would implement procedures "[t]o ensure that such transactions are in ***the best interest of the Fund's investors***" and would "address potential conflicts that may arise."  *Id.*, at S-2.   Indeed, even though Defendants leveraged the Funds to the hilt, the TFPRF prospectus stated feebly that the Fund "***may***" use leverage to invest but "[t]here can be no guarantee" that it would do so.  *Id.*, at S-4 to S-5.  This is the exact type of boilerplate language that courts routinely reject as insufficient notice of dangers that are known to defendants. *Dandong v. Pinnacle Performance Ltd.*, 2011 WL 5170293, at *13 (S.D.N.Y. Oct. 31, 2011) ("Boilerplate language indicating that Morgan Stanley 'may be adverse to the interest of the Noteholders' and '[p]otential and actual conflicts of interest may arise' is insufficient to put investors on notice of what Plaintiffs allege was the inevitable risk that Morgan Stanley would

---

[17] Because the facts that UBS failed to disclose to clients with respect to these and other matters alleged in the Complaint were not contemporaneously known or knowable to general market participants, the cases cited by the UBS Defendants, UBS Br. at 23, are distinguishable.  *See Brown v. E.F. Hutton Grp.*, 991 F.2d 1020 (2d Cir. 1993) (complete information was available to plaintiff); *Crigger v. Fahnestock & Co.*, 443 F.3d 230 (2d Cir. 2006) (same).

invest their principal in an instrument that was engineered to fail."); *see also In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described."); *CRT Investments, Ltd. v. Merkin*, 29 Misc. 3d 1218(A), 918 N.Y.S.2d 397 (Sup. Ct. 2010) *aff'd sub nom. CRT Investments, Ltd. v. BDO Seidman, LLP*, 85 A.D.3d 470, 925 N.Y.S.2d 439 (2011) ("cautionary language does not shield defendants from liability" where plaintiffs allege "misrepresentations of a present known fact").

Further, as cases under the analogous common law 'Bespeaks Caution' doctrine have long held, "[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."). Neither before nor after reading the boilerplate risk disclosures in the Fund prospectuses would Class members have been aware of Defendants' multiple breaches of their fiduciary duties.

***The UBS Defendants' Breaches Of Duty Caused Substantial Damages.*** Plaintiffs have adequately pled damages resulting from the alleged breaches of fiduciary duty. For example, the Complaint describes how the Funds, which Defendants had turned into "ticking time bombs" and then oversold to Plaintiffs and Class members, plummeted in value in mid-2013. This caused Plaintiffs and other Class members to suffer billions of dollars in damages. ¶¶131-37. As alleged, these problems afflicted not discrete transactions, but the Funds as a class, and thus affected Class members, including Plaintiffs, in a consistent and uniform manner, such that the type of

particularized share and transaction analysis that Defendants would require is not necessary to plead damages for purposes of Rule 8(a).

## B.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT CERTAIN UBS DEFENDANTS AIDED AND ABETTED BREACHES OF FIDUCIARY DUTY

Plaintiffs adequately allege that UBS Puerto Rico aided and abetted the fiduciary breaches of UBS Financial and vice-versa, and that UBS AG, UBS Trust and Defendants Ubiñas and Ferrer aided and abetted the breaches by both UBS Puerto Rico and UBS Financial.  The UBS Defendants' arguments to the contrary are unavailing.

"[A] claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007); *see also Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 294 (2d Cir. 1993) ("Anyone who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestius que trust.").  As demonstrated above, Plaintiffs have pleaded the first and third elements of aiding and abetting by providing detailed allegations establishing that UBS Puerto Rico and UBS Financial each breached their fiduciary duties, which caused substantial damages to Plaintiffs and other Class members.

Plaintiffs have also adequately alleged the second element of this cause of action, by alleging that the defendants "provide[d] 'substantial assistance' to the primary violator."  *Lerner*, 459 F.3d at 294 (quoting *Kaufman v. Cohen*, 307 A.D. 2d 113, 126 (1st Dep't 2003)).  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [breach of fiduciary duty] to occur."  *Id.* at 295.  With respect to both UBS Financial and UBS Puerto Rico, Plaintiffs have pled numerous instances in which each

substantially assisted fiduciary breaches by the other.  *See, e.g.,* ¶¶70 (as part of "Objective: Soft Landing," UBS Financial directed UBS Puerto Rico to unload UBS's high-risk Fund inventory onto unwitting clients, which it did); ¶¶112-14 (UBS Financial's internal controls overridden to allow UBS Puerto Rico to exceed concentration limits with respect to Funds); ¶¶115-21 (compensation decisions intended to motivate UBS Puerto Rico's Financial Advisors to keep clients from selling Funds).  Plaintiffs have also pled substantial assistance by the other UBS Defendants of UBS Puerto Rico and UBS Financial's breaches.  *See, e.g.,* ¶¶70 (Ferrer and Ubiñas participated in "Objective: Soft Landing" initiative to dump UBS's Fund inventory onto Class members); ¶68 (UBS Trust held massive quantities of short term notes issued by the Funds, thus receiving fees paid by Fund investors' capital and participating in self-dealing arrangements); ¶¶104-10 (UBS AG indirect subsidiaries UBS Bank and UBS Puerto Rico collaborated in unlawful loan scheme).

Moreover, Plaintiffs have alleged facts showing that there was far more than commonplace "overlap" between the highest management of the UBS Defendant entities.  For example, Ferrer was CEO and founder of UBS Trust, and Chairman, CEO and President of UBS Puerto Rico; UBS Financial's President and CEO was an executive committee member of UBS AG and an owner and executive officer of UBS Puerto Rico; and UBS Trust and UBS Puerto Rico shared offices. ¶35.  Ferrer's knowing participation in the breaches by UBS Puerto Rico and UBS Financial may be plausibly imputed to UBS Trust, of which Ferrer was CEO.[18]  Thus, Plaintiffs' aiding and abetting claims are adequately alleged.

---

[18] The UBS Defendants do not contest Plaintiffs' damages allegations for this cause of action.

### C.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT THE UBS CONTRACTING DEFENDANTS BREACHED THEIR CONTRACTUAL DUTIES

The UBS Defendants concede that, under the CRAs, UBS was required "to deal fairly with" clients, and to "have a reasonable basis for believing" that advice or recommendations provided to clients were "suitable and appropriate" for them.  *See* UBS. Br. at 26-27 (citing ¶¶54, 56, 185); Millett Aff., Ex. A at 50.  Plaintiffs plead the applicability of these provisions, UBS Defendants' breaches of such provisions and resulting damages.[19]

As already seen, Plaintiffs have pled detailed allegations of the UBS Defendants' failure to deal fairly with Plaintiffs and other clients, and to provide them with investment recommendations that UBS had a "reasonable basis" to believe were suitable and appropriate.  For example, the following allegations plausibly plead that the UBS Defendants breached their contractual obligations of good faith and fair dealing, and failed to heed their duty to analyze suitability:  (i) Financial Advisors' grave concerns over the suitability of Funds for clients, which UBS management overrode to force them to continue to sell the Funds (¶¶6, 89-93); (ii) self-dealing repurchase and note transactions that increased Funds' leverage and caused Class members' capital to be paid in fees to UBS affiliates (¶¶28, 68-69); and (iii) UBS's "Objective: Soft Landing" initiative in which it sold its own Fund holdings while telling its clients to buy (¶71).  It is well established that a defendant's alleged wrongdoing can violate both contractual duties and independent fiduciary duties, *see Bayerische Landesbank*, 692 F.3d at 58, and such is the case here.[20]

---

[19] "Under New York law, there are four elements to a breach of contract claim: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011).  As to the second element, there is no dispute as to whether Plaintiffs met their obligations under the relevant contracts.

[20] Finally, the damages proximately caused by the UBS Defendants' contractual breaches are the same as those set forth above.

In response, Defendants argue that Plaintiffs have failed to allege the specifics of their investment profiles.  *See, e.g.,* UBS Br. at 27-28.  But this misses the point.  Plaintiffs do not dispute suitability in and of itself.  Rather, Plaintiffs challenge the fact that Defendants failed to conduct *any* analysis of suitability in their conflicted and disloyal greed for fees.  *See, e.g.,* ¶¶1, 6, 8, 186-87.  Thus, nothing turns on the investment profile of any particular Class member. Plaintiffs' breach of contract claims against UBS are well-pled.

As for Defendant Ferrer's separate motion to dismiss, his only argument for dismissal of Plaintiffs' aiding and abetting fiduciary duty claim is that Plaintiffs have failed to plead the prerequisite breach of fiduciary duty claim against the UBS Defendants.  Ferrer Br. at 12-14.  As discussed in detail above, Plaintiffs have adequately pled breach of fiduciary duty claims against UBS.  Further, as explained above, Plaintiffs have adequately pled aiding and abetting claims against Ferrer.  Therefore, Ferrer's argument should be rejected and his motion to dismiss denied.

*          *          *

In sum, Plaintiffs have adequately alleged that Defendants UBS Puerto Rico and UBS Financial breached their fiduciary duties to Plaintiffs and other Class members (Count I); that Defendants UBS AG, UBS Trust, UBS Puerto Rico, UBS Financial, Ubiñas and Ferrer aided and abetted those breaches (Count II) and that Defendants UBS AG, UBS Financial, UBS Puerto Rico, UBS Trust and UBS Bank breached their contractual obligations to Plaintiffs and other Class members (Count V).

### D. PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT POPULAR SECURITIES BREACHED ITS FIDUCIARY DUTIES

***Popular Securities' Fiduciary Duty Under Puerto Rico Law***.  Popular Securities' fiduciary duty to Plaintiffs and other Class members is expressly defined by Regulation 6078.  *See*

¶49.[21]  Yet, disregarding the law, Popular asserts that because Plaintiffs Toro Velez's and Vela's financial advisors were broker-dealers, and not actually financial advisors, they somehow owed a lesser duty.  Pop. Br. at 24-26.  This position finds no support in and is expressly contrary to Regulation 6078, which does not distinguish between the duties owed by broker-dealers and investment advisors in imposing on both a uniform obligation to "observe the highest standard of fiduciary duty toward their customers and investors."  Regulation 6078; ¶49.  Moreover, as confirmed by Popular's own public statements on its website, Popular Securities did more than "consummate[] trades requested by the client."  *See* Popular Def. Br. at 25.  Instead, Popular Securities represented to its clients that it would, *inter alia,* "work with our clients to understand their particular circumstances and financial goals [and] offer specialized, trustworthy advice with one objective in mind: to help our clients achieve their goals and those of their families"; offer "objective advice"; "create strategies that work[ed] with our clients' capital in the most efficient way possible" and "prepare an investment plan based on each client's objectives and particular level of risk tolerance."  *See, e.g.,* ¶58.[22]  In sum, Popular provided investment advice to Class members.

Puerto Rico authority further demonstrates that the Complaint adequately alleges that Popular is a fiduciary.  A fiduciary is "a person or institution who manages money or property and who must exercise a standard of care in such management activity imposed by law or contract . . . The status of being a fiduciary gives rise to certain legal incidents and obligations, including the

---

[21] Popular contends that Plaintiffs must comply with Rule 9(b) in pleading their fiduciary duty claims.  As explained *supra* Section I, Popular is wrong.  Rule 8(a)'s "notice" pleading standard applies.

[22] Regardless of the technical title used to refer to the Popular Securities financial advisors—broker-dealer or investment advisor—these individuals owed Plaintiffs fiduciary duties and Defendants' attempts to circumscribe or disclaim these duties are unavailing.  Notably, while Mr. Vela's client agreement (Pop., Ex. G) specifically disclaims any fiduciary duty for the custodian (*i.e.,* NFS), it does not include any language doing so for Popular Securities, which is tacit acknowledgment that Popular Securities owed such heightened duties.

prohibition against investing the money or property in investments which are speculative or otherwise imprudent."  *Satellite Broad. Cable, Inc. v. Telefonica de España*, 786 F. Supp. 1089, 1097-98 (D.P.R. 1992); *see also An-Port, Inc. v. MBR Indus., Inc.*, 772 F. Supp. 1301, 1314 (D.P.R. 1991) (an agent "is a fiduciary [who] is required to exercise fidelity and the utmost good faith, loyalty and honesty toward his principal at all times.").

Notwithstanding the clear authority establishing that Popular owed a fiduciary duty to Plaintiffs and the Class, the question of whether a fiduciary relationship existed is generally reserved for the fact finder.  *See, e.g.*, *Wilson Farm, Inc. v. Berkshire Life Ins. Co.*, 2002 WL 31440151, at *8 (Mass. Supp. 2002) ("[w]hether or not a fiduciary relationship existed is a factual question to be decided by a jury"); *Pearce v Duchesneau Grp., Inc.*, 392 F. Supp. 2d 63, 72 (D. Mass 2005) ("[o]n a motion to dismiss, the plaintiff is not obligated to prove that fiduciary relationship existed").  While Popular will be free to attempt to develop whatever fact-based defenses it wishes in discovery, it is clear that Plaintiffs have plausibly pleaded that Popular owed the highest standard of fiduciary duty to Class members.

***Popular Securities Breached Its Fiduciary Duty.***  Popular Securities breached its fiduciary duty to Plaintiffs and the Class by engaging in self-dealing transactions designed to profit the Defendants at Class members' expense and by pushing Class members to invest in the Funds, including through uniform policies that failed to consider suitability.  *See* Richard A. Lord, 19 *Williston on Contracts* § 54:28 (4th ed.) ("The primary obligation imposed on an agent by the fiduciary duty of loyalty is to avoid self-dealing with regard to the business of the principal.").  In addition, Popular Securities further breached its fiduciary duty to Plaintiffs and other Class members by repeatedly representing that the Funds were safe, secure, fixed-income investments in various sources, including, *inter alia*, prospectuses, offering documents and annual reports.  *See*

¶¶123, 125-26.  Defendants represented, for example, that the investment goal of each Fund was to provide "a high level of current income…consistent with the preservation of capital."  *See* ¶¶125-26; *see also, e.g.,* Pop., Ex. C (PRITFF VI prospectus) at S-2.[23]  Contrary to Defendants' representations, the Funds were not safe, secure, low-risk, fixed income investments, were not guaranteed and did not preserve Class members' capital.  *See* ¶130.  Popular Securities motivated individual financial advisors to sell Fund shares through inflated commissions on Fund transactions—these commissions were generally around 5% while commissions on normal bond sales were less than 1%.  ¶¶97-100.  Plaintiffs have thus sufficiently pled that Popular Securities failed to comply with the statutorily imposed "highest standards of fiduciary duty toward their customers and investors."  Reg. 6078.

   ***Popular Securities' Breaches Of Duty Caused Substantial Damage.***  As explained above, Plaintiffs have adequately pled damages for their breach of fiduciary duty claim against Popular. The Popular Defendants' motion to dismiss these claims should be denied.

### E.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT BANCO POPULAR AIDED AND ABETTED POPULAR SECURITIES' BREACH OF FIDUCIARY DUTY

   As explained above, Plaintiffs have pled the first and third elements of aiding and abetting by providing detailed allegations establishing that Popular Securities breached its fiduciary duties, which caused substantial damage to Plaintiffs and other Class members.

   Contrary to the Popular Defendant's arguments (Pop. Br. at 29-30), Plaintiffs have also adequately pled Banco Popular's "actual knowledge of the breach" and "substantial assistance." For example, in addition to alleging an overlap in directorships and management between Popular

---

[23] For this reason, the Popular Defendants are incorrect to assert that the Complaint is "utterly devoid" of any allegations concerning "what *Popular* represented."  Pop. Br. at 9.  The Popular Defendants made these representations in the prospectuses and other offering materials for the Funds they jointly managed with the UBS Defendants.  *See, e.g.,* Pop., Ex. A at 5; *see also id.* Ex. B at 14; Ex. C at S-2.

and Banco Popular (*see* ¶38) and that Popular "generally disregarded corporate distinctions" (¶179), Plaintiffs allege that Banco Popular, through its Popular Asset Management division, serves as "Co-Investment Adviser," together with UBS Asset Managers, to the nine Jointly Managed Funds.  ¶38.  In its role as investment advisor, Banco Popular is responsible for "selecting the assets to be purchased by the Funds" (¶79) and therefore was necessarily aware of the nature and risk of the Funds and of the representations regarding these characteristics included in communications with Class members.  Plaintiffs further allege that Banco Popular was one of the only buyers when the Funds issued short-term notes (*see* ¶68), which were used to increase the Funds' leverage, thus further establishing that Banco Popular was actively involved in the scheme. In light of Banco Popular's role, Plaintiffs have adequately shown that Banco Popular both:  (i) knew of Popular's breach of fiduciary duty; and (ii) substantially assisted Popular.  *See* Popular Def. Br. at 29 (citing *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 333 (S.D.N.Y)); *Rodriguez v. Banco Cent.*, 727 F. Supp. 759, 774 (D.P.R. 1989)).[24]

### F.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THAT POPULAR SECURITIES BREACHED ITS CONTRACTUAL DUTIES

To state a claim for breach of contract under Puerto Rico law,[25] "a party must sufficiently allege (1) a valid contract, (2) breach of that contract, and (3) resulting damages."  *Montalvo v. LT's Benjamin Records, Inc.*, 56 F. Supp. 3d 121, 135 (D.P.R. 2014).   Similarly, under Massachusetts law,[26] a claim for breach of contract must allege: "(1) the existence of a valid and binding contract; (2) that plaintiff has complied with the contract and performed his own

---

[24] As explained above, Plaintiffs have adequately pled damages for their aiding and abetting breach of fiduciary duty claim against Banco Popular.

[25] The Toro Velez agreement referenced in the Popular Defendants' Brief provides: "This agreement and all the transactions on my account will be governed by the laws of the Free Associated State of Puerto Rico."  Pop., Ex. E at §8.

[26] The version of the Popular client agreement at Pop., Ex. G provides: "This agreement and its enforcement are governed by the Free State of Massachusetts, except with respect to its provisions regarding legal conflicts."

obligations under it; and (3) breach of the contract and causing damages." *Persson v. Scotia Prince Cruises Ltd.*, 330 F.3d 28, 34 (1st Cir. 2003).   Plaintiffs have adequately pled each of these elements against Popular Securities under both Puerto Rico and Massachusetts law.

  ***Popular Securities' Contractual Obligations.***  Plaintiffs sufficiently allege, and the Popular Defendants do not dispute, that Plaintiffs Toro Velez and Vela entered into valid contracts with Popular Securities.  *See* ¶¶21-22, 57; *see also* Popular Def. Br. at 21-22.[27]  In addition to the express obligations set forth in these client agreements,[28] "Puerto Rican law imposes the duty of good faith performance on contracting parties."  *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 108-09 (1st Cir. 2001) (citing *AMECO v. Jaress Corp.*, 98 P.R.R. 820 (1970) (contracting parties have obligations by law that extend "to cover not only what has been expressly stipulated, but also the consequences which, according to their nature, are in accordance with good faith")); *see also Westernbank Puerto Rico v. Kachkar*, 2009 WL 6337949, at *28 (D.P.R. 2009) ("although it is not termed an 'implied covenant,' good faith is a requirement in Puerto Rico contract law").[29] Similarly, under Massachusetts law, every contract is subject to an implied covenant of good faith and fair dealing so as to "ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract."  *FAMM Steel Inc. v. Sovereign Bank*, 571 F.3d 93, 100 (1st Cir. 2009); *see also Speakman v. Allmerica Fin. Life Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) ("The essential inquiry is whether the challenged conduct conformed to the parties' reasonable

---

[27] Contrary to Defendants' assertion that Plaintiffs attempt to plead a breach of contract claim based on the statements on Popular's website (Popular Def. Br. at 20-22), Plaintiffs instead cite to the representations on Popular's website as support for the fiduciary duties and obligations that Popular Securities owed to Plaintiffs as Popular Securities clients. *See* ¶50 ("In their marketing materials, the UBS Defendants and the Popular Defendants each acknowledged the fiduciary duties they owed to Class members."); *see also* ¶58 (setting forth representations on Popular website).

[28] *See, e.g.,* Pop., Ex. G at 4 ("As your broker/dealer, we will…[d]etermine the suitability of any recommendation or investment advice.").

[29] The Popular Defendants do not contend that Plaintiffs have failed to comply with or perform under the client agreements.  *See generally* Popular Def. Br. at 20-23; *see also Persson*, 330 F. 3d at 34.

understanding of performance obligations, as reflected in the overall spirit of the bargain . . .").

Plaintiffs allege that pursuant to express and implied contractual obligations, Popular Securities was required to, *inter alia*:  act in Class members' best interests in recommending investments; "determine whether any investment advice or recommendations they gave Class members were suitable for [those] Class members"; and "operate in compliance with all applicable laws, rules and regulations relating to their own operations, the supervision of their sales representatives . . . [and] of transactions and other activity in Class members' accounts."  ¶¶57, 190; *see also* Pop., Ex. G at 4 (Popular "will…[d]etermine the suitability of any recommendation or investment advice.").  Thus, Plaintiffs have adequately alleged that Popular Securities owed its clients valid and binding contractual obligations.

***Popular Securities Breached Its Contractual Obligations***.  Plaintiffs have adequately alleged that Popular Securities breached its contracts with Toro Velez, Vela and other Class members by failing to abide by its express and implied contractual duties, including the obligation to act in good faith.  *See, e.g.,* ¶¶68, 74, 85, 95.

In light of the trust and confidence that Plaintiffs and the Class placed in Popular Securities, the latter's tireless efforts to enable Popular to profit from the Funds at the expense of Plaintiffs and other Class members represent a clear violation of Defendants' obligation to act with good faith in fulfilling their contractual duties.  *See, e.g.*, *Speakman*, 367 F. Supp. 2d at 132 (breach of implied covenant of good faith occurs when one party violates reasonable expectation of other).

Popular Securities' violation of its contractual duty to act in good faith is further shown by its efforts to push Plaintiffs and other Class members to invest in the Funds, regardless of the suitability of such investments for the Class members' needs.  *See, e.g.* ¶95.  Through these actions, Popular Securities failed to faithfully adhere to the purpose of the client agreements—providing

appropriate investment opportunities for Plaintiffs and the Class.  *See Adria Int'l Grp.*, 214 F.3d at 108 ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party."); *Uno Rests. Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (Mass. 2004) ("[T]he purpose of the covenant [of good faith] is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.").

Finally, the Popular Defendants assert that Plaintiffs' claims are undermined by the disclosures contained in the offering documents for the Funds.  *See, e.g.*, Pop. Br. at 7-9, 22, 28-29.  As discussed *supra* at 24-26, the Funds and Defendants' vague, generic and boilerplate disclosures were inadequate to put Plaintiffs and the Class on notice of the serious risks and dangers of investing in the Funds.[30]

**Popular Securities' Breach of Contract Caused Substantial Damages.**  As discussed previously, Plaintiffs have adequately pled damages.  Thus, the Popular Defendant's motion to dismiss Plaintiffs' breach of contract claims should be denied.

---

[30] Relatedly, contrary to Popular's assertions, the provisions in certain Popular client agreements stating that the clients agreed to "accept full responsibility" for transactions (Pop., Ex. G), that Popular would "not provide any investment advice" or "opinions with respect to the suitability of any security or order" (Pop., Ex. E) do not defeat Plaintiffs' contract claims.  Pop. Br. at 22.  *First*, the contracts expressly state that Popular is responsible for "ensuring that all transactions…are in compliance with applicable laws and rules" (Pop., Ex. E at 5), including Regulation 6078, and that Popular would "[d]etermine the suitability of any recommendation and investment advice" (Pop., Ex. G at 4).  *Second,* these contract provisions do not excuse or render inactionable Defendants' misconduct in placing their own interests ahead of Class members' interests by engaging in self-dealing transactions designed to profit Defendants at Class members' expense.  Defendants' cited cases on this point are inapposite because the plaintiffs in those cases expressly agreed to accept responsibility for the conduct that constituted the alleged breach, *see Szulik v. State St. Bank & Trust Co.*, 935 F. Supp. 2d 240, 256 (D. Mass. 2013), and disclaimed reliance on the very representations that they then claimed were actionable, *see Matana v. Merkin*, 989 F. Supp. 2d 313, 319 (S.D.N.Y. 2013).  Here, by contrast, Plaintiffs did not agree to accept responsibility for the Popular Defendants' misconduct—*i.e.*, their self-dealing transactions and their misrepresentations regarding the Funds.  Further, the Popular Defendants actively provided investment advice to Plaintiffs and Class members.

## III.    SLUSA DOES NOT APPLY TO THIS BREACH OF DUTY ACTION

Defendants argue that this entire Action must be dismissed under SLUSA.  *See* Pop. Br. at 10-15; UBS Br. at 11-12; Ferrer Br. at 12.  Defendants are wrong.  As explained below, Defendants' exact arguments are foreclosed by the Supreme Court's recent opinion in *Troice*.[31]

### A.    SLUSA DOES NOT APPLY BECAUSE THE FUNDS ARE NOT "COVERED SECURITIES" AND ALL ALLEGED MISREPRESENTATIONS CONCERN THE FUNDS

To invoke SLUSA, Defendants must show that the Action:  (1) is a "covered class action;" (2) based on state or local law; (3) concerning a "covered security"; and (4) alleges misrepresentations "in connection with the purchase or sale of that security."   15 U.S.C. § 78bb(f)(1); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 842 F. Supp. 2d 587, 591-92 (S.D.N.Y. 2012).  While Plaintiffs do not dispute that the first two requirements are met,[32] Defendants do not and cannot satisfy the third and fourth requirements.

As Defendants themselves admit, the Funds do not meet SLUSA's definition of "covered securities."[33]  *See* Pop. Br. at 2, 12; UBS Br. at 11.  And Plaintiffs do not *allege* misrepresentations "in connection with" a covered security as the Complaint only alleges misrepresentations relating to Plaintiffs' purchase of uncovered Funds (*see, e.g.,* ¶¶122-30).[34]  Accordingly, SLUSA does not apply.  Indeed, in *Troice*, the Supreme Court made clear that SLUSA's "in connection with" requirement was *not* satisfied where "plaintiffs d[id] not allege that the defendants'

---

[31] Because SLUSA concerns securities claims, Defendants now assert that this Action involves "classic securities claims."  Pop. Br. at 10.  But, as noted herein, Defendants took the exact opposite position in order to defeat consolidation, arguing that the claims here were different from the securities claims at issue in the Securities Action.

[32] Defendants assert that this Action is a "covered class action" (Pop. Br. at 11; UBS Br. at 11), which is defined in SLUSA as action involving "more than 50 persons" where "questions of law or fact common to those persons … predominate over any [individualized] questions."  15 U.S.C. § 78bb(f)(5)(B)(i)(I).  Plaintiffs agree and, as such, the issues of numerosity and predominance are not in dispute in this litigation.

[33] SLUSA defines "covered securities" as securities that are "traded nationally and listed on a national securities exchange" or "issued by [a registered] investment company."  15 U.S.C. § 78bb(f)(5)(E); 15 U.S.C. § 77r(b)(1).

[34] Defendants concede that the misrepresentations in the Complaint only induced transactions in the Funds.  *See, e.g.,* ¶¶3, 122-30; Pop. Br. at 11. (Plaintiffs' "theory [is] that [they] *purchased the Funds* in reliance on Defendants' 'misrepresent[ations] [about] the nature, stability and risk of *the Funds*.'").

misrepresentations led anyone to buy or sell (or to maintain positions in) *covered* securities." *Troice*, 134 S.Ct. at 1062.[35]

Numerous other courts facing similar facts have likewise held that SLUSA does not apply. *See, e.g.*, *Pension Comm. of U. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 750 F. Supp. 2d 450, 451, 455 (S.D.N.Y. 2010) (SLUSA held not to apply where plaintiffs purchased "shares of hedge funds that [were] not covered securities under SLUSA," even though the hedge funds themselves owned covered securities; concluding "the alleged fraud relates to th[e] hedge funds rather than to the covered securities in the portfolios"); *In re Tremont Sec. Law, State Law, and Insurance Litig.*, 2014 WL 1465713, at *3 (S.D.N.Y. Apr. 14, 2014) (purchases of limited partnership interests provided insufficient connection to a covered security under *Troice*); *Anwar v. Fairfield Greewich Ltd.*, 728 F. Supp. 2d 372, 398 (S.D.N.Y. 2010) (purchases of uncovered shares in offshore funds did not meet SLUSA's "in connection with" requirement"); *Hidalgo-Velez v. San Juan Asset Mgmt.*, 759 F.3d 98, 107-08 (1st Cir. 2014) (SLUSA held not to apply where plaintiffs purchased uncovered shares in Puerto Rico funds, like the Funds here, that might themselves have owned covered securities).  In fact, although Defendants omit mention of it, the District Court in the Securities Action rejected the notion that SLUSA applies to the ***very Puerto Rico Funds at issue here***.[36]  The same result is warranted in this Action.

---

[35] In *Troice* there was even a closer connection between the misrepresentations and the covered securities than here because, there, plaintiffs actually alleged misrepresentations relating to the underlying covered securities.  *See, e.g.*, *id* at *1071.  Even so, the Supreme Court held that SLUSA did not apply.

[36] In the Securities Action, as they do here, certain Defendants argued in a motion to dismiss that "the shares of the Funds are 'covered securities' under SLUSA because the Funds themselves invest in securities that meet the definition of 'covered securities.'"  *See, e.g.*, Ross Decl. Ex. G at 28.  The District Court in the Securities Action refused to apply SLUSA to the Funds and denied Defendants' motion to dismiss.  *Id.*, Ex. H (order denying motion to dismiss; no application of SLUSA).  Defendants then moved for reconsideration, arguing for a second time that SLUSA applied to the Funds.  *Id.*, Ex. I at 12.  The court again refused to apply SLUSA to the Funds and denied Defendants' motion for reconsideration.  *Id.*, Ex. J.

Notwithstanding these fatal facts, Defendants still claim that SLUSA applies by arguing that Plaintiffs allege misrepresentations "in connection with" securities (other than the Funds) that are covered by SLUSA.  Pop. Br. at 12-15.  Defendants' arguments, however, not only contradict the allegations of the Complaint and the relevant facts – but they were expressly rejected by the Supreme Court in *Troice*.

*First*, in *Troice*, the Supreme Court squarely rejected Defendants' argument that SLUSA applies because "the Funds themselves necessarily purchased covered securities."  Pop. Br. at 12; UBS Br. 11.  There, the Supreme Court considered whether SLUSA's "in connection with" requirement was met where plaintiffs purchased *uncovered* securities issued by a bank that supposedly owned underlying *covered* securities.  The Supreme Court held that the fact that the bank itself, like the Funds here, could purchase or sell covered securities was immaterial given that the plaintiffs, like Plaintiffs here, only bought uncovered securities.  *Troice*, 134 S.Ct. at 1066-67.  As the Supreme Court explained: "[i]f the only party who decides to buy or sell a covered security as a result of a lie is a liar, that is not a "connection" that matters."  *Id.* at 1066.[37]  Accordingly, SLUSA did not apply.  *Id.*[38]

---

[37] The Supreme Court was also not concerned with analyzing what percentage of covered securities the issuer might have owned and, instead, determined that those underlying covered securities were too remote to satisfy SLUSA's "in connection with" requirement.  For this reason, Defendants' argument that the First Circuit's opinion in *Hidalgo-Velez* was "wrongly decided" is unavailing.  Pop. Br. at n.13.  Further, the First Circuit followed *Troice* in holding that even though some "part of the [f]und's portfolio might include covered securities, *any such holdings were incidental*" because "the link between the alleged misrepresentations and the covered securities… is too attenuated to bring the complaint within the maw of the SLUSA."  759 F.3d at 108.  Thus, *Hidalgo-Velez* is yet another nail in the coffin for Defendants' SLUSA arguments.

[38] Defendants misplace reliance on so-called "feeder fund" cases arising from the Madoff Ponzi scheme, including *In re Kingate Management Ltd. Litig.*, 784 F.3d 128 (2d Cir. 2015), and *In re Herald*, 730 F.3d. 112 (2d Cir. 2013), ("*Herald I*").  These cases are inapposite because, unlike here, the funds there were merely intermediaries through which the plaintiffs sought to own covered securities and the misrepresentations at issue all directly concerned those covered securities.  For example, in *Kingate*, the Second Circuit expressly noted that "plaintiffs' expectation…was that the [f]unds would invest in  common stock of Standard & Poors ("S&P") 100 companies [which are] covered securities under the terms of SLUSA."  784 F.3d at 133.  Further, the plaintiffs there, unlike here, received "account statements" that "purported to show purchases and sales…of covered securities."  *Id.* at 134.  Similarly, in *In re Herald*, the Second Circuit found that the plaintiffs' claims were "integrally tied to the underlying fraud committed by Madoff," which involved the purchase of covered securities.  730 F.3d. at 119.

Even if *Troice* had not rejected Defendants' exact argument, it would still fail on the facts at issue in this case. Indeed, Defendants' argument that the Funds' underlying securities are material is contradicted by the Funds and Defendants' own documents, which made clear that Class members were not purchasing an interest in the Funds' underlying securities. For example, Fund prospectuses explicitly warned investors that "[a]n investment in the Fund is ***not*** equivalent to an investment in the underlying securities of the Fund" and that they "should ***not*** view the Fund as a vehicle for trading purposes." *See, e.g.,* Ross Decl., Ex. K at 1. Similarly, Plaintiffs' account statements state that Plaintiffs owned shares only of the Funds themselves – not any underlying assets. *See, e.g., id.,* Exs. B, C, and D.

***Second***, Defendants are also incorrect to argue that SLUSA applies because Plaintiffs purportedly allege that "Defendants duped them into selling covered securities [*i.e.*, IRA investments and mutual funds] in order to invest in the Funds." *See* Pop. Br. at 12-14. But Plaintiffs do not allege that Defendants "duped" them into selling either covered IRAs or mutual funds (or any other covered security). The only "mutual funds" discussed in the Complaint are the uncovered Funds (*see, e.g.,* ¶47) and, to the extent that the Complaint discusses IRA investors, it is only because Defendants focused on ***selling the uncovered Funds*** to them. *See, e.g.,* ¶87 ("Defendant Ferrer directed Defendant UBS's Financial Advisors to channel 'IRA investors' ***into the Funds***."). Defendants' mischaracterizations of the Complaint should be swiftly rejected.[39]

---

[39] None of the Complaint paragraphs cited by Defendants allege that Plaintiffs were "duped" into selling covered IRAs or mutual funds. Pop. Br. at 12. For example, ¶72 discusses Defendants "pushing Class members to invest in ***the Funds***"; ¶77 discusses the fees that Defendants earned from stuffing ***the Funds*** with high-risk and uncovered Puerto Rico municipal bonds; and ¶98 discusses the fact that Defendants earned higher fees by bundling "risky bonds into ***the Funds*** and selling shares of ***the Funds*** to clients." Similarly, ¶134 focuses on the losses suffered by investors in ***the Funds***—and this paragraph does not allege that covered IRAs or mutual funds were sold due to Defendants' misrepresentations or even mention covered IRAs or mutual funds. Further, any vague reference to "liquid assets" in ¶134 is precisely the type of "incidental" allegation that the Supreme Court rejected in *Troice*. 134 S.Ct. at 1071-72.

Moreover, the names, dates and amounts of the purported IRA/Fund transactions Defendants rely on do not add up – and certainly do not establish the conclusion that Defendants posit.[40]

But even if Defendants' recitation of the facts were correct, the Supreme Court also rejected this exact argument in *Troice*.  There, the district court below had "found that one of the plaintiffs acquired [uncovered securities] 'with the proceeds of selling' covered securities contained in his IRA portfolio." *Troice*, 134 S.Ct. at 1071-72.  In holding that SLUSA did not apply, the Supreme Court determined that these IRA "sales constituted no relevant part of [Defendants' misconduct] but were rather incidental to it." *Id.*  The same conclusion is compelled here because, as discussed above, Plaintiffs do "not allege that the sale of…covered securities…constituted any part of [Defendants'] scheme." *Id.* at 1072.  And, as in *Troice*, Defendants were not at all "interested in how the plaintiffs obtained the funds they needed to purchase" the Funds.  *Id.*  Defendants even **loaned** Class members money in order to purchase **more of the Funds**.  ¶¶104-11.  Thus, even if covered IRAs and mutual funds were sold in order to purchase the Funds, those sales are "incidental" to Defendants' alleged misconduct and insufficient to implicate SLUSA.  *Id.* at 1072.[41]

---

[40] For example, Popular argues that in 2005 Mr. Toro-Velez sold a covered IRA to buy a Fund and cites Pop., Ex. E at 7, which states that Mr. Toro-Velez "*100,000*" shares of "*Preferred stock*" in "*PR [Inv.] Tax Free.*"  But Mr. Toro-Velez did not own a Fund named "Puerto Rico Investors Tax Free" Fund (*see* ¶21) and Popular does not argue otherwise.  This cannot refer to the Funds that Mr. Toro-Velez did own (*i.e.*, PRITFF III or PRITFF V) because (i) it is common ground that PRITFF III and PRITFF V issued common stock – not preferred stock (*see* Pop., Exs. A and B); and (ii) Mr. Toro-Velez did not own 100,000 shares of either PRITFF III or PRITFF V in 2005.  As Defendants concede, Mr. Toro-Velez bought 4,761 shares of PRITFF V for $49,995.00 on January 11, 2005, and 2,065 shares of PRITFF III for $20,035.00 on January 22, 2007.  Pop. Br. at 5; *see also* Pop., Exs. H and I (Mr. Toro-Velez's account statements).  Similarly, Popular offers no evidence of the exact timing or order of Mr. Vela's transactions, as his account statement lists only settlement dates and does not show the precise order in which the trades were made.  In sum, on Defendants' own proffered evidence their SLUSA arguments cannot be credited.

[41] Citing the pre-*Troice* opinion in *Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010), Defendants argue that SLUSA "merely requires a covered transaction to "coincide' with a misrepresentation." Pop. Br. at 13. But in *Romano*, the Second Circuit interpreted "coincide" to mean that the alleged misrepresentations must "induce" and "necessarily involve" (or "necessarily rest on") transactions in covered securities.  *Romano*, 609 F.3d at 522.  Here, Plaintiffs do not allege that they were "induced" to sell any IRAs, mutual funds or other covered securities and this Action absolutely does not "necessarily involve" or "necessarily rest on" any such transactions.  Thus, even under this pre-*Troice* standard, there is not a sufficient "connection" for SLUSA to apply.  *Id.*  Further, *Romano* is factually inapposite

### B.    SLUSA CANNOT BAR ALL CLAIMS IN THIS ACTION

Defendants are also incorrect to assert that, if SLUSA did apply, it would "preclude[] all of Plaintiffs' claims."  Pop. Br. at 2, 15.  In this Circuit, SLUSA's application is analyzed claim-by-claim.  *LaSala v. Bank of Cyprus Public Co. Ltd.*, 510 F. Supp. 2d 246, 274 (S.D.N.Y. 2007).  The Court must consider both "the technical elements of [each] claim" as well as the "factual allegations intrinsic to [each] claim as alleged," and then can "dismiss under SLUSA only claims that include 'misstatements or omissions' as a 'necessary component.'"  *See Anwar*, 728 F. Supp. 2d at 399 n.7; *Xpedior*, 341 F. Supp. 2d at 266 ("SLUSA does not preempt claims 'which do not have as a necessary component misrepresentation[s], untrue statements or omissions of material facts' made in connection with the purchase or sale of a [covered] security.").

Under this test, SLUSA is not remotely applicable to Plaintiffs' breach of contract claims, as they do not depend on allegations of affirmative misrepresentations.  *See, e.g.*, ¶¶186-87 (Count V); ¶¶191-92 (Count VI).  Accordingly, assuming *arguendo* that SLUSA applied to the Funds (it does not), Plaintiffs' breach of contract claims are still not preempted.  *Xpedior*, 341 F. Supp. 2d at 269-70  (holding that claims of violating an underwriting agreement were not preempted by SLUSA; reasoning that "[n]one of the state law claims asserted by [plaintiff] [including] breach of contract … require misrepresentations or omissions as a necessary component."); *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 385-88 (SLUSA held not to apply to breach of contract claims alleged against investment advisor; such claims did "not depend in any way on

---

because there, unlike here, plaintiffs purchased "covered securities" and those covered securities were directly at issue the case.  *Id.* at 524 ("[T]his is a case where defendants' alleged misrepresentations induced [plaintiffs] to…invest their retirement savings with defendants, where the savings were used to purchase *covered securities*.").  Defendants' other pre-*Troice* authorities are equally inapposite.  *Superintendent of Ins. Of State of N.Y. v. Bankers Life & Cas. Co.*, 400 U.S. 6 (1971) (interpreting Exchange Act, §10(b), not SLUSA; victim sold covered securities while receiving no compensation as a result of deception); *S.E.C. v. Zandford*, 535 U.S. 813, 822 (2002) (interpreting Exchange Act, §10(b), not SLUSA; victims were "duped into believing" that the defendant would "invest" their assets in covered securities in the "stock market").

establishing [that defendants' made] misrepresentations actionable under the securities laws."). Similarly, the core of the breach of fiduciary duty and related claims is that Defendants breached their duties through conflicted and disloyal conduct.  *See, e.g.*, ¶1*; see also* Count I, ¶155 (certain UBS Defendants "pushed Plaintiffs and other Class members to invest in the Funds regardless of Class members' investment objectives…"); Count III, ¶172 (same re Popular Securities); *see also* Counts II and IV (aiding and abetting the alleged breaches of fiduciary duty).  These claims do not depend on proving any misrepresentations.   Because misrepresentations are not a "necessary component" of these claims, they are not preempted by SLUSA.  *Norman*, 350 F. Supp. 2d at 385-88 (SLUSA held not to apply to, *inter alia*, breach of fiduciary duty claims because they did not "not depend" on "establishing… misrepresentations actionable under the securities laws."); *see also LaSala v. TSB Bank, PLC*, 514 F. Supp. 2d 447, 473 (S.D.N.Y. 2007) ("If merely making allegations of fraud somewhere in the complaint were sufficient to bring the case within the reach of SLUSA, a class action complaint for commission of an environmental tort, that also alleged that the company fraudulently altered its books…would be preempted, even if the claim against the defendant had nothing to do with securities fraud.").

## IV.   DEFENDANTS' STATUTE OF LIMITATIONS DEFENSES FAIL

Defendants' statute of limitations defenses fail because they are predicated on an erroneous interpretation of Puerto Rico law concerning when tort claims accrue.

Defendants do not raise any statute-of-limitations challenge to Plaintiffs' contract claims,[42] aside from arguing – incorrectly, as discussed *infra* Section V – that PRUSA's statute of repose

---

[42] Plaintiffs' contracts respectively state that they are governed by (i) New York law (Plaintiffs Fernandez, Schreiner, Velez and Viera/Sanatana), which provides for a six year statute of limitations pursuant to N.Y. C.P.L.R. § 213(2); (ii) Massachusetts law (Plaintiff Vela), which also provides for a six year statute of limitations pursuant to Mass. Gen. Law ch. 260 §2; and (iii) Puerto Rico law (Plaintiff Toro), which provides for a fifteen year limitations period for contract claims under 31 L.P.R.A. § 5294.

bars those claims.  Defendants do challenge Plaintiffs' breach of fiduciary duty and aiding and abetting claims, arguing that, by operation of New York's borrowing statute, Puerto Rico's one year statute of limitations governs these claims.  31 L.P.R.A. § 5298(2).  Under the borrowing statute, "all extensions and tolls" available under Puerto Rico law likewise apply.  *Gordon & Co. v. Ross*, 63 F. Supp. 2d 405, 409 (2d Cir. 1999).

Under Puerto Rico law, the statute of limitations for tort claims "does not begin to run until the plaintiff possesses, or with due diligence would possess, information sufficient to permit a suit."  *Villarini-Garcia v. Hosp. Del Maestro, Inc.*, 8 F.3d 81, 84 (1st Cir. 1993).  A person has sufficient knowledge to permit a suit when she has "notice of the injury" and "notice of the person who caused it."  *Colón Prieto v. Géigel*, 115 D.P.R. 232, 247, 15 Off. Trans. 313, 331 (1984).  In turn, a person has "notice of the injury" when there "exist some outward…signs through which the aggrieved party may become aware and realize that he has suffered an injurious aftereffect" *Delgado Rodriguez v. Nazario de Ferrer*, 1988 WL 580813, *356 (P.R. May 16, 1988).

"[T]he knowledge required to start the statute running is knowledge not only of harm but also of 'the origin of the injury,' . . . which we take to include knowledge of the wrong and a causal link between the wrong and some harm."  *Villarini-Garcia*, 8 F.3d at 84 (quoting *Colón Prieto*, 115 D.P.R. at 245, 15 Off. Trans. at 329); *see also Espada v Lugo*, 312 F.3d 1, 4 (1st Cir. 2002) (noting that "actual knowledge" only occurs when a claimant has "enough to provide a causal nexus between [the tortfeasor's conduct] and the injury."); Ross Decl., Ex. L, *Torres Sánchez v. Hosp. Dr. Pila*, 2002 WL 32090928, *4 (P.R. Cir. Nov. 26, 2002) ("According to the traditional doctrine . . . the knowledge required to start the statute of limitations is the *damage* suffered.").  A claimant "need not take all possible steps to ascertain the identity" of the tortfeasor; instead, it is

enough to "act as a reasonable person in her position."  *Velazquez v. Schindler Corp. of P.R.*, 968 F. Supp. 2d 475, 479 (D.P.R. 2013).

## A. PLAINTIFFS' INJURIES BEGAN AFTER MAY 2013

The facts pleaded in the Complaint demonstrate that Plaintiffs' claims are timely.  The Complaint alleges that Plaintiffs' injuries began in mid-2013, when the value of their Fund holdings dropped precipitously as the consequence of Defendants' conflicted and disloyal conduct. ¶¶11, 131.  Plaintiffs initiated this Action on May 30, 2014, within a year of the commencement of their injuries.  Thus, Plaintiffs' claims are timely.[43]

Defendants argue that Plaintiffs' claims are barred because Plaintiffs were injured earlier than May 2013.  UBS contends that Plaintiffs were injured at the time they "purchased shares of the Funds." UBS Br. at 13.  Banco Popular and Ferrer, on the other hand, decline to state when they believe Plaintiffs were injured.  Instead, they simply proclaim that Plaintiffs had knowledge of their "claims" (as opposed to injuries) before May 30, 2014.  *See* Pop. Br. at 18; Ferrer Br. at 16.

But this is not the law.  As discussed above, in Puerto Rico, the limitations period does not begin before a party is able to bring a claim, which requires, among other things, that the plaintiff be injured and have notice of such injury.  *Villarini-Garcia*, 8 F.3d at 84; *Vera v. Dr. Bravo*, 161 D.P.R. 308, 330-31 (P.R. 2004) (noting that the evidence of damage must be sufficient to support the filing of an action for damages; if it is not, such evidence cannot be considered sufficient notice to start the limitations period).  It is equally clear that a claim for monetary damages for Defendants' breach of their fiduciary duties would not be ripe before such damages had been

---

[43] Because the case was initiated within a year of Plaintiffs' injuries, the burden remains with Defendants to establish evidence supporting their statute-of-limitations defense.  *Diaz-Rivera v. Supermercados Econo, Inc.*, 22 F. Supp. 3d 146, 150 (D.P.R. 2014).

incurred.  *See Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993) (torts cannot accrue until an injury has been sustained); *see also Hudson v. Delta Kew Holding Corp.*, 43 Misc.3d 1223(A), (Table), 992 N.Y.S.2d 158, 2014 WL 1924324, at *5 (N.Y. Sup. Ct. Apr. 22, 2014) (applying *Kronos* and deciding that breach of fiduciary duty claim cannot be brought until "damages are sustained").

In this case, at the time Plaintiffs purchased their shares, they had suffered no harm.[44]  It was not until the consequences of Defendants' wrongdoing manifested in the precipitous decline in the value of Plaintiffs' investments that Plaintiffs could be said to have suffered the "outward or physical signs through which the aggrieved party may become aware and realize that he has suffered an injurious aftereffect."  *Delgado Rodriguez*, 1988 WL 580813 at *356.  Because this did not occur until mid-2013, it was only then that Plaintiffs' claims became ripe.  ¶¶11, 131.

### B.    PLAINTIFFS LACKED KNOWLEDGE OF THE CAUSE OF THEIR INJURIES

Defendants argue at length about when Plaintiffs purportedly had knowledge of their claims.  UBS Br. at 14-18; Pop. Br. at 18-20; Ferrer Br. at 16-20.  However, as discussed above, because Plaintiffs suffered their injuries and filed this Action within the limitations period, the claims are timely and the question of Plaintiffs' knowledge need not be reached.

Even if Plaintiffs had been injured, and could have known of such injury more than a year before they sued, Plaintiffs had no reason to suspect that any particular decline in value of their investments was the result of the Defendants' breaches of duty.  *Velazquez*, 968 F. Supp. 2d at 479 (noting that a claimant need only "act as a reasonable person in her position").  As noted above,

---

[44] According to Puerto Rico law, it is not the misconduct, but the manifestation of an injury, that starts the limitations period.  At times, the injury will occur concurrently with the misconduct; in other circumstances, such as those presented here, the wrongdoing only leads to an injury at a later date.  *See, e.g., Ortega v. Pou*, 135 D.P.R. 711 (P.R. 1994) (determining in a case of a failed sterilization procedure that the damage occurred at the time the woman became pregnant, despite the fact that the conduct constituting the alleged malpractice occurred at the time of the surgery itself).

the statute of limitations does not begin to run until a claimant has notice both of her injury *and* of the casual nexus between the injury and the wrongdoer or wrongful act. *Espada*, 312 F.3d at 2-5 (indicating that "notice," for the purposes of evaluating a limitations defense, requires knowledge of a casual nexus between the injury and the challenged act or actor); *Guzman-Camacho v. State Ins. Fund Corp.*, 418 F. Supp. 2d 3, 8 (D.P.R. 2006) (deciding that the limitations period did not accrue until plaintiff learned that the injury to his father could have been caused by negligent treatment).

Here, no reasonable person in Plaintiffs' position would have expected that Defendants' conflicted and disloyal behavior had actually *maximized* the riskiness of their Fund investments, or that such behavior ultimately caused their injuries.   In fact, Defendants repeatedly assured Plaintiffs that their shares in the Funds were safe, low-risk, fixed-income investments.  *See* ¶¶83, 85 ("Defendants consistently represented to Class members that the Funds were both low-risk and low-volatility investments."), 128, 129.   At the time Plaintiffs purchased their shares, UBS told them it would act in Plaintiffs' "best interests" and "place your interests before our own" in the case of any conflicts of interest.  ¶54.  Even as late as May 2012, after the commencement of all of the lawsuits relied on by Defendants (which are also discussed below), Defendant Ferrer was publicly proclaiming that he "at all times ha[s] acted in the best interests of [UBS's] customers." Ross Decl., Ex. M.[45]  Thus, Plaintiffs could not have been aware of the casual link between the

---

[45] The UBS Defendants assert that because Plaintiffs were invested in shares of the Funds as of May 2012, they should have been aware of their claims based on the filing of the SEC proceeding and its surrounding news reports.  UBS Br. at 16.  Defendants overlook the fact that during this same time period they were still touting the Funds as safe, secure investments and recommending that Plaintiffs and class members remain invested in the Funds.  *See, e.g.*, ¶128 ("Defendants also falsely portrayed the Funds as safe and secure investments at numerous Investor Conferences' held during the Class Period, including in conferences held in . . . February 2013, which thousands of clients, including Class Members, attended.").  Moreover, as evidenced by the articles they cite, Defendants staunchly denied any wrongdoing with respect to the claims in the SEC proceedings, which, unlike this case, concerned whether UBS had failed to tell investors that it "controlled the secondary market for [the Funds] … and us[ed] that control to prop up market prices."  *See, e.g.,* Youngwood Decl. Ex. 11 (*Puerto Rico Unit of UBS Pays SEC Settlement*, ASSOCIATED PRESS, dated May 1, 2012 ("UBS agreed to the settlement without admitting or denying the findings of an

Defendants' disloyalty and Plaintiffs' pecuniary losses and their claims are not barred. *Rodriguez-Suris v. Montesinos*, 123 F.3d 10, 15 (1st Cir. 1997) ("In circumstances where a plaintiff has not abandoned a cause of action, but instead was never aware that such a cause of action existed, the statute of limitation would not operate as a bar . . .") (applying Puerto Rico law).

### C.   THE SEC ACTION AND THE SECURITIES ACTION DID NOT PUT PLAINTIFFS ON NOTICE

Contrary to Defendants' assertions (UBS Br. at 14-18; Pop. Br. at 18-20; Ferrer Br. at 16-19), no storm warnings alerted Plaintiffs to their claims.[46]  Defendants premise this argument upon equating the allegations in this Action to those in a 2012 SEC proceeding concerning the liquidity of the Funds (the "SEC Proceeding") and the Securities Action.  This argument is incorrect, disingenuous and, based on their contradictory representations in this very Action, Defendants are estopped from making it.

As the UBS Defendants' own brief acknowledges, the SEC Proceeding was based on misrepresentations about the "***liquidity*** of the CEF market." *See, e.g.,* UBS Br. at 15 (citing Ferrer, Exchange Act Release No. 66892, 2012 WL 1514677 (May 1, 2012)).[47]  Accordingly, it could not

---

investigation"). Defendants' words of comfort prevented Plaintiffs and members of the Class from being on notice of their claims. *See LC Capital Partners, LP v. Frontier Insurance Group, Inc.,* 318 F.3d 148, 154 (2d Cir.2003) (holding that "[t]here are occasions where, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management," and that such reassurances offset apparent storm warnings "if an investor of ordinary intelligence would reasonably rely on them to allay the investor's concerns"); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) ("courts have been reluctant to find that public disclosures" triggered limitations period "where those disclosures were tempered with positive statements").

[46] As discussed above, *supra* Section IV, Puerto Rico's limitations periods begins from the time a plaintiff has notice of the injury and notice of the causal link between the injury and the wrongdoer or wrongful or wrongful act.  While Defendants are therefore incorrect to refer to notice "of a claim," Plaintiffs' discussion of the purported "storm warnings" employs the "notice of claim" construct simply for the sake of convenience.  The fact of consequence is that neither proceeding gave Plaintiffs notice of either their injuries or the cause of their injuries.

[47] Defendants argue certain findings in the SEC Proceedings support the proposition that they did not misrepresent or omit material facts "in connection with the sale of the Funds."  UBS Br. at 5; *see also* Ferrer Br. at 11 (same).  Defendants vastly overreach.  The SEC Proceedings, which occurred before Plaintiffs knew of their injury in mid-2013, did not purport to consider or determine for all purposes the question of whether UBS and Ferrer made any Fund-related misrepresentations during the alleged Class Period (which ends in 2014).  Quite the contrary – the SEC Proceedings and the findings therefrom concerned discrete issues related to whether UBS, Ferrer and others

serve to notify Plaintiffs of the breach of duty claims advanced in this Action, which do not concern the liquidity of the secondary market for the Funds.

As for the Securities Action, this Action asserts different claims, against different defendants, involving a different time period and focuses on different underlying conduct. Defendants themselves have admitted this.  Indeed, Defendants have repeatedly explained in court filings that this Action is completely different from the Securities Action, and that the two actions assert completely different claims.  For instance, in opposing Plaintiffs' motion to consolidate this Action with the Securities Action, Defendants filed a Joint Opposition brief in which they argued:

> **[T]he differences between the two actions are substantial.**  Among other things, **in addition to alleging _different claims_,** the two cases:
>
> - **name different defendants** (notably the Popular Defendants are not parties to the Securities Action);
>
> - **allege different putative class periods** (the putative class period in [this] Action extends two years later than the Securities Action);
>
> - **concern different closed-end funds** (the Securities Action does not include allegations regarding five of the funds purportedly co-managed by UBS and Popular and five of the funds managed solely by UBS);
>
> - **focus on different underlying conduct** (the Securities Action alleges misconduct in connection with the secondary market for the thirteen funds managed by a division of UBS Trust, while [this] Action focuses on the suitability of funds for and the sale of funds to clients); and
>
> - **seek damages for purported misconduct that occurred at different periods of time** (the primary damages complained of in [this Action] occurred in 2013 and 2014, after the Securities Action was filed**).**
>
> Given these **substantial differences**, the scope of discovery in the two cases will be **distinct, as will the legal issues facing the parties and the Court.**

---

misrepresented matters of **Fund pricing** and **liquidity** in the Fund secondary market in 2008-2009.  Substantively, these issues overlap minimally with the allegations herein, and findings on these issues have little bearing on the timeliness or adequacy of Plaintiffs' claims.  In a similar vein, because Plaintiffs' claims concern a far broader array of misconduct than the claims in the SEC Proceedings, Ferrer's argument that Plaintiffs' case is untimely as to him because the cases share certain common allegations (Ferrer Br. 8-9), goes nowhere.

*See* Defendants' Joint Opposition Brief, ECF No. 36 at 2-3; *see also id.* at 10-12 ("[I]n addition to alleging different claims, there are other substantial differences between the two cases … includ[ing] different defendants, different funds, different putative class members and class periods, different underlying conduct at issue, *and* different damages."); The UBS Defendants' Motion to Transfer Venue, ECF No. 35 at 3, 6-7 (same); The UBS Defendants' Reply Brief in Support of Their Motion to Transfer Venue, ECF No. 41 at 8 (same).[48]   The Puerto Rico District Court relied on these arguments in denying consolidation.  *See* ECF No. 52.

In light of these representations, Defendants cannot now maintain that the Securities Action is so similar to this Action that it put Plaintiffs on notice of their claims.  Quite the contrary, Defendants are estopped from "taking a litigation position that is inconsistent with a litigation position successfully asserted by [them] in an earlier phase of th[is] same case."  *Flores-Febus v. MVM, Inc.*, 45 F. Supp. 3d 175, 178 (D.P.R. 2014) (explaining that the judicial estoppel "doctrine serves to protect the integrity of the judicial process and prevent litigants from playing 'fast and loose with the courts'."); *see also Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993), cert. denied, 510 U.S. 992 (1993).

Defendants' inquiry notice argument also fails for the reasons articulated by the Second Circuit in *Staehr v. Hartford Financial Services, Inc.*, 547 F.3d 406 (2d Cir. 2008).  In that case, a lawsuit filed in July 2001 contained allegations similar to those in the plaintiff's complaint, which was filed in October 2004.  *See id.* at 434-36.  The defendants argued that because the plaintiff in the prior litigation had been able to detect "storm warnings" that caused him to file a lawsuit alleging fraud, the plaintiff in the subsequent litigation could have done so as well, and that the subsequent litigation was therefore time-barred.  *See id.*  The Second Circuit found this argument

---

[48] The Popular Defendants again "adopt[ed] the points set forth in the contemporaneously filed reply brief by the UBS Defendants.")  Popular's Reply in Support of Its Motion to Transfer, ECF No. 42, at 1.

to be "fundamentally flawed," pointing out that the prior plaintiff, an attorney who worked in the relevant industry, was unusually sophisticated. *Id.*[49] "The fact that an investor of more-than-ordinary intelligence filed a lawsuit against subsidiaries of The Hartford in 2001 cannot be used as a bellwether for the adequacy of the 'storm warnings.'" *Id.* at 436; *see also In re Ames Dep't. Stores, Inc. Note Litig.*, 991 F.2d 968, 981 (2d Cir. 1993).[50] The same result is warranted here.

Finally, the UBS Defendants argue that Plaintiffs' claims should be dismissed as time-barred because Plaintiffs did not "plead that they lacked notice of their claims before May 30, 2013." UBS Br. at 17. As discussed above, Plaintiffs were not injured until after May 30, 2013, and therefore the Complaint was timely filed. But, more to the point, the law simply does not require such specificity at the pleading stage. *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) ("The pleading requirements in the Federal Rules of Civil Procedure, however, do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses") (citing *Jones v. Bock*, 549 U.S. 199 (2007)). In fact, it is clear that once the affirmative statute-of-limitations defense is raised by a defendant, the questions of diligence and knowledge are reserved for the jury. *Villarini-Garcia*, 8 F.3d at 87.

The UBS Defendants cite two cases, *Quintana Lopez v. Liggett Group, Inc.*, 336 F. Supp. 2d 153 (D.P.R. 2004) and *Doe 171 v. Order of Saint Benedict*, 2012 WL 1410320, at *3 (D.P.R.

---

[49] Although Defendants attempt to make much of the fact that some of Plaintiffs' counsel were involved in another proceeding against some of the same defendants, this is of no moment. *See Schmitz v. Davis*, 2010 WL 3861843, at *6 (D. Kan. Sept 23, 2010) ("[t]he court is not persuaded by this analysis, which imputes an attorney's knowledge to these plaintiffs at a time the attorney was ***not shown*** to have been employed by them."). As clearly set forth in the Complaint, Plaintiffs and other Class members' damages did not start to arise until mid-2013 (¶¶11, 131-37).

[50] *See also E.W. French & Sons, Inc. v. Gen. Portland, Inc.*, 885 F.2d 1392, 1400 (9th Cir. 1989) ("The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice, but to rule that it does so as a matter of law is to compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights . . . The mere filing of a similar lawsuit, without more, does not necessarily give "good ground" because that suit might well be frivolous or baseless.") (citing *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979))).

Apr. 20, 2012), to support their position.  Neither suggests that Puerto Rico law requires a claimant to plead its lack of knowledge.  At most, *Quintana Lopez* states that "under certain circumstances" a court can resolve a statute of limitations defense at the motion-to-dismiss stage.  *Quintana Lopez*, 336 F. Supp. 2d at 320.  But this is nothing more than a recitation of what Plaintiffs have already acknowledged – that under some circumstances, the fact that a claim is barred will be obvious on the face of the pleading.  As explained above, this is ***not*** such a case.

### D.   DEFENDANTS' STATUTE OF LIMITATIONS ARGUMENTS ARE FACT ISSUES INAPPROPRIATE FOR RESOLUTION AT THE PLEADING STAGE

The questions of when claimants had the requisite knowledge of their injuries and whether they have exercised reasonable diligence are factual inquiries.  Such questions should be left for a jury and not be decided on a motion to dismiss.  *See Villarini-Garcia*, 8 F.3d at 87 ("[Eve]n where no raw facts are in dispute, the issues of due diligence and adequate knowledge are still ones for the jury so long as the outcome is within the range where reasonable men and women can differ."); *see also In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 199 (S.D.N.Y. 2003) (noting that question of due diligence in discovering a claim for purposes of statute of limitations is typically a factual question for the jury to decide); *Brody v. Brody*, 2009 WL 436404, at *3 (S.D.N.Y. Feb. 17, 2009) (denying motion to dismiss on timeliness grounds and holding that "[a]t this stage of the proceedings, without the aid of discovery, the Court finds that dismissal is inappropriate and premature.").

## V.   PRUSA DOES NOT APPLY TO PLAINTIFFS' CLAIMS

Defendants argue that a two-year statute of repose under Puerto Rico's blue sky law, 10 L.P.R.A. § 890(e) ("PRUSA") bars a minor subset of Plaintiffs' claims.[51]   UBS Br. at 18-19; Pop. Br. at 16-17.   Again, Defendants are wrong.

*First,* Defendants assert that PRUSA's two-year statute of repose applies to Plaintiffs' claims because those claims sound in fraud.   *Id.*   But, as explained above, this Action does not allege fraud, does not allege claims that are the "equivalent of securities fraud," and does not sound in fraud.   *See supra* Section II.   Moreover, Defendants have already admitted in this very Action – and are estopped from denying – that this case does not involve securities claims.   *See supra* at IVC.   Accordingly, PRUSA does not apply.

Virtually all of the cases that Defendants cite in support of their misguided PRUSA argument are securities fraud cases.   For example, the court in *Ambert v. Caribe Equity Grp., Inc.*, 2011 WL 4626012, at *7 (D.P.R. Sept. 30, 2011) (UBS Br. at 19), applied § 890(e) where the plaintiffs asserted both federal securities fraud and common law fraud claims.   *See id.* ("PRUSA applies to securities fraud—the very conduct alleged in this case.").   Similarly, *Salgado* v. *Piedmont Capital Corp.*, 534 F. Supp. 938, 947 (D.P.R. 1981) (Pop. Br. at 16) is inapposite, as the plaintiff in that case alleged federal securities fraud.   Additionally, neither *Soley v. Wasserman*, 2010 WL 931888, at *7 (S.D.N.Y. Mar. 12, 2010) nor *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (Pop. Br. at 16 n.15) had anything to do with the application of PRUSA to breach of fiduciary duty and/or breach of contract claims.   Both cases involved, *inter alia*, the application of Rule 9(b) to common law claims alleged in conjunction with securities fraud claims under § 10(b)

---

[51] Defendants argue that only some of Plaintiffs' claims are time-barred under PRUSA's statute of repose.   The UBS Defendants argue that Plaintiff Georgina Velez Montes' claims are completely time-barred but concedes that the other UBS Plaintiffs have timely claims under PRUSA.   UBS Br. at 18-19 n.7.   Popular asserts that all of Plaintiff Toro's claims and some, but not all, of Plaintiff Vela's claims are barred by PRUSA's statute of repose.   Pop. Br. at 17.

of the Securities Exchange Act of 1934.  Here, as Defendants have conceded, the Complaint does not allege securities law violations.  As discussed above, nor does the Complaint assert fraud claims.  *See Asociacion de Enfermeria Visitante Auffant, Inc. v. Great–West Life & Annuity Ins. Co.*, 775 F. Supp. 2d 333, 346 (D.P.R. 2011) (declining to apply § 890 even where the plaintiff brought a general claim under PRUSA, because "the complaint never mention[ed] fraud.").[52]

The Court should not countenance Defendants' attempt to re-write the Complaint to allege securities fraud claims and to deflect from the gravamen of Plaintiffs' claims – namely, that Defendants violated the fiduciary and contractual duties they owed to Plaintiffs and the other members of the Class by pushing them to invest in the Funds.

**Second**, Defendants' PRUSA argument is premature and cannot be decided on the pleadings.  *See, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 29 F. Supp. 3d 345, 349-50 (S.D.N.Y. 2014) (While "[a] defendant may raise a statute of limitations defense in a Rule 12(b)(6) motion to dismiss . . . 'the Court can only grant [this] motion . . . if there is no factual question as to whether the alleged violations occurred within the statutory period."); *see also Brody*, 2009 WL 436404, at *3.  Here, Defendants have raised numerous factual issues, including interpretation of the contracts at issue and allegations regarding Plaintiffs' transactions in the Funds, all of which raise questions of fact as to whether the alleged violations occurred within the statutory period, and therefore cannot be decided at this stage of the proceedings.

---

[52] Further, the courts in *PaineWebber, Inc. v. First Boston Inc.,* 136 D.P.R. 541, 544 (P.R. 1994) and *Tollinche Puig v. Triple-S Mgmt. Corp.* 2010 WL 3200382, at *3 (P.R. Ct. App. May 28, 2010) applied PRUSA's statute of repose because the claims specifically arose from a "purchase/sale agreement" and a "stock purchase," which fell directly within the purview of PRUSA.  Here, by contrast, Plaintiffs' claims are not premised on specific agreements of purchase and sale, but more generalized contracts for investment advisory/brokerage services and the fiduciary duties arising from the trust and confidence that Plaintiffs and other Class members reposed in Defendants.

## VI.   PLAINTIFFS HAVE STANDING TO BRING THIS SUIT ON BEHALF OF ALL PURCHASERS OF ALL THE FUNDS

Contrary to Defendants' argument (UBS Br. at 29-30; Pop. Br. at 30; Ferrer Br. at 20), Plaintiffs have standing to bring claims not only with respect the Funds they purchased, but also with respect to Funds they did not.  As an initial matter, Defendants conflate standing to represent a class of similarly situated investors with Article III standing.  *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 158 (2d Cir. 2012) ("whether NECA has 'class standing' – that is, standing to assert claims on behalf of purchasers of Certificates from other Offerings . . . does not turn on whether NECA would have statutory or Article III standing to seek recovery for misleading statements in those Certificates' Offering Documents"); *cf Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, (1992) (holding that to demonstrate Article III standing a plaintiff must allege (1) an injury in fact, (2) fairly traceable to defendants' actions, that is (3) redressable by the requested relief).  Plaintiffs' allegations in the Complaint plainly satisfy this standard as to the Funds they themselves purchased.[53]

Whether Plaintiffs have class standing is a premature question at the motion to dismiss stage.  *See e.g.*, *In re China Valves Tech. Secs. Litig.*, 979 F. Supp. 2d 395, 415 (S.D.N.Y. 2013) ("whether [plaintiffs] ha[ve] standing under *NECA–IBEW* to represent shareholders who

---

[53] *See, e.g.*, ¶15 ("Through this action, Plaintiffs seek to recover the losses caused by Defendants' breaches of duty and other misconduct, as well as disgorgement of the fees and other profits Defendants reaped in violation of their duties to Plaintiffs and to the other members of the Class."); ¶¶19-24 (Plaintiffs "suffered losses on [their] investments … as a result of Defendants' misconduct"); ¶158 ("As a direct and proximate consequence of UBS Puerto Rico and UBS Financial's breaches of their fiduciary duties, Plaintiff and the Class have suffered, and continue to suffer, damages …".); ¶137 (As a result of the misconduct alleged herein, Plaintiffs and the other members of the Class have been harmed."); ¶167 ("As a direct and proximate result of the UBS Aiding and Abetting Defendants' aiding and abetting UBS Puerto Rico and UBS Financial's breaches of fiduciary duty, Plaintiffs and other members of the Class suffered injuries for which monetary damages are sought."); ¶174 ("As a direct and proximate consequence of Popular Securities' breaches of its fiduciary duties, Plaintiff and the Class have suffered, and continue to suffer, damages …"); ¶181 ("As a direct and proximate result of Banco Popular aiding and abetting Popular Securities' breaches of fiduciary duty, Plaintiffs and other members of the Class suffered injuries for which monetary damages are sought."); ¶¶188-89 (alleging substantial harm, caused by the UBS Defendants, that can be redressed via damages); ¶¶193-94 (alleging substantial harm, caused by the Popular Defendants, that can be redressed via damages)).

purchased pursuant to other prospectuses is a class certification question to be decided, if necessary, in due course."); *see also Bais Yaakov of Spring Valley v. Houghton Mifflin Harcourt Publishers, Inc.*, 36 F. Supp. 3d 417, 421 (S.D.N.Y. 2014) ("Because Plaintiff in this case has satisfied the requirements for Article III standing, the issue of whether Plaintiff has standing to represent putative class members is an issue to be decided on a motion for class certification."); *In re Frito–Lay N. Am., Inc. All Natural Litig.*, 2013 WL 4647512, at *12 (E.D.N.Y. Aug. 29, 2013) ("*NECA–IBEW* thus instructs that, because plaintiffs have satisfied the Article III standing inquiry, their ability to represent putative class members who purchased products plaintiffs have not themselves purchased is a question for a class certification motion.") (collecting cases).

Even if Plaintiffs were required to demonstrate class standing at this stage (which they are not), they have done so.  In *NECA-IBEW*, the Second Circuit set forth a two-part inquiry for class standing, holding that, "[I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally had suffered some actual ... injury as a result of the putatively illegal conduct of the defendant, ... and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  *See NECA-IBEW*, 693 F.3d at 162.[54]

As set forth in the Complaint, Defendants uniformly breached the fundamental fiduciary and contractual duties they owed to Plaintiffs and the thousands of other customers Defendants pushed to invest in the Funds, conduct which would come to result in massive losses for Plaintiffs and the members of the Class.  ¶¶8, 10, 59, 84, 122-37.

---

[54] *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010) (UBS Br. at 29-30) and *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010) (Pop. Br. at 30) are inapposite because they both pre-date and were abrogated by the Second Circuit's decision in *NECA-IBEW*, which, as set forth above, articulated the appropriate standard for asserting class standing.

Simply put, the *same* misconduct by the *same* Defendants, which included the *same* conflicts of interest, the *same* breaches of duty and the *same* alleged misrepresentations, caused thousands of Class members to suffer the *same* injuries by investing in Funds that were sold pursuant to the *same* information and had the *same* risks associated with them.[55]  Further, the Funds were each structured by Defendants in the *same* way and they even included many of the *same* types of underlying assets.  For example, a review of the holdings of both Puerto Rico Investors Tax-Free Fund III, Inc. ("PRTFF3"), which Plaintiff Toro Velez purchased, (¶21) and Puerto Rico Investors Tax-Free Fund II, Inc. ("PRTFF2"), which no named plaintiff purchased, reveals that of the 68 assets underlying PRTFF2, *42* of them are also in PRTFF3.[56]

Consequently, the egregious conduct that caused significant losses to Plaintiffs implicates the "same set of concerns" as the conduct that caused injury to all members of the putative class. Plaintiffs have thus established class standing under *NECA-IBEW*.

## CONCLUSION

For all the foregoing reasons, Defendants' motions to dismiss the Complaint should be denied in their entirety.[57]

---

[55] *See CitiGroup*, 723 F. Supp. 2d at 584–85 (named plaintiffs who purchased only in specific bond offerings had standing to represent purchasers in different offerings made pursuant to the same shelf registration statement because the registration statements had "common information" and, therefore, all purchasers "suffered from the same alleged injury").

[56] *Ret. Bd. of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 166–70 (2d Cir. 2014) (Pop. Br. at 30) is inapposite.  In that case, the Court found that the plaintiffs did not have standing under *NECA* to represent absent class members relating to trusts in which the named plaintiff did not invest because the claims plaintiffs alleged required the Court to look within the trusts, to the characteristics of the individual assets (in that case mortgage loans unique to each trust) held by each.  *Id.* at 165.  Here, by contrast, the underlying assets within the Funds are common across the Funds.  Moreover, as discussed more fully above in connection with Defendants' misguided SLUSA argument (*see* Section III), Plaintiffs' claims – that Defendants breached their fiduciary and contractual duties in the same manner to Plaintiffs and all Class members across all of the Funds – relate to the Funds rather than to any rights or privileges derived from the underlying assets.  *See, e.g.*, *Pension Comm. of U. of Montreal Pension Plan*, 750 F. Supp. 2d at 451, 455.

[57] In the event that any of Defendants' motions to dismiss are granted, Plaintiffs respectfully request leave to re-plead and file an amended complaint.

Dated: July 31, 2015

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER &**
   **GROSSMANN LLP**

s/ Hannah G. Ross
Gerald H. Silk
Hannah G. Ross
Jeremy P. Robinson
Jake Nachmani
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

**GRANT & EISENHOFER P.A.**

/s/ Daniel L. Berger
Jay W. Eisenhofer
Daniel L. Berger
Mary S. Thomas
Deborah A. Elman
Robert D. Gerson
485 Lexington Ave 29th Floor
New York, New York 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**

/s/ Michael K. Yarnoff
Michael K. Yarnoff
Johnston de F. Whitman, Jr.
Joshua E. D'Ancona
Margaret E. Onasch
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

**THE LAW OFFICES OF ANDRES W.**
   **LOPEZ P.S.C.**

/s/ Andrés W. López
Andrés W. López (pro hac vice pending)
PO Box 13909
San Juan, Puerto Rico 00908
Tel: (787) 294-9508

*Counsel for Plaintiffs and the putative Class*