

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NORA FERNANDEZ; AUGUSTO
SCHREINER; EDDIE TORO VELEZ;
VICTOR R. VELA DIEZ DE ANDINO;
JUAN VIERA; GEORGINA VELEZ
MONTES; and ESTHER SANTANA, on
behalf of themselves and all others
similarly situated,

      Plaintiffs,

 -against-

        15-Cv-2859 (SHS)

UBS AG; UBS FINANCIAL SERVICES,
INC.; UBS FINANCIAL SERVICES
INCORPORATED OF PUERTO RICO; UBS    <u>OPINION & ORDER</u>
TRUST COMPANY OF PUERTO RICO;
UBS BANK USA; CARLOS V. UBIÑAS;
MIGUEL A. FERRER; BANCO POPULAR
de PUERTO RICO; and POPULAR
SECURITIES, LLC,

      Defendants.

---

Contents

I. Background ......................................................................... 5
 A. The Funds ................................................................... 6
 B. The Parties .................................................................. 6
  1. Plaintiffs ................................................................ 6
  2. The UBS Defendants ............................................ 7
  3. The Popular Defendants ....................................... 8
  4. The Individual Defendants .................................. 8
 C. Alleged Misconduct ..................................................... 9
 D. This Litigation ............................................................ 12
II. Standard of Review ........................................................... 13
III. The Court's Jurisdiction ................................................... 14

A. Plaintiffs Have Standing to Bring Claims on Behalf of Absent Class Members.................................................................. 15

B. SLUSA Does Not Preclude Plaintiffs' Claims Because Any Alleged Misrepresentations Are Not in Connection with the Sale or Purchase of Covered Securities ................................ 19

    1.    The Funds' Investments....................................................... 20

    2.    Securities sold in order to purchase shares in the Funds or in lieu of selling shares in the Funds ............................. 23

IV. The Timeliness of Plaintiffs' Action............................................. 25

A. Puerto Rico's One-Year Statute of Limitations Bars Plaintiffs' Tort Claims Against the UBS Defendants and Ferrer but Not Against the Popular Defendants.............. 26

    1.    Puerto Rico's Statute of Limitations.................................... 26

    2.    Time of Injury...................................................................... 28

    3.    Notice of Injury ................................................................... 29

B. Puerto Rico Uniform Securities Act ("PRUSA") ...................... 37

V. Sufficiency of the Pleadings............................................................. 41

A. Pleading Standard ........................................................................ 41

B. The Breach of Fiduciary Duty and the Breach of the Implied Covenant of Good Faith and Fair Dealing Claims Are Not Pled with the Particularity Required by Rule 9(b) ... 42

    1.    Popular Defendants' alleged breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing ............................................................................. 42

    2.    UBS Defendants' alleged breach of the implied covenant of good faith and fair dealing............................. 43

C. Aiding and Abetting Breach of Fiduciary Duty ....................... 43

D. Breach of Contract ....................................................................... 44

    1.    UBS Defendants .................................................................. 44

    2.    Popular Defendants............................................................. 45

VI. Conclusion........................................................................................ 46

SIDNEY H. STEIN, U.S. District Judge.

    This action tells part of the story of Puerto Rico's debt crisis.  It arises out of the regulatory exceptions that apply to Puerto Rico and the

resulting lack of safeguards for the investors in certain mutual funds. Plaintiffs and putative class members are clients of UBS Financial Services Inc. of Puerto Rico ("UBS Puerto Rico") and Popular Securities, LLC who invested in any of 23 closed-end mutual funds[1] (the "Funds") administered by defendants UBS Trust Co. of Puerto Rico ("UBS Trust") and Banco Popular de Puerto Rico ("Banco Popular") during the period from May 5, 2008 through May 5, 2014.  Taking advantage of gaps in regulations that apply to Puerto Rico, the Funds were highly leveraged and also highly concentrated in debt securities issued by the Puerto Rico government.  As a result, when the Puerto Rico government was facing default in 2013–2014 and the ratings of its general debt obligations were downgraded to junk bond status, the Funds collapsed and plaintiffs and putative class members—many of them retirees—faced staggering losses.

Plaintiffs now bring this putative class action for state law claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract against the entities involved in the Funds' management and those entities that were party to client relationships with investors in the Funds—UBS AG, UBS Financial Services, Inc. ("UBS Financial"), UBS Puerto Rico, UBS Trust, and UBS Bank USA (collectively the "UBS Defendants" or "UBS"), and Banco Popular and Popular Securities (collectively the "Popular Defendants" or "Popular")—as well as against individual defendants Carlos Ubiñas, CEO of UBS Puerto Rico, and Miguel Ferrer, the former Chair and CEO of UBS Puerto Rico and the founder and former CEO of UBS Trust.  Plaintiffs do not assert any federal claims.

---

[1] The U.S. Securities and Exchange Commission (the "SEC") defines as "traditional and distinguishing characteristics of closed-end funds," *inter alia*, that closed-end funds "generally do not continuously offer their shares for sale" and "[t]he price of closed-end fund shares that trade on a secondary market after their initial public offering is determined by the market and may be greater or less than the shares' net asset value (NAV)."   U.S. Sec. Exch. Comm'n, *Fast Answers: Closed-End Fund Information*, http://www.sec.gov/answers/mfclose.htm (last modified Jan. 16, 2013).

The UBS Defendants,[2] Ferrer, and the Popular Defendants have brought three separate motions to dismiss the Amended Class Action Complaint ("Amended Complaint") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Defendants contend variously that plaintiffs lack standing to bring claims regarding funds in which the individually named plaintiffs did not invest; plaintiffs' claims are precluded by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"); plaintiffs' tort claims are time-barred by the statute of limitations and certain of plaintiffs' claims are barred by the Puerto Rico Uniform Securities Act ("PRUSA"); plaintiffs have failed to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 8, 9(b), and 12(b)(6).

For the reasons set forth below, the UBS Defendants' and the Popular Defendants' motions to dismiss are granted in part and denied in part; Ferrer's motion to dismiss is granted in its entirety. This Court has jurisdiction over plaintiffs' claims, as plaintiffs have standing to bring claims on behalf of unnamed class members and their claims are not barred by SLUSA. However, Puerto Rico's one-year statute of limitation that applies to tort claims bars plaintiffs' breach of fiduciary duty claims against the UBS Defendants, Ubiñas, and Ferrer. Accordingly, Counts I and II—the breach of fiduciary duty claims against the UBS Defendants, Ubiñas, and Ferrer—are dismissed with prejudice.

Plaintiffs' tort claims against the Popular Defendants, on the other hand, are timely pursuant to Puerto Rico's statute of limitations because plaintiffs were not on notice of their claims against the Popular Defendants.

However, PRUSA's two-year statute of repose applies to Vela's 2011 and Toro's breach of fiduciary duty claims against the Popular Defendants because plaintiffs' allegations sound in fraud. Similarly, Vela's 2011, Toro's, and Montes' claims for breach of the implied covenant of good faith and fair dealing sound in fraud and are time-barred pursuant to PRUSA. Accordingly, these claims are dismissed with prejudice.

---

[2] Ubiñas, represented by the same counsel as the UBS Defendants, has joined in the UBS Defendants' motion to dismiss.

However, those breach of contract claims against the UBS Defendants and the Popular Defendants which are based on defendants' failures to perform any suitability analyses are timely because those breach of contract claims do not sound in fraud.

Vela's remaining 2012 breach of fiduciary duty claim and breach of the implied contractual duty of good faith and fair dealing claim against the Popular Defendants—which were brought within PRUSA's timeframe—sound in fraud and plaintiffs have not adequately pled these claims pursuant to Fed. R. Civ. P. 9(b). Accordingly, Vela's breach of fiduciary duty claim and breach of the implied covenant of good faith and fair dealing claim against the Popular Defendants premised on Vela's 2012 purchase of Fund Shares are dismissed without prejudice for failure to state a claim. Fernandez's, Schreiner's, Santana's, and Viera's breach of the implied covenant of good faith and fair dealing claims against the UBS Defendants—similarly brought within PRUSA's timeframe—are dismissed without prejudice for failure to state a claim pursuant to Fed. R. Civ. P. 9(b), as well.

Plaintiffs' remaining breach of contract claims for defendants' purported failures to perform any suitability analyses, on the other hand, must be examined pursuant to Fed. R. Civ. P. 8 because they do not sound in fraud. Plaintiffs Fernandez, Montes, Schreiner, and Vela have adequately pled their breach of contract claims against the UBS Defendants and Popular Securities for defendants' failure to have a reasonable basis for believing that the Funds were suitable and appropriate for plaintiffs. The Court finds, however, that the remaining plaintiffs (Santana, Viera, and Toro) cannot assert a breach of contract claim because their contracts did not contain any provision that obligated defendants to conduct a suitability analysis. Accordingly, defendants' motions to dismiss Counts V and VI are granted in part and denied in part.

I.   BACKGROUND

The following facts are as alleged in the Amended Complaint and are taken as true solely for purposes of this motion.

5

### A.   The Funds

The closed-end mutual funds at issue in this case are incorporated pursuant to Puerto Rico law and are structured to provide tax-free income to Puerto Rico residents.  As long as at least 67% of each Fund's holdings are comprised of Puerto Rico assets, the income that shareholders receive from the Funds' investments is not taxed by the municipal, state, or federal governments.  (Am. Compl. ¶¶ 2, 44.)  In order to take advantage of this tax benefit, a high percentage of each Fund's holdings are Puerto Rico government bonds.  (*See id.* ¶¶ 2, 44, 60, 64-65, 131.)  Only Puerto Rico residents can purchase shares in the Funds, which do not trade nationally and are not listed on any national securities exchange.  (*Id.* ¶¶ 44-45.)

The Funds are also exempt from registration pursuant to the Investment Company Act of 1940 (the "Act").  (*Id.* ¶ 46.)  Consequently, the Act's rules governing conflicts of interests in mutual fund transactions and the Act's restrictions on the use of leverage do not apply to the Funds as a matter of federal statutory law.  *See* 15 U.S.C. § 80a-6(a)(1).  As a result, the Funds were highly leveraged, with approximately 50% of their assets financed through loans.  (Am. Compl. ¶ 4.)

### B.   The Parties

#### 1.   *Plaintiffs*

Plaintiffs are all Puerto Rico residents who invested in the Funds. Collectively, they invested in twelve of the twenty-three Funds at issue in this action.[3]  Plaintiffs bring claims on behalf of a putative class of "[a]ll

---

[3] The twelve funds in which named-plaintiffs invested are Tax Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; and Puerto Rico Fixed Income Fund V, Inc., which are managed by UBS; and Puerto Rico Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; and Puerto Rick Investors Tax-Free Fund VI, Inc., which are jointly managed by Popular and UBS entities. (Am. Compl. ¶¶ 19-24.)

persons who were clients of UBS Puerto Rico and/or Popular Securities and who were invested in any of the [twenty-three] Funds . . . from May 5, 2008 through May 5, 2014." (Am. Compl. ¶¶ 143-44.)

## 2. *The UBS Defendants*

UBS Financial is a subsidiary of the Swiss global financial services company UBS AG, and UBS Puerto Rico in turn is a subsidiary of UBS Financial. UBS Financial and UBS Puerto Rico served as broker-dealers for plaintiffs who signed client agreements with UBS—Nora Fernandez, Augusto Schreiner, Georgina Velez Montes ("Montes"), Juan Viera, and Esther Santana—and advised these plaintiffs to invest in one or more of the Funds. (*Id.* ¶¶ 26-27.)

UBS Financial is registered with the SEC as a broker-dealer and an investment advisor, and is also registered as an investment adviser with the Oficina del Comisionado de Instituciones Financieras (the "OCIF"). (*Id.* ¶ 26.) UBS Puerto Rico is registered with the SEC as a broker-dealer and is a member of the Financial Industry Regulatory Authority ("FINRA") and Securities Investor Protection Corporation ("SIPC"). (*Id.* ¶ 27.) UBS Puerto Rico offers investment advisory services through UBS Financial. (*Id.*) Additionally, UBS Puerto Rico has served as financial advisor to, and underwriter for, Puerto Rico governmental entities in certain of their efforts to raise capital in bond markets. (*Id.*)

UBS Trust is a trust company incorporated in Puerto Rico offering personal and corporate trust services, retirement services, investment consulting services, and money management services. (*Id.* ¶ 28.) In addition, it acts as the issuing, paying, and transfer agent, and as the administrator and custodian of the UBS-managed closed-end mutual funds. (*Id.*) UBS Trust manages the assets of the Funds through one of its divisions, UBS Asset Managers of Puerto Rico, which serves as the investment advisor for the Funds. (*Id.*)

UBS Bank USA—a subsidiary of UBS Americas, Inc.—made loans to members of the putative class. (*Id.* ¶ 29.) Those loans were secured by the investors' shares in the Funds and the proceeds were then put toward the investor acquiring additional shares in the Funds. (*Id.*)

Plaintiffs' client relationship agreements with UBS state that the contract is between the client and UBS, which is defined to include all the UBS Defendants. (*Id.* ¶ 34.)

### 3. *The Popular Defendants*

Popular Securities is a securities brokerage firm incorporated in Puerto Rico  and registered with FINRA and SIPC. (Am. Compl. ¶ 37.) Popular Securities served as an underwriter for many Puerto Rico debt offerings. (*Id.* ¶ 81.) It also acted as a broker-dealer for plaintiffs Eddie Toro Velez ("Toro") and Victor R. Vela Diez de Andino ("Vela"). (*See id.* ¶¶ 21-22.) Of the plaintiffs, only Toro and Vela had relationships with the Popular Defendants. (*See id.* ¶¶ 19-24.)

Banco Popular, a corporation registered and headquartered in Puerto Rico, is the Commonwealth's largest bank and is affiliated with Popular Securities. (*Id.* ¶ 38.) Through its Popular Asset Management Division, Banco Popular acts as a co-investment adviser along with UBS Asset Managers for nine of the Funds at issue.[4] (*Id.*)

### 4. *The Individual Defendants*

Carlos Ubiñas and Miguel Ferrer were officers of UBS Puerto Rico during the class period and were involved in the Funds' management. (Am. Compl. ¶¶ 31-32.)

Starting in 2005, Ubiñas acted as President of UBS Puerto Rico, and in 2009 he was promoted to CEO of UBS Puerto Rico. (*Id.* ¶ 31) He also served as Chairman of the Board of Directors and Executive Vice President of each of the UBS-managed Funds throughout the time period relevant to this action, and was Executive Vice President of each of the Funds jointly

---

[4] These funds are Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund II, Inc.; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Investors Bond Fund I; Puerto Rico Tax-Free Target Maturity Fund, Inc.; and Puerto Rico Tax-Free Target Maturity Fund II, Inc. (Am. Compl. ¶ 42(a).)

managed with Popular. (*Id.*) Ubiñas allegedly directs the management and policies of UBS Puerto Rico. (*Id.*)

Ferrer held several leadership positions within UBS entities as well. He was Chairman and CEO of UBS Puerto Rico and CEO of UBS Trust until September 2009. (*Id.* ¶ 32.) After leaving UBS briefly in September 2009, he returned three months later as Vice Chairman of UBS Puerto Rico and became Chairman in 2010. (*Id.*) Ferrer served as a Director and President of each of the UBS Funds. In June 2014, UBS Puerto Rico terminated Ferrer. (*Id.*)

## C.  Alleged Misconduct

Plaintiffs allege that UBS Financial, UBS Puerto Rico, and Popular Securities breached the fiduciary duties owed to them as clients, and that these entities were aided and abetted in their breaches by UBS AG, UBS Financial, UBS Puerto Rico, UBS Trust, Ubiñas, Ferrer, and Banco Popular. Plaintiffs point to a litany of conduct to support this claim—characterized variously as conflicted, disloyal, as well as lacking in good faith, due care, and candor. Additionally, plaintiffs allege that the UBS Defendants and Popular Securities breached their contractual obligation to perform an analysis assessing the suitability of the Funds for the investors, as well as their implied contractual duty of good faith and fair dealing.[5]

According to plaintiffs, UBS Financial, UBS Puerto Rico, and Popular Securities structured the Funds in service of defendants' own financial gain and ignored the interests of class members. While

---

[5] Upon the parties' briefing and at oral argument, it has become apparent that plaintiffs allege the UBS Defendants breached their contracts in only two respects—despite plaintiffs' originally having pointed to several other provisions in the UBS Client Relationship Agreement and the UBS Agreements and Disclosures Booklet in the Amended Class Action Complaint. (*See* Am. Compl. ¶¶ 184-85.) The two alleged breaches are: (1) breach of the covenant of good faith and fair dealing and (2) breach of the term in the Client Relationship Agreement that provided that UBS would have a "reasonable basis" for believing that investment recommendations that it offered were suitable and appropriate for plaintiffs. (Oct. 14, 2016 Tr. at 58:22-60:24; Opp'n at 29-30.)

structuring the Funds' assets so that 67% of them would be in Puerto Rico assets, defendants sold to the Funds and purchased for the Funds what plaintiffs allege were some of the riskiest government-backed securities in the marketplace.   (Am. Compl. ¶¶ 60-65.)   In these transactions, defendants acted as the underwriters of the bonds, plus traders of the bonds, plus the Funds' investment advisors and thus earned advisory fees and management fees when selecting Puerto Rico government bonds they underwrote as the assets to be purchased for the Funds.   (Id. ¶¶ 73-83.) Because the Funds are exempt from the 1940 Act, defendants were able to engage in such allegedly self-dealing transactions and earn fees at each stage of the transactions.   (Id. ¶¶ 47-48, 78, 81-82.)   Defendants also obtained a waiver exempting them from the Investment Companies Act of Puerto Rico's prohibition on holding investments from a single issuer that amount to more than 25% of a portfolio.   (Id. ¶ 66.)   The result was that the Funds were packed with Puerto Rico bonds and had a high concentration of risk.

Moreover, because the Funds were lucrative for them, defendants allegedly adopted programs to drive clients to invest more heavily in the Funds and told class members that the Funds were safe, secure, and conservative investments despite the risks posed by the Funds being so highly concentrated in Puerto Rico debt.   (See, e.g., id. ¶¶ 60-66, 83-96.) UBS instituted a dividend reinvestment program—under which interest payments were used to automatically purchase additional shares in the Funds—and also a loan program, which "pushed" clients to borrow additional money—collateralized by their shares in the Funds—to invest even more money in the Funds.   (Id. ¶¶ 102-111.)   The UBS Defendants allegedly also changed their internal controls to disable and bypass overconcentration alerts, thus permitting clients to be more heavily invested in the Funds in violation of UBS guidelines and policy, allegedly in breach of their duties of care, prudence, good faith, and loyalty.   (Id. ¶¶ 7, 112-13.)

In addition, defendants adopted policies that would incentivize their financial-advisor employees to steer class members to invest in the Funds.   For example, defendants—and specifically Ferrer—purportedly issued directives to the financial advisors whom they employed to round

up investors for the Funds. (*Id.* ¶¶ 87-88.) Defendants also provided their financial advisors inflated sales commissions on transactions in Fund shares. (*Id.* ¶¶ 97-101, 115-121). UBS Puerto Rico even changed its policy in order to have its financial advisors earn additional fees when their clients simply remained invested in the Funds, in order to encourage their advisors to market the Funds. (*Id.* ¶¶ 115-121.) When UBS financial advisors expressed numerous concerns about the Funds' viability, suitability, leverage, instability, and lack of transparency, defendants— including Ferrer himself—represented to the advisors that the Funds were safe and volatility-free. (*Id.* ¶¶ 6, 89-91, 124). The financial advisors in turn represented to putative class members that the Funds were conservative investments that would preserve their principal investment while providing high, tax-free returns. (*Id.* ¶¶ 122-24.)

Plaintiffs do not allege specific examples of the Popular Defendants adopting similar policies; however, they allege generally that the Popular Defendants "pushed" investors to invest more money in the Funds as well. (*See, e.g., id.* ¶¶ 94-99.) UBS allegedly did so even though UBS "had particular reason to know that PR Employees Retirement bonds [held by the Funds] were high risk" because UBS was an underwriter for those bonds. (*Id.* ¶¶ 63-64.) Similarly, plaintiffs allege that Popular Securities served as an underwriter for many offerings that were purchased by the Funds. (*Id.* ¶ 81.)

Yet, in spite of the risks involved and despite representing the Funds as safe investments, defendants allegedly failed to conduct any analysis whatsoever regarding whether the Funds constituted suitable investments for class members in light of their investment profiles—many of them retirees who sought liquidity and low-risk investments. (*See, e.g., id.* ¶¶ 8, 84, 95.) This failure to conduct a suitability analysis was contrary to defendants' contractual and fiduciary duties, according to plaintiffs.

Moreover, at the same time, acknowledging the risks associated with the Funds, UBS Financial ordered UBS Puerto Rico, Ferrer, and Ubiñas to reduce the inventory of Fund shares that UBS itself owned. (*Id.* ¶ 70.) In order to unload its own shares, UBS launched an aggressive operation called "Objective: Soft Landing" to push its clients to buy up the

shares UBS owned. (*Id.*) Plaintiffs do not assert similar, specific allegations against the Popular Defendants regarding any offloading of shares in the Funds in acknowledgement of the risks.

From mid-2013 through March 2014, the risks posed by the Funds' structures came to a head. In June 2013, the value of the Puerto Rico government bonds began to decline due to the market's concerns about the government's creditworthiness and the possibility of a rating agency downgrade. (*Id.* ¶ 131.) Consequently, the market value of the Funds' assets plummeted as well. By March 2014, the Funds had lost more than half their value. (*Id.* ¶ 11.) Plaintiffs' losses were aggravated by the lack of diversity in the Funds' assets as well as by the highly leveraged nature of the Funds. (*Id.* ¶ 132.) Furthermore, investors were additionally exposed to losses by margin loans that they had taken out against their shares in the Funds in order to increase their investments in the Funds at the encouragement of the UBS Defendants. (*Id.* ¶¶ 9, 83, 108, 156.)

In the midst of the Funds' collapse, several government investigations into UBS and Ferrer were launched related to the conduct outlined above; Puerto Rico regulators, federal prosecutors, the SEC, and the FBI led certain of these investigations. (*Id.* ¶ 12.) In October 2013, UBS launched its own internal investigation into the alleged misconduct. (*Id.* ¶ 138.) Several lawsuits have since been brought against UBS, including this one.

### D.  This Litigation

Plaintiffs filed the first iteration of this lawsuit in the Southern District of New York on May 5, 2014. However, three weeks later, plaintiffs voluntarily withdrew their complaint, and on May 30, 2014, plaintiffs brought this putative class action in the District of Puerto Rico, seeking to consolidate it with a putative securities class action pending in that district—*Roman v. UBS Financial Services*, No. 12-cv-01663 (D.P.R. Aug. 13, 2012) (the "2012 Securities Action"). On January 30, 2015, however, the District of Puerto Rico denied plaintiffs' motion for consolidation; and on March 30, 2015, upon defendants' motion, the court ordered the action transferred back to this District pursuant to a forum selection clause in the parties' client agreements. (Dkt. No. 53.) The action was transferred on

April 14, 2015, and plaintiffs filed this Amended Class Action Complaint on May 8, 2015. (Dkt. Nos. 54, 68.) Defendants subsequently moved to dismiss that complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) in the three separate motions now before this Court. (Dkt. Nos. 84, 85, 90.)

## II.  STANDARD OF REVIEW

In evaluating a motion to dismiss a complaint brought pursuant to Fed. R. Civ. P. 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011). In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) where the claims have not been "nudged...across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

A claim is properly dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate the claim. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Where the district court's decision is based solely on the complaint's allegations, the same standards that apply to a Rule 12(b)(6) motion apply to a Rule 12(b)(1) motion. *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 159 (2d Cir. 2014) ("*Retirement Board*"); *see Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). However, to the extent that a Rule 12(b)(1) motion places jurisdictional facts in dispute, a district court may consult evidence outside of the pleadings to decide the motion—in contrast to a Rule 12(b)(6) motion, where the Court cannot rely on evidence outside of the pleadings. *Robinson v. Malaysia*, 269 F.3d 133, 140-41 & n.6 (2d Cir. 2001). The party calling upon the court's jurisdiction has the burden of proof on a Rule 12(b)(1) motion. *Makarova*, 201 F.3d at 113.

### III. The Court's Jurisdiction

Before the Court may address the sufficiency of the Amended Complaint on defendants' Rule 12(b)(6) motions, the Court must assess defendants' Rule 12(b)(1) motions to determine whether it has jurisdiction to hear the claims alleged and to grant relief. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732-33 (2008).

The UBS Defendants, Ferrer, and the Popular Defendants have each moved to dismiss plaintiffs' Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) on two separate jurisdictional grounds. First, defendants contend that this Court lacks jurisdiction over plaintiffs' claims with regard to eleven of the twenty-three Funds because the named plaintiffs did not invest in those eleven funds and thus they lack standing to assert claims arising out of ownership in them.[6] Second, defendants urge that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") bars plaintiffs' claims.[7] Neither argument raised precludes this Court from hearing plaintiffs' individual and class claims.

---

[6] The eleven funds in which no named plaintiff invested are Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund II, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Bond Fund I; Puerto Rico Tax-Free Target Maturity Fund, Inc.; Puerto Rico Tax-Free Maturity Fund II, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Mortgage-Backed & U.S. Securities Fund, Inc.; and Puerto Rico Fixed Income Fund VI, Inc.

[7] Courts within the Second Circuit have debated whether SLUSA preclusion is properly raised on a Rule 12(b)(1) or Rule 12(b)(6) motion when SLUSA is wielded as a defense rather than within the context of removal and remand procedures pursuant to 15 U.S.C. §§ 77p(c) and 78bb(f)(2). *See, e.g., LaSala v. Bank of Cyprus Pub. Co.*, 510 F. Supp. 2d 246, 254 (S.D.N.Y. 2007); *Winne v. Equitable Life Assurance Soc'y*, 315 F. Supp. 2d 404, 409 (S.D.N.Y. 2003). Recently, the Second Circuit has suggested that an analysis of SLUSA's application is always driven by a jurisdictional inquiry even when not considered on remand and removal grounds. *See In re Kingate Mgmt. Ltd. Litig.*, 784 F.3d 128, 135 n.9 (2d Cir. 2015); *see also Anwar v. Fairfield Greenwich Ltd.*, 118

### A. Plaintiffs Have Standing to Bring Claims on Behalf of Absent Class Members

The doctrine of standing derives from Article III's "case or controversy" requirement, which limits the jurisdiction of federal courts. *Retirement Board*, 775 F.3d at 159. In order to establish standing, the party invoking the power of a federal court must demonstrate for each claim, "a personal injury that is fairly traceable to the defendant's conduct and likely to be redressed by the requested relief." *DaimlerChyrsler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). These requirements test whether "a plaintiff has a sufficiently personal stake in the outcome of the suit so that the parties are adverse." *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008).

Defendants contend that named plaintiffs do not have standing to bring claims that pertain to the eleven Funds in which none of them invested because, with respect to those claims, plaintiffs cannot show that they have been personally injured. Furthermore, defendants argue that plaintiffs' claims will rely on investment-specific proof that will vary across the Funds, so their claims relating to the twelve funds in which they invested do not implicate the same set of concerns as those of the absent class members.

Plaintiffs, on the other hand, maintain that defendants confuse standing issues with Fed. R. Civ. P. 23 certification questions. Plaintiffs underscore that each one of them in fact has been injured individually and thus has Article III standing to assert claims on his or her own behalf. Moreover, plaintiffs contend that they have standing to assert claims on behalf of unidentified members of the putative class whom they represent, even if plaintiffs did not personally invest in eleven of the Funds, because defendants uniformly breached the fundamental fiduciary and contractual duties owed by defendants to all twenty-three Funds' shareholders. According to plaintiffs, the same misconduct by the same defendants applies equally to all of the Funds and caused the same type of injury to

---

F. Supp. 3d 591, 599 (S.D.N.Y. 2015) *on reconsideration in part* No. 09-CV-118, 2015 WL 9450503 (S.D.N.Y. Aug. 28, 2015). This Court analyzes the question as jurisdictional.

the shareholders in all twenty-three Funds.   The alleged misconduct includes the same conflicts of interest, the same uniform failure to conduct a suitability analysis for investors, and the same purported misrepresentations.   Moreover, plaintiffs allege that shares in the Funds were sold to them pursuant to the same disclosures and that all of the Funds had the same risks associated with them.   Based on these similarities that exist across the Funds, plaintiffs urge that they meet all standing requirements.

The United States Court of Appeals for the Second Circuit has recently sought to clarify the standing doctrine as it pertains to named plaintiffs in a class action.   In *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 160 (2d Cir. 2012), the Second Circuit recognized that there is some "tension" in Supreme Court case law as to whether any "variation between (1) a named plaintiff's claims and (2) the claims of putative class members is a matter of Article III standing . . . or whether it goes to the propriety of class certification" pursuant to Rule 23. The Second Circuit then set forth a two-part test for what it calls "class standing":

> [I]n a putative class action, a plaintiff has class standing if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants.

*Id.* at 162.  The Second Circuit additionally clarified that this two-part test, "which derives from constitutional standing principles, is . . . distinct from the criteria that govern whether a named plaintiff is an adequate class representative under Rule 23(a)."  *Retirement Board*, 775 F.3d at 161.  When the two requirements outlined in *NECA-IBEW* are met, the named plaintiff's litigation incentives are "sufficiently aligned with those of the absent class members that the named plaintiff may properly assert claims on their behalf."  *Id.*

In *NECA-IBEW*, the named plaintiff's alleged injuries stemmed from misrepresentations that defendants made in the offering documents for various residential mortgage-backed securities certificates. The Second Circuit held that the named plaintiff had standing to assert claims on behalf of absent purchasers of certificates that were sold in offerings in which the plaintiff did not partake when the same lenders originated the mortgages backing the certificates in the offerings in which the plaintiff did participate. *NECA-IBEW*, 693 F.3d at 162-64. The court reasoned that because the named plaintiff's Securities Act claims were based on similar or identical misstatements in the offering documents for certificates backed by mortgages originated by the same lenders, the plaintiff's interests were sufficiently aligned with the missing class members' interests such that the plaintiff had standing to assert claims on their behalf. *Id.* However, the plaintiff did not have standing to assert claims with respect to offerings backed by loans originated by different lenders. *Id.* at 163-64. The court reasoned that the alleged injury for those certificates could vary and turn on divergent proof since the lenders backing those mortgages were different. *Id.* at 163.

In *Retirement Board*, the Second Circuit elaborated further on the second half of the *NECA-IBEW* test. At issue in *Retirement Board* were breach of contract and fiduciary duty claims that the plaintiffs brought against the trustee of residential mortgage-backed securities trusts, including several trusts in which the named plaintiffs had not invested. The Second Circuit distinguished the breach of duty claims at issue in *Retirement Board* from the Securities Act claims in *NECA-IBEW*, noting that they were "very different" because the *Retirement Board* plaintiffs' breach of contract and fiduciary duty claims had to be proved "loan-by-loan" and "trust-by-trust." *Retirement Board*, 775 F.3d at 162. In *Retirement Board*, the trustee defendant's obligation to act depended on whether the defendant became aware that the lender, which originated the mortgage loans underlying the trust, had breached its representations and warranties about the loans. The court reasoned that evidence of the systematic inaction offered to prove the trustee's breach of its duty of care, even if applicable to all trusts, would not be enough to align the named plaintiffs' interests with those of absent class members. The court would still need to examine evidence of the trustee's inaction within the context of each trust

and the loans underlying each trust in order to determine whether the trustee's obligation to act had been triggered based on its awareness of the particular lenders' breach of representations and warranties. *Id.* at 162-63. The *Retirement Board* court emphasized that the critical inquiry is whether the similarities across the claims lead to the conclusion that the named plaintiff "has a sufficiently personal and concrete stake in proving other, related claims against the defendant." *Id.* at 163.

Here, defendants do not contest that plaintiffs easily meet the first criterion elaborated in *NECA-IBEW*: plaintiffs allege that they have each been individually injured with regard to the Funds in which they invested and thus have Article III standing to assert claims individually for those Funds. (*See* Am. Compl. ¶¶ 19-24, 131-37.) Defendants urge that plaintiffs cannot satisfy the second half of the test.

This Court concludes that plaintiffs also meet the second criterion set forth in *NECA-IBEW*. Although plaintiffs allege similar types of claims as the plaintiffs in *Retirement Board*—*i.e.*, breaches of fiduciary duty and contract claims—the theories behind and the proof required for plaintiffs' claims as alleged in the Amended Complaint are better analogized to those in *NECA-IBEW*. The underlying allegations regarding defendants' misconduct—as alleged—applies to all twenty-three Funds and the Funds are all alleged to be structured the same way and to hold the same types of assets by the same defendants. Plaintiffs allege that the client agreements at issue are all substantially similar and that their relationships with defendants are all substantially similar, such that fiduciary duties arose out of those relationships. *Cf. NECA-IBEW*, 693 F.3d at 162-63. Because of these similarities, if defendants' systematic conduct is tortious with respect to one fund, it is also tortious with respect to another fund, and does not depend on the individualized circumstances of each Fund.

Attempting to point to potential differences in proof across the Funds, defendants state conclusively that plaintiffs do not plead that the Funds had the same holdings or concentrations of holdings as each other. However, plaintiffs have alleged that the Funds had similar concentrations of similar holdings, which posed similar risks and led to similar conflicts of interest. (*See* Am. Compl. ¶¶ 4, 42-48, 61-66.), and defendants have not

pointed to any evidence to suggest otherwise in order to raise an issue of fact for this Court to address at this stage in the litigation.

Accordingly, at this stage in the litigation, plaintiffs' claims regarding the Funds in which they invested implicate the "same set of concerns" as those of absent putative class members who invested in the other closed-end mutual funds—even if plaintiffs did not invest in those funds—and named plaintiffs thus have standing to assert those claims on their behalf. *See NECA-IBEW*, 693 F.3d at 162. Issues regarding the differences that defendants attempt to draw out are best resolved on a motion for class certification pursuant to Fed. R. Civ. P. 23, and not on a motion to dismiss. *See Normand v. Bank of N.Y. Mellon*, No. 16-Cv-212, 2016 WL 5477783, at *8 (S.D.N.Y. Sept. 29, 2016); *Merryman v. Citigroup, Inc.*, No. 15-Cv-9185, slip op. at *24 (S.D.N.Y. Aug. 15, 2016).

### B. SLUSA Does Not Preclude Plaintiffs' Claims Because Any Alleged Misrepresentations Are Not in Connection with the Sale or Purchase of Covered Securities

Defendants also seek to dismiss all of plaintiffs' claims on the grounds that SLUSA precludes this Court from hearing them. Pursuant to SLUSA, (1) no covered class action "[(2)] based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party [(3)] alleging [ ] a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). A covered class action, as defined by SLUSA, is an action in which "damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class . . . predominate over any questions affecting only individual persons or members." 15 U.S.C. § 78bb(f)(5)(B). A "covered security" is defined "narrowly to include only securities traded on a national exchange." *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1062 (2014) (citing 15 U.S.C. §§ 78bb(f)(5)(E), 77r(b)(1)-(2)).

The parties agree that this is a covered class action because the putative class is made up of more than 50 people and "questions of law or

fact common to those persons . . . predominate over any [individualized] questions." 15 U.S.C. § 78bb(f)(5)(B)(i)(I).  They also agree that plaintiffs are private parties who seek to establish liability pursuant to state law.

The parties disagree, however, whether the substance of plaintiffs' allegations is precluded by SLUSA—*i.e.*, whether plaintiffs allege "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1).  Plaintiffs urge that their claims do not pertain to "covered securities," nor to any misrepresentations made in connection with covered securities.  Moreover, plaintiffs contend that they have not alleged claims sounding in fraud such that SLUSA is triggered.  This Court concludes that regardless of whether any of plaintiffs' claims sound in fraud, SLUSA does not apply to this action and thus this action is not precluded by SLUSA.  SLUSA does not preclude any of plaintiffs' claims—whether or not the claims rely on allegations that defendants made misrepresentations—because no misrepresentations were alleged to have been made "in connection with the purchase or sale of covered securities."

Even though the parties agree that the shares of the Funds themselves are not traded on national exchanges—and therefore the shares of the Funds are not covered securities—there are two categories of securities referred to in the Amended Complaint that defendants urge qualify as "covered securities" for purposes of SLUSA.  First, defendants suggest that the Funds' investments—*i.e.*, the securities held by the Funds—trigger the statute.  Second, defendants point to the securities that plaintiffs purportedly sold in order to purchase shares in the Funds.  This Court finds that plaintiffs have not alleged that misrepresentations or omissions of material fact were made in connection with the sale or purchase of the securities held by the Funds nor any securities sold by plaintiffs in order to invest in the Funds.

### 1.   *The Funds' Investments*

In *Chadbourne & Parke v. Troice*, the Supreme Court held that SLUSA did not preclude claims brought by holders of certificates of deposits— which were indisputably not covered securities—even though the certificates of deposit had been marketed with vague references to the

holding bank's portfolio of investments in covered securities.  The Court noted that SLUSA focuses on transactions involving the statutorily relevant securities and reasoned that SLUSA's "in connection with" requirement extends only to those covered securities in which the victims themselves maintained an ownership interest.  *Troice,* 134 S. Ct. at 1066.  Because plaintiffs did not hold ownership interests in the covered securities themselves—only the bank that issued the certificates of deposit held the securities—the plaintiff's claims were not "in connection with" covered securities.  *Id.* at 1066-67.

The Second Circuit, however, distinguished *Troice* in *In re Herald* ("*Herald II*") and found that the transactions in covered securities carried out by a fund that was itself not a covered security barred the plaintiffs' claims pursuant to SLUSA. 753 F.3d 110 (2d Cir. 2014).  This was true even though the plaintiffs never held a direct interest in the covered securities because the funds were essentially "feeder funds," *i.e.,* mere intermediaries. *Herald II,* 753 F.3d at 113.  The *Herald II* court reasoned that in *Troice* the plaintiffs "were not seeking, directly or *indirectly,* to purchase covered securities."  753 F.3d at 113 (emphasis added).  In *Herald II,* by contrast, the defendants allegedly promised to invest the plaintiffs' assets in covered securities when inducing the plaintiffs to invest in feeder funds, which were simply intermediaries for Bernard Madoff's infamous Ponzi scheme.  Accordingly, the Second Circuit determined that the plaintiffs had intended to invest in covered securities, albeit through feeder funds. *Id.*

In *In re Kingate,* the Second Circuit extended the same logic to distinguish *Troice* yet again.  784 F.3d 128 (2d Cir. 2015).  Because the *Kingate* plaintiffs expected that the uncovered funds in which they were purchasing shares would invest in Standard & Poor 100 stocks, the court found that the plaintiffs were indirectly trying to purchase covered securities and the funds were feeder funds.  The plaintiffs also alleged that the defendants had deceived them about the investments—which were the covered securities.   Accordingly, the court opined that SLUSA's "in connection with" requirement had been met.  784 F.3d at 142.

Defendants urge that this action is like *Herald II* and *Kingate* because the Funds invest in covered securities and were marketed as holding covered securities.  *See Kingate*, 784 F.3d at 141-42; *Herald II*, 753 F.3d at 113.  Defendants state that the key feature of the Funds is that they were structured to provide tax-free benefits on otherwise taxable securities, and that the Funds' prospectuses stated that the Funds' assets could be invested in preferred stock and that the two-thirds of the Funds' holdings required to be invested in Puerto-Rico-issued securities could certainly include covered securities in the form of preferred stock.  (*See, e.g.*, Decl. of James F. Ianelli, dated June 18, 2015, Ex. B at 14; Decl. of Jonathan K. Youngwood, dated June 18, 2015, Ex. 2.)

Plaintiffs, however, contend—correctly—that the Funds were not in fact marketed as intermediaries through which plaintiffs could own any underlying covered securities.  The Fund prospectuses stated that "[a]n investment in the Fund is not equivalent to an investment in the underlying securities of the Fund" and that investors "should not view the Fund as a vehicle for trading purposes."  (*See, e.g.*, Decl. of Hannah G. Ross, dated July 31, 2015, Ex. K at 4, 10.)

Indeed, the Court finds that the marketing statements pointed to by defendants are much more similar to those in *Troice* than in *Herald II* because they are vague and are not promises to invest in covered securities.  In addition to stating that the Funds *might* invest in preferred stock, the prospectuses also provide that the Funds were able to invest in mortgage-backed and asset-backed securities, other securities issued or guaranteed by the United States government, its agencies, and instrumentalities, municipal securities issued by issuers in the United States, and corporate obligations—all of which are not necessarily securities listed and traded on a national stock exchange and thus are not "covered securities."  (*See, e.g.*, Ianelli Decl., Ex. B at 14; Ross Decl., Ex. K at 8.)  Therefore, the facts at this stage in the litigation do not suggest that plaintiffs were directly or indirectly attempting to invest in covered securities.

Furthermore, even if it appeared that plaintiffs were directly or indirectly trying to invest in covered securities as were the plaintiffs in

*Kingate* and *Herald II*, defendants cannot point to any alleged misrepresentations made in connection with the underlying covered securities that were purchased or sold by the Funds. In both *Kingate* and *Herald II*, the alleged misrepresentations related directly to purchases and sales of covered securities that were made by the funds at issue. *In re Kingate*, 784 F.3d at 133-34; *In re Herald*, 753 F.3d at 113. Here, plaintiffs' claims do not rest on alleged misrepresentations about the quality or existence of the covered securities held in the Funds' portfolios. Any alleged misrepresentations relate to the riskiness of the Funds themselves—*un*covered securities. (*See, e.g.*, Am. Compl. ¶¶ 122-30.) The potentially relevant covered securities are too attenuated from the alleged misrepresentations to come within the strictures of SLUSA. *See Troice*, 134 S. Ct. at 1066.

### 2. *Securities sold in order to purchase shares in the Funds or in lieu of selling shares in the Funds*

Stretching mightily to find "covered securities" that would preclude plaintiffs' claims, defendants next point to the securities that plaintiffs may have sold in order to purchase shares in the Funds or in lieu of selling shares in the Funds. To substantiate this argument, the Popular Defendants submit the bank statements of two plaintiffs, which show sales of mutual fund and IRA investments around the time that these plaintiffs purchased shares in the Funds. (Ianelli Decl., Ex. K at 9, Ex. L at 3.) The UBS Defendants do not point to any such documentation, and instead rely solely on vague allegations in the Amended Complaint, which they maintain suggest that covered securities were sold. (Am. Compl. ¶ 87.)

Defendants identify two paragraphs in the Amended Complaint to highlight that covered securities were sold: (1) the allegation that "Ferrer directed Defendant UBS's Financial Advisors to channel 'IRA investors' into the Funds," (*id.* ¶ 87), and (2) the allegation that "Mulholland instructed UBS Financial Advisors to sell their clients' most liquid assets— *i.e.*, securities other than the UBS Closed-End Funds,'" (*id.* ¶ 134).

Defendants' reading of the Amended Complaint cannot bear the weight that defendants place on it. Plaintiffs do not allege that they sold IRA securities in order to invest in the Funds or that defendants induced

them to do so based on misrepresentations in connection with the IRAs—rather, plaintiffs allege that defendants profiled the types of investors whom the financial advisors were instructed to pursue. (*See id.* ¶ 87.)  In fact, plaintiffs' allegation regarding Ferrer's instructions to channel IRA investors into the Funds does not even amount to a claim that sales of IRA securities were made.

Furthermore, regardless of whether plaintiffs actually sold IRA investments that might be covered securities in order to buy shares of the Funds, plaintiffs have not alleged any misrepresentations closely enough connected to those investments to suggest that the sale of those potentially covered securities constituted part of any fraudulent scheme.  *Cf. Kingate*, 784 F.3d at 142.  Any sale of IRA investments would be tangential at most to the alleged misrepresentations.

Additionally, when Mulholland allegedly directed UBS financial advisors to "sell clients' most liquid assets," these sales were part of UBS's attempts to minimize plaintiffs' exposure created by the use of leverage in the Funds, (*see* Am. Compl. ¶ 134), and no misrepresentation was alleged in connection with these alleged sales.

Although the two clients' bank statements presented by the Popular Defendants show that mutual fund shares and IRA shares were indeed sold, they do not bring those plaintiffs' claims under the scope of SLUSA for the same reasons.  Although these plaintiffs' bank statements suggest that those two plaintiffs may have used proceeds from the sale of covered securities to invest in the Funds, none of the misrepresentations in the Amended Class Action Complaint were made "in connection with" the securities that were sold and, indeed, those securities are at most incidental to the alleged misconduct.  *Troice*, 134 S. Ct. at 1072; *cf. Romano v. Kazacos*, 609 F.3d 512, 521-24 (2d Cir. 2010) ("SLUSA's 'in connection with' standard is met where plaintiff's claims 'turn on injuries caused by acting on misleading investment advice'—that is where plaintiff's claims 'necessarily involve,' or 'rest on' the purchase or sale of securities" (quoting *Dabit v. Merrill Lynch, Fenner & Smith, Inc.*, 395 F.3d 25, 48, 50 (2d Cir. 2005))).

Because plaintiffs' claims do not satisfy SLUSA's requirement that the allegations be made "in connection with the purchase or sale of a covered security," 15 U.S.C. § 78bb(f)(1), SLUSA does not preclude any of plaintiffs' claims.

## IV. THE TIMELINESS OF PLAINTIFFS' ACTION

Defendants urge that all plaintiffs' tort claims are untimely pursuant to the applicable statute of limitations and also that the claims brought by three of the individually named plaintiffs are time-barred pursuant to the Puerto Rico Uniform Securities Act ("PRUSA"). For the reasons set forth below, this Court concludes that plaintiffs' tort claims against the UBS Defendants, Ubiñas, and Ferrer are time-barred pursuant to Puerto Rico's one-year statute of limitations that applies to tort claims. However, plaintiffs' tort claims against the Popular Defendants are timely pursuant to the statute of limitations because, upon the current record, plaintiffs were not on notice of their claims against the Popular Defendants.

Nonetheless, plaintiffs' breach of fiduciary duty claims, as well as their breach of contract claims premised on the breach of the implied duty of good faith and fair dealing, that pertain to shares in the Funds purchased prior to May 30, 2012 are time-barred pursuant to 10 L.P.R.A. § 890(a) because those claims sound in fraud and thus are subject to PRUSA's two-year statute of repose. Because only Vela, Toro, and Montes purchased Fund shares prior to May 30, 2012, PRUSA only affects their claims.

Vela's claim for breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing pertaining to his June 2012 purchase were brought within the two-year period permitted by PRUSA and thus are timely, as are Fernandez's, Schreiner's, Viera's, and Santana's breach of the implied covenant of good faith and fair dealing claims. Additionally, plaintiffs' breach of contract claims for defendants' failure to perform a suitability analysis do not sound in fraud and therefore are not time-barred pursuant to PRUSA.

### A. Puerto Rico's One-Year Statute of Limitations Bars Plaintiffs' Tort Claims Against the UBS Defendants and Ferrer but Not Against the Popular Defendants

Defendants contend that it is plain from the Amended Complaint—as well as documents integral to the Amended Complaint and judicially noticeable documents—that the statute of limitations has expired on plaintiffs' breach of fiduciary duty claims. Plaintiffs, on the other hand, contend that they timely filed this action once they had notice that they had been injured, which plaintiffs submit was only when their shares in the Funds plummeted in value, starting in June 2013. The Court has concluded that the UBS Defendants' and Ferrer's position is the correct one and that Puerto Rico's one-year statute of limitations bans plaintiffs' tort claim against the UBS Defendants and Ferrer.

#### 1. *Puerto Rico's Statute of Limitations*

The parties agree that Puerto Rico law dictates the limitations period on plaintiffs' tort claims. Pursuant to Puerto Rico's statute of limitations that applies to torts, a plaintiff must bring suit within one year "from the time the aggrieved person had knowledge thereof." 31 L.P.R.A. § 5298(2). Because plaintiffs filed their complaint in this action on May 30, 2014, their tort claims' timeliness depends on an accrual date of no earlier than May 30, 2013.

Section 5298(2) has been interpreted to incorporate the "discovery rule." *Gonzalez-Perez v. Hosp. Interamericano De Medicina Avanzada*, 355 F.3d 1, 2 (1st Cir. 2004). In other words, a claim accrues in Puerto Rico when the injured party has notice of her injury and knowledge of the likely identity of the tortfeasor. *Colón Prieto v. Géigel*, 15 P.R. Offic. Trans. 313, 330-31 (P.R. 1984). Notice of an injury is triggered when there "exist some outward or physical signs through which the aggrieved party may become aware and realize that she has suffered an injurious aftereffect." *Espada v. Lugo*, 312 F.3d 1, 3 (1st Cir. 2002).

The statute does not require "actual knowledge"—"deemed knowledge" will suffice. *Rodríguez-Suris v. Montesinos*, 123 F.3d 10, 14 (1st Cir. 1997). A person is deemed "as being aware of all that, having

awareness constituting notice, that person would have been likely to come to know through the exercise of care." *Id.* at 16.  Once a plaintiff has notice of her injury and knowledge of the likely identity of the tortfeasor, "she must pursue that claim with reasonable diligence, or risk being held to have relinquished her right to pursue it later, after the limitation period has run." *Id.*  "[D]ue diligence . . . requires reasonable, active efforts to seek answers and clarify doubts." *Quintana Lopez v. Liggett Grp., Inc.*, 336 F. Supp. 2d 153, 157 (D.P.R. 2004).

Plaintiffs urge that because the statute of limitations begins to run only from the time when they became aware of their injuries, the prescription period began at the earliest in June 2013 when the Funds' values dropped precipitously, and thus plaintiffs brought their claims within the allowable one-year period when they filed this action on May 30, 2014.  According to plaintiffs, they did not have sufficient knowledge to bring a suit prior to June 2013 because there were no outward signs that they had been damaged before then.  Plaintiffs also suggest that they did not suffer any injury or damages until the Funds' value diminished drastically in June 2013.

According to defendants, on the other hand, plaintiffs were injured on the date when they purchased shares in the Funds.  All named plaintiffs purchased shares prior to May 30, 2013, more than one year before plaintiffs filed the complaint in this action.  (*See* Ianelli Decl., Exs. H–K; Aff. of Annie Naughton dated June 17, 2015, Exs. A–D).  Furthermore, the alleged misconduct predates May 30, 2013: "Objective: Soft Landing" was instituted in 2009, (Am. Compl. ¶ 70); allegations regarding the margin loan scheme date back to 2011, (*id.* ¶ 109); and the compensation structure for UBS financial advisers was changed in 2009–2010, (*id.* ¶¶ 117-120).

Moreover, defendants contend that even if plaintiffs were not aware of their injuries on the date that they purchased their shares—or on the date of defendants' other earlier alleged misconduct—plaintiffs were put on notice of their injuries prior to May 2013 because publicized lawsuits and administrative proceedings, as well as mainstream news articles, detailed the alleged wrongdoing regarding the management of the

Funds.   Consequently, defendants urge that plaintiffs discovered or reasonably should have discovered their injuries before May 2013, and thus the tort claims in this action are time-barred.

### 2.   Time of Injury

Plaintiffs' attempt to persuade the Court that they were not injured until the Funds' risks materialized in 2013 is unavailing.  Plaintiffs conflate injury with manifestations of injury.[8]  The harm associated with a breach of fiduciary duty occurs at the time of the breach—i.e., plaintiffs were injured when plaintiffs parted with their money to purchase shares in the Funds based on defendants' misrepresentations; when defendants obtained fees in an undisclosed self-dealing transaction in violation of their duty of loyalty; when defendants failed to conduct a suitability analysis; etc. See Rodriguez v. Banco Cent., 727 F. Supp. 759, 779 (D.P.R. 1989); see also Gould v. Berk & Michaels, P.C., No. 89 Civ. 5036, 1991 WL 152613, at *5 (S.D.N.Y. July 29, 1991).

It is possible that in some instances no outward manifestations of the injury inflicted by a breach of fiduciary duty will exist until money is lost.  Cf. Espada v. Lugo, 312 F.3d 1, 3-4 (1st Cir. 2002).  Indeed, one outward manifestation of an injury inflicted by a breach of fiduciary duty could be the loss in share prices, as plaintiffs suggest.  However, other outward signs may exist, as well.  "In actions for civil liability the period of limitation starts to run from the moment the aggrieved party had knowledge of the damage, although he need not know the amount thereof."  Ortiz v. Municipio De Orocovis, 13 P.R. Offic. Trans. 619, 622 (P.R.

---

[8] Plaintiffs' cite Ortega v. Pou, 135 D.P.R. 711 (D.P.R. 1994) for the proposition that injury does not necessarily occur at the time of the wrongdoing, but Ortega only stands for the principle that the manifestation of the injury does not necessarily occur at the time of the wrongdoing.  In Ortega, the statute of limitations did not start to run until plaintiff learned she had been harmed—she did not learn she had been harmed and that malpractice had occurred during a sterilization procedure until she learned that she had become pregnant.  The woman still suffered an injury at the time of the sterilization procedure, but there were no outward manifestations of the injury that put her on notice of the injury she had suffered until she became pregnant.  See id.; cf. Kaiser v. Armstrong World Indus., Inc., 872 F.2d 512, 526 (1st Cir. 1989).

1982). Thus, the relevant question for this Court is whether the plaintiffs discovered or reasonably should have discovered defendants' alleged breach of their fiduciary duty prior to May 2013 based on any outward signs of the injury inflicted on them. *Id.*

### 3. *Notice of Injury*

Defendants, in supporting their position that plaintiffs were aware—or should have been aware—of the alleged conduct long before this action was filed, identify the following information that was available to plaintiffs: the SEC's orders instituting proceedings against Ferrer and the UBS Defendants; a February 2010 class action by shareholders in the District of Puerto Rico; an August 2012 securities action by shareholders in the District of Puerto Rico; and various articles from mainstream news sources.   The UBS Defendants additionally point to the Funds' prospectuses.[9]

The Court may take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of the contents. *See, e.g., Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *Arturet-Velez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 15 (1st Cir. 2005); *Rivera-Muniz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 65 (D.P.R. 2010). The Court recognizes, however, it can be "somewhat risky to employ Rule 12(b)(6) as the vehicle for disposition of the statute of limitations issue." *Arturet-Velez*, 429 F.3d at 13.

---

[9] The UBS Defendants contend that the Funds' prospectuses put plaintiffs on notice that the Funds were risky and not suitable investments and that UBS had conflicts of interest. The Popular prospectuses have similar disclosures. (Ianelli Decl., Exs. A-D.) However, the Popular Defendants do not argue that the prospectuses' disclosures triggered accrual of plaintiffs' claims, but rather that the disclosures contradict plaintiffs' substantive allegations, warranting dismissal of their claims as a matter of law. Because the Court finds that the publicized lawsuits and administrative proceedings against the UBS Defendants put plaintiffs on notice of their tort claims, the Court does not address whether the prospectuses were sufficient to put plaintiffs on notice.

Nonetheless, District of Puerto Rico courts have taken judicial notice of prior lawsuits and news coverage on a motion to dismiss in order to determine whether a plaintiff's tort claims were time-barred pursuant to 31 L.P.R.A. § 5298(2) and the discovery rule. *See, e.g., Rivera-Muniz*, 737 F. Supp. 2d at 65; *Quintana Lopez v. Liggett Grp., Inc.*, 336 F. Supp. 2d 153, 158 (D.P.R. 2004); *Estate of Alicano Ayala v. Philip Morris, Inc.*, 263 F. Supp. 2d 311, 317 (D.P.R. 2003). Publicized legal proceedings and news reports may be evidence of "common knowledge" and give rise to a plaintiff being deemed to have knowledge of the tortious conduct. *See Rivera-Muniz*, 737 F. Supp. 2d at 65 (citing *Rodríguez-Suris*, 123 F.3d at 16); *see also generally Staehr*, 547 F.3d 406.

Plaintiffs contend that the conduct alleged in the other lawsuits and administrative proceedings brought against certain of the UBS Defendants and Ferrer, as well as the news articles covering these actions, overlap minimally with plaintiffs' allegations. Plaintiffs again urge that their claims concern "a far broader array of misconduct" than defendants focus on. (Opp'n at 50 n.47.) Because the prior lawsuits and proceedings center mainly on alleged misrepresentations about the Funds' pricing and the liquidity of the market in the Funds, plaintiffs believe those allegations were not sufficient to notify plaintiffs of the fiduciary duty claims asserted in this action.

However, as outlined *infra*, publicized, company-specific information, which was probative of the breach of fiduciary duty alleged against the UBS Defendants and Ferrer, triggered plaintiffs' duties to investigate their potential claims against the UBS Defendants, Ubiñas, and Ferrer. *See Shah v. Meeker*, 435 F.3d 244, 247 (2d Cir. 2006), *abrogated on narrower grounds by Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010); *see also Rivera-Muniz*, 737 F. Supp. 2d at 65 (citing *Rodríguez-Suris*, 123 F.3d at 16). At the same time, the Court finds that plaintiffs Toro and Vela—the two plaintiffs asserting claims against the Popular Defendants—were not on notice of their tort claims against the Popular Defendants because the Popular Defendants do not point to any press coverage or publicized lawsuits and administrative proceedings mentioning the Popular Defendants by name or explicitly tying them to UBS's misconduct.

a. *The Lawsuits and Administrative Proceedings*

i. 2010 Action

In February 2010, investors brought a putative class action in the U.S. District Court for the District of Puerto Rico against UBS Puerto Rico and UBS Trust and a derivative claim on behalf of four of the Funds, alleging, *inter alia,* breach of fiduciary duty and fraud (the "2010 Action"). (Youngwood Decl., Ex. 7 (*Union de Empleados de Muelles de P.R. PRSSA Welfare Plan et al. v. UBS Fin. Servs. Inc. of P.R.,* No. 10-cv-01141 (D.P.R. Feb. 19, 2010) (Dkt. No. 1))). This lawsuit alleged that UBS Financial Services used the Funds to maximize UBS's fees and also to increase the bonds' offering prices by engaging in self-dealing transactions. (*Id.* ¶¶ 1-2, 10, 66-79.)

The 2010 action also alleges a fiduciary breach based on UBS's conflict of interests arising out of UBS's multiple roles in transactions in these Funds, including acting as bond issuer, bond underwriter, and then bond purchaser as the manager of funds purchasing the bonds. (Youngwood Decl., Ex. 7 ¶¶ 72-79.) Furthermore, it alleges "material misstatements" about the suitability of purchases of bonds for the Funds. (Youngwood Decl., Ex. 7 ¶ 9.)

Defendants point to accompanying press coverage of the 2010 Action as well. In February 2011, *BloombergBusiness* ran an article in which it set forth that mutual fund shareholders had sued UBS, alleging a claim for breach of fiduciary duty based on the fees UBS earned on the bond offering at the same time it earned fees for managing closed-end mutual funds that purchased bonds. (Youngwood Decl., Ex. 10.) The article also quoted a Duke University School of Law professor as stating, "The whole thing from the ground up was riddled with conflicts of interest that could only work to the advantage of UBS and not in the interest of investors." (*Id.*) The Popular Defendants were not mentioned in the lawsuit or in the articles cited by defendants.

ii.   SEC Proceedings

In May 2012, the SEC instituted administrative and cease-and-desist proceedings against Ferrer and another UBS officer based on allegations that they had misrepresented the nature and liquidity of the closed-end mutual fund market to UBS financial advisers and, in turn, clients.   (Youngwood Decl., Ex. 5.)   The SEC order commencing the proceedings against Ferrer outlines the same key conduct alleged in the Amended Complaint here.   It refers to the UBS dividend reinvestment program, (*id.* ¶ 20); mentions "Objective: Soft-Landing," whereby UBS unloaded its own inventory of shares in the Funds onto UBS's own clients, exhibiting one of the alleged conflicts of interest that UBS possessed and failed to disclose, (*id.* ¶¶ 7, 19, 57-58, 66); and it outlines how Ferrer pushed investment advisors to sell the Funds to clients despite the advisors' reservations about the Funds, (*id.* ¶¶ 43, 73).

That same month—May 2012—the SEC instituted proceedings against UBS Puerto Rico.   That order contains similar allegations to those brought against Ferrer by the SEC, including that UBS Puerto Rico failed to disclose its conflict of interest in recommending the Funds to investors at the same time that UBS was selling off its own shares in the Funds. (Youngwood Decl., Ex. 6 ¶¶ 24-28, 37-44.)   UBS Puerto Rico later entered into a settlement agreement with the SEC, while neither admitting nor denying liability. (Youngwood Decl., Ex. 11.)

These SEC investigations and proceedings were publicized in national and Puerto Rico press. (*See, e.g.,* Youngwood Decl., Exs. 11, 13.) In February 2011, *BloombergBusiness* reported that the SEC might bring an action against UBS over its actions regarding its Puerto Rico closed-end mutual funds and, as noted *supra*, mentioned that UBS's involvement with the Funds "was riddled with conflicts of interest." (Youngwood Decl., Ex. 10.)   This same article also reiterated that a 2009 *Bloomberg Markets* magazine article had reported on the multiple hats that UBS wore in connection with the Puerto Rico bonds and the Funds. (*Id.*)

The contemporaneous news coverage of the SEC administrative proceedings largely focused on the allegations that UBS was propping up the closed-end mutual fund market by buying up shares at the same time

as it promoted the Funds as highly liquid investments.  It also reported on claims that UBS had misrepresented or failed to disclose that UBS set the prices and controlled the secondary market for the Funds.  (*See, e.g.,* Youngwood Decl., Exs. 13, 15.)  A May 2012 *El Vocero* article details how UBS's strategy of selling the shares it owned in the Funds purportedly hurt investors who also sold or tried to sell their shares.  (Decl. of Melvin A. Brosterman, dated June 18, 2015, Ex. D.)

In addition, the press singled out the dividend reinvestment program, (Brosterman Decl., Ex. G), as well as "Objective Soft Landing," both outlined in the Amended Complaint.  (Brosterman Decl., Exs. E., F.) The articles also referred specifically to Ferrer.  (*See, e.g.,* Brosterman Decl., Exs. D-F, H.)  Again, neither the SEC orders instituting proceedings nor the news reports refer to the Popular Defendants.

### iii.  2012 Securities Action

In August 2012, investors brought a securities action in the U.S. District Court for the District of Puerto Rico against UBS Puerto Rico, UBS Trust, Ferrer, a non-party UBS Officer, and two of the jointly managed Funds and four of the UBS-managed Funds alleging that defendants failed to disclose the illiquidity of the market in the Funds to investors, while portraying the Funds as safe investments (the "2012 Securities Action"). (Youngwood Decl., Ex. 8 (*Roman v. UBS Fin. Servs.*, No. 12-cv-1663 (D.P.R. Aug. 13, 2012) (Dkt. No. 1)).)

The 2012 Securities Action contains further allegations regarding the conduct alleged in the SEC orders instituting proceedings, including UBS's dividend reinvestment program, (Youngwood Decl., Ex. 8 ¶¶ 26-27, 44); how Ferrer pushed UBS Puerto Rico's financial advisers to encourage investors to purchase two new Fund offerings, (*id.* ¶¶ 39-43); "Objective: Soft Landing," *i.e.*, UBS Puerto Rico's sale of its own shares in the Funds, thereby undercutting customers' attempts to sell their shares, (*id.* ¶¶ 47-57.)  Plaintiffs in that action additionally alleged that UBS Puerto Rico and UBS Trust misrepresented the nature of the Funds and the risks and volatile nature inherent in them.  (*Id.* ¶¶ 5, 71.)

This 2012 Securities Action was publicized in an August 15, 2012, *Caribbean Business* article. (Youngwood Decl., Ex. 16; Brosterman Decl., Ex. K.)  Similar to the media coverage surrounding the SEC proceedings, the *Caribbean Business* account mainly focused on the liquidity of the Funds and UBS's role in manipulating prices.   (Youngwood Decl., Ex. 16.)  However, the *Caribbean Business* also reported on UBS's conflicting roles as advisor to Puerto Rico's Government Employees Retirement Fund, underwriter of the bonds, and manager of the mutual-fund portfolios that purchased the bonds.  (*See id.*)  In addition, the article specifically names the six funds relevant to the 2012 Securities Action and which are among the twenty-three Funds pertinent to this action:  Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Investors Bond Fund I, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; and Puerto Rico AAA Portfolio Bond Fund II, Inc.  (*Id.*)  The Popular Defendants are not named in the 2012 Securities Action complaint, nor are they named in the press coverage pointed to by defendants.

> b.   *Publicized Reports of Lawsuits Put Plaintiffs on Notice of their Claims Against the UBS Defendants.*

Plaintiffs are "charged with notice of . . . reports in the media." *Rivera-Muniz*, 737 F. Supp. 2d at 65 (*citing Rodríguez-Suris*, 123 F.3d at 16); *see Arturet-Velez*, 429 F.3d at 15; *see also generally Staehr*, 547 F.3d 406. Defendants cite to articles in two Puerto Rico newspapers, *El Vocero* and *El Nueva Día*, as well as *US News and World Report* and two additional publications, *BloombergBusiness* and *Caribbean Business*.  The publicized lawsuits and administrative proceedings and accompanying media coverage are sufficient for this Court to find that UBS investors had constructive notice and knowledge of their tort claims against UBS certainly by August 2012, if not earlier. *See Staehr*, 547 F.3d at 435.

In *Staehr*, the Second Circuit noted that "storm warnings" adequate to put a party on inquiry notice need not outline every aspect of conduct

ultimately alleged.[10]  *Id.* at 427.  Indeed, an "investor need not have 'notice of the entire fraud being perpetrated to be on inquiry notice.'" *Id.* at 435 (quoting *Dodds v. Cigna Secs. Inc.*, 12 F.3d 346, 352 (2d Cir. 1993)).  While "the triggering information" must relate directly to the conduct later alleged in the action at issue, *id.* (citing *Newman v. Warnaco Grp., Inc.*, 355 F.3d 187, 193 (2d Cir. 2003)), *Staehr* suggests that lawsuits that do not assert the exact same claims but rather bring "allegations that are similar to *some* of the key allegations in the instant complaint" trigger inquiry notice when sufficiently publicized, 547 F.3d at 435 (emphasis added).

Here, published reports of legal proceedings and the proceedings themselves put plaintiffs on notice of their exact allegations against the UBS Defendants and Ferrer.  As noted *supra*, several of the articles to which defendants point specifically name defendants UBS Puerto Rico, UBS Financial Services, and Ferrer in describing the allegations brought against them.  (*See, e.g.*, Youngwood Decl., Ex. 16; Brosterman Decl., Exs. E-G, K.)   The press coverage also describes much of the alleged misconduct with some specificity.  These articles are a far cry from the general news coverage of fraudulent activity described in *Staehr*, which did not mention the particular defendant or in some instances did not even directly implicate the defendants' industry.  *Cf. Staehr*, 547 F.3d at 430-31, 435.  Instead, here, the articles describe in detail several of the business practices that serve as the basis of plaintiffs' complaint.  *Cf. Shah*, 435 F.3d at 251.

Although the news reports and proceedings against the UBS Defendants do not contain all of the allegations that plaintiffs bring against them, the articles most certainly would put an investor of ordinary intelligence on notice of potential additional fiduciary breaches and claims

---

[10] Although *Staehr* analyzed inquiry notice in the securities fraud context and was thus implicitly overruled by the Supreme Court's interpretation of the Sarbanes-Oxley Act in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010), *Staehr* is still informative for understanding the common law discovery rule.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 152 (2d Cir. 2012) (noting that "pre-*Merck* securities fraud cases grounded inquiry notice doctrine upon common law principles" and can continue to inform analysis of inquiry notice outside of the securities fraud statutory framework).

against the UBS Defendants and Ferrer. *See Staehr*, 547 F.3d at 434-35. For example, although the articles do not outline in particular the alleged margin loan scheme or point to some of the incentives created in order to push financial advisors to sell shares in the Funds to their clients, the articles do report that UBS and Ferrer were pushing financial advisors to sell shares in the Funds and that there was at least one program in place—the dividend reinvestment program—to channel investors into increasing their shares in the Funds. *See Shah*, 435 F.3d at 251. The margin loan scheme was similarly part of the UBS Defendants' alleged attempts to dump more shares of the Funds onto the investors and sufficiently similar to put the UBS investors on notice of their tort claims related to that conduct.

This Court finds that these lawsuits and administrative proceedings and the public coverage of them in the press put plaintiffs on notice of their claims against the UBS Defendants.[11]

> c.   *Publicized Lawsuits and Administrative Proceedings Did Not Put Plaintiffs on Notice of their Claims Against the Popular Defendants.*

The court in *Staehr* placed import on whether the articles and lawsuits specifically mentioned the particular defendants named in the case at hand. Although UBS and Ferrer are called out by name in the publicized legal proceedings and accompanying press coverage, the Popular Defendants are not.[12] (*See, e.g.*, Youngwood Decl., Exs. 10-16.)

---

[11] At oral argument, plaintiffs confirmed that they have neither alleged nor argued an equitable tolling defense to the statute of limitations. (Oct. 14, 2016 Tr. at 34:4-9).

[12] The articles do not focus on Carlos Ubiñas, but the 2010 Action—the shareholder derivative action—did. (Youngwood Decl., Ex. 7.) In addition, Ubiñas is quoted in at least one article as the main executive officer of UBS Puerto Rico. (Brosterman Decl., Ex. D.) This additional more particular reference to Ubiñas, a named defendant in the 2010 Action, gave plaintiffs constructive knowledge of his alleged connection to wrongdoing. *Cf. Staehr*, 547 F.3d at 434. Moreover, the specific allegations regarding Ferrer and Ortiz and UBS Puerto Rico were sufficient to put plaintiffs on notice to inquire further into the management of UBS Puerto Rico.

Although the SEC order instituting administrative proceedings names the nine jointly managed Funds in a footnote, (Youngwood Decl., Ex. 6 at 3 n.2), it does not explicitly name the Popular Defendants and simply states that UBS Trust co-managed the funds without naming the co-manager.   Similarly, although the *Caribbean Business* article that mentions two jointly managed Funds which were referred to in the 2012 Securities Action and are also relevant in this action, (Brosterman Decl., Ex. K), there is no reference to the Popular Defendants in the article.

The footnote in the SEC order and the *Caribbean Business* article are not enough to notify investors of the fact that they had been injured by the Popular Defendants.  On this record, the Court cannot say as a matter of law that an ordinary investor would have inferred that the Popular Defendants were involved in the misconduct.  *See Staehr*, 547 F.3d at 434. Accordingly, at this stage of the litigation, the tort claims against Popular cannot be dismissed as time-barred pursuant to Puerto Rico's one year statute of limitations for tort claims.

## B.   Puerto Rico Uniform Securities Act ("PRUSA")

Section 890 of PRUSA, Puerto Rico's blue sky law, prohibits a plaintiff from bringing any claim pursuant to the statute more than two years after the sale contract has been executed.  10 L.P.R.A. § 890(e). Although Section 890(e) (as translated) provides that the time limitation applies to claims brought specifically pursuant to Section 890, Puerto Rico courts have interpreted the statute more broadly to preclude plaintiffs from bringing claims that sound in securities fraud, even when those claims are brought pursuant to a common law theory—*e.g.*, breach of contract and unjust enrichment claims involving a securities transaction and an alleged material misrepresentation—more than two years after the sale contract has been executed. (*See* Ianelli Decl., Ex. P (certified translation of *PaineWebber, Inc. v. First Boston Inc.*, 136 D.P.R. 541, 548 (P.R. June 30, 1994)); *id.*, Ex. Q (certified translation of *Tollinche Puig v. Triple S Mgmt. Corp.*, No. 2008-1749(905), 2010 WL 3200382 (P.R. Ct. App. May 28, 2010))).  *See also Ambert v. Caribe Equity Grp.*, No. 11-Civ-1254, 2011 WL 4626012, at *7 (D.P.R. Sept. 30, 2011) (PRUSA barred common law fraud claim).

In analogous contexts, courts analyzing whether claims sound in fraud look to whether fraud or deception is a necessary component of that claim. *Cf. Anwar v. Fairfield Greenwich Ltd.*, 118 F. Supp. 3d 591, 602-03 (S.D.N.Y. 2015); *Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 261 (S.D.N.Y. 2004). If the allegation is extraneous to the complaint's theory of liability, it does not turn the complaint into one for fraud. *Cf. In re Kingate*, 784 F.3d at 142-43. At the same time, courts should be wary of artful pleading, and regardless of a plaintiff's characterization of a claim as based on a theory other than falsity, courts must examine whether fraud is nonetheless an essential part of the plaintiff's theory. *Id.* at 140; *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

Defendants advocate that PRUSA's two-year statute of repose bars some of the claims brought by three plaintiffs because those plaintiffs purchased shares in the Funds more than two years before bringing suit and their claims sound in fraud. Specifically, the UBS Defendants contend that PRUSA precludes all of plaintiff Montes' remaining contract claims because Montes purchased shares in Puerto Rico Fixed Income Fund III, Inc. on February 7, 2012, over two years before she filed this suit in May 2014. (Naughton Aff., Ex. C.) The UBS Defendants concede, however, that all other UBS plaintiffs have timely contract claims pursuant to PRUSA.

The Popular Defendants urge that PRUSA bars all of plaintiff Toro's claims and some (but not all) of plaintiff Vela's claims; they concede that Vela's claims based on his purchase of shares in June 2012 survive PRUSA's time limitation.[13]

According to defendants, regardless of how plaintiffs characterize their claims in this action, the Amended Complaint is based on the theory that plaintiffs purchased shares in the Funds in reliance on defendants'

---

[13] Toro purchased shares in Puerto Rico Investors Tax-Free Fund V, Inc. and Puerto Rico Investors Tax Free Fund III, Inc. in January 2005 and January 2007, respectively; Banco Popular and UBS co-managed both funds. (Ianelli Decl., Exs. H & I.) Vela purchased shares in Puerto Rico Fixed Income Fund and Puerto Rico Investors Tax-Free Fund VI, Inc. in December 2011 and June 2012, respectively. (*Id.*, Exs. J & K.)

knowing material misrepresentations regarding the nature, stability, and risk of the Funds, and thus their claims sound in fraud.

Plaintiffs, on the other hand, urge that PRUSA does not apply to their claims, advocating that defendants misleadingly attempt to re-write the Amended Class Action Complaint to reduce their claims to common law fraud and securities fraud, when plaintiffs contend their claims rest on other theories.

This Court concludes that plaintiffs' remaining breach of fiduciary claims against the Popular Defendants sound in fraud and thus PRUSA applies. Plaintiffs accurately state that they do not use the word "fraud" in their Amended Class Action Complaint. Yet, although plaintiffs' are the master of their complaint, artful pleading does not excuse the fact that plaintiffs' theory underlying its breach of fiduciary duty claims is not mere negligence, but is essentially fraud. *In re Kingate*, 784 F.3d at 140.

The main thrust of plaintiffs' breach of fiduciary duty claims against the Popular Defendants is that defendants misrepresented the risks involved in the Funds and pushed plaintiffs to invest in the Funds in order "to line their own pockets," without disclosing all of their conflicts of interest and without assessing the suitability of the investments for their clients, when the funds were risky and when defendants knew or should have known how risky they were because they helped underwrite the bonds that comprised the bulk of the Funds. (*See, e.g.*, Am. Compl. ¶¶ 59, 72-82.) Plaintiffs use language characteristically connotative of deliberate deceptive conduct such as "steered" (*id.* ¶ 6), "pushed" (*e.g.*, *id.* ¶¶ 59, 83, 95), "exhort[ed]," (*id.* ¶ 84), and "induce[d]," (*id.* ¶ 97), as well as "falsely portrayed" and "falsely assure[d]," (*id.* ¶¶ 128-129). Furthermore, as the Popular Defendants point out, plaintiffs suggest in their briefing that defendants gave insufficient disclosures regarding dangers *known* to them. (Opp'n at 25, 26 (emphasis added)).[14] In sum, plaintiffs' claim for breach of

---

[14] Indeed, at oral argument, plaintiffs could not avoid alluding to knowledge in describing their claim. (*See* Oct. 14, 2016 Tr. at 48:18-49:2 ("[Defendants said the Funds] are suitable for you, and they were not suitable because they did no investigation of it because they *knew* they were putting too many. They were over

fiduciary duty against Popular Securities relies on factual allegations of fraud and deceit that are integral to their claim. *Rombach*, 355 F.3d at 172.

Similarly, plaintiffs' breach of the implied covenant of good faith and fair dealing claims rely on the same alleged misconduct that forms the basis of their breach of fiduciary duty claims. Because these claims are premised on the same allegations of intentional misrepresentations and omissions by defendants, these claims sound in fraud as well. *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07-cv-318, 2009 WL 2242605, at *12 (S.D.N.Y. July 27, 2009).

On the other hand, plaintiffs' remaining breach of contract claims against the UBS Defendants and the Popular Defendants, premised on the breach of an express provision imposing an obligation to conduct a suitability analysis, are not subject to PRUSA because these breach of contract claims do not rely on allegations of fraudulent conduct. All that is relevant to these breach of contract claims is whether there was a contractual provision in their client agreements imposing an obligation on defendants to conduct a suitability analysis and whether or not defendants conducted such an analysis. *See U.S. Bank Nat'l Ass'n v. Citigroup Global Markets Realty Corp.*, No. 13 Civ. 6989, 2014 WL 7714382, at *3 (S.D.N.Y. Nov. 14, 2014). This claim is not entangled with the allegations of misrepresentations and the gravamen of the claim is a traditional breach of contract claim premised on the alleged breach of the contractual obligation to perform a suitability analysis. *See id.; see also Rombach*, 355 F.3d at 172.

Accordingly, Vela's 2011 and Toro's breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing claims against the Popular Defendants and Montes' breach of the implied covenant of good faith and fair dealing claim against the UBS Defendants are dismissed as time-barred. Vela's 2012 breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing claims, and Toro's, Vela's, and Montes' breach of contract claims premised on breach of the contractual obligation to conduct a suitability analysis are timely pursuant to PRUSA.

---

concentrating certain issues of bonds in the funds, and that would make the funds much more risky than represented.") (emphasis added).)

## V.   SUFFICIENCY OF THE PLEADINGS

Regardless of PRUSA's application, plaintiffs' breach of fiduciary duty claims against the Popular Defendants and plaintiffs' breach of the implied covenant of good faith and fair dealing claims against both the Popular Defendants and the UBS Defendants have not been sufficiently pled pursuant to Fed. R. Civ. P. 9(b).  The Court concludes, however, that those plaintiffs whose contracts contained a provision obligating defendants to perform a suitability analysis—namely, Fernandez, Mondes, Schreiner, Viera, and Toro—have stated a claim for breach of contract.[15]

### A.   Pleading Standard

Before scrutinizing the sufficiency of the pleadings, the Court must consider whether the allegations need to satisfy Fed. R. Civ. P. 9(b)'s heightened pleading standards that apply "to all averments of fraud or mistake whatever may be the theory of legal duty—statutory, common law, tort, contractual or fiduciary." *Frota v. Prudential-Bache Secs. Inc.*, 639 F. Supp. 1186, 1193 (S.D.N.Y. 1986); *see also In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 429 (Bankr. S.D.N.Y. 2005).  In other words, Rule 9(b)'s particularity requirement for pleading "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

Because—as explained *supra*—this Court concludes that plaintiffs' breach of fiduciary duty claim against the Popular Defendants and breach of the implied covenant of good faith and fair dealing claims against defendants sound in fraud, Rule 9(b) applies and these claims must therefore be asserted with particularity.

---

[15] The only remaining claims for the Court to scrutinize pursuant to Fed. R. Civ. P. 12(b)(6) are: (1) Vela's breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing claims against Popular Securities pertaining to his 2012 purchase of Fund shares; (2) Vela's accompanying aiding and abetting claim for breach of fiduciary duty against Banco Popular for his 2012 purchase of Fund shares; and (3) Fernandez's, Schreiner's, Viera's, and Santana's breach of the implied covenant of good faith and fair dealing claim against the UBS Defendants.

However, Rule 9(b) does not apply to plaintiffs' remaining breach of contract claims that the UBS Defendants and the Popular Defendants failed to conduct a suitability analysis because those breach of contract claims do not rely on allegations of fraudulent conduct. Accordingly, the claims that defendants failed to conduct a suitability analysis are scrutinized pursuant to Fed. R. Civ. P. 8.

### B. The Breach of Fiduciary Duty and the Breach of the Implied Covenant of Good Faith and Fair Dealing Claims Are Not Pled with the Particularity Required by Rule 9(b)

In order to comply with Rule 9(b), plaintiffs' breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing claims must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Blank*, 459 F.3d 273, 290 (2d Cir. 2006). "The Court must be especially vigilant in applying Rule 9(b) where a complaint is made against multiple defendants. . . . Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Lobatto v. Berney*, No. 98-Cv-1984, 1999 WL 672994, at *10 (S.D.N.Y. Aug. 26, 1999) (internal citations omitted).

#### 1. *Popular Defendants' alleged breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing*

The allegations against the Popular Defendants are generalized and lack the required particularity. Indeed, the Popular Defendants appear to have been tacked onto the complaint as defendants, as the Amended Class Action Complaint focuses mainly on the specifics of the UBS Defendants' alleged misconduct. (*See, e.g.*, Am. Compl. ¶¶ 7, 13, 70, 104, 107, 110.) As the Popular Defendants note, plaintiffs' arguments boil down to "[t]he Popular Defendants are likewise liable for [ ] misdeeds, as well as their own disloyalty and lack of candor, because they *jointly managed many of the Funds with the UBS Defendants* and similarly focused on generating massive fees to the detriment of their clients." (Popular Reply Br. at 4 (quoting Plfs.' Opp'n at 3).) These general allegations that the Popular Defendants

pushed plaintiffs to invest in the Funds by representing that they were safe when they were actually risky fall far from pleading the required who/what/where/why/when of the alleged misrepresentations or omissions. *Frota*, 639 F. Supp. at 1193.

### 2. *UBS Defendants' alleged breach of the implied covenant of good faith and fair dealing*

Although plaintiffs' allegations against the UBS Defendants contain greater specificity regarding the UBS Defendants' purported misconduct than do plaintiffs' allegations regarding the Popular Defendants, plaintiffs' contentions pertaining to the UBS Defendants still do not provide the required who/what/where/why/when of the purported misrepresentations and omissions. (*See, e.g.*, ¶¶ 70, 84, 104, 107.) "[A] complaint may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 584 (S.D.N.Y. 1995). Yet, that is exactly what plaintiffs' Amended Class Action Complaint does as it fails to attribute the UBS Defendants' purported misrepresentations and omissions to any particular UBS Defendant. Furthermore, plaintiffs' Amended Class Action Complaint is a jumble, often unclear as to when, where, or by whom the alleged misrepresentations or omissions were purportedly made. Such blanket allegations are not adequate to meet the purposes of Rule 9(b)—namely, to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *DeBlasio*, 2009 WL 2242605, at *13-14.

### C.  Aiding and Abetting Breach of Fiduciary Duty

The only remaining claim for aiding and abetting a breach of fiduciary duty is Vela's claim based on his 2012 Fund purchases that Banco Popular aided and abetted Popular Securities. In order to assert a claim for aiding and abetting breach of fiduciary duty, a plaintiff must assert an

underlying breach. *See Bullmore v. Ernst & Young Cayman Is.*, 45 A.D.3d 461, 464 (1st Dep't 2007). Because, as an initial matter, Vela has not alleged a claim for breach of fiduciary duty against Popular Securities, he has not adequately alleged an aiding and abetting claim against Banco Popular. *See McBride v. KPMG Int'l*, 135 A.D.3d 576, 579 (1st Dep't 2016).

### D. Breach of Contract

#### 1. *UBS Defendants*

The parties agree that New York law applies to the UBS client relationship agreements for all plaintiffs who were UBS's clients. Pursuant to New York law, a party claiming breach of contract must allege: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages. *Neckles Builders, Inc. v. Turner*, 117 A.D.3d 923, 924 (2d Dep't 2014).

According to the UBS Defendants, even if their contracts imposed an obligation on them to possess a reasonable basis for believing that an investment recommendation was suitable for the customer, the UBS Defendants urge that plaintiffs have failed to allege facts regarding whether a particular investment was not suitable for a given plaintiff and, therefore, that plaintiffs have not alleged a breach of that provision. According to the UBS Defendants, plaintiffs need to allege each individual plaintiff's financial circumstances, needs, and goals in order to allege that a particular investment was not suitable and thus that the Client Relationship Agreement provision has been breached. Regardless, the UBS Defendants contend that plaintiffs have failed to plead damages as a result of any breach.

In their opposing brief, plaintiffs clarify that the theory underlying their claim is *not* a standard suitability claim—*i.e.*, that an investment was not suitable—but rather simply that defendants were obligated to conduct a suitability analysis and failed to conduct any such analysis, regardless of whether the investment was suitable or not.

The UBS Defendants argue that not all of the client relationship agreements contained provisions requiring UBS to conduct suitability analyses. In particular, only three of the named-plaintiffs—Fernandez, Montes, and Schreiner—had such provisions in their agreements with UBS. (*Compare* Aff. of Maureen Millett dated June 18, 2015, Ex. A at 21, 50, Ex. D at I-3, II-2, Ex. G at 3, 12 *with id.*, Exs. I-K.)

This Court finds that Fernandez, Montes, and Schreiner have pointed to a provision in their contracts that UBS Defendants are alleged to have breached and that plaintiffs have alleged that they were damaged as a result. Accordingly, Fernandez's, Montes', and Schreiner's breach of contract claims may proceed.

Santana and Viera, however, fail to point to a provision in their contracts with UBS requiring that UBS conduct a suitability analysis that they allege was breached and thus they have failed to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Neckles Builders, Inc.*, 117 A.D.3d at 924.

### 2. *Popular Defendants*

Here, too, the plaintiffs who were clients of Popular Securities have divergent client relationship agreements with the broker-dealer. Toro's agreement is governed by the laws of Puerto Rico. (Ianelli Decl., Ex. E at 3, § 8.) To state a claim for breach of contract pursuant to Puerto Rico law, "a party must sufficiently allege (1) a valid contract, (2) breach of that contract, and (3) resulting damages." *Montalvo v. LT's Benjamin Records, Inc.*, 56 F. Supp. 3d 121, 135 (D.P.R. 2014). Popular Securities' agreement with Vela provides that Massachusetts law governs. (Ianelli Decl., Ex. G at 4.) Pursuant to Massachusetts law, a party alleging breach of contract must allege (1) a valid contract, (2) that plaintiff performed his own obligations under the contract, (3) breach of the contract, and (4) resulting damages. *Persson v. Scotia Prince Cruises, Ltd.*, 330 F.3d 28, 34 (1st Cir. 2003).

Like the UBS Defendants, the Popular Defendants also contend that plaintiffs fail to identify any terms of the agreement that were breached. Only Vela points to an express provision in the contract that he alleges

Popular Securities breached. (Ianelli Decl., Ex. G at 4.) It states, "As your broker/dealer, we will . . . [d]etermine the suitability of any recommendations and investment advice." (*Id.*)

Toro's contract, by contrast, contains no such clause. (*See* Ianelli Decl., Ex. E.) Accordingly, Toro has no claim for breach of contract because he has not pointed to a provision of the contract that was breached. *See Montalvo*, 56 F. Supp. 3d at 135.

Popular Securities submits that its contracts with plaintiffs expressly contradict the obligation to perform a suitability analysis that plaintiffs allege was breached. It points out that Vela's contract with National Financial Services LLC provided that he agreed to "accept full responsibility for . . . all investment decisions and transaction orders, and all instructions that you or anyone authorized by you places." (Ianelli Decl., Ex. G.) However, at this stage in the litigation, the Court is not prepared to conclude that this provision expressly contradicts the Popular Defendants' obligation to conduct a suitability analysis.

Accordingly, Vela's breach of contract claim based on Popular Securities' alleged failure to conduct a suitability analysis may proceed. Toro's breach of contract claim based on the same failure, on the other hand, is dismissed.

## VI. CONCLUSION

Counts I and Count II are DISMISSED with prejudice as time-barred pursuant to 31 L.P.R.A. § 5298(2).

Counts III and IV are DISMISSED with prejudice in part and without prejudice in part. Vela's 2011 tort claims and Toro's tort claims are dismissed with prejudice as time-barred pursuant to PRUSA. Vela's 2012 tort claims are dismissed without prejudice for failing to meet the requirements of Fed. R. Civ. P. 9(b). Vela is granted leave to replead Counts III and IV as they pertain to his 2012 Fund purchases.

The UBS Defendants' motion to dismiss Count V is GRANTED IN PART and DENIED IN PART. Plaintiff Montes' breach of the implied

covenant of good faith and fair dealing claim is DISMISSED with prejudice as time-barred pursuant to PRUSA.  Plaintiffs Fernandez's, Schreiner's, Santana's and Viera's breach of the implied covenant of good faith and fair dealing claims are DISMISSED without prejudice for failing to meet the requirements of Fed. R. Civ. P. 9(b).  Plaintiffs Santana's and Viera's breach of contract claims premised on the UBS Defendants' failure to conduct a suitability analysis are DISMISSED with prejudice for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  However, the UBS Defendants' motion to dismiss plaintiffs Fernandez's, Montes', and Schreiner's breach of contract claims is DENIED to the extent those plaintiffs' breach of contract claims are premised on the breach of an express provision of their contracts obliging the UBS Defendants to conduct a suitability analysis.

The Popular Defendants' motion to dismiss Count VI is similarly GRANTED IN PART and DENIED IN PART.  Vela's 2011 claim and Toro's claims for breach of the implied covenant of good faith and fair dealing are DISMISSED with prejudice as time-barred pursuant to PRUSA.  Vela's 2012 claim for breach of the implied covenant of good faith and fair dealing is DISMISSED without prejudice for failing to meet the requirements of Fed. R. Civ. P. 9(b).  Toro's breach of contract claims premised on Popular Securities' failure to conduct a suitability analysis is DISMISSED with prejudice for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  However, the Popular Defendants' motion to dismiss Vela's breach of contract claim is DENIED to the extent his breach of contract claim is premised on the breach of an express provision of the contract obliging Popular Securities to conduct a suitability analysis.

Thus the UBS Defendants' motion to dismiss (Dkt. No. 90) is GRANTED IN PART and DENIED IN PART; the Popular Defendants' motion to dismiss (Dkt. No. 84) is GRANTED IN PART and DENIED IN PART; and Ferrer's motion to dismiss (Dkt. No. 85) is GRANTED in its entirety.

If plaintiffs intend to replead (1) Counts III and IV as they pertain to Vela's 2012 Fund purchases, (2) plaintiffs Fernandez's, Schreiner's, Santana's, and Viera's breach of the implied covenant of good faith and fair dealing claims in Count V, or (3) Vela's 2012 claim in Count VI for

breach of the implied covenant of good faith and fair dealing, they should do so within 21 days of this order.  If plaintiffs do not intend to attempt to replead those allegations, they should notify the Court in writing in order for the Court to establish a schedule for the remainder of the litigation.

Dated:  New York, New York
        December 7, 2016

SO ORDERED:

Sidney H. Stein, U.S.D.J.