UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NORA FERNANDEZ; AUGUSTO
SCHREINER; EDDIE TORO VELEZ;
VICTOR R. VELA DIEZ DE ANDINO;
JUAN VIERA; GEORGINA VELEZ
MONTES; and ESTHER SANTANA, on
behalf of themselves and all others
similarly situated,

                    Plaintiffs,

   -against-

                                15-Cv-2859 (SHS)

UBS AG; UBS FINANCIAL SERVICES,
INC.; UBS FINANCIAL SERVICES
INCORPORATED OF PUERTO RICO; UBS             OPINION & ORDER
TRUST COMPANY OF PUERTO RICO;
UBS BANK USA; CARLOS V. UBIÑAS;
MIGUEL A. FERRER; BANCO POPULAR
de PUERTO RICO; and POPULAR
SECURITIES, LLC,

                    Defendants.

---

SIDNEY H. STEIN, U.S. District Judge.

    This breach of contract action concerns investments that plaintiffs
made in one or more of twenty closed-end mutual funds ("CEFs," or
"Funds"), each of which contained a high percentage of Puerto Rico
government bonds.  Plaintiffs are current or former clients of defendant
UBS Financial Services Incorporated of Puerto Rico.  The contract at issue
is the client agreement ("Client Agreement") between plaintiffs and the
defendants – subsidiaries of the Swiss global financial services company
UBS (collectively, "UBS").

    Plaintiffs contend that UBS – their broker-dealer – breached the Client
Agreement by failing to perform suitability analyses in connection with

plaintiffs' investments in the Funds.  Thus, "the theory underlying [plaintiffs'] claim is *not* a standard suitability claim – *i.e.*, that an investment was not suitable – but rather simply that defendants were obligated to conduct a suitability analysis and failed to conduct any such analysis, regardless of whether the investment was suitable or not." *Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 389 (S.D.N.Y. 2016).  A suitability analysis, as described more fully below, is an analysis that leads to a determination that a particular investment product is suitable for investment generally and for a client specifically – or not.

Before the Court is plaintiffs' motion to certify the following class:

> All persons who had client agreements with UBS Financial Services Incorporated of Puerto Rico ("UBS") requiring UBS to conduct suitability analyses and who purchased shares of one or more of the Twenty CEFs[1] between May 5, 2008 and May 5, 2014 (the "Class Period").

(Pl.'s Am. Not. of Mot. for Class Cert. Modifying the Class Def'n ("Not. of Class Def'n"), ECF No. 212.)

Whether an investment is suitable for a particular client is an inherently individualized inquiry; it depends on the unique characteristics of both the investor and the investment at a particular point in time. However, plaintiffs contend that by focusing on the conduct of UBS, together with a representative sample of client accounts, common proof

––––––––––––––––––––––

[1] The "Twenty CEFs" are: Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund II, Inc.; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Investors Bond Fund I; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; and Puerto Rico Fixed Income Fund VI, Inc.

can establish whether or not UBS failed to conduct suitability analyses for members of the proposed class.

For the reasons that follow, the Court finds that plaintiffs have not demonstrated that the facts and allegations in this case are susceptible to generalized proof. To the contrary, the Court finds that individual questions overwhelm the classwide questions, thus contravening the predominance requirement of Federal Rule of Civil Procedure 23(b)(3), and that each proposed class member's claim arises from a course of events that is unique to that class member, in contravention of the typicality requirement of Rule 23(a). Accordingly, plaintiffs' motion for class certification is denied.

## I.   PROCEDURAL HISTORY

Plaintiffs' Amended Complaint asserted state law claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract, against UBS together with Banco Popular de Puerto Rico and an affiliated LLC, and two individual defendants:  Carlos Ubiñas, CEO of UBS Puerto Rico, and Miguel Ferrer, the former Chair and CEO of UBS Puerto Rico and the founder and former CEO of UBS Trust.  (Am. Compl., ECF No. 68.)  *See Fernandez*, 222 F. Supp. 3d at 363-64.  In three separate motions, the original defendants moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *Fernandez*, 222 F. Supp. 3d at 369.

In December 2016, the Court granted in part and denied in part the motions to dismiss, *id.* at 390-91, and the reader is referred to that Opinion for relevant background.  As a result, the only claims remaining at that time were Fernandez's, Montes's, and Schreiner's breach of contract claims against UBS and Vela's breach of contract claim against the Banco Popular defendants, to the extent those claims were premised on the breach of an express provision of plaintiffs' contracts obliging the defendants to conduct a suitability analysis.  *Id.*

In July 2017, the parties stipulated to the dismissal of all claims against the Banco Popular defendants as a result of Vela – the sole remaining

plaintiff with claims against those defendants – having passed away. (Stip. and Order, ECF No. 157.)

Now before the Court is the motion by the remaining plaintiffs to certify the class pursuant to Federal Rule of Civil Procedure 23(b)(3). (Notice of Mot. for Class Cert., ECF No. 174.)  On May 10, 2018, concurrent with the filing of their reply brief, plaintiffs amended the definition of their proposed class.  (Not. of Class Def'n.)  The Court then granted the parties' joint request for supplemental briefing, and the motion was fully briefed and ripe for decision in late June, 2018.  (Pls.' Sur-Sur-Reply Mem. of Law ("Pls.' Sur-Reply"), ECF No. 228; *see also* Stip. and Order 4 ("All submissions necessary for the Court to decide plaintiffs' motion for class certification must be submitted by June 25, 2018"), ECF No. 223; Letter at 1, ECF No. 222.)  The Court heard oral argument on the motion on August 8, 2018.  (*See* Oral Arg. Tr. ("Oral Arg."), ECF No. 249.)

Also before the Court is UBS's motion to exclude the reports and opinions of two of plaintiffs' experts, Alan J. Besnoff and Mercer E. Bullard, pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702.  (Notice of Motion, ECF No. 200.)

## II.   FACTUAL BACKGROUND[2]

The sole issue in this breach of contract action is whether UBS breached its obligation to members of the proposed class by failing to perform any suitability analyses with regard to the Funds before recommending that class members purchase or hold the Funds.

### A.   The Requirement of a Suitability Analysis

UBS was bound by a common provision in the Client Agreements with members of the proposed class that states as follows:  "We must have a reasonable basis for believing that any securities recommendations we make to you are suitable and appropriate for you, given your individual financial circumstances, needs, and goals."[3]  (*E.g.*, Account Application 20, PX-34; UBS Client Relationship Agreement and Disclosures 50, DX-30.)

---

[2] Plaintiffs' exhibits, denoted "PX," are attached to the Declarations of Jon T. Pearson (ECF Nos. 175, 215, 217) and Jeremy P. Robinson (ECF No. 227).  Defendants' exhibits, denoted "DX," are attached to the Declarations of Jonathan K. Youngwood.  (ECF Nos. 198, 224.)  Among the exhibits are two reports from each expert for each party; the parties conceive of these as class certification reports and merits reports. However, since all are submitted to the Court at this pre-merits stage, the Court considers them all to the extent they are relevant to class certification, and denotes them "First [Expert] Report" or "Second [Expert] Report" rather than "Class" and "Merits."  Plaintiffs' experts' reports are located in the record as follows:  Joseph R. Mason (PX-26 and PX-70A), Mercer E. Bullard (PX-27 and PX-67), Alan J. Besnoff (PX-28 and PX-68), and David Madigan (PX-29 and PX-69).  Defendants' experts' reports are located in the record as follows:  Christopher Laursen (DX-1 and DX-66), John Davenport Maine (DX-2 and DX-67), Chudozie Okongwu (DX-3 and DX-68), and David E. Paulukaitis (DX-69).

[3] The precise language of this provision was not identical among the Client Agreements, but the parties do not contend that any minor variation is material to this action.  (*See* Pls.' Mem. of Law in Supp. of Mot. for Class Cert. ("Pls.' Mem.") 17, ECF No. 176; Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Cert. ("Defs.' Opp'n") 1, ECF No. 199.)  In addition, some UBS clients had Client Agreements that omitted this provision altogether; those clients are expressly excluded from the class proposed by plaintiffs.  (*See* Not. of Class Def'n.)  *See also Fernandez*, 222 F. Supp. 3d at 389 (dismissing claims by plaintiffs whose Client Agreements did not include this provision).

The Client Agreement itself does not elaborate on this provision or the duties it imposes on UBS.

Separate and apart from the Client Agreements, UBS was obligated to perform suitability analyses by Financial Industry Regulatory Authority (FINRA) regulations, as well as UBS's own internal policies.  FINRA's suitability rule – FINRA Rule 2111[4] ("Rule 2111," or the "Suitability Rule") – comes with a well-developed body of guidance, and plaintiffs contend that the duties imposed by the Client Agreement are either informed by Rule 2111 and the related guidance, or coextensive with them.  Although UBS does not concede that the contract should be interpreted in line with Rule 2111,[5] it nonetheless frames its arguments around Rule 2111 and its related guidance, as do plaintiffs.

Rule 2111 provides that UBS

> must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of [UBS] to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to [UBS] in connection with such recommendation.

FINRA Rule 2111(a).

---

[4] FINRA Rule 2111 became effective in the middle of the Class Period, on July 9, 2012, when FINRA succeeded the National Association of Securities Dealers (NASD) as UBS's self-regulatory organization.  (First Bullard Report ¶ 7; Second Besnoff Report 8-10; First Laursen Report ¶¶ 38-44; First Maine Report 6.)  Prior to that, UBS was subject to NASD Rule 2310, an analogue to FINRA Rule 2111.  (*Id.*)

[5] (*See* Oral Arg. 31:6-12 ("[I]t is unclear whether or not the FINRA suitab[ility] rules themselves . . . apply to this case.").)

FINRA elaborates on Rule 2111 in "Supplementary Materials" to the rule, which explain that the Suitability Rule requires UBS to make a determination that any securities it recommends are (1) suitable for investment generally, and (2) suitable for the particular client to whom it is being recommended for investment.  Here, the parties refer to these obligations, respectively, as (1) "product-focused suitability," or "suitability per se" or "reasonable-basis suitability," and (2) "client-focused suitability" or "customer-specific suitability."[6]

According to the Supplementary Materials, the product-focused suitability analysis required UBS and its financial advisors to determine "that the recommendation is suitable for at least *some* investors."  FINRA Rule 2111 supp. mat. 05(a) (emphasis in original).  Of particular relevance to this action, the parties dispute the role of a product's stated investment objective in a product-focused suitability analysis.  Although a product's investment objective is not mentioned in Rule 2111 or the Supplementary Materials, there is some evidence that FINRA deems it to be at least relevant to the product-focused suitability analysis.  (*See* Second Bullard Report ¶¶ 29, 31; *see also* Corr. Reply Mem. of Law in Supp. of Pls.' Mot. for Class Cert. ("Pls.' Reply") 7 n.21, ECF No. 218.)

A client-focused suitability analysis required UBS and its financial advisors to make a highly individualized determination "that the recommendation is suitable for a particular customer based on that customer's investment profile."  FINRA Rule 2111 supp. mat. 05(b).  The investment profile "includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to [UBS] in connection with such recommendation."  FINRA Rule 2111(a). For example, depending on the circumstances, a recommendation might be unsuitable for a client if it would cause that client to become

---

[6] FINRA's product-focused and client-focused suitability obligations were mirrored in UBS's own internal policies during the Class Period.  (*See, e.g.*, Suitability and Ethical Sales Practices 3-4 (internal UBS document setting forth suitability obligations), PX-9; 2007 Legal and Compliance Presentation 4 (same), PX-2.)

overconcentrated in a particular security – that is, if the security would occupy a disproportionate percentage of the client's aggregate investment portfolio.  (*See* Second Besnoff Report 29 (quoting UBS Sales Practice Compliance Manual 60 (July 2008)); UBS Sales Practice Compliance Manual 58 (Dec. 2008), PX-33.)

By its terms, Rule 2111 – as with the suitability provision in the Client Agreement – only applied with respect to investments that were "recommended" by UBS or its financial advisors.  A FINRA notice explained that "determining whether a particular communication could be viewed as a recommendation for purposes of the suitability rule" depends on "the facts and circumstances of the particular case."  (FINRA Regulatory Notice 11-02 at 2 (Jan. 2011), DX-73; *see also* NASD Notice to Members 96-60 at 473-74 (Sept. 1996), PX-74.)  The notice also sets forth certain "guiding principles [that] are relevant" to that determination, such as "a communication's content, context and presentation," and whether a communication is "individually tailored . . . to a particular customer or customers."  (FINRA Regulatory Notice 11-02 at 2-3.)

Although FINRA imposed "a general obligation to evidence compliance with applicable FINRA rules," it had no explicit requirement that UBS or its financial advisors document their suitability analyses and determinations, except under certain circumstances.[7]  (FINRA Regulatory Notice 11-25 at 7 (May 2011), DX-23; *see also* Second Besnoff Report 19-20; Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Class Cert. ("Defs.' Opp'n") 8, ECF No. 199.)  The parties dispute whether the explicit documentation requirements were applicable to the Funds, and also the nature and extent of the documentation that was required.  (Pls.' Reply 8-9; Defs.' Sur-Reply Mem. of Law in Opp'n to Pls.' Mot. for Class Cert. ("Defs.' Sur-Reply") 3-4, ECF No. 225.)  Plaintiffs also contend that suitability documentation was considered an industry best-practice.  (Pls.' Reply 8-9.)

---

[7] Internal UBS policies did not impose any documentation requirement either, at least not until October 1, 2013.  (*See* Suitability and Ethical Sales Practices 1 (Oct. 1, 2013), PX-43.)

### B.   Common Evidence Related to the Funds

The investment products at the center of this litigation are the Funds, which the Court described in its prior Opinion in this action as follows:

> The closed-end mutual funds at issue in this case are incorporated pursuant to Puerto Rico law and are structured to provide tax-free income to Puerto Rico residents. As long as at least 67% of each Fund's holdings are comprised of Puerto Rico assets, the income that shareholders receive from the Funds' investments is not taxed by the municipal, state, or federal governments. In order to take advantage of this tax benefit, a high percentage of each Fund's holdings are Puerto Rico government bonds. Only Puerto Rico residents can purchase shares in the Funds, which do not trade nationally and are not listed on any national securities exchange.

> The Funds are also exempt from registration pursuant to the Investment Company Act of 1940 (the "Act"). Consequently, the Act's . . . restrictions on the use of leverage do not apply to the Funds as a matter of federal statutory law. As a result, the Funds were highly leveraged, with approximately 50% of their assets financed through loans.

> . . . .

> In June 2013, the value of the Puerto Rico government bonds began to decline due to the market's concerns about the government's creditworthiness and the possibility of a rating agency downgrade. Consequently, the market value of the Funds' assets plummeted as well. By March 2014, the Funds had lost more than half their value. [Those] losses were aggravated by the lack of diversity in the Funds' assets as well as by the highly leveraged nature of the Funds.

*Fernandez*, 222 F. Supp. 3d at 365, 369 (citations omitted).

To support their motion for class certification, plaintiffs invoke certain attributes of the Funds and other related facts which they contend are common evidence of UBS's failure to perform suitability analyses.  In particular, plaintiffs invoke the Funds' stated investment objectives, the fact that the Funds were excluded from a UBS internal control system, and certain known concerns about the Funds within UBS.

### 1.   The Funds' Stated Investment Objectives

Each of the Funds had two or more explicitly stated objectives that were set forth in that Fund's prospectus.  (*See, e.g.*, Puerto Rico Investors Tax-Free Fund, Inc. Prospectus 5, DX-36; *see also* Second Laursen Report app'x C tab. C.1 (collecting the stated objectives from each of the twenty Funds).)  The Funds all had one objective in common:  preservation of capital.  (First Bullard Report ¶ 12; First Laursen Report ¶ 72.)  All of the Funds also had an income-generation objective (*see* Second Laursen Report ¶ 66 ("highest possible current income," "high level of current income," or "current income")), and some Funds had other objectives in addition, such as "income that is exempt from Federal and Puerto Rico income taxes," (Defs.' Opp'n 20-21 (alteration omitted) (quoting Puerto Rico Investors Tax-Free Fund, Inc. Prospectus 5)), and to "return your initial investment . . . by or before" a specified "Target Date," (First Laursen Report ¶ 73; Puerto Rico AAA Portfolio Target Maturity Fund, Inc. Prospectus at S-1, DX-37).

Plaintiffs contend that common evidence will establish that the Funds were not actually structured in accordance with one of these stated objectives: preservation of capital.  According to plaintiffs' expert on product-focused suitability, this common proof will include evidence that the Funds: held securities that presented a risk of default and that traded in illiquid markets; were highly concentrated and highly leveraged; and "issued shares that traded in an unregulated, artificial market at prices that were determined by defendants."  (First Bullard Report ¶ 3.)

Critically, plaintiffs and their expert limit their focus to the capital-preservation objective.  Apart from that objective, plaintiffs do not contend

that any Fund was not structured consistently with any of its other objectives.  Nor do plaintiffs contend that any Fund was not structured consistently with all of its objectives collectively.

### 2. *Exclusion of the Funds from a UBS Internal Control System*

Plaintiffs also cite as common evidence the fact that UBS excluded the Funds from an internal control system called the Branch Management Supervisory System ("BMSS").  Among other things, the BMSS generated an alert when a client account became overconcentrated in a particular security.  (Second Besnoff Report 57; Second Maine Report 48.)  Because the Funds were excluded from the BMSS during the Class Period, BMSS could not alert UBS and its financial advisors if a client account became overconcentrated in the Funds.  (Second Besnoff Report 57; Second Maine Report 48.)  Because concentration is a factor to be considered in the client-focused suitability analysis, plaintiffs contend that the exclusion of the Funds from the BMSS is common evidence that UBS failed to conduct any client-focused suitability analyses.

UBS has not provided a reason for why the Funds were excluded from the BMSS.  However, according to its expert on client-focused suitability, UBS did not include *any* closed-end funds in the BMSS system.  (Second Maine Report 48.)  According to the expert, those funds, along with mutual and other funds, "provide internal geographic and issuer diversification because of the numerous positions that they hold."  (*Id.*)  As a result, closed-end fund concentration "normally does not deliver the same urgency that can occur with concentration in a single-issuer security."  (*Id.*)  Furthermore, UBS contends that it monitored client concentration of investment in the Funds using other systems and methods apart from the BMSS, such as by the Compliance Surveillance Unit as well as through reports created by UBS Legal & Compliance.[8]  (*Id.* 45-47; *see, e.g.*, Email re: "Compliance Inquiry: Closed End Funds" (Mar. 10, 2011), DX-60.)

---

[8] Plaintiffs contend that "[n]o other UBS system performed th[e] critical risk-control function" that BMSS did.  (Pls.' Reply 7 n.23 (citing Mendez Dep. 249:25-264:15, PX-50).)  However, it is not apparent that the exhibit cited supports this proposition.

### 3.  *Known Concerns About the Funds Within UBS*

As additional common proof, plaintiffs cite evidence that individuals within UBS harbored concerns about the Funds during the Class Period. Specifically, plaintiffs refer to an email and speech from 2011 that raised specific concerns about the Funds, as well as a 2009 initiative that resulted in UBS reducing its own investment in the Funds.

In 2011, a group of financial advisors at one of the UBS branch offices in Puerto Rico raised specific concerns about the Funds which were reduced to email by the branch manager.  (Email from Colon to Almonte (June 1, 2011), PX-12; *see* Almonte Dep. 211-12, PX-24.)  Among their concerns about the Funds were: "low liquidity, excessive leverage, instability, geographic concentration, and a lack of information."  (Pls.' Mem. of Law in Supp. of Mot. for Class Cert. ("Pls.' Mem.") 7 (quoting Email from Colon to Almonte), ECF No. 176; *see* Almonte Dep. 212-26 (translating email).)  In response to those concerns, the CEO of UBS Puerto Rico, Miguel Ferrer, visited the branch office and addressed the financial advisors directly.  (Transcript of June 2, 2011 Comments by Miguel Ferrer to UBS Puerto Rico Financial Advisors ("Ferrer Transcript"), PX-13.)

The parties have different views about the purpose and significance of Ferrer's talk:  in defendants' recounting, the address was along the lines of a pep talk (Defs.' Opp'n 19); according to plaintiffs, it was an exercise in exerting pressure by management upon the financial advisors to keep recommending the Funds in spite of their concerns (Pls.' Mem. 7-8, 19).  It is undisputed that Ferrer told the financial advisors that they should "go home [and] get a new job" if they could not continue selling the Funds.  (*See* Ferrer Transcript 3:17.)

Plaintiffs also cite a 2009 UBS initiative called "Operation: Soft Landing."  According to UBS – not disputed by plaintiffs – this initiative was a global UBS policy to reduce UBS's own risk exposure following the financial crisis of 2008.  (Defs.' Opp'n 19.)  Pursuant to that policy, UBS temporarily reduced its *own* holdings of the Funds.  (*Id.*; Pls.' Mem. 7.)

### C.  Statistical Proof:  The 500-Account Sample

Plaintiffs' primary evidence that UBS breached its obligation to undertake any client-focused suitability analyses consists of a study of 500 accounts conducted by its expert (the "Besnoff Study").  The Besnoff Study's methodology and conclusions are the subject of vigorous dispute between the parties; the study is also one of the subjects of UBS's separate *Daubert* motion.  (*See* Notice of Motion, ECF No. 200.)

Pursuant to an agreement between the parties, UBS produced to plaintiffs information pertaining to a random sample of 500 accounts that were invested in the Funds during the Class Period.  The production included the following information for each of the accounts in the sample: (1) notes recorded by financial advisors in UBS's client relationship management system; (2) BMSS daily reports; (3) "Know Your Client" account changes; and (4) buy, sell, and reinvestment transaction data. (Second Besnoff Report 31; Second Maine Report 26.)

The Besnoff Study reviewed the information from the 500 accounts and concluded that it was devoid of evidence of any client-focused suitability analyses whatsoever.  (Second Besnoff Report 1 ("[T]here is no documented evidence indicating that UBS or its financial advisors performed the required customer-specific suitability review when recommending investments in the Funds during the Class Period.").) Besnoff limited his review to the "documented evidence" in the sample, and expressly did not consider whether evidence outside of the documents might reflect that suitability analyses were undertaken.  (*Id.* at 43 ("[I]t is my understanding that the documents for the sample that UBS has produced in this litigation are the sources that would contain evidence of any suitability analysis conducted by financial advisors when recommending investments in the Funds for accounts within the 500 account sample.").)

UBS challenges the Besnoff Study as inherently flawed because Besnoff considered only the documents in the agreed-upon production.  According to UBS, the parties agreed only that UBS would produce certain information – not, as Besnoff assumed in his study, that UBS would produce all documents reflecting whether a suitability analysis was done.

(Defs.' Sur-Reply 4-5; Second Maine Report 26 n.11; *see* Hr'g Tr. 28:18-31:7 ("We're not agreeing about whether or not this is the full universe of material that proves the existence of suitability or not suitability."), ECF No. 162.)

   To the contrary, UBS and its rebuttal expert contend that suitability analyses for accounts in the sample may in fact have been documented in materials that were not part of the negotiated production at all, such as emails and client presentations.  (Second Maine Report 27-28, 38-44.)  More fundamentally, they contend that there was no requirement that suitability analyses be documented at all, and so any adequate study would have to consider information outside of the documentary record, such as testimony from clients and financial advisors.  (*Id.*; *see also generally* Paulukaitis Report.)

   UBS's rebuttal expert also undertook an account-level challenge to the Besnoff Study, contesting Besnoff's conclusion that documents in the sample do not evince any client-focused suitability analyses.  (*See* Second Maine Report app'x A.)  For example, the parties disagree about whether more than thirty notes recorded by financial advisors in UBS's client management system reflect the existence of client-focused suitability analyses.  (*Id.*)

   Finally, the parties also dispute whether the conclusions of the Besnoff Study can properly be extrapolated to the rest of the proposed class.  Plaintiffs' statistics expert found that conclusions based on the 500-account sample could indeed be extrapolated to the full class with 95% confidence.  (First Madigan Report ¶¶ 12-13.)  Defendants observe that the sample is not actually reflective of the proposed class, because it includes accounts for clients who came within plaintiffs' proposed class as originally defined (*see* Pls.' Mem. 1), but who were then excluded from the revised class definition (*see* Not. of Class Def'n) which was not revised until after the random sample had been generated and analyzed,[9] (Defs.' Sur-Reply 3

_____

[9] Specifically, the original class definition – and the sample – included accounts for clients who (1) *held* but did not purchase the Funds during the class period, (2) purchased (or held) funds that are no longer at issue in this litigation, and (3)

n.5).  The sample also includes accounts for clients who had Client Agreements that did not contain the relevant provision requiring UBS to conduct suitability analyses.  (*Id.*)  According to defendants, once accounts excluded from the amended class are scrubbed from the 500-account sample, it reduces to only 260 accounts.  (*See id.*)  In reply, plaintiffs' statistics expert contends that conclusions from the original sample can still be extrapolated to the class, and even if it were reduced to 260 accounts, it could still be extrapolated with 95% confidence.  (*See generally* Madigan Dec., PX-77.)

## III.  THE MOTION FOR CLASS CERTIFICATION[10]

### A.  Legal Standards

Where a plaintiff seeks to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(3), she

> bears the burden of satisfying the requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – as well as Rule 23(b)(3)'s requirements: (1) that "the questions of law or fact common to class members predominate over any questions affecting only individual members" (the "predominance" requirement); and (2) that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (the "superiority" requirement).

---

purchased Funds based on something other than a UBS recommendation.  (Defs.' Sur-Reply 3 n.5.)

[10] For the avoidance of doubt, the Court notes that it has already determined that plaintiffs have "class standing" to assert claims on behalf of absent class members. *Fernandez*, 222 F. Supp. 3d at 373.  In the Opinion granting in part and denying in part defendants' motions to dismiss, the Court found that plaintiffs had standing, and that defendants' arguments to the contrary were more relevant to whether a Rule 23 class could be certified, not to whether plaintiffs had standing to seek its certification.  The Court turns to those arguments now.

*In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting Fed. R. Civ. P. 23(b)(3)); *see also Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 159 (S.D.N.Y. 2017). "A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule—that is, [she] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) ("[A] court must . . . satisfy[] itself that Rule 23 compliance may be demonstrated through 'evidentiary proof.' (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013))); *Leber*, 323 F.R.D. at 159.

"To certify a class, a district court must 'make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, must resolve material factual disputes relevant to each Rule 23 requirement,' and must find that each requirement is 'established by at least a preponderance of the evidence.'" *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) (internal quotation marks and alteration omitted) (quoting *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010)); *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 75 (2d Cir. 2015) (noting that at the certification stage, a district court should "only resolve[] factual disputes to the extent necessary to decide the class certification issue").

The elements of a breach of contract claim under New York law are "(1) the existence of a contract between [the plaintiff] and th[e] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011). "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages." *Id.* (emphasis omitted) (quoting *Nat'l Mkt. Share v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)). In this action, the parties dispute only whether the third and fourth elements, including causation, are satisfied.

At issue on the present motion is whether the proposed class satisfies the Rule 23(a) requirements of commonality, typicality, and adequacy of representation, and the Rule 23(b)(3) requirements of predominance and superiority.  There is no dispute that the requirement of numerosity is satisfied (Pls.' Reply 3 n.4), and the Court agrees that it is satisfied.[11]

### B.   Commonality: Rule 23(a)(2)

"Rule 23(a)'s commonality prerequisite is satisfied if there is a common issue that 'drives the resolution of the litigation' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 84 (2d Cir. 2015) (alterations omitted) (quoting *Wal-Mart*, 564 U.S. at 350); *see also Wal-Mart*, 564 U.S. at 350 ("What matters to class certification is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." (alteration omitted) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009))); *Leber*, 323 F.R.D. at 160.

Plaintiffs suggest several questions which they contend are common to the proposed class.  Those questions can be summarized as:  (1) What were UBS's duties to members of the proposed class pursuant to the suitability provision in the Client Agreement, (2) did UBS breach its duties pursuant to that provision, and (3) what are the proposed class members' damages.[12]

---

[11] "In this Circuit, numerosity is 'presumed at a level of 40 members.'"  *Leber*, 323 F.R.D. at 159 (quoting *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).  The proposed class satisfies this requirement "in light of UBS's representation that more than 20,100 client accounts held the Funds during the Class Period."  (Pls.' Mem. 12.)

[12] In their briefing, plaintiffs suggested only one allegedly common question: "[W]hether UBS breached its contractual obligations to putative Class members by failing to conduct adequate suitability analyses when making investment recommendations regarding the Funds."  (Pls.' Mem. 12.)  At oral argument plaintiffs for the first time suggested four different questions that were not identified in the briefing:  did UBS have a contractual obligation to perform suitability analyses, did that obligation require product-focused and client-focused suitability analyses, did

The Court agrees that the first question is common to the class and capable of generating common answers that are apt to drive the resolution of the litigation.

In the context of a claim for breach of contract, where members of a proposed class entered into contracts that were identical in all material respects, matters of contract interpretation generally supply a common question sufficient to satisfy Rule 23's commonality requirement. *See Dover v. British Airways, PLC (UK)*, 321 F.R.D. 49, 54 (E.D.N.Y. 2017), *leave to appeal denied*, No. 17-1121, 2017 WL 2590319 (2d Cir. June 14, 2017); *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 94-95 (S.D.N.Y. 2010).

Plaintiffs contend – and UBS does not dispute – that the suitability provisions in the proposed class members' Client Agreements were identical in all material respects.  (*See* Pls.' Mem. 17; Defs.' Opp'n 1.)  But the parties differ with respect to how those provisions should be interpreted and, specifically, whether and to what extent they are informed by FINRA's Suitability Rule and related guidance.  (*See* Oral Arg. 31:6-12 ("[I]t is unclear whether or not the FINRA suitab[ility] rules themselves . . . apply to this case."); Defs.' Sur-Reply 6 ("Plaintiffs have no claim regarding whether UBS met its obligations to FINRA . . . .").)  UBS's refusal to concede the point is entirely perfunctory, but it nonetheless preserves a concrete dispute that can be resolved across the proposed class as a whole.

By contrast, for the reasons discussed *infra*, plaintiffs' second and third proposed questions – relating to whether UBS breached its duties to the class members and what damages they suffered – are not capable of classwide resolution, at least by any of the methods suggested by plaintiffs.

Because the question regarding UBS's duties to the proposed class members pursuant to the Client Agreement is common to the class, the

---

UBS breach that obligation, and can damages be calculated on a common, classwide basis.  (*See* Pls.' Oral Arg. Slides.)  Because the four questions are essentially subparts of the original "core question," (Pls.' Mem. 12), the Court considers them even though they were not explicitly set forth in the briefing.

Court finds that the proposed class meets the commonality requirement of Rule 23(a)(2).  *See Wal-Mart*, 564 U.S. at 359 ("[F]or purposes of Rule 23(a)(2) 'even a single common question' will do." (alterations omitted) (quoting *id.* at 376 n.9 (Ginsburg, J., dissenting))).

### C.  Typicality:  Rule 23(a)(3)

"To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 162 (S.D.N.Y. 2017) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)); *see also Adkins v. Morgan Stanley*, 307 F.R.D. 119, 138 (S.D.N.Y. 2015) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)), *aff'd*, 656 F. App'x 555 (2d Cir. 2016).  "[A] class representative can establish the requisite typicality under Rule 23 if the defendants 'committed the same wrongful acts in the same manner against all members of the class.'"  *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004) (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995)).

Although "in certain 'contexts the commonality and typicality requirements . . . tend to merge,'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 84 n.2 (2d Cir. 2015) (alterations omtted) (quoting *Wal-Mart*, 564 U.S. at 349 n.5), that is  not always the case, *see, e.g., Adkins*, 307 F.R.D. at 138; *Levitt v. PricewaterhouseCoopers, LLP*, No. 04-Cv-5179, 2007 WL 2106309, at *2 (S.D.N.Y. July 19, 2007); *Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 316 (S.D.N.Y. 2003).  In some cases, as here, "the typicality inquiry is also intertwined with . . . predominance under Rule 23(b)(3)." *Adkins*, 307 F.R.D. at 138 n.19; *see also Stream Sicav v. Wang*, No. 12-Cv-6682, 2015 WL 268855, at *5 (S.D.N.Y. Jan. 21, 2015).

Here, as set forth in greater detail below, each proposed class member's claim arises from a course of events that is unique to that class member.  *See Leber*, 323 F.R.D. at 162.  Put another way, the manner in which UBS allegedly failed to perform a suitability analysis before recommending a Fund to a proposed class member is different for each class member.  *See Hevesi*, 366 F.3d at 82-83.

Plaintiffs' arguments to the contrary are the same as their arguments for why UBS's breach of its contractual suitability obligations to the proposed class members can be established through generalized evidence. However, for the reasons discussed *infra*, the Court finds that UBS's alleged breach is not susceptible to generalized proof.

Moreover, the fact that UBS's alleged suitability failures were far from uniform is reflected in the review conducted by plaintiffs' own expert, in which he concluded that UBS financial advisors failed to perform client-focused suitability analyses. For example, whereas one financial advisor allegedly failed to perform a suitability analysis by "[c]onsider[ing the client's] primary objective, alternatives, and risk" but not considering "liquidity needs, time horizon or other considerations," another financial advisor allegedly failed to perform a suitability analysis by "reviewing liquidity, risk tolerance, and investment objectives" but not considering "either tax status or alternative investments." (Second Besnoff Report 35, 40.) Furthermore, the evidence bearing on whether a financial advisor considered these factors and others is different for each plaintiff and member of the proposed class – that is, a suitability analysis (or lack thereof) for one plaintiff might be reflected in an email, or in a client note for another plaintiff, or in testimonial evidence for a third, or some combination of these and other evidence. *See infra* § E.1.b.i.

Accordingly, the Court finds that the typicality requirement is not satisfied.

### D.  Adequacy:  Rule 23(a)(4)

"Adequacy 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)). With respect to the first element, "[t]he focus is on uncovering 'conflicts of interest between named parties and the class they seek to represent.' In order to defeat a motion for certification, however, the conflict 'must be fundamental.'" *Id.* (first quoting *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 625 (1997), then quoting *In re Visa
Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001)).

UBS challenges the first element only, and it does so on the basis of its
contention that the named plaintiffs suffered no damages.  However, the
Court is not persuaded that, at least on the facts of this case, such a conflict
is so "fundamental" as to contravene the adequacy requirement of Rule 23,
and UBS has cited no contrary authority.[13]

Because UBS has identified no fundamental conflict of interest between
the named plaintiffs and the proposed class, and because the Court is not
aware of any such conflict, the Court finds that the adequacy requirement
is satisfied.

### E.  Predominance:  Rule 23(b)(3)

"Class-wide issues predominate if resolution of some of the legal or
factual questions that qualify each class member's case as a genuine
controversy can be achieved through generalized proof, and if these
particular issues are more substantial than the issues subject only to
individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d
Cir. 2002).  "Rule 23(b)(3)'s predominance requirement is 'more
demanding than [the] Rule 23(a)'" requirement of commonality.  *Johnson v.
Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting *Comcast
Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).

The Court has concluded, as set forth above, that the nature of UBS's
duties to the proposed class members pursuant to the suitability provision
in the Client Agreement is a common issue that can be resolved through
generalized proof.  However, for the reasons set forth below, the Court
also finds that single common issue is substantially outweighed by

---

[13] The only case cited by UBS is both dissimilar and not binding.  *See Opiela v. Bruck*,
139 F.R.D. 257, 261 (D. Mass. 1990).  Animating the court's concerns there was the fact
that the plaintiff sought to certify *two* classes, but had only suffered damages as a
member of one of them.  The fundamental conflict identified by the district court was
that the plaintiff might favor the claims of one class – the one through which he might
recover damages – over the claims of the other.  No such concerns are present here.

numerous individual questions. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 94-95, 99 (S.D.N.Y. 2010) (finding, in putative class action for breach of a uniform contract, that commonality was satisfied but predominance was not). In particular, the issue of whether UBS breached the Client Agreement by failing to perform any suitability analyses can only be resolved on a client-by-client basis – or perhaps even on a transaction-by-transaction basis. *See Fernandez v. Wells Fargo Bank, N.A.*, Nos. 12-Cv-7193 and 12-Cv-7194, 2013 WL 4540521, at *14 (S.D.N.Y. Aug. 28, 2013) ("Without meaningful evidence of a [company-wide policy], a determination of liability turns on highly individualized, employee-by-employee analysis . . . .").

### 1. Individual questions with respect to breach

In order to succeed on their claims, plaintiffs will have to show by a preponderance of the evidence that UBS breached its contractual suitability obligations to the proposed class members by recommending the Funds to them without first determining that they were suitable investments. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52-53 (2d Cir. 2011).

A suitability determination is inherently individualized because each investor had unique circumstances and objectives including risk tolerance, cash flow and income needs, debts, net worth, total assets, tax needs, investment time horizon, asset allocation, health, and investment experience. (Defs.' Opp'n 7 (citing financial advisor affidavits and deposition testimony).) The individualized nature of the suitability inquiry is reflected in the language of the Client Agreement itself, which provides that suitability determinations must account for each client's "individual financial circumstances, needs, and goals." (*See, e.g.*, Account Application 20, PX-34; UBS Client Relationship Agreement and Disclosures 50, DX-30.)

Similarly, determining whether UBS failed to undertake a suitability inquiry altogether, and whether a class member's decision to purchase or hold an investment in a Fund was pursuant to a recommendation from UBS in the first place, are also individual questions.

None of plaintiffs' attempts to avoid these individual inquiries are ultimately successful. According to plaintiffs, generalized proof will establish that: (1) the Funds were *un*suitable per se and therefore UBS necessarily did not undertake any meaningful suitability analyses, (2) UBS in fact undertook no client-focused suitability analyses with respect to proposed class members' investments in the Funds, and (3) *every* decision by a class member to purchase or hold an investment in a Fund during the Class Period was pursuant to a recommendation by UBS.[14]

For the reasons set forth below, this generalized proof cannot answer the putatively common question of whether UBS breached its suitability obligations to members of the proposed class. As a result, that question splinters into an enormous number of individual questions – potentially as many as the number of purchase and hold decisions made by each member of the proposed class during the Class Period. Accordingly, the Court finds that classwide questions do not predominate over individual questions as required by Rule 23(b)(3).

---

[14] Plaintiffs' views of UBS's obligations pursuant to the Client Agreement – including the separate requirements of product-focused suitability and client-focused suitability – are informed by the FINRA suitability rule. As discussed above, the contract itself does not expound upon UBS's suitability obligations to its clients. For the purposes of this motion, the Court assumes plaintiffs are correct that reference to FINRA guidance is indeed appropriate. The Court is comfortable doing so because only plaintiffs have offered a framework for interpreting the suitability provision: the FINRA rules on suitability. UBS neither concedes that those rules "apply to this case," (Oral Arg. 31:6-12), nor offers any argument for how the contract should or should not be interpreted. Moreover, UBS, like plaintiffs, applies the FINRA rules in responding to plaintiffs' arguments on this motion. In any event, it is certainly permissible for the Court to reach this merits question at this stage because the Court cannot decide whether the issue of UBS's *breach* is resolvable through generalized proof without knowing what UBS's *obligations* were under the contract. *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 75 (2d Cir. 2015) (at the certification stage, a district court should "only resolve[] factual disputes to the extent necessary to decide the class certification issue").

> a. *Individual questions cannot be avoided by reference to product-focused suitability*

A security is objectively unsuitable – unsuitable per se – if it would not be suitable for any reasonable investor; so long as there is "*some* investor[]" for whom a security is a suitable investment, that security is suitable per se. (First Bullard Report ¶ 8 (quoting FINRA Rule 2111 supp. mat. 05(a)) (emphasis in original); Second Bullard Report ¶ 26 (same); Bullard Dep. at 96:23-97:2 ("[Y]ou would have to have a reasonable basis that the investment in and of itself would be reasonable for . . . some investor.  In my mind that would be one investor."), DX-19; Second Laursen Report ¶ 49 ("Even if a security could only be suitable in a small amount for uncommon investors having very specific financial profiles and objectives . . . the security-specific [reasonable-basis suitability] standard is passed.").)

Plaintiffs contend that generalized proof will demonstrate that the Funds were *not* suitable per se, and that such evidence will therefore generate a common answer to the question of whether UBS breached its contractual obligation to plaintiffs.  That is, if the Funds were not suitable for *any* reasonable investor but UBS nonetheless recommended them, then it is manifest that UBS did not undertake any meaningful suitability analyses before making the recommendations, whether product- or client-focused.

As generalized proof in support of this theory, plaintiffs point to evidence that: (1) the Funds were not structured in accordance with one of their stated objectives (which plaintiffs contend made them inherently unsuitable), and (2) individuals within UBS were concerned about the Funds' riskiness (which plaintiffs contend suggests that UBS did not conduct any adequate product-focused suitability analyses).

> i. Proof that the Funds were not structured in accordance with one of two or more stated objectives is not proof of inherent unsuitability

As noted, each of the Funds had two or more enumerated objectives set forth in that Fund's prospectus.  (*See* Second Laursen Report app'x C tab.

C.1 (collecting the stated objectives from each of the twenty Funds); *see, e.g.*, Puerto Rico Investors Tax-Free Fund, Inc. Prospectus 5, DX-36.)  The Funds all had one objective in common: preservation of capital.  (First Bullard Report ¶ 12; First Laursen Report ¶ 72.)  All of the funds had at least one other objective in addition to preservation of capital.

Plaintiffs contend that the Funds were not in fact structured in accordance with the capital preservation objective and that the Funds were therefore inherently unsuitable.  Apart from that objective, plaintiffs do not contend that the Funds were structured inconsistently with any of the Funds' other stated objectives, or with each Fund's set of objectives collectively.

According to UBS, this limitation is fatal to plaintiffs' position.  Specifically, UBS contends that a Fund which is not suitable for one enumerated objective may nonetheless be suitable for another enumerated objective (or with the Fund's objectives collectively), and therefore, there is at least "some investor" for whom a security is a suitable investment.  If defendants are correct, then evidence that the Funds were not structured in accordance with the preservation-of-capital objective cannot establish that the Funds were unsuitable per se, and therefore cannot generate a common answer to the question of whether UBS breached its contractual obligation to plaintiffs.

There is some evidence that FINRA deems a security's consistency with its enumerated objectives to be a factor that is at least relevant to the product-focused suitability analysis.  (Second Bullard Report ¶¶ 29, 31; *see also* Pls.' Reply 7 n.21.)  Citing this evidence, plaintiffs' reasonable-basis suitability expert makes the logical leap to conclude that a security's consistency with its enumerated objectives is a *requirement* to satisfy reasonable-basis suitability.  (First Bullard Report ¶¶ 11-12; Second Bullard Report ¶¶ 25-32.)  Plaintiffs' expert then makes one further leap of logic to conclude that a security with multiple enumerated objectives is unsuitable per se if it is inconsistent with *any one* of its objectives.  (*Id.*)

UBS objects to both leaps,[15] but it is the second one that the Court focuses on.  According to defendants' reasonable-basis suitability expert, it would be illogical to elevate one of the Funds' stated objectives for evaluation in isolation because "the different portions of the investment objectives . . . pose some conflict with one another."  (Second Laursen Report ¶ 121.)  Defendants' expert explained the possible "tension" between the income generation and capital preservation objectives in particular:

> [I]f a fund seeks to achieve an objective of the "highest possible income," a "high level of current income," or even simply "current income," this would normally reduce the fund's probability of meeting the "capital preservation" portion of the objective. . . .   The tension between the various primary "income"-related and secondary ("capital preservation") investment objectives clearly indicate[s] that a Fund would, within the context of its stated investment policies, likely seek to construct portfolios that achieve a balance.

(*Id.*)

The Court agrees with Mr. Laursen.  It would be illogical to determine whether the Funds were suitable per se by examining their compatibility with a single objective – preservation of capital – in isolation, and plaintiffs cite no evidence that this standard has ever actually been applied in the real world.

Accordingly, evidence that the Funds were not structured in accordance with the preservation-of-capital objective would not prove that the Funds were unsuitable per se, and therefore cannot generate a

---

[15] UBS also disputes the contention that the Funds were in fact inherently inconsistent with the preservation-of-capital objective in the first place.

common answer to the question of whether UBS breached its contractual obligation to plaintiffs.[16]

> ii. Proof that individuals within UBS were concerned about the Funds' riskiness is not proof that UBS failed to conduct any product-focused suitability analyses

Plaintiffs' remaining evidence with respect to product-focused suitability reflects that: (1) in 2009, UBS reduced its *own* holdings of the funds pursuant to a global UBS policy to rein in risk exposure in light of the 2008 financial crisis (*see* Pls.' Mem. 7), and (2) in 2011, in response to specific concerns about the Funds that were raised by a group of UBS financial advisors at one branch office, the CEO of UBS Puerto Rico visited that office and told the financial advisors that they should "go home [and] get a new job" if they could not continue selling the Funds, (*see id.* 7-8).

At most, this is generalized proof that individuals within UBS had concerns about the riskiness of the Funds and recommended them to clients anyway. But as plaintiffs' reasonable-basis suitability expert admits, even "riskier investments . . . make sense," as long as "there is a commensurate expectation of greater returns." (First Bullard Report ¶ 16; *see also id.* ¶ 18 ("[Even] a so-called 'junk' (high-yield) bond, for example, can be a rational investment because investors are compensated for taking greater risk by a higher expected return.").) But plaintiffs offer no evidentiary proof whatsoever with respect to Funds' expected return relative to their riskiness.

Furthermore, with respect to UBS's reduction of its own holdings, plaintiffs' own expert testified that this was of "limited relevance."

---

[16] Plaintiffs' alternative theory – that the Funds were unsuitable per se because their risk-return ratio made them economically irrational investments – is not supported by any "evidentiary proof" whatsoever, and is therefore disregarded on this motion. *Johnson*, 780 F.3d at 138 (quoting *Comcast*, 569 U.S. at 33). The Court notes that plaintiffs' reasonable-basis suitability expert makes no suggestion that the Funds were in fact irrational, (First Bullard Report ¶¶ 5-6, 14-21, 39-41), and that aspect of his opinion is abandoned altogether in his second report.

(Bullard Dep. 231:21-232:1.)  That is hardly surprising, as there is no evidence that the Funds were unloaded based on anything other than their riskiness pursuant to UBS's general policy at that time to reduce holdings in risky investments.  As plaintiffs' client-focused suitability expert admits, a security being excessively risky for one investor is not itself proof that the security is excessively risky (or unsuitable) for all investors.  (*See* First Besnoff Report 10 (listing factors to be considered in a client-focused suitability determination including "risk tolerance").)  It is not apparent why that would be any less true where the investor is UBS itself.

Accordingly, evidence that individuals within UBS were concerned about the Funds' riskiness would not prove that UBS failed to conduct any product-focused suitability analyses, and therefore cannot generate a common answer to the question of whether UBS breached its contractual obligation to plaintiffs.

> *b.   Individual questions about client-focused suitability cannot be avoided through plaintiffs' statistical proof or other evidence*

Plaintiffs contend that generalized proof will show that UBS also breached the client agreement by failing to undertake any client-focused suitability analyses before recommending the Funds to the proposed class members.

A client-focused suitability analysis is necessarily individualized, requiring consideration of, among other things, the client's age, assets, tax status, annual income, net worth, investment objectives, risk tolerance, liquidity needs, and concentration of investments.  (First Besnoff Report 10; *see also* First Maine Report 5 ("Customer-specific suitability is an individualized concept based upon the unique profile of each client.").)

Nonetheless, plaintiffs contend that generalized proof will demonstrate that UBS failed to conduct *any* meaningful client-focused suitability analyses, and that such evidence will therefore generate a common answer to the question of whether UBS breached its contractual obligation to plaintiffs.  As common evidence in support of this theory, plaintiffs point primarily to the Besnoff Study of 500 sample client accounts that held Funds during the class period.  Plaintiffs contend UBS did not conduct a

meaningful suitability analysis in connection with any of the 500 accounts in the sample.  Apart from the Besnoff Study, plaintiffs point to evidence that UBS excluded the Funds from a system of internal controls that, among other things, monitored client accounts for overconcentration.

> i.  The Besnoff Study:  Proof that financial advisors failed to document each reason for their suitability determinations is not proof that they failed to conduct any suitability analyses

The Besnoff Study concluded that UBS had not conducted any meaningful client-focused suitability analyses whatsoever for any of the accounts in the 500-account sample with respect to their investments in the Funds.  In reaching this conclusion, the study reviewed only documentary evidence.  According to plaintiffs and their expert, this limitation is appropriate because UBS and its financial advisors were required to document their suitability analyses pursuant to FINRA regulations, internal company policy, and industry "best practices."  (Pls.' Reply 8-9.)

Whether or not there was a documentation requirement, the one applied in the Besnoff Study is extraordinarily rigorous – and has no support in the record (except, perhaps, as what Besnoff himself claims to have required of financial advisors he once supervised).  (*See* Second Besnoff Report 32-33; *see also generally* Paulukaitis Report.)  According to the documentation requirement Besnoff applied, UBS's financial advisors had to document their suitability determination together with all of the reasons underlying that determination, including express consideration of each factor that FINRA deemed relevant to the client-focused suitability determination.  Where a financial advisor documented a suitability determination, and even documented her or his consideration of some of the suitability factors – but not others – the Besnoff Study concluded that the financial advisor had not conducted any meaningful client-focused suitability analysis at all.  That conclusion is not credible.

Two examples suffice to illustrate the point:  Upon review of two notes recorded by financial advisors in UBS's client management system regarding recommendations made to specific clients to purchase or hold the Funds, the Besnoff Study concluded that neither note reflected that the

financial advisor undertook a client-focused suitability analysis. (Second
Besnoff Report 35; *id.* at 40.) The notes, which are printed in full below,
were recorded by different financial advisers regarding different clients;
one was recorded in December of 2012[17] and the other in September of
2013.[18]

_____

[17] As translated into English, the December 2012 note reads:

> I met with [the client], in my office, and did a complete review of all
> his accounts. I told him that I think the value of the POB and the
> funds would keep going down before they came up but that the
> dividend and interest would remain intact. Given that the
> fundamental objective is income, I didn't recommend he sell. I told
> him that even if they keep going down, the monthly payment
> would be maintained and if he wants to sell now he would receive
> less than what he invested and alternative investments would pay
> less than what he is currently receiving. After talking about the
> risks and benefits he decided not to do anything and continue as is.
> He knows that the value could go down but doesn't think that the
> bonds could stop paying dividends and the principal on maturity.
> He knows the POB matures in 2038 and that the funds don't have a
> maturity date.

(CRM Data 1 (UBS10000986), Row 232 (emphasis omitted), DX-55.)

[18] The September 2013 note reads:

> Spoke with [client] today regarding the decline in value of his
> investments. He wanted to get an idea of where his investment was
> headed given the volatility so as to make certain investment
> decisions. I could not give him any assurance as to where the
> investment was head[e]d. However our discussion revolved
> around his original intention in making this investment and his
> current financial situation. His financial situation is very healthy
> with enough cash reserves and income to sustain the current
> market environment. Additionally, he will be retiring soon and will
> be receiving a substantial amount of pension income that will be
> complemented by other investments. My question to him was: Has
> his original objective changed or does he need the principal, his
> answer was no. Does he have the patience to withstand this
> volatility and he said yes. So based on that assessment he decided

With respect to the December 2012 note, the Besnoff Study found that although it "[c]onsidered primary objective, alternatives, and risk . . . there is no documentation regarding liquidity needs, time horizon or other considerations." (*Id.* at 35.)  As for the September 2013 note, although it "review[ed] liquidity, risk tolerance, and investment objectives . . . there does not appear to be any consideration of either tax status or alternative investments." (*Id.* at 40.)

In sum, the Besnoff Study is not an acceptable measure of whether UBS financial advisors conducted client-focused suitability analyses because there is no evidence supporting Besnoff's position that each suitability analysis required express consideration and documentation of every single factor FINRA deemed relevant.

In addition, UBS's rebuttal expert quite reasonably concluded that the December 2012 and September 2013 notes both *did* "contain[] evidence of the [financial advisor]'s customer-specific suitability determination," (Second Maine Report 84-85, 99-100), and reached similar conclusions with respect to other documents in the record, (*id.* App'x A (client management notes), B (emails), C (client presentations), D (financial goal analysis reports)).  As a result, use of the 500-account sample would necessitate numerous mini-trials to determine whether or not an adequate client-focused suitability analysis was performed with respect to each purchase or hold recommendation in every account in the sample.

Plaintiffs have not suggested a judicially administrable means of accomplishing this, but instead argue that "use of the sample no more necessitates 500 mini-trials here than did the use of representative

---

[that] he could maintain the investment.  As a[] result of this conversation, he has decided to bring in an additional $60,000 resulting from stock sales and $40,000 in cash value of his life insurance and about $20,000 he has in a non-performing CD account.  Also, when he retires in 3 years he plans to rollover $300,000+ in his 401K.  [W]e will meet this [F]riday to implement a strategy to diversify his current portfolio with new funds.

(CRM Data 4 (UBS10000989), Row 115, DX-58.)

evidence require multiple mini-trials in *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1043-49 (2016)."  (Pls.' Sur-Reply 5 n.8.)

In *Tyson Foods*, however, the employer had no records at all of the time employees spent donning and doffing protective gear, so the plaintiffs took "744 videotaped observations" as a sample of "how long various donning and doffing activities took."  *Tyson Foods*, 136 S. Ct. at 1043-44.  Apart from that sample, "there were no alternative means for the employees to establish their hours worked."  *Tyson Foods*, 136 S. Ct. at 1047; *see id.* (noting that the employer's "primary defense was to show that [the study itself] was unrepresentative or inaccurate").  By contrast, the record here reflects a substantial number of documents bearing on whether suitability analyses were performed (that is, the same kinds of documents produced in the sample), which could serve as fodder for 500 mini-trials.

Accordingly, the Besnoff Study is not proof that UBS failed to conduct any client-focused suitability analyses, and therefore cannot generate a common answer to the question of whether UBS breached its contractual obligation to plaintiffs and the proposed class.[19]

_____

[19] Separately, it is not clear whether the Besnoff Study is even proper evidence of classwide liability in light of *Tyson Foods*, 136 S. Ct. 1036, and *Wal-Mart*, 564 U.S. 338. According to the Supreme Court, "[o]ne way [to show that a sample] is a permissible method of proving classwide liability is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action." *Tyson Foods*, 136 S. Ct. at 1046-47.  This standard from *Tyson Foods* has rarely been invoked in this circuit, and no court in this circuit has ever disregarded a sample because a class plaintiff failed to meet it.  *But see Perez v. Isabella Geriatric Ctr., Inc.*, No. 13-Cv-7453, 2016 WL 5719802, at *4 (S.D.N.Y. Sept. 30, 2016) (finding that a statistical sample *could* be used to demonstrate predominance under *Tyson Foods*).  *Cf. Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 82-83 (S.D.N.Y. 2018).  Plaintiffs here cite no basis for their position that each class member could have relied on the Besnoff Study to establish liability if she or he had brought an individual action for breach of the Client Agreement.  It may be that there are certain contexts where a breach of contract plaintiff could use a sample to prove liability in an individual action, *see, e.g., Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chicago v. Bank of N.Y. Mellon*, 775 F.3d 154, 162-63 & n.6 (2d Cir. 2014) (citing *Assured Guar. Mun. Corp. v.*

ii.  Proof that UBS excluded the Funds from a system of internal controls is not proof that UBS failed to consider concentration before recommending the Funds to plaintiffs

Plaintiffs' remaining evidence with respect to client-focused suitability is that UBS excluded the Funds from the BMSS system.  As noted, BMSS is a system of internal controls that, among other things, monitored client accounts for overconcentration.  Both parties recognize that concentration is one of the factors to be considered in a client-focused suitability analysis. (*See* Second Besnoff Report 29 ("Suitable investments can become unsuitable when they constitute too large a portion of a client's portfolio." (quoting UBS Sales Practice Compliance Manual 60 (July 2008))).)

However, the evidence reflects that UBS had other systems in place apart from BMSS to alert its financial advisors to possible overconcentration, and that these systems monitored the Funds.  (Second Maine Report 45-47, 49 (describing monitoring by the Compliance Surveillance Unit and Legal & Compliance, and reviews by branch office managers).)  And beyond a system of alerts, UBS expected its financial advisors to review client accounts for overconcentration regularly – and prior to making an investment recommendation – and there is evidence that they did so with respect to the Funds.  (*Id.* 47; *see, e.g.*, Email re: "Account analysis" (July 25, 2013), DX-48; Second Maine Report 115-21 (describing emails to clients at UBS402209-12, UBS124036-42, UBS79566).) That financial advisors were not alerted to possible overconcentration of the Funds – an alert that would necessarily have been backward-looking, after a recommendation was made and the Fund purchased or held (*see* Second Maine Report 45 (quoting Ubinas Dep. at 268:12-269:6)) – is not evidence that financial advisors failed to consider concentration in conducting their suitability analyses.

Accordingly, evidence that UBS excluded the Funds from the BMSS system does not establish by itself that UBS failed to conduct any adequate

---

*Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 486-87, 512 (S.D.N.Y. 2013)), but plaintiffs have not called any to the Court's attention or explained how they apply to the facts of this case.

client-focused suitability analyses, and therefore cannot generate a common answer to the question of whether UBS breached its contractual obligation to plaintiffs.[20]

> c.  *Plaintiffs cannot avoid individual questions by deeming every decision by a class member to purchase or hold an investment in a Fund to have been pursuant to a recommendation by UBS*

UBS's Client Agreement provided that:  "We must have a reasonable basis for believing that any securities *recommendations* we make to you are suitable and appropriate for you . . . ."  (*E.g.*, Account Application 20 (emphasis added).)  The FINRA Suitability Rule is phrased similarly.  FINRA Rule 2111(a) (requiring "a reasonable basis to believe that a recommended transaction . . . is suitable for the customer").  Accordingly, UBS contends that "[d]etermining whether UBS 'recommended' a transaction" – or whether it was unsolicited – "presents an[] individualized question."[21]  (Defs.' Opp'n 24.)

Plaintiffs contend that *all* Funds purchased during the class period were "recommended" by UBS because "UBS brought the [Funds] to class members' attention, and encouraged them to buy, . . . through advertisements, publishing Fund prices and yields in local newspapers, investor conferences, public websites, client flyers and quarterly reports."  (Pls.' Reply 12 n.42; *see also* Oral Arg. 56:7-9 ("[W]e think [the Funds] were recommended to everyone on the island of Puerto Rico . . . .").)  Plaintiffs' expansive interpretation of the word "recommend" is apparently

---

[20] Plaintiffs also cite statements contained in defendants' regulatory settlements as proof that UBS failed to meet its suitability obligations.  That evidence of settlements will not be considered at this juncture.  *See* Fed. R. Evid. 408.

[21] Plaintiffs note that 83 percent of Fund purchases during the class period were marked by UBS as "solicited" in client account records (Pls.' Reply 12 n.42), and defendants do not dispute that these purchases were in fact recommended (*see* Defs.' Sur-Reply 8 n.12).  Accordingly, the dispute regarding whether UBS made a "recommendation" with respect to the Funds is limited to the 17 percent of Fund purchases marked as "unsolicited" by UBS, as well as any recommendations by UBS to "hold" – that is, to not sell – the Funds.  (*See* Defs.' Opp'n 24-25; Defs.' Sur-Reply 8 n.12.)

premised on regulatory guidance issued by NASD, which provides that a "transaction will be considered to be recommended when [UBS] brings a specific security to the attention of the customer through any means, including, but not limited to direct telephone communication, the delivery of promotional material through the mail, or the transmission of electronic messages."  (Pls.' Reply 12 n.42 (quoting NASD Notice to Members 96-60 at 473-74 (Sept. 1996), PX-74).)

Plaintiffs stretch the language of the NASD guidance too far, as there is nothing to suggest that NASD intended that "recommend" encompassed communications directed to the public at large.  Plaintiffs have not cited any authority in support of their interpretation, which contravenes more recent FINRA guidance, which provides that "the more individually tailored the communication is to a particular customer or customers about a specific security or investment strategy, the more likely the communication will be viewed as a recommendation."  (FINRA Regulatory Notice 11-02 at 3 (Jan. 2011), DX-73.)[22]

In fact, both the NASD guidance and the FINRA guidance support UBS's contention that whether UBS recommended a transaction presents an individualized question.  (*See* FINRA Regulatory Notice 11-02 at 2 ("The determination of the existence of a recommendation [is] based on the facts and circumstances of the particular case."); NASD Notice to Members 96-60 at 473-74 ("[A] broad range of circumstances may cause a transaction to be considered recommended . . . .").)

Accordingly, whether a transaction was recommended such that UBS's suitability obligations arose pursuant to the Client Agreement is an individualized question.

## 2.   *Individual questions with respect to causation*

Under New York law "[c]ausation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a

---

[22] UBS also contends that certain of its public-facing communications were labeled for "informational purposes only" and not "solicitation."  (Defs.' Sur-Reply 8 n.12 (citing Our Best Credential Is Our Results (Mar. 31, 2011), DX-71).)

defendant's breach *directly and proximately caused* his or her damages."
*Diesel Props*, 631 F.3d at 52–53 (emphasis in original) (quoting *Nat'l Mkt. Share*, 392 F.3d at 525).

According to UBS, plaintiffs cannot make out the necessary element of
causation without proving that their investments in the Funds were
*actually* unsuitable – an issue that is not susceptible to generalized proof.
Plaintiffs do not respond to this apart from contending that "[c]lass
members were . . . deprived of adequate suitability analyses and, as such,
they became invested in Funds that were unsuitable per se, which caused
them to suffer damages."  (Pls.' Reply 12-13.)

In the Court's decision denying UBS's motion to dismiss, it relied on
plaintiffs' clarification that "the theory underlying their claim is *not* a
standard suitability claim – *i.e.*, that an investment was not suitable – but
rather simply that defendants were obligated to conduct a suitability
analysis and failed to conduct any such analysis, regardless of whether the
investment was suitable or not."  *Fernandez*, 222 F. Supp. 3d at 389.
However, the issue of whether plaintiffs would have to prove causation –
and what it would take for them to do so – was not presented to or
considered by the Court at that time.  *See id.* (*See also* Memoranda of Law,
ECF Nos. 91, 99, 108.)

In the absence of any meaningful reply from plaintiffs, the Court finds
that UBS is correct that plaintiffs cannot prove the necessary element of
causation without proving that the Funds were actually unsuitable for
them.  The element of causation, therefore, is another "issue[] subject only
to individualized proof."  *Moore*, 306 F.3d at 1252.

### 3.    *Individual questions with respect to affirmative defenses*

Individual and affirmative defenses, "are 'factors that [a court] must
consider in deciding whether issues susceptible to generalized proof
outweigh individual issues,' even though 'standing alone, they are not
sufficient to defeat class certification."  *Johnson*, 780 F.3d at 138 (internal
quotation marks and alterations omitted) (quoting *McLaughlin v. Am.
Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by
Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)).

According to UBS, some members of the proposed class opted to hold their investments in the Funds in the face of a recommendation to sell. Similarly, according to UBS, members of the proposed class were "obligated to alert their broker if they believe[d] their investment [was] unsuitable." (*Id.* 26 ("An investor cannot take a 'heads I win, tails you lose approach' by waiting to see how his investment performs." (citing *Altschul v. Paine, Webber, Jackson & Curtis, Inc.*, 518 F. Supp. 591, 594 (S.D.N.Y. 1981))).)

UBS contends that these class members would be individually subject to affirmative defenses such as failure to mitigate and duty to object, which would require individualized proof. (*Id.*) Plaintiffs do not disagree, but simply contend that such issues should not on their own preclude certification of the class. (Pls.' Reply 14.)

Accordingly, UBS's affirmative defenses are another "issue[] subject only to individualized proof." *Moore*, 306 F.3d at 1252.

### 4.   *Individual questions with respect to damages*

The parties agree that the proper measure of damages in this action is "market-adjusted damages" or "well-managed account damages" – that is, (1) "what [an investor] would have received if the account had been properly managed," less (2) "what she actually received from the investment at issue." (Pls.' Mem. 22 & n.56; Defs.' Opp'n 27.) The parties do not agree that market-adjusted damages can be measured classwide in this action, but plaintiffs, via their damages expert, have put forward a model which they contend can do just that. (*See* First Mason Report; Second Mason Report.)

"[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to" the theory of liability advanced in that action. *Comcast*, 569 U.S. at 35; *see also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("[A] model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury . . . ."); *Rodriguez v. It's Just Lunch Int'l*, No. 07-Cv-9227, 2018 WL 3733944, at *4-5 (S.D.N.Y. Aug. 6, 2018). "If the model does

not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.

In this action, plaintiffs' theory of liability is that "defendants were obligated to conduct a suitability analysis and failed to conduct any such analysis." *Fernandez*, 222 F. Supp. 3d at 389. Accordingly, the proper measure of market-adjusted damages is (1) what clients would have received if UBS had performed a suitability analysis and recommended a suitable investment, less (2) what they actually received from their investments in the Funds.

Plaintiffs' model, however, "does not even attempt to" measure the damages attributable to their theory of liability. *Comcast*, 569 U.S. at 35. Rather, they "propose 'no damages model at all' that is linked to their theory of liability," *It's Just Lunch*, 2018 WL 3733944, at *5 (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014)), for at least two reasons.

First, under plaintiffs' theory of liability, a class member suffered no damage as a result of any breach if the Funds were actually suitable for them at the time they were recommended. Plaintiffs' model, however, does not even attempt to measure whether the Funds were actually suitable for any members of the proposed class. (*See* First Laursen Report ¶ 157; Second Okongwu Report ¶ 15.) Absent an appropriate model, the question of whether the Funds were actually suitable for a particular client is clearly an individualized one.

Second, to the extent the Funds were *not* actually suitable for members of the proposed class, plaintiffs' model does not attempt to measure the minuend of the market-adjusted damages formula outlined above – that is, what clients would have received if UBS had performed a suitability analysis and recommended a suitable investment. *See Comcast*, 569 U.S. at 35; *It's Just Lunch*, 2018 WL 3733944, at *5. In order to measure that, "one would have to understand the type of investment that each client would have invested in had UBS performed a 'suitability analysis' for that client." (Second Okongwu Report ¶ 19.) That is, one would essentially have to perform a retrospective suitability analysis for each client. (*See* First

Laursen Report ¶ 142 ("[A] proper suitability analysis for each investor at each investment decision point during the . . . Class Period must be undertaken.").)  As plaintiffs make clear (and defendants agree), a suitability analysis requires consideration of many client-specific factors including, without limitation, the client's age, assets, tax status, annual income, net worth, investment objectives, risk tolerance, liquidity needs, investment time horizon, and concentration of investments – all as of the date of the recommendation.  (Second Besnoff Report 28.)

Plaintiffs' model endeavors to avoid such highly individualized determinations by proposing "alternative benchmark investments" that (1) had risk/return profiles similar to those that the Funds were represented to have, and (2) that were in fact structured in accordance with the preservation-of-capital objective.  (First Mason Report ¶¶ 45-52; Second Mason Report ¶¶ 69-80.)  However, plaintiffs do not contend that the benchmark investments would have been suitable for members of the proposed class, or even that it would be possible to find benchmarks that would have been uniformly suitable.

Furthermore, as set forth in truly fulsome detail above, a meaningful client-focused suitability analysis requires consideration of far more than a client's risk tolerance and objective of preserving capital – the criteria used to select benchmarks in plaintiffs' model.  Indeed, the "members of the proposed class had a variety of different investment profiles during the proposed Class Period.  They had different reported levels of annual income, net worth, . . . liquidity needs[,] . . . stated investment objectives and risk tolerances," among other things.  (Second Okongwu Report ¶ 21.) The Court concludes that the manner in which plaintiffs propose to select benchmark investments would almost certainly not satisfy the requirements of their own client-specific suitability expert.  (*See* Second Besnoff Report 28-30.)

Accordingly, because plaintiffs "propose 'no damages model at all' that is linked to their theory of liability," *It's Just Lunch*, 2018 WL 3733944, at *5 (quoting *ConAgra Foods*, 302 F.R.D. at 552), the measure of damages is yet another "issue[] subject only to individualized proof," *Moore*, 306 F.3d at 1252.

### F. Superiority

The superiority requirement asks a court to consider whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

As far as the Court is aware, this is not a case where members of the proposed class will be left without a remedy if the class is not certified, because they may arguably pursue their individual claims in FINRA arbitrations if they so choose.[23] However, because the proposed class fails to satisfy the predominance and typicality requirements of Rule 23, the Court need not – and does not – determine that FINRA arbitrations are superior to a class action.

### IV. CONCLUSION

For the reasons set forth above, the Court finds that the sole question of law or fact common to members of the proposed class is significantly outweighed by a number of questions affecting only individual members. Accordingly plaintiffs' motion for class certification (ECF No. 174) is DENIED, and defendants' *Daubert* motion (ECF No. 200) is DISMISSED as moot.

Dated: New York, New York
       September 17, 2018

SO ORDERED:

Sidney H. Stein, U.S.D.J.

_____

[23] According to UBS, members of the proposed class have already brought claims against UBS in more than 1,720 individual FINRA arbitrations based on their investments in the Funds, and new claims continue to be filed against UBS. (Defs.' Opp'n 29.)